COMMONWEALTH OF PENNSYLVANIA

**PRIVATE**

**CRIMINAL COMPLAINT**

COUNTY OF: _____

Magisterial District Number: _____

MDJ Name: Hon. _____

Address: _____

Telephone: ( )

Docket No.: _____

Date Filed: _____

OTN: _____

(Above to be completed by court personnel)

**COMMONWEALTH OF PENNSYLVANIA**
**VS.**

DEFENDANT:  NAME and ADDRESS

Donegal Mutual Insurance Company
1195 River Road
Marietta, PA 17547

(Fill in defendant's name and address)

**Notice:  Under Pa.R.Crim.P. 506, your complaint may require approval by the attorney for the Commonwealth before it can be accepted by the magisterial district court.  If the attorney for the Commonwealth disapproves your complaint, you may petition the court of common pleas for review of the decision of the attorney for the Commonwealth.**

Fill in as much information as you have.

| Defendant's Race/Ethnicity | Defendant's Sex | Defendant's D.O.B. | | Defendant's SID (State Identification Number) |
|---|---|---|---|---|
| ☐ White  ☐ Black  ☐ Asian  ☐ Native American  ☐ Hispanic  ☐ Unknown | ☐ Female  ☐ Male | | | |
| Defendant's A.K.A. (also known as) | Defendant's Vehicle Information  Plate Number    State | Registration Sticker (MM/YY) | Defendant's Driver's License Number  State | |

I, David B. Carpenter

(Name of Complainant-Please Print or Type)

do hereby state: (check appropriate box)

1.  ☐  I accuse the above named defendant who lives at the address set forth above
    ☐  I accuse the defendant whose name is unknown to me but who is described as _____

    ☐  I accuse the defendant whose name and popular designation or nickname is unknown to me and whom I have therefore designated as John Doe

with violating the penal laws of the Commonwealth of Pennsylvania at _____

(Place-Political Subdivision)

in _____ County on or about _____

Participants were: (if there were participants, place their names here, repeating the name of the above defendant)

_____

_____

_____

AOPC 411A-10                                             Page 1 of 2



**Sistah Space**

WOMENS INSTITUTION     WOMEN EMPOWERMENT     LEGAL GUIDANCE     GOVERNMENT RESOURCES     POLITICAL FUNDING



| Donald Herbert Nikolaus, Attorney and Corporate & Community Leader | obituaries                                                      ⬚ 0

BY **NEAL HERRMAN** ON FEBRUARY 6, 2022                                                          LEGAL GUIDANCE

Donald Herbert Nikolaus, 79, of Silver Spring, PA, passed away on Tuesday morning, February 1, 2022 after a long illness at the University of Pennsylvania Hospital in Philadelphia, PA.

Don was born on April 17, 1942 in Columbia, PA, the youngest son of Paul Joseph and Alma Marie (Baker) Nicholas.

He attended Holy Trinity Catholic School (now known as Our Lady of the Angels Catholic School) and graduated from Lancaster Catholic High School in 1960. Don then attended Villanova University and graduated from the Commerce and Finance School in 1964. He was active in many college organizations such as the Blue Key Society, the Delta Pi MU Fraternity, and the Economist Society.

After acceptance under the direction of attorney Wilson Bucher (later President Lancaster County Judge), Don entered the Villanova School of Law where he served as a resident assistant at the undergraduate school, graduating with a juris doctor degree in 1967 and passing the state bar exam this year. In January 1968 he was admitted to the Pennsylvania Supreme Court and the Lancaster County Bar. After law school, Don practiced law under the direction of Attorney Wilson Bucher, his preceptor. After his tenure with the Bucher law firm, Don joined the law firm of Columbia attorney William Blank. In 1968, Colonel Blank hired Don to provide legal counsel to the Columbia Borough School District, an account still held today by the law firm of Nikolaus & Hohe Nadel.

In April 1972, Don joined forces with John P. Hohe Nadel, a fellow Colombian and Villanova Law School graduate, to form the law firm of Nikolaus & Hohe Nadel. The firm has grown over the years with twenty-three (23) attorneys in four (4) locations serving the greater Lancaster County area. Don continued to practice law until his recent death and had an astonishing legal career specializing in corporate, probate and municipal law.

After an introduction to J. Edward Charles, President and CEO of Donegal Mutual Insurance Co., Don was appointed the youngest member of Donegal's Board of Directors in 1972 at the age of 30. Following the death of Mr Charles, Don was elected President and CEO , a position he held until 2018. He also served as President, CEO and Director of Donegal Group, Inc. from 1986 to 2016. Don inherited a small nationwide insurance company that originally started providing fire and casualty insurance to farmers and grew into a national company. Through his entrepreneurial acumen and foresight, the company began to expand, acquiring small similar insurance providers in the US and

https://sistahspace.com/donald-herbert-nikolaus-attorney-and-corporate-community-leader-obituaries/

### RECENT POSTS

Experts are divided on why Russia's cyber offensiv against Ukraine has been limited so far

Separating the signal from the noise

Judge Thomas slams culture cancel and 'wraps' Supreme Court.

Russian Biological Weapons Conspiracy Theory Fir Support in US | New Policies

Someone Somewhere is expanding initiatives to empower marginalized or poor women

### ARCHIVES

March 2022

February 2022

January 2022

December 2021

November 2021

October 2021

September 2021

August 2021

July 2021

June 2021

April 2021

### CATEGORIES

Government Resources

Legal Guidance

Political Funding

Women Empowerment

Womens Institution

soon Donegal was recognized as a significant part of the insurance industry. Under his leadership and keen sixth business acumen, Donegal entered the banking services industry, forming Province Bank and purchasing the former Union National Mount Joy Bank. Donegal also expanded into the title insurance business with the purchase of Conestoga Title Insurance Co., an acquisition he pursued for many years. At the time of his death he was Chairman of Donegal Mutual Insurance Co. and Chairman of Conestoga Title Insurance Co. and has a fifty (50) year career in that industry. He also served as past chairman of the Pennsylvania Insurance Association.

Additionally, Don became involved with Columbia Water Co., one of the oldest privately owned public water companies in the United States. He served as President of the Company and used his gifted business logic to lead an expansion program for the water company, acquiring the former Marietta Water Gravity Co. and expanding service territory to include the boroughs of Columbia, Marietta and Mountville and four (4) townships in Lancaster and York counties . The pumping and filtration plant at Columbia was expanded and upgraded, a project Don oversaw and gave him immense sense of accomplishment.

Don's church affiliations were broad and varied. His most important was the Columbia Catholic Housing for the Elderly. He took the original idea presented to him by the late Mary Loreto, a Columbia legend, and with the late Msgr. Rudolf Fuhr developed the two (2) high rise residential buildings in Columbia known as Trinity House and St. Peter's Apartments and offer high-quality apartments for seniors. He was instrumental in founding the Housing Development Corporation (HDC) and served as a director for many years. Don has served as a director of many community organizations including the Columbia Healthcare Foundation, the Economic Development Corp. of Lancaster Co., the Lancaster Alliance, St. Anne's Retirement Community and past President of the Columbia Rotary Club.

Don was a life member of Holy Trinity Catholic Church, Columbia, the Holy Name of Jesus Society, the St. Vincent de Paul Society, and served as a member of the Harrisburg Parish and Diocese Finance Committee. He was also a member of the Knights of Columbus, Columbia Council 2294, and the Santa Maria General Assembly Fourth Degree.

Don considered the greatest honor bestowed upon him as his invitation to become a member of the Equestrian Order of the Equestrian Order of the Holy Sepulcher of Jerusalem, a Catholic order founded in 1099 AD and which has existed uninterruptedly ever since. He was ordained at St. Patrick's Cathedral in New York City.

Don was preceded in death by his parents, brother Paul J. Nicholas, Jr., and many beloved aunts and uncles. He is survived by wife Elizabeth (Rankin), daughters Lauren Zink of Lancaster, PA, Anne Nikolaus of Haverford, PA and son Matthew Nikolaus of Silver Spring, PA, grandson Tyler Zink, granddaughters Lindsay and Kate Zink, all of Lancaster , PA and Victor Nikolaus-Pereira of Haverford, PA. He is also survived by brother Gerald Nikolaus, sisters-in-law Lucretia Nikolaus and Margaret Nikolaus Bransby, all from Columbia, PA; Mary Stadden and Julie Fulmer of Lancaster, PA and brothers-in-law Richard Rankin of Fairfax, VA and John Rankin of Salisbury, MD. In addition, his mother-in-law Lucy Lolli Rankin survives.

A Christian funeral service will be held on Saturday, February 12, 2022 at 11:00 am at Holy Trinity Catholic Church, 409 Cherry St., Columbia, PA with Fr. Stephen Kelley as celebrant. There is no public viewing.

In lieu of flowers, those who wish to honor Donald may do so by making a contribution to Our Lady of the Angels Catholic School, 404 Cherry St., Columbia, PA 17512 Holy Trinity Church, 409 Cherry St., Columbia, PA 17512 to arrive there by 9:30 am on Saturday, February 12, 2022. Personal handwritten condolences are greatly appreciated and may be mailed to the Clyde W. Kraft Funeral Home. 519 Walnut St., PO Box 231, Columbia, PA 17512.

The live stream of the funeral mass can be viewed at facebook.com/htparish.

Arrangements of the Clyde W. Kraft Funeral Home, Inc., Columbia/Landisville. www.clydekraft.com

### Related Posts:

1. **Marion County Approves Forest Service Agreement; Tables Action on Community Center | news**
2. **The dangers of driving on crowded Mississippi roads**
3. **USCIS Issues Guidelines for Improving Immigration Services: What Employers and Foreigners Need to Know | Gibney Anthony & Flaherty, LLP**
4. **Scott Boras calls for clarification of MLBLB's guidelines for sticky substances**

SHARE.



ABOUT AUTHOR

NEAL HERRMAN

RELATED POSTS

MARCH 12, 2022

**Separating the signal from the noise**

MARCH 8, 2022

**The FDA issues final guidance on drug importation ahead of expected approval**

MARCH 6, 2022

**Protecting student rights is a delicate task**

Comments are closed.

Privacy Policy

Terms and Conditions

 100%      Search the website    🔍



## The
# DISCIPLINARY BOARD
*of the Supreme Court of Pennsylvania*

**FOR ATTORNEYS FOR THE PUBLIC CASES NEWS & MEDIA ABOUT**

*Quick Links*

❮ Back to Search

**BROWSE RULES**
*Browse the Rules that govern attorneys.*

**FILE A COMPLAINT**
*File a complaint against an attorney.*

**LOOK UP AN ATTORNEY**
*View an attorney's contact information and disciplinary history.*

**SEARCH OPINIONS**
*Search Supreme Court and*

# Nikolaus, Donald H.

*Public Information*

*Pending Proceedings*        *History*

*Disciplinary Board Opinions.*

**RECENT CASES**

*Search Supreme Court and Disciplinary Board Actions.*

| | |
|---|---|
| **Attorney ID:** | 7500 |
| **Current Status:** | Active |
| **Date of Admission:** | 1/8/1968 |
| **Employer:** | Nikolaus & Hohenadel, LLP |
| **Address:** | NIKOLAUS & HOHENADEL LLP 327 LOCUST ST COLUMBIA, Pennsylvania 17512-1120 |
| **Country:** | United States |
| **Telephone:** | (717) 684-4422 |
| **Fax:** | (717) 684-6099 |
| **County:** | Lancaster |
| **District:** | District 2 |

**Professional Liability Insurance:**

I maintain, either individually or through my firm, professional liability insurance pursuant to the provisions of Rule of Professional Conduct 1.4(c).

**Thomas J. Farrell**
Chief Disciplinary Counsel

**Raymond S. Wierciszewski**
Deputy Chief Disciplinary Counsel

**Jana M. Palko**
Counsel-in-Charge, Central Intake
Frick Building, Ste. 1300
437 Grant Street
Pittsburgh, PA 15219
(412) 565-3173



## THE DISCIPLINARY BOARD
### OF THE
## SUPREME COURT OF PENNSYLVANIA



### OFFICE OF DISCIPLINARY COUNSEL
www.padisciplinaryboard.org

**Intake Counsel**

Robin B. Godfrey
1601 Market St., Ste. 3320
Philadelphia, PA 19103-2337
(215) 560-6296

Elizabeth J. Rubin
1601 Market St., Ste. 3320
Philadelphia, PA 19103-2337
(215) 560-6296

Alan J. Davis
820 Adams Ave., Ste. 170
Trooper, PA 19403
(610) 650-8210

Suzy S. Moore
820 Adams Ave., Ste. 170
Trooper, PA 19403
(610) 650-8210

Anna M. Ciardi
Frick Building, Ste. 1300
437 Grant Street
Pittsburgh, PA 15219
(412) 565-3173

September 15, 2020

## PERSONAL AND CONFIDENTIAL

David Carpenter
1128 Greens Avenue
Landisville, PA 17538

Re:   Complaint Against Donald H. Nikolaus, Esquire
File Reference #C2-20-652

Complaint Against Joshua James Knapp, Esquire
File Reference #C2-20-653

Complaint Against Donald Huber Hess, Esquire
File Reference #C2-20-695

Complaint Against Thomas A. French, Esquire
File Reference #C3-20-552

Complaint Against Marcus Wanner Shand, Esquire
File Reference #C4-20-671

Complaint Against Michael Steven Grab, Esquire
File Reference #C2-20-712

Dear Mr. Carpenter:

We conducted a review of your complaints against Attorneys Donald H. Nikolaus, Joshua James Knapp, Donald Huber Hess, Thomas A. French, Marcus Wanner Shand, and Michael Steven Grab. After review of your complaints, our office has determined that the complaints warrants dismissal for the reasons set forth below.

David Carpenter
Page Two
September 15, 2020

Please note that your complaint to our office against Paul J. Killion will be handled separately by the Disciplinary Board.

Your multiple complaints to our office raise concerns related to attorneys that appear to be involved in your attempted purchase of a real estate located at 1148 Mill Mar Road, Lancaster, Pennsylvania in 2017. While you have supplied voluminous documentation with your complaints, we note that a significant portion of that documentation is both repetitive and/or print outs of publicly available information regarding the various attorneys. You appear to assert, among other things, that the above-referenced attorneys have engaged in fraud, mortgage fraud, real estate fraud, and conspiracy to commit mail fraud.

From our review, we note that Mr. Hess represented you related to your attempted purchase of real estate. Mr. Knapp represented the realty company Berkshire Hathaway. Mr. Nikolaus and Mr. Grab are attorneys with Nikolaus & Hohenadel. Mr. French represents Donegal Insurance Group. Mr. Shand later purchased the real estate at issue.

We note that the voluminous documentation you supplied to our office along with your complaints contains references to various other attorneys. Please remember, as we informed you previously, this office will not conduct reviews of any attorneys unless and until you complete and sign a complaint form which clearly specifies the attorney about whom you are complaining and the specific conduct about which you are concerned. There is no need for you to supply to us publicly available information, such as contact information or biographies, regarding any attorneys. We also note that the documentation you supplied contains publicly available information regarding various other professionals. Please understand that this office only has jurisdiction over attorneys licensed to practice law in Pennsylvania.

Some of the documentation which you supplied to our office references Judges in Pennsylvania. Complaints against Judges must be made to the Judicial Conduct Board at:

>Judicial Conduct Board
>Pennsylvania Judicial Center
>601 Commonwealth Ave., Ste. 3500
>P.O. Box 62525
>Harrisburg, PA 17120

Please consider the following regarding the legal disciplinary system. The Rules of Professional Conduct are limited in scope, and express specific prohibitions in limited areas of what might be called "improper" or "unethical" behavior. Some actions which one might consider "improper" or "unethical" do not violate any of the pertinent Rules. Moreover, an



David Carpenter
Page Three
September 15, 2020

attorney can only be disciplined for conduct when there is "clear and satisfactory proof" of facts that an attorney has violated a specific Rule.

To the extent that your complaint takes issue with Mr. Hess' advice, or the quality of his representation, this aspect of your complaint has been dismissed. Securing the services of an attorney is done in reliance upon his or her professional judgment and advice. The fact that the client may disagree with the attorney's judgment or conduct does not necessarily mean that the attorney has engaged in any violation of the Rules of Professional Conduct. An attorney's advice or judgment as to action which should be taken on a case is often unique to the circumstances surrounding that matter. Further, an attorney has discretion in representing a client. This office will not second-guess those actions during representation, unless there are compelling and substantial indications that we should do so. Those indications are not present in your description of the circumstances of your complaint.

To the extent that you believe that Mr. Hess may have committed malpractice, please understand that the Disciplinary Board is not a malpractice forum. This office cannot review your file to give you a "second opinion" regarding the manner in which Mr. Hess handled your legal matter. Nor can this office engage in a "fishing expedition" with a view to uncovering conduct that might constitute a violation of our Rules of Professional Conduct.

In so far as your complaints against Mr. Nikolaus, Mr. Grab, Mr. Knapp or Mr. French are related to them sending you notice to cease and desist, or pursuing charges against you, these portions of your complaint have been dismissed as well. Please understand that the attorneys have a duty to pursue the interests of their respective clients, which may oppose your interests. While you may have arguments against the position advocated by the attorneys, and while you may feel your position is correct. The attorneys are nonetheless entitled to seek to advance the interests of their clients. Further, our office has no authority or jurisdiction to impact any criminal charges that might have been brought against you related to same.

To the extent that your complaint alleges that Mr. Shand acted inappropriately in later purchasing the property you had previously attempted to purchase, from our review, we find no evidence to substantiate misconduct on the part of Mr. Shand related to the property at issue.

To the extent that your complaint implies that the above-named attorneys somehow conspired or acted in concert against you, these portions of your complaints have been dismissed as well. Please understand that this office, like any other prosecutorial agency, has the burden of proof. Each and every allegation of ethical misconduct must be proven by "clear and satisfactory proof" of facts. Surmise, conjecture



David Carpenter
Page Four
September 15, 2020

or even a strong suspicion of misconduct on the part of an attorney, will not suffice to meet our burden of proof. From our review, we do not find sufficient evidence to prove misconduct on the part of any of the above-referenced attorneys related to your concerns.

To the extent that you believe that the conduct of which you complain amounts to the commission of a crime or crimes by the any of the above-referenced attorneys, please note that this office does not enforce the Pennsylvania Crimes Code. If you believe that any of the above-referenced attorneys have committed a crime you should consult with law enforcement offices or counsel of your own choosing as to your legal rights and remedies in this regard. If any of the attorneys about which you complaint is convicted of a crime, you may report the conviction to this office at that time.

We do not have a basis to conduct further disciplinary inquiry and have dismissed your complaint. Let me briefly explain the process in which we engage before dismissing a complaint. After reviewing the file and making a determination for the dismissal, I forward the file to another attorney in this office. The second attorney will then review my recommendation and the file and will either concur in or modify my recommendation. In this case the reviewing attorney concurred in my recommendation to dismiss this complaint.

With few exceptions, the attorney disciplinary system is confidential and remains so unless and until formal disciplinary charges are filed by the Office of Disciplinary Counsel against the respondent-attorney with the Disciplinary Board and the respondent-attorney has had the opportunity to answer those charges.

We appreciate the interest and concern with the legal profession which you showed by bringing this matter to our attention.

Very truly yours,

Anna Marie Ciardi
Disciplinary Counsel

AMC/rm

EX-10.1 2 w83857exv10w1.htm EX-10.1

Exhibit 10.1

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") dated as of July 29, 2011 among Donegal Mutual Insurance Company, a Pennsylvania mutual insurance company having its principal place of business at 1195 River Road, Marietta, Pennsylvania 17547 ("Donegal Mutual"), Donegal Group Inc., a Delaware corporation having its principal place of business at 1195 River Road, Marietta, Pennsylvania 17547 ("DGI," and, together with Donegal Mutual, the "Employers"), and Donald H. Nikolaus, an individual whose principal office address is 1195 River Road, Marietta, Pennsylvania 17547 (the "Executive").

## WITNESSETH:

WHEREAS, the Employers desire, by this Agreement, to provide for the continued employment of the Executive by the Employers, and the Executive desires to provide for the continued employment of the Executive by the Employers, all in accordance with the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the parties are entering into this Agreement to set forth and confirm their respective rights and obligations with respect to the Executive's continued employment by the Employers;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, the Employers and the Executive, intending to be legally bound hereby, mutually agree as follows:

1. Employment and Term.

(a) (i) Effective August 1, 2011 (the "Effective Date"), (i) Donegal Mutual agrees to continue to employ the Executive, and the Executive agrees to continue the Executive's employment, as the President and Chief Executive Officer of Donegal Mutual and (ii) DGI agrees to employ the Executive, and the Executive agrees to continue the Executive's employment, as the President and Chief Executive Officer of DGI, with the positions described in clauses (i) and (ii) collectively referred to in this Agreement as the "Position", in accordance with the terms and subject to the conditions this Agreement sets forth. Donegal Mutual and DGI shall be jointly and severally liable to the Executive with respect to (i) all liabilities of Donegal Mutual to the Executive under this Agreement and (ii) all liabilities of DGI to the Executive under this Agreement; provided, however, that Donegal Mutual shall not be responsible for any liability of DGI to the Executive to the extent that DGI has discharged such liability, and DGI shall not be responsible for any liability of Donegal Mutual to the Executive to the extent that Donegal Mutual has discharged such liability.

---

(ii) The term of this Agreement, as the same may be extended from time to time pursuant to the provisions of this clause (ii) or otherwise, shall commence on the Effective Date and end on the fifth anniversary of the Effective Date, provided, however, that on the first anniversary of the Effective Date and on each subsequent anniversary of the Effective Date (each, an "Extension Date"), the Term shall automatically extend for one additional year so that on each such succeeding Extension Date, this Agreement shall have a remaining Term of five years, unless either the Executive or the respective board of directors of Donegal Mutual and DGI (together, the "Boards") give notice to the other, not less than six months in advance of the next succeeding Extension Date, that such automatic extensions shall terminate as of such next succeeding Extension Date, unless the Employers earlier terminate the employment of the Executive for Cause, as defined in this Agreement, or because of the death or the Permanent Disability, as defined in this Agreement, of the Executive.

(b) Unless this Agreement otherwise provides or pursuant to the mutual agreement of the Employers and the Executive, all of the terms and conditions of this Agreement shall continue in full force and effect throughout the Term and, with respect to those terms and conditions that apply after the Term, after the Term. Upon the retirement of the Executive as President and Chief Executive Officer of Donegal Mutual and DGI or such earlier date on which the Employers terminate the employment of the Executive under this Agreement for other than Cause or the Death or the Permanent Disability of the Executive or the Executive's termination of the Executive's employment under this Agreement for Good Reason, as defined in this Agreement, on such date, the term of the Consulting Agreement dated as of July 29, 2011 (the "Consulting Agreement") among the Employers and the Executive, in substantially the form of Appendix A to this Agreement, shall commence and shall continue for a period of five years thereafter.

(c) Notwithstanding paragraph 1(a) of this Agreement, the Employers, by action of the Boards and effective as specified in a written notice thereof to the Executive in accordance with the terms of this Agreement, shall have the right to terminate the Executive's employment under this Agreement at any time during the Term, for Cause or other than for Cause or on account of the Executive's death or Permanent Disability, subject to the provisions of this paragraph 1.

(i) As used in this Agreement, "Cause" shall mean (A) the Executive's willful and continued failure substantially to perform the Executive's material duties with the Employers as set forth in this Agreement, or the commission by the Executive of any activities constituting a willful violation or breach under any material federal, state or local law or regulation applicable to the activities of Donegal Mutual or DGI or their respective subsidiaries and affiliates, in each case, after notice of such failure, breach or violation from the Employers to the Executive and a reasonable opportunity for the Executive to cure such failure, breach or violation in all material respects, (B) fraud, breach of fiduciary duty,

-2-

dishonesty, misappropriation or other actions by the Executive that cause intentional material damage to the property or business of Donegal Mutual or DGI or their respective subsidiaries and affiliates, (C) the Executive's repeated absences from work such that the Executive is substantially unable to perform the Executive's duties under this Agreement in all material respects other than for physical or mental impairment or illness or (D) the Executive's non-compliance with the provisions of paragraph 2(b) of this Agreement after notice of such non-compliance from the Employers to the Executive and a reasonable opportunity for the Executive to cure such non-compliance. Notwithstanding the foregoing, the Employers may not terminate the Executive's employment under this Agreement for Cause unless the Employers provide the Executive with (A) written notice of special meetings of the Boards of the Employers given in accordance with the By-laws of the Employers to consider the termination of the Executive's employment under this Agreement for Cause and (B) the Boards provide the Executive with the opportunity to address such special meetings.

(ii) As used in this Agreement, "Permanent Disability" shall mean a physical or mental disability of the Executive such that the Executive is substantially unable to perform those duties that the Executive would otherwise reasonably be expected to continue to perform and the Executive's nonperformance of such duties has continued for a period of 240 consecutive days, provided, however, that in order to terminate the Executive's employment under this Agreement on account of Permanent Disability, the Employers must provide the Executive with written notice of the Boards' good faith determinations to terminate the Executive's employment under this Agreement for reason of Permanent Disability not less than 30 days prior to such termination, and such notice shall specify the date of termination. Until the specified effective date of termination by reason of Permanent Disability, the Executive shall continue to receive compensation at the rates set forth in paragraph 3 of this Agreement. No termination of the Executive's employment under this Agreement because of Permanent Disability shall impair any rights of the Executive under any disability insurance policy the Employers maintained at the commencement of the aforesaid 240-day period.

(d) The Executive shall have the right to terminate the Executive's employment under this Agreement at any time during the Term for Good Reason or without Good Reason or in the event a Change of Control occurs.

(i) As used in this Agreement, "Good Reason" shall mean (A) a material diminishment of the Executive's Position or the scope of the Executive's authority, duties or responsibilities as this Agreement describes without the Executive's written consent, excluding for this purpose any action the Employers do not take in bad faith and that the Employers remedy promptly following written notice thereof from the Executive to the Employers, or (B) a material breach by either Employer of its respective obligations to the Executive under this Agreement, provided, that with respect to any termination by the

-3-

Executive for Good Reason, the Executive shall have provided the Employers with written notice within 90 days of the date on which the Employers first had actual knowledge of the existence of the Good Reason and which Good Reason shall not have been cured or otherwise rectified by the Employers in all material respects to the reasonable satisfaction of the Executive within 30 days after the Employers receive such written notice or (C) any termination of the Executive's employment under this Agreement without Cause.

(ii) "Change of Control" shall mean (A) the acquisition of shares of DGI by any "person" or "group," as Rule 13d-3 under the Securities Exchange Act of 1934, as now or hereafter amended, uses such terms in a transaction or series of transactions that result in such person or group directly or indirectly first owning after the Effective Date more than 25% of the aggregate voting power of DGI's Class A common stock and Class B common stock taken as a single class, (B) the consummation of a merger or other business combination transaction after which the holders of the outstanding voting capital stock of DGI taken as a single class do not collectively own 60% or more of the aggregate voting power of the entity surviving such merger or other business combination transaction, (C) the sale, lease, exchange or other transfer in a transaction or series of transactions of all or substantially all of the assets of DGI, but excluding therefrom the sale and re-investment of the consolidated investment portfolio of DGI and its subsidiaries, (D) as the result of or in connection with any cash tender offer or exchange offer, merger or other business combination transaction, sale of assets or contested-election of directors or any combination of the foregoing transactions or (E) the acquisition of "control" of Donegal Mutual as such term is defined in the Pennsylvania Insurance Holding Companies Act (each, a "Transaction"), the persons who constituted a majority of the members of the Boards on the Effective Date and persons whose election as members of the Boards received the approval of such members then still in office or whose subsequent election had been so approved prior to the date of a Transaction, but before the occurrence of an event that constitutes a Change of Control, no longer constitute such a majority of the Boards then in office. A Transaction constituting a Change of Control shall be deemed to have occurred only upon the closing of the Transaction.

(e) (i) If (A) the Employers terminate the Executive's employment under this Agreement for any reason other than for Cause and such termination occurs as of a date that is within 270 days preceding or within 180 days after the consummation of a Change of Control (with such 270-day period and such 180-day period collectively referred to in this Agreement as a "Change of Control Period", (B) the Employers terminate this Agreement as a result of the death or Permanent Disability of the Executive, effective as of a date within a Change of Control Period, (C) the Executive terminates the Executive's employment under this Agreement within 180 days after the consummation of a Change of Control or (D) the Executive terminates the Executive's employment under this Agreement for Good Reason, the Employers shall pay to the Executive or the Executive's estate promptly after the event giving rise to such payment occurs, an amount equal to the sum of (x) (1) the Executive's Base Salary, as defined in this Agreement, accrued through the date the termination of the

-4-

or penalties the Executive incurs with respect to such excise tax, the Employers, within 30 days thereafter, shall pay to the Executive, in addition to any other payment, coverage or benefit due and owing under this Agreement, an additional amount that will result in the Executive's net after tax position, after taking into account any interest, penalties or taxes imposed on the amounts payable under this paragraph 1(f), upon the receipt of the payments for which this Agreement provides be no less advantageous to the Executive than the net after tax position to the Executive that would have been obtained had Sections 280G and 4999 not been applicable to such payment, coverage or benefits. Except as this Agreement otherwise provides, tax counsel, whose selection shall be reasonably acceptable to the Executive and the Employers and whose fees and costs shall be paid for by the Employers, shall make all determinations under this paragraph 1(f) requires.

(g) In the event that the independent registered public accounting firm of either of the Employers or the IRS determines that any payment, coverage or benefit due or owing to the Executive pursuant to this Agreement is subject to the excise tax Section 409A imposes or any successor provision of Section 409A or any interest or penalties, including interest imposed under Section 409(A)(1)(B)(i)(I) of the Code, the Executive incurs as a result of the application of such provision, the Employers, within 30 days of the date of such impositions, shall pay to the Executive, in addition to any other payment, coverage or benefit due and owing under this Agreement, an additional amount that will result in the Executive's net after tax position, after taking into account any interest, penalties or taxes imposed on the amounts paid under this paragraph 1(g), being no less advantageous to the Executive than the net after tax position the Executive would have obtained had Section 409A not been applicable to such payment, coverage or benefits. Except as this Agreement otherwise provides, tax counsel, whose selection shall be reasonably acceptable to the Executive and the Employers and whose fees and costs the Employers shall pay, shall make all determinations this paragraph 1(g) requires.

(h) The Employers and the Executive shall give any notice of termination of this Agreement to the Executive or the Employers, as the case may be, in accordance with the provisions of paragraph 12.

(i) The Employers agree to reimburse the Executive for the reasonable fees and expenses of the Executive's attorneys and for court and related costs in any proceeding to enforce the provisions of this Agreement in which the Executive is successful on the merits.

2. Duties of the Executive.

(a) Subject to the ultimate control and discretion of the Boards, the Executive shall serve in the Position and perform all duties and services commensurate with the Position. Throughout the Term of this Agreement as the same may be extended from time to time, the Executive shall perform all duties reasonably assigned or delegated to the Executive under the By-laws of the Employers or from time to time by the Boards consistent with the

-8-

Position. Except for travel normally incidental and reasonably necessary to the business of the Employers and the duties of the Executive under this Agreement, the duties of the Executive shall be performed from an office location not greater than 35 miles from Marietta, Pennsylvania.

(b) The Executive shall devote substantially all of the Executive's business time and attention to the performance of the Executive's duties under this Agreement and, during the term of the Executive's employment under this Agreement, the Executive shall not engage in any other business enterprise that requires any significant amount of the Executive's personal time or attention, unless granted the prior permission of the respective Boards, provided, however, that this requirement for prior permission from the respective Boards shall not apply to any business or profession in which the Executive is engaged on the Effective Date, provided, however, that the Executive shall require the prior permission of the respective Boards to the extent the Executive proposes to increase substantially the amount of time he devotes to such other businesses. The foregoing provision shall not prevent the Executive's purchase, ownership or sale of any interest in, or the Executive's engaging in, any business that does not compete with the business of the Employers or the Executive's involvement in charitable or community activities, provided, that the time and attention that the Executive devotes to such business and charitable or community activities does not materially interfere with the performance of the Executive's duties under this Agreement and that a material portion of the time the Executive devotes to charitable or community activities are devoted to charitable or community activities within the Employers' market area and further provided that such conduct complies in all material respects with applicable policies of the Employers.

(c) The Executive shall receive 30 days of vacation leave during each calendar year with full compensation, and which the Executive may take at such time or times, as the Executive and the Employers shall mutually determine. The Employers shall accrue earned but unused vacation in accordance with the Employers' vacation policy.

3. Compensation. For all services the Executive renders under this Agreement:

(a) The Employers shall pay the Executive a base salary (the "Base Salary") at the annual rate that the Executive is currently receiving from the Employers, plus such other compensation as the Employers may, from time to time, determine. The Employers shall pay such Base Salary and other compensation in accordance with the Employers' normal payroll practices as in effect from time to time.

(b) The Employers agree that the Executive shall be entitled to participate in the Employer's annual incentive programs, in accordance in all material respects with applicable policies of the Employers relating to incentive compensation for executive officers, including the objectives set forth in the Employers' Executive Incentive Plan.

-9-



(c) From and after the Effective Date and throughout the Term:

(i) Subject to any required stockholder approval, DGI shall annually grant the Executive options, which shall be non-qualified stock options, to purchase not less than 150,000 shares of Class A common stock of DGI (the "Options") at a price per share equal to the closing price of DGI's Class A common stock on the NASDAQ National Market System ("NASDAQ") on the day before the date of the annual stock option grant (the "Exercise Price"). The Options shall have the following other additional terms:

(A) Each Option shall become exercisable and be vested, and remain exercisable and vested for a term of ten years after the date of grant of its grant, in three cumulative installments as follows:

(1) the first installment of each option, consisting of 50,000 shares of DGI Class A common stock, shall become exercisable from and after the nine months following the date of such grant;

(2) the second installment of each option, consisting of 50,000 shares of DGI Class A common stock, shall become exercisable from and after the second anniversary of the date of such grant; and

(3) the third installment of each option, consisting of 50,000 shares of DGI Class A common stock, shall become exercisable from, and after the third anniversary of the date of such grant.

(ii) The Options shall become immediately vested and exercisable and shall remain exercisable for the remainder of the original term of such options in the event of (A) a Change of Control, (B) the Employers terminate this Agreement without Cause or (C) the Executive terminates this Agreement for Good Reason;

(iii) Any unvested Options shall terminate immediately in the event of (A) the Employers terminate the employment of the Executive under this Agreement for Cause or (B) the Executive terminates the Executive's employment under this Agreement without Good Reason;

(iv) The Options shall remain exercisable until the earlier of the expiration of their respective terms or three years after the Employers terminate this Agreement because of the Executive's death, Permanent Disability or retirement, and the Options shall become immediately vested and exercisable if such termination occurs during the 270 days the preceding consummation of a Change of Control;

(v) The Executive may transfer some or all of the Options by gift to members of the Executive's immediate family or to entities that such family members control or by will or by the laws of descent and distribution;

-10-

(vi) In the event that, after the Effective Date, the outstanding shares of DGI's Class A common stock subject to the Options increase or decrease or are changed into or exchanged for a different kind or number of shares of DGI or other securities of DGI or of another corporation by reason of a reorganization, merger, consolidation, reclassification, stock split, reverse stock split, stock dividend or combination of shares of DGI's Class A common stock, the Board of Directors of DGI shall make an appropriate and equitable adjustment in the number and kind of shares as to which the Options or the remaining portion of the Options then unexercised shall be exercisable and in the Exercise Price. DGI shall make such adjustment in the Options without any change in the total price applicable to the unexercised portion of the Options, except for any change in aggregate exercise price that results from the rounding-off of share amounts or prices and with any necessary corresponding adjustment in the Exercise Price. In the event DGI from time to time after the Effective Date DGI issues shares of its Class A common stock at a price less than the then prevailing market price on NASDAQ on the date of any such issuance (the "Prevailing Market Price"), the Board of Directors of DGI shall reduce the Exercise Price of that portion of the Options not then exercised to the price determined by multiplying the Exercise Price as then in effect by a fraction, the numerator of which shall be that price per share at which DGI issued its Class A Common Stock at a price less than the Prevailing Market Price and the denominator of which shall be such Prevailing Market Price. Any such adjustment that the Board of Directors of DGI makes shall be final and binding upon the Executive, DGI and their respective successors in interest;

(vii) if DGI adopts an option plan for its employees and such option plan contains terms more favorable to the optionees under such plan than the terms of the Options granted to the Executive as set forth in this Agreement, then, in such event, the terms of the Options shall adjust so that the terms of the Options incorporate the more favorable provision of such option plan; and

(viii) Subject to any required stockholder approval, DGI shall promptly file a Form S-8 registration statement with the Securities and Exchange Commission and shall use its commercially reasonable efforts to cause such registration statement to remain effective for as long as any of the Options remain outstanding.

(d) The compensation that the Employers agree to pay to the Executive in this paragraph 3 shall be in addition to such rights as the Executive may have, during the Executive's employment under this Agreement or after such employment, to participate in and receive benefits from or under any benefit plans the Employers may in their discretion establish for their employees or executives, including, but not limited to, employment benefit plans either of the Employers maintain now or in the future, and specifically including the Stock Option Plan and group health insurance, life insurance and disability insurance plans. To the extent the Executive incurs a tax liability as a result of any of such benefits, the Executive shall be solely responsible for such taxes.

-11-

(c) The parties acknowledge that Towers Watson is in the process of evaluating the compensation and employee benefit plans the Employers make available to their senior executive officers. To the extent the respective boards of directors of the Employers, based upon the recommendations of Towers Watson, to approve the enhancement the compensation and other benefits the Employers make available to their senior executive officers, the Employers and the Executive agree to negotiate in good faith and to execute an amendment to this Agreement that would appropriately reflect any such enhancements.

4. Expenses. The Employers shall promptly reimburse the Executive for all reasonable expenses the Executive pays or incurs in connection with the performance of the Executive's duties and responsibilities under this Agreement, upon presentation of expense vouchers or other appropriate documentation therefor.

5. Consulting Services. Unless the Employers have terminated the employment of the Executive under this Agreement for Cause, the Death or the Permanent Disability of the Executive, the Executive has terminated the Executive's employment under this Agreement for Good Reason, or the date on which the Executive no longer serves as President and Chief Executive Officer of the Employers, and in the absence of the death or Permanent Disability of the Executive, the Employers expressly contemplate that upon the earlier of the expiration of the Term of this Agreement or the date on which the Executive terminates his employment under this Agreement for Good Reason, the Executive shall serve as a consultant to the Employers under the terms and conditions of the Consulting Agreement.

6. Indemnification. Notwithstanding anything in the Employers' respective certificates or articles of incorporation or their By-laws to the contrary, the Employers shall at all times indemnify the Executive during the Executive's employment by the Employers or while the Executive is providing consulting services to the Employers, and thereafter, to the fullest extent applicable law permits for any matter in any way relating to the Executive's employment by, consultation with or other affiliation with the Employers or its subsidiaries; provided, however, that if the Employers shall have terminated the Executive's employment under this Agreement for Cause, then, except to the extent otherwise required by law, the Employers shall have no obligation whatsoever to indemnify the Executive for any claim arising out of the matter for which the Employer shall have terminated Executive's employment under this Agreement for Cause or for any conduct of the Executive not within the scope of the Executive's duties under this Agreement.

7. Confidential Information. The Executive understands that, in the course of the Executive's employment by the Employers, the Executive will receive confidential information concerning the business of the Employers and that the Employers desire to protect. The Executive agrees that the Executive will not at any time during or after the period of the Executive's employment by the Employers reveal to anyone outside the Employers, or use for the Executive's own benefit, any such information that the Employers

-12-

have designated as confidential or that the Executive understood to be confidential without specific designation by the Employers. Upon termination of the employment of the Executive under this Agreement, and upon the request of the Employers, the Executive shall promptly deliver to the Employers any and all written materials, records and documents, including all copies of such written materials, documents and records, the Executive made or that come into the Executive's possession during the Term and that the.Executive retained contain or concern confidential information of the Employers and all other written materials the Employers furnished to the Executive for the Executive's use during the Term, including all copies of such written materials, documents and records, whether of a confidential nature or otherwise.

8. Non-Competition.

(a) For the purposes of this Agreement, the term "Competitive Enterprise" shall mean any insurance company, insurance holding company, federal or state-chartered bank, savings and loan association, savings bank, credit union, consumer finance company, bank holding company, savings and loan holding company, unitary holding company, financial holding company or any of the foregoing types of entities in the process of organization or application for federal or state regulatory approval and shall also include other providers of financial services and entities that offer financial services or products with which the Employers or their respective subsidiaries or affiliates currently offer or may in the future offer.

(b) For a period of two years (the "Restricted Period") immediately following the Employers' termination of the Executive's employment under this Agreement for Cause or the Executive's termination of his employment under this Agreement for other than Good Reason, the Executive shall not, provided that the Employers remain in compliance with their respective obligations under this Agreement:

(i) serve as a director, officer, employee or agent of, or act as a consultant or advisor to, any Competitive Enterprise in any city or county in which the Employers or their respective subsidiaries or affiliates are then conducting business or maintain an office or have publicly announced their intention to conduct business or maintain an office;

(ii) in any way, directly or indirectly, solicit, divert or contact any existing or potential customer or business of the Employers or any of their respective subsidiaries or affiliates that the Executive solicited, became aware of or transacted business with during the Employers' employment of the Executive for the purpose of selling any financial services or products that compete with the financial services or products the Employers or their respective subsidiaries and affiliates currently offer or in the future, may offer or solicit or assist in the employment of any employee of the Employers or their

-13-

respective subsidiaries or affiliates for the purpose of becoming an employee of or otherwise provide services for any Competitive Enterprise.

9. Representation and Warranty of the Executive. The Executive represents and warrants that the Executive is not under any obligation, contractual or otherwise, to any other firm or corporation, which would prevent the Executive's performance of the terms of this Agreement.

10. Entire Agreement; Amendment. This Agreement and the Consulting Agreement contain the entire agreement between the Employers and the Executive with respect to the subject matter of this Agreement, and may not be amended, waived, changed, modified or discharged except by an instrument in writing executed by the Employers and the Executive.

11. Assignability. The services of the Executive under this Agreement are personal in nature, and the Employers may not assign the rights or obligations of the Executive under this Agreement, whether by operation of law or otherwise, without the Executive's prior written consent. This Agreement shall be binding upon, and inure to the benefit of, the Employers and their permitted successors and assigns under this Agreement. This Agreement shall not be assignable by the Executive, but shall inure to the benefit of the Executive's heirs, executors, administrators and personal representatives.

12. Notice. Any notice that a party to this Agreement may give under this Agreement shall be in writing and be deemed given when hand delivered and acknowledged or, if mailed, one day after mailing by registered or certified mail, return receipt requested, or if delivered by an overnight delivery service, one day after the notice is delivered to such service, to the Employers or the Executive at their respective addresses stated in the preamble to this Agreement, or at such other address as either party may by similar notice designate.

13. Specific Performance. The Employers and the Executive agree that irreparable damage would occur in the event that any of the provisions of paragraphs 7 or 8 of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Employers and the Executive shall have the right to an injunction or injunctions to prevent breaches of such paragraphs 7 or 8 and to enforce specifically the terms and provisions of such paragraphs 7 or 8, this being in addition to any other remedy to which the Employers or the Executive are entitled at law or in equity.

14. No Third Party Beneficiaries. Nothing in this Agreement, express or implied, shall confer upon any person or entity other than the Employers and the Executive (and the Executive's heirs, executors, administrators and personal representatives) any rights or remedies of any nature under or by reason of this Agreement.

-14-

15. Successor Liability. The Employers shall require any successor, whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of the business or assets of the Employers to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Employers would be required to perform it if no such succession had taken place.

16. Mitigation. The Executive shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for in this Agreement be reduced by any compensation the Executive earns as the result of employment by another employer or by retirement benefits payable after the termination of this Agreement, except that the Employers shall not be required to provide the Executive and the Executive's eligible dependents with medical insurance coverage as long as the Executive and the Executive's eligible dependents are receiving comparable medical insurance coverage from another employer.

17. Waiver of Breach. The failure at any time to enforce or exercise any right under any of the provisions of this Agreement or to require at any time performance by the other parties of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or to affect either the validity of this Agreement or any part of this Agreement, or the right of any party hereafter to enforce or exercise its rights under each and every provision in accordance with the terms of this Agreement.

18. No Attachment. Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge or hypothecation or to execution, attachment, levy or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect; provided, however, that nothing in this paragraph 18 shall preclude the assumption of such rights by executors, administrators or other legal representatives of the Executive or the Executive's estate and their assigning any rights hereunder to the person or persons entitled to such rights.

19. Severability. The invalidity or unenforceability of any term, phrase, clause, paragraph, restriction, covenant, agreement or other provision of this Agreement shall in no way affect the validity or enforceability of any other provision, or any part of this Agreement, but this Agreement shall be construed as if such invalid or unenforceable term, phrase, clause, paragraph, restriction, covenant, agreement or other provision had never been contained in this Agreement unless the deletion of such term, phrase, clause, paragraph, restriction, covenant, agreement or other provision would result in such a material change as to cause the covenants and agreements contained in this Agreement to be unreasonable or would materially and adversely frustrate the objectives of the Employers and the Executive as expressed in this Agreement.

-15-

20. <u>Construction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania, without giving effect to principles of conflict of laws. All headings in this Agreement have been inserted solely for convenience of reference only, are not to be considered a part of this Agreement and shall not affect the interpretation of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

DONEGAL MUTUAL INSURANCE COMPANY

By: /s/ Kevin G. Burke
  Kevin G. Burke, Senior Vice President, Human Resources

DONEGAL GROUP INC.

By: /s/ Jeffrey D. Miller
  Jeffrey D. Miller, Senior Vice President and Chief Financial Officer

/s/ Donald H. Nikolaus
Donald H. Nikolaus

-16-

EX-10.2 3 w83857exv10w2.htm EX-10.2

Exhibit 10.2

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "Agreement") dated as of July 29, 2011 among Donegal Mutual Insurance Company, a Pennsylvania mutual insurance company having its principal place of business at 1195 River Road, Marietta, Pennsylvania 17547 ("Donegal Mutual"), Donegal Group Inc., a Delaware corporation having its principal place of business at 1195 River Road, Marietta, Pennsylvania 17547 ("DGI," and, together with Donegal Mutual, the "Companies"), and Donald H. Nikolaus, an individual whose principal office address is 1195 River Road, Marietta, Pennsylvania 17547 (the "Consultant").

## WITNESSETH:

WHEREAS, the Consultant has served for many years as the President and Chief Executive Officer of Donegal Mutual and DGI; and

WHEREAS, upon the earlier of the retirement of the Consultant or the date on which the Companies shall have terminated the employment of the Consultant under the Employment Agreement dated as of July 29, 2011 among Donegal Mutual, DGI and the Consultant (the "Employment Agreement") for other than Cause, as defined in the Employment Agreement, the Death or the Permanent Disability of the Consultant, as defined in this Agreement, or the Consultant shall have terminated the Consultant's employment as President and Chief Executive Officer of the Companies under the Employment Agreement for Good Reason, as defined in the Employment Agreement, the Companies agree to retain the Consultant to provide consulting services to the Companies and their respective boards of directors (together, the "Boards"), and the Consultant agrees to render consulting services to the Companies and the Boards, in each case in accordance with the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, the Companies and the Consultant, intending to be legally bound hereby, mutually agree as follows:

1. Consulting Services.

(a) (i) Effective on the date of the retirement of the Consultant as the President and Chief Executive Officer of Donegal Mutual and DGI or such earlier date on which the Companies shall have terminated the employment of the Consultant as President and Chief Executive Officer of the Companies under the Employment Agreement for other than Cause or the Death or Permanent Disability of the Consultant or the date on which the Consultant shall have terminated the employment of the Consultant as President and Chief

Executive Officer of the Companies under the Employment Agreement for Good Reason (the "Effective Date") and except as otherwise provided in this Agreement, this Agreement shall supersede and replace the Employment Agreement and the Companies shall thereupon retain the Consultant to provide consulting services to the Companies and the Boards in accordance with the terms and conditions set forth in this Agreement and the Consultant agrees to provide consulting services to the Companies and the Boards in accordance with the terms and conditions set forth in this Agreement. Donegal Mutual and DGI shall be jointly and severally liable to the Consultant with respect to (i) all liabilities of Donegal Mutual to the Consultant under this Agreement and (ii) all liabilities of DGI to the Consultant under this Agreement; provided, however, that Donegal Mutual shall not be responsible for any liability of DGI to the Consultant to the extent that DGI has discharged such liability, and DGI shall not be responsible for any liability of Donegal Mutual to the Consultant to the extent that Donegal Mutual has discharged such liability.

(ii) The term of this Agreement shall commence upon the Effective Date and end on the fifth anniversary of the Effective Date, unless the Companies earlier terminate the retention of the Consultant for Cause, as defined in this Agreement, the death of the Consultant or the Permanent Disability of the Consultant.

(b) Unless this Agreement otherwise provides or pursuant to the mutual agreement of the Companies and the Consultant, all of the terms and conditions of this Agreement shall continue in full force and effect throughout the Term and, with respect to those terms and conditions that apply after the Term, after the Term.

(c) Notwithstanding paragraph 1(a) of this Agreement, the Companies, by action of the Boards and effective as specified in a written notice thereof to the Consultant in accordance with the terms of this Agreement, shall have the right to terminate the Consultant's retention under this Agreement at any time during the Term, for Cause or for other than for Cause or on account of the Consultant's Death or Permanent Disability, subject to the provisions of this paragraph 1.

(i) As used in this Agreement, "Cause" shall mean (A) the Consultant's willful and continued failure substantially to provide consulting services to with the Companies as set forth in this Agreement, or the commission by the Consultant of any activities constituting a willful violation or breach under any material federal, state or local law or regulation applicable to the activities of Donegal Mutual, DGI or their respective subsidiaries and affiliates, in each case, after notice of such failure, breach or violation from the Companies to the Consultant and a reasonable opportunity for the Consultant to cure such failure, breach or violation in all material respects, (B) fraud, breach of fiduciary duty, dishonesty, misappropriation or other actions by the Consultant that cause intentional material damage to the property or business of Donegal Mutual, DGI or their respective subsidiaries and affiliates, or (C) the Consultant's inability to render consulting services such

-2-

that the Consultant is substantially unable to perform the Consultant's duties under this Agreement in all material respects other than for physical or mental impairment or illness.

(ii) As used in this Agreement, "Permanent Disability" shall mean a physical or mental disability of the Consultant such that the Consultant is substantially unable to perform those consulting services that the Consultant would otherwise reasonably have been expected to continue to perform and the nonperformance of such consulting services continues for a period of 240 consecutive days, provided, however, that in order to terminate the Consultant's retention under this Agreement on account of Permanent Disability, the Companies must provide the Consultant with written notice of the respective Boards' good faith determinations to terminate the Consultant's retention under this Agreement for reason of Permanent Disability not less than 30 days prior to such termination, which notice shall specify the date of termination. Until the specified effective date of termination by reason of Permanent Disability, the Consultant shall continue to receive the consulting fees at the rates set forth in paragraph 3 of this Agreement. No termination of the Consultant's retention under this Agreement because of Permanent Disability shall impair any rights of the Consultant under any disability insurance policy the Companies maintained at the commencement of the aforesaid 240-day period.

(d) The Consultant shall have the right to terminate the Consultant's retention under this Agreement at any time during the Term for Good Reason or without Good Reason. As used in this Agreement, "Good Reason" shall mean a material breach by either of the Companies of its respective obligations to the Consultant under this Agreement, and the Companies do not cure such breach in all material respects to the reasonable satisfaction of the Consultant, within 30 days, in each case following written notice of such breach from the Consultant to the Companies, which notice the Companies shall provide within 90 days of the date on which the Companies first have actual knowledge of the existence of the breach.

(e) Termination Obligations.

(i) If (A) the Companies terminate the retention of the Consultant under this Agreement for any reason other than Cause or the death or Permanent Disability of the Consultant or (B) the Consultant terminates the retention of the Consultant under this Agreement for Good Reason, the Companies shall pay the Consultant's annual fee for the remainder of the Term at the same times and in the same installments as the Companies paid the consulting fee to the Consultant until the Companies shall have discharged such obligations.

(ii) If (A) the Companies terminate the retention of the Consultant under this Agreement for Cause or (B) the Consultant terminates the Consultant's retention under this Agreement for any reason other than Good Reason, the sole obligation of the Companies to the Consultant shall be to pay to the Consultant any accrued obligation of the

-3-

Companies to the Consultant pursuant to this Agreement within 30 days after the date of such termination.

(iii) No provision of this Agreement shall adversely affect any vested rights of the Consultant under the Companies' employee benefit plans or other plans the Companies have established prior to the Effective Date of this Agreement.

(f) The Companies and the Consultant intend that this Agreement be drafted and administered in compliance with Section 409A of the Code, including, but not limited to, any future amendments to Section 409A, and any other Internal Revenue Service ("IRS") or other governmental rulings or interpretations (together, "Section 409A") issued pursuant to Section 409A so as not to subject the Consultant to payment of interest or any additional tax under Section 409A. The Companies and the Consultant intend for any payments under paragraphs 1(e)(i) or (ii) to satisfy either the requirements of Section 409A or to be exempt from the application of Section 409A, and the Companies and the Consultant shall construe and interpret this Agreement accordingly. In furtherance of such intent, if payment or provision of any amount or benefit under this Agreement that is subject to Section 409A at the time specified in this Agreement would subject such amount or benefit to any additional tax under Section 409A, the Companies shall postpone payment or provision of such amount or benefit to the earliest commencement date on which the Companies can make such payment or provision of such amount or benefit can be made without incurring such additional tax. In addition, to the extent that any IRS guidance issued under Section 409A would result in the Consultant being subject to the payment of interest or any additional tax under Section 409A, the Companies and the Consultant agree, to the extent reasonably possible, to amend this Agreement in order to avoid the imposition of any such interest or additional tax under Section 409A. Any such amendment shall have the minimum economic effect necessary and be determined reasonably and in good faith by the Companies and the Consultant.

(g) If a payment under paragraphs 1(e)(i) or (ii) of this Agreement does not qualify as a short-term deferral under Section 409A or any similar or successor provisions, as of the Consultant's Termination Date, the Companies may not make such distributions to the Consultant before the date that is six months after the date of the Consultant's Termination Date or, if earlier, the date of the Consultant's death (the "Six-Month Delay"). The Companies shall accumulate payments to which the Consultant would otherwise be entitled during the first six months following the Termination Date (the "Six-Month Delay Period") and make such payments on the first day of the seventh month following the Consultant's Termination Date. Notwithstanding the Six-Month Delay set forth in this paragraph 1(g):

(i) To the maximum extent Section 409A or any similar or successor provisions permit, during each month of the Six-Month Delay Period, the Companies will pay the Consultant an amount equal to one-sixth of the lesser of (1) the maximum amount that Code Section 401(a)(17) permits to be taken into account under a qualified plan for the

-4-

year in which the Consultant's Termination Date occurs and (2) the sum of the Consultant's annualized fees based upon the annual rate of pay for the consulting services provided to the Companies for the taxable year of the Consultant preceding the taxable year of the Consultant in which the Consultant's Termination Date occurs, adjusted for any increase during that year that was expected to continue indefinitely if the Consultant's Termination Date has not occurred ; provided that amounts paid under this sentence will count toward, and will not be in addition to, the total payment amount the Companies have the obligation to pay to the Consultant under paragraphs 1(e)(i) and (ii) of this Agreement; and

(ii) To the maximum extent Section 409A, or any similar or successor provisions, permits within ten days following the Consultant's Termination Date, the Companies shall pay the Consultant an amount equal to the applicable dollar amount under Code Section 402(g)(1)(B) for the year in which the Consultant's Termination Date occurred; provided that the amount the Companies pay under this sentence may include, and need not be in addition to, the total payment amount this Agreement requires the Companies to pay to the Consultant under paragraph 1(e).

(h) In the event that the independent registered public accounting firm of either of the Companies or the IRS determines that any payment, coverage or benefit provided to the Consultant pursuant to this Agreement is subject to the excise tax imposed by Sections 280G or 4999 of the Code or any successor provisions of Sections 280G and 4999 or any interest or penalties the Consultant incurs with respect to such excise tax, the Companies, within 30 days thereafter, shall pay to the Consultant, in addition to any other payment, coverage or benefit due and owing under this Agreement, an additional amount that will result in the Consultant's net after tax position, after taking into account any interest, penalties or taxes imposed on the amounts payable under this paragraph 1(h), upon the receipt of the payments for which this Agreement provides be no less advantageous to the Consultant than the net after tax position to the Consultant that would have been obtained had Sections 280G and 4999 of the Code not been applicable to such payment, coverage or benefits. Except as this Agreement otherwise provides, tax counsel, whose selection shall be reasonably acceptable to the Consultant and the Companies and whose fees and costs shall be paid for by the Companies, shall make all determinations this paragraph 1(h) requires.

(i) In the event that the independent registered public accounting firm of either of the Companies or the IRS determines that any payment, coverage or benefit due or owing to the Consultant pursuant to this Agreement is subject to the excise tax Section 409A of the Code imposes or any successor provision of Section 409A or any interest or penalties, including interest imposed under Section 409(A)(1)(B)(i)(I) of the Code, the Consultant incurs as a result of the application of such provision, the Companies, within 30 days of the date of such impositions, shall pay to the Consultant, in addition to any other payment, coverage or benefit due and owing under this Agreement, an additional amount that will result in the Consultant's net after-tax position, after taking into account any interest, penalties or taxes

-5-

imposed on the amounts paid under this paragraph 1(i), being no less advantageous to the Consultant than the net after-tax position the Consultant would have obtained had Section 409A of the Code not been applicable to such payment, coverage or benefits. Except as this Agreement otherwise provides, tax counsel, whose selection shall be reasonably acceptable to the Consultant and the Companies, and whose fees and costs the Companies shall pay, shall make all determinations this paragraph 1(i) require.

(j) The Companies and the Consultant shall give any notice of termination of this Agreement to the Consultant or the Companies, as the case may be, in accordance with the provisions of paragraph 9.

(k) The Companies agree to reimburse the Consultant for the reasonable fees and expenses of the Consultant's attorneys and for court and related costs in any proceeding to enforce the provisions of this Agreement in which the Consultant is successful on the merits.

2. Services of the Consultant.

(a) The Consultant agrees to provide services to the Companies in connection with the general operations of the Companies and merger and acquisition activities, participating in meetings and other activities of the Insurance Federation of Pennsylvania and such other projects and assignments upon which the Companies and the Consultant shall from time to time mutually agree. The Consultant shall report to the Boards of Directors of the Companies. The Consultant agrees to perform such services faithfully, diligently and in accordance with the commercially reasonable efforts of the Consultant. The Consultant shall provide, on an average weekly basis during the course of any fiscal year of the Companies, up to 20 hours of consulting services per week. Except for travel normally incidental and reasonably necessary to the business of the Companies and the duties of the Consultant under this Agreement, the duties of the Consultant may be performed from his residence in Silver Spring, Pennsylvania or from an office location the Companies provide that is not more than 35 miles distance from Silver Spring, Pennsylvania.

(b) The Companies and the Consultant intend that the Consultant shall render services under this Agreement as an employee of the Companies, and no one shall construe this Agreement to be inconsistent with that status. The Consultant shall be entitled to receive all benefits the Companies provide to the executive officers of the Companies named in the annual proxy statement of DGI, including health insurance and such benefits of the Consultant as became fully vested while serving as President and Chief Executive Officer of the Companies under the Employment Agreement. The fees, benefits and other compensation the Consultant receives under this Agreement shall be subject to and net of any federal, state of local taxes or contributions imposed under any employment insurance, social security, income tax or other tax law or regulation with respect to the Consultant's performance of consulting services under this Agreement.

-6-

3. Fees. For all services the Consultant renders under this Agreement:

(a) As compensation for the Consultant's services under this Agreement, the Companies shall pay the Consultant annual compensation in an amount equal to the sum of 50% of the Base Salary, as defined in the Employment Agreement, for the completed last fiscal year of the Companies before the date the Consultant commences the provision of consulting services pursuant to this Agreement, but in no event less than $600,000 plus such discretionary incentive payments as the Companies may from time to time determine.

(b) From and after the Effective Date and throughout the Term, the Companies shall provide the Consultant with office facilities and secretarial services consistent with the Consultant's stature as the long-term former Chief Executive Officer of the Companies.

4. Expenses. The Companies shall promptly reimburse the Consultant for all reasonable expenses the Consultant pays or incurs in connection with the performance of the Consultant's duties and responsibilities under this Agreement, upon presentation of expense vouchers or other appropriate documentation therefor.

5. Indemnification. Notwithstanding anything in the Companies' respective certificates or articles of incorporation or their By-laws to the contrary, the Companies shall at all times indemnify the Consultant during the Consultant's retention by the Companies or while the Consultant is providing consulting services to the Companies, and thereafter, to the fullest extent applicable law permits for any matter in any way relating to the Consultant's affiliation with the Companies or its subsidiaries; provided, however, that if the Companies shall have terminated the Consultant's retention under this Agreement for Cause, then, except to the extent otherwise required by law, the Companies shall have no obligation whatsoever to indemnify the Consultant for any claim arising out of the matter for which the Companies have terminated the Consultant's retention for Cause.

6. Confidential Information. The Consultant understands that in the course of the Consultant's retention by the Companies the Consultant will receive confidential information concerning the business of the Companies and that the Companies desire to protect such confidential information. The Consultant agrees that the Consultant will not at any time during or after the period of the Consultant's retention by the Companies reveal to anyone outside the Companies, or use for the Consultant's own benefit, any such information that the Companies have designated as confidential or that the Consultant understood to be confidential without specific written designation by the Companies. Upon termination of the retention of the Consultant under this Agreement, and upon the request of the Companies, the Consultant shall promptly deliver to the Companies any and all written materials, records and documents, including all copies of such written materials, documents and records, the Consultant made or that come into the Consultant's possession during the Term and that the Consultant retained contain or concern confidential information of the

-7-

Companies and all other written materials the Companies furnished to the Consultant for the Consultant's use during the Term, including all copies of such written materials, documents and records, whether of a confidential nature or otherwise.

7. Non-Competition.

(a) For the purposes of this Agreement, the term "Competitive Enterprise" shall mean any insurance company, insurance holding company, federal or state-chartered bank, savings and loan association, savings bank, credit union, consumer finance company, bank holding company, savings and loan holding company, unitary holding company, financial holding company or any of the foregoing types of entities in the process of organization or application for federal or state regulatory approval and shall also include other providers of financial services and entities that offer financial services or products with which the Companies or their respective subsidiaries or affiliates currently offer or may in the future offer.

(b) For a period of two years (the "Restricted Period") immediately following the Companies' termination of the Consultant's retention under this Agreement for Cause or the Consultant's termination of his consulting services under this Agreement for other than Good Reason, the Consultant shall not, provided that the Companies remain in compliance with their respective obligations under this Agreement:

(i) serve as a director, officer, employee or agent of, or act as a consultant or advisor to, any Competitive Enterprise in any city or county in which the Companies or their respective subsidiaries or affiliates are then conducting business or maintain an office or have publicly announced their intention to conduct business or maintain an office;

(ii) in any way, directly or indirectly, solicit, divert or contact any existing or potential customer or business of the Companies or any of their respective subsidiaries or affiliates that the Consultant solicited, became aware of or transacted business with during the Companies' retention the Consultant for the purpose of selling any financial services or products that compete with the financial services or products the Companies or their respective subsidiaries and affiliates currently offer or in the future, may offer or solicit or assist in the employment of any employee of the Companies or their respective subsidiaries or affiliates for the purpose of becoming an employee of or otherwise provide services for any Competitive Enterprise.

8. Entire Agreement; Amendment. This Agreement and the Employment Agreement contain the entire agreement between the Companies and the Consultant with respect to the subject matter of this Agreement, and may not be amended, waived, changed, modified or discharged except by an instrument in writing executed by the Companies and the Consultant.

-8-

9. Notice. Any notice that a party to this Agreement may give under this Agreement shall be in writing and be deemed given when hand delivered and acknowledged or, if mailed, one day after mailing by registered or certified mail, return receipt requested, or if delivered by an overnight delivery service, one day after the notice is delivered to such service, to the Companies or the Consultant at their respective addresses stated in the preamble to this Agreement, or at such other address as either party may by similar notice designate.

10. Specific Performance. The Companies and the Consultant agree that irreparable damage would occur in the event that any of the provisions of paragraphs 6 or 7 of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Companies and the Consultant shall have the right to an injunction or injunctions to prevent breaches of such paragraphs 6 or 7 and to enforce specifically the terms and provisions of such paragraphs 6 or 7, this being in addition to any other remedy to which the Companies or the Consultant are entitled at law or in equity.

11. No Third Party Beneficiaries. Nothing in this Agreement, express or implied, shall confer upon any person or entity other than the Companies and the Consultant, and the Consultant's heirs, executors, administrators and personal representatives, any rights or remedies of any nature under or by reason of this Agreement.

12. Successor Liability. The Companies shall require any successor, whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of the business or assets of the Companies to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Companies would be required to perform it if no such succession had taken place.

13. No Attachment. Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge or hypothecation or to execution, attachment, levy or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect; provided, however, that nothing in this paragraph 13 shall preclude the assumption of such rights by executors, administrators or other legal representatives of the Consultant or the Consultant's estate and their assigning any rights under this Agreement to the person or persons entitled to such rights.

14. Severability. The invalidity or unenforceability of any term, phrase, clause, paragraph, restriction, covenant, agreement or other provision of this Agreement shall in no way affect the validity or enforceability of any other provision, or any part of this Agreement, but this Agreement shall be construed as if such invalid or unenforceable term, phrase, clause, paragraph, restriction, covenant, agreement or other provision had never been contained in this Agreement unless the deletion of such term, phrase, clause, paragraph,

-9-

restriction, covenant, agreement or other provision would result in such a material change as to cause the covenants and agreements contained in this Agreement to be unreasonable or would materially and adversely frustrate the objectives of the Companies and the Consultant as expressed in this Agreement.

15. Construction. This Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania, without giving effect to principles of conflict of laws. All headings in this Agreement have been inserted solely for convenience of reference only, are not to be considered a part of this Agreement and shall not affect the interpretation of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

DONEGAL MUTUAL INSURANCE COMPANY

By: /s/ Kevin G. Burke
    Kevin G. Burke, Senior Vice President, Human Resources

DONEGAL GROUP INC.

By: /s/ Jeffrey D. Miller
    Jeffrey D. Miller, Senior Vice President and Chief Financial Officer

/s/ Donald H. Nikolaus
Donald H. Nikolaus

-10-

EX-10.3 4 w83857exv10w3.htm EX-10.3

Exhibit 10.3

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") dated as of July 29, 2011 among Donegal Mutual Insurance Company, a Pennsylvania mutual insurance company having its principal place of business at 1195 River Road, Marietta, Pennsylvania 17547 ("Donegal Mutual"), Donegal Group Inc., a Delaware corporation having its principal place of business at 1195 River Road, Marietta, Pennsylvania 17547 ("DGI," and, together with Donegal Mutual, the "Employers"), and Kevin G. Burke, an individual whose principal office address is 1195 River Road, Marietta, Pennsylvania 17547 (the "Executive").

### WITNESSETH:

WHEREAS, the Employers desire, by this Agreement, to provide for the continued employment of the Executive by the Employers, and the Executive agrees to the continued employment of the Executive by the Employers, all in accordance with the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the parties are entering into this Agreement to set forth and confirm their respective rights and obligations with respect to the Executive's continued employment by the Employers;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, the Employers and the Executive, intending to be legally bound hereby, mutually agree as follows:

1. Employment and Term.

(a) (i) Effective August 1, 2011 (the "Effective Date"), (i) Donegal Mutual agrees to continue to employ the Executive, and the Executive agrees to continue the Executive's employment as, the Senior Vice President of Human Resources of Donegal Mutual and (ii) DGI agrees to employ the Executive, and the Executive agrees to continue the Executive's employment as, the Senior Vice President of DGI, with positions described in clauses (i) and (ii) collectively referred to in this Agreement as the "Position", in accordance with the terms and subject to the conditions this Agreement sets forth. Donegal Mutual and DGI shall be jointly and severally liable to the Executive with respect to (i) all liabilities of Donegal Mutual to the Executive under this Agreement and (ii) all liabilities of DGI to the Executive under this Agreement; provided, however, that Donegal Mutual shall not be responsible for any liability of DGI to the Executive to the extent that DGI has discharged such liability, and DGI shall not be responsible for any liability of Donegal Mutual to the Executive to the extent that Donegal Mutual has discharged such liability.

(ii) The term of this Agreement, as the same may be extended from time to time pursuant to the provisions of this clause (ii) or otherwise, shall commence on the Effective Date and end on the third anniversary of the Effective Date, provided, however, that on the first anniversary of the Effective Date and on each subsequent anniversary of the Effective Date (each, an "Extension Date"), the Term shall automatically extend for one additional year so that on each such succeeding Extension Date, this Agreement shall have a remaining Term of three years, unless either the Executive or the respective board of directors of Donegal Mutual and DGI (together, the "Boards") give notice to the other, not less than 90 days in advance of the next succeeding Extension Date, that such automatic extensions shall terminate as of such next succeeding Extension Date, unless the Employers earlier terminate the employment of the Executive for Cause, as defined in this Agreement, or because of the death or the Permanent Disability, as defined in this Agreement, of the Executive.

(b) Notwithstanding paragraph 1(a) of this Agreement, the Employers, by action of the Boards and effective as specified in a written notice thereof to the Executive in accordance with the terms of this Agreement, shall have the right to terminate the Executive's employment under this Agreement at any time during the Term, for Cause or other than for Cause or on account of the Executive's death or Permanent Disability subject to the provisions of this paragraph 1.

(i) As used in this Agreement, "Cause" shall mean (A) the Executive's willful and continued failure substantially to perform the Executive's material duties with the Employers as set forth in this Agreement, or the commission by the Executive of any activities constituting a willful violation or breach under any material federal, state or local law or regulation applicable to the activities of Donegal Mutual or DGI or their respective subsidiaries and affiliates, in each case, after notice of such failure, breach or violation from the Employers to the Executive and a reasonable opportunity for the Executive to cure such failure, breach or violation in all material respects, (B) fraud, breach of fiduciary duty, dishonesty, misappropriation or other actions by the Executive that cause intentional material damage to the property or business of Donegal Mutual or DGI or their respective subsidiaries and affiliates, (C) the Executive's repeated absences from work such that the Executive is substantially unable to perform the Executive's duties under this Agreement in all material respects other than for physical or mental impairment or illness or (D) the Executive's non-compliance with the provisions of paragraph 2(b) of this Agreement after notice of such non-compliance from the Employers to the Executive and a reasonable opportunity for the Executive to cure such non-compliance.

(ii) As used in this Agreement, "Permanent Disability" shall mean a physical or mental disability of the Executive such that the Executive is substantially unable to perform those duties that the Executive would otherwise reasonably be expected to continue to perform and the Executive's nonperformance of such duties has continued for a

-2-

period of 180 consecutive days, provided, however, that in order to terminate the Executive's employment under this Agreement on account of Permanent Disability, the Employers must provide the Executive with written notice of the Boards' good faith determinations to terminate the Executive's employment under this Agreement for reason of Permanent Disability not less than 30 days prior to such termination, and such notice shall specify the date of termination. Until the specified effective date of termination by reason of Permanent Disability, the Executive shall continue to receive compensation at the rates set forth in paragraph 3 of this Agreement. No termination of the Executive's employment under this Agreement because of Permanent Disability shall impair any rights of the Executive under any disability insurance policy the Employers maintained at the commencement of the aforesaid 180-day period.

(c) The Executive shall have the right to terminate the Executive's employment under this Agreement at any time during the Term for Good Reason or without Good Reason or in the event a Change of Control occurs. As used in this Agreement, "Good Reason" shall mean (A) a material diminishment of the Executive's Position or the scope of the Executive's authority, duties or responsibilities as this Agreement describes without the Executive's written consent, excluding for this purpose any action the Employers do not take in bad faith and that the Employers remedy promptly following written notice thereof from the Executive to the Employers, or (B) a material breach by either Employer of its respective obligations to the Executive under this Agreement, provided, that with respect to any termination by the Executive for Good Reason, the Executive shall have provided the Employers with written notice within 90 days of the date on which the Employers first had actual knowledge of the existence of the Good Reason and which Good Reason shall not have been cured or otherwise rectified by the Employers in all material respects to the reasonable satisfaction of the Executive within 30 days after the Employers receive such written notice or (C) any termination of the Executive's employment under this Agreement without Cause.

(d) "Change of Control" shall mean (A) the acquisition of shares of DGI by any "person" or "group," as Rule 13d-3 uses such terms under the Securities Exchange Act of 1934, as now or hereafter amended, in a transaction or series of transactions that result in such person or group directly or indirectly first owning after the Effective Date more than 25% of the aggregate voting power of DGI's Class A common stock and Class B common stock taken as a single class, (B) the consummation of a merger or other business combination transaction after which the holders of the outstanding voting capital stock of DGI taken as a single class do not collectively own 60% or more of the aggregate voting power of the entity surviving such merger or other business combination transaction, (C) the sale, lease, exchange or other transfer in a transaction or series of transactions of all or substantially all of the assets of DGI, but excluding therefrom the sale and re-investment of the consolidated investment portfolio of DGI and its subsidiaries, (D) as the result of or in connection with any cash tender offer or exchange offer, merger or other business combination transaction, sale of assets or contested-election of directors or any combination of the foregoing transactions or

-3-

(E) a change of "control" of Donegal Mutual as such term is defined in the Pennsylvania Insurance Holding Companies Act (each, a "Transaction"), the persons who constituted a majority of the members of the respective Boards on the Effective Date and persons whose election as members of the respective Boards received the approval of such members then still in office or whose subsequent election had been so approved prior to the date of a Transaction, but before the occurrence of an event that constitutes a Change of Control, no longer constitute such a majority of the Boards then in office. A Transaction constituting a Change of Control shall only be deemed to have occurred upon the closing of the Transaction.

(e) (i) If (A) the Employers terminate the Executive's employment under this Agreement for any reason other than for Cause and such termination occurs as of a date that is within 180 days preceding or within 180 days after the consummation of a Change of Control (such 180-day period preceding the Change of Control and such 180-day period after the Change of Control collectively referred to in this Agreement as a "Change of Control Period", (B) the Employers terminate this Agreement as a result of the death or Permanent Disability of the Executive, effective as of a date within a Change of Control Period, (C) the Executive terminates the Executive's employment under this Agreement for Good Reason or (D) the acquisition of "control" of Donegal Mutual as defined in the Pennsylvania Insurance Holding Companies Act, the Employers shall pay to the Executive or the Executive's estate promptly after the event giving rise to such payment occurs, an amount equal to the sum of (x) (1) the Executive's Base Salary, as defined in this Agreement, accrued through the date the termination of the Executive's employment under this Agreement is effective, (2) any incentive, as defined in this Agreement, the Employers have the obligation to pay to the Executive pursuant to paragraph 3(b) of this Agreement, (3) any amounts payable under any of the Employers' benefit plans in accordance with the terms of such plans, except as Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") may otherwise require and (4) any amount in respect of excise taxes the Employers have the obligation to pay to the Executive pursuant to paragraph 1(f) of this Agreement, with such payments, rights and benefits described in clauses (x)(1), (x)(2) and (x)(3) of this Agreement being collectively referred to in this Agreement as the "Accrued Obligations," (y) an amount equal to the aggregate premiums that the Executive would have to pay to maintain in effect throughout the period (the "Subsequent Period") from the date of termination of the Executive's employment under this Agreement through the remainder of the Term had the Executive remained employed, assuming no increase in insurance premium rates, the same medical, health, disability and life insurance coverage the Employers provided to the Executive immediately prior to the date of such termination (the "Benefit Obligations") and (z) the Employers shall pay to the Executive or the Executive's estate, as a severance payment, for three years from the date of such termination, the Executive's annual Base Salary as of the effective date of termination of the Executive's employment under this Agreement and any incentive paid to the Executive during the last completed fiscal year of the Employers before

-4-

such termination. The Employers shall pay such amounts for the Executive in 36 equal monthly installments.

(ii) If (A) the Employers terminate the Executive's employment under this Agreement for any reason other than for Cause effective as of a date that is not within a Change of Control Period or (B) the Executive terminates the Executive's employment under this Agreement for Good Reason effective as of a date that is not within a Change of Control Period, the Employers shall pay the Executive, provided the Executive concurrently signs and delivers a general release in a commercially reasonable form that is mutually acceptable to the Employers and the Executive in favor of the Employers and their respective subsidiaries, an amount equal to the sum of (w) the Accrued Obligations, (x) the Benefit Obligations and (y) the Executive's Base Salary as of the effective date of termination of the Executive's employment under this Agreement the Executive would have received had the Executive remained employed under this Agreement for the Subsequent Period. The Employers shall pay such amounts to the Executive at the same time and in the same installments had the Executive remained employed under this Agreement for the Subsequent Period.

(iii) If (A) the Employers terminate the Executive's employment under this Agreement for Cause or because of the death or Permanent Disability of the Executive or (B) the Executive terminates the Executive's employment under this Agreement for any reason other than Good Reason, the Executive's death or Permanent Disability, or (C) the Employers terminate this Agreement as a result of the death or Permanent Disability of the Executive effective as of a date that is not within a Change of Control Period, the sole obligation of the Employers to the Executive under this Agreement shall be to pay the Accrued Obligations to the Executive or the Executive's estate, provided, however, that in the event the Employers terminate the employment of the Executive under this Agreement because of the death of the Executive, the Employers shall pay to the personal representatives of the Executive an amount equal to the Executive's Base Salary and incentive for the remainder of the Term.

(iv) No provision of this Agreement shall adversely affect any vested rights of the Executive under the Employers' existing employee benefit plans or other plans the Employers may establish in the future; provided, however, upon the termination of the employment of the Executive as provided in this Agreement, all future vesting of the Executive's rights under all existing and any future employee benefit plans shall terminate without further action by the Employers.

(v) The Employers and the Executive intend that this Agreement be drafted and administered in compliance with Section 409A of the Code, including, but not limited to, any future amendments to Section 409A, and any other Internal Revenue Service ("IRS") or other governmental rulings or interpretations (together, "Section 409A") issued pursuant to Section 409A so as not to subject the Executive to payment of interest or any

-5-

additional tax under Section 409A. The Employers and the Executives intend for any payments under paragraphs 1(e)(i), (ii) or (iii) to satisfy either the requirements of Section 409A or to be exempt from the application of Section 409A, and the Employers and the Executive shall construe and interpret this Agreement accordingly. In furtherance of such intent, if payment or provision of any amount or benefit under this Agreement that is subject to Section 409A at the time specified in this Agreement would subject such amount or benefit to any additional tax under Section 409A, the Employers shall postpone payment or provision of such amount or benefit to the earliest commencement date on which the Employers can make such payment or provision of such amount or benefit without incurring such additional tax but not in excess of six months. In addition, to the extent that any IRS guidance issued under Section 409A would result in the Executive being subject to the payment of interest or any additional tax under Section 409A, the Employers and the Executive agree, to the extent reasonably possible, to amend this Agreement in order to avoid the imposition of any such interest or additional tax under Section 409A. Any such amendment shall have the minimum economic effect necessary and be determined reasonably and in good faith by the Employers and the Executive.

(vi) If a payment under paragraph 1(e)(i), (ii) or (iii) of this Agreement does not qualify as a short-term deferral under Section 409A or any similar or successor provisions, and the Executive is a Specified Employee, as defined in this Agreement, as of the Executive's Termination Date, the Employers may not make such distributions to the Executive before a date that is six months after the date of the Executive's Termination Date or, if earlier, the date of the Executive's death (the "Six-Month Delay"). The Employers shall accumulate payments to which the Executive would otherwise be entitled during the first six months following the Termination Date (the "Six-Month Delay Period") and make such payments on the first day of the seventh month following the Executive's Termination Date. Notwithstanding the Six-Month Delay set forth in this paragraph 1(e)(vi):

(A) To the maximum extent Section 409A or any similar or successor provisions permit, during each month of the Six-Month Delay Period, the Employers will pay the Executive an amount equal to the lesser of (I) the total monthly severance for which paragraph 1(e)(ii) and (iii) provide or (II) one-sixth of the lesser of (1) the maximum amount that Section 401(a)(17) permits to be taken into account under a qualified plan for the year in which the Executive's Date of Termination occurs and (2) the sum of the Executive's annualized compensation based upon the annual rate of pay for services provided to the Employers for the taxable year of the Executive preceding the taxable year of the Executive in which the Executive's Termination Date occurs, adjusted for any increase during that year that the parties expected to continue indefinitely if the Executive's Termination Date has not occurred ; provided that amounts paid under this sentence will count toward, and

-6-

will not be in addition to, the total payment amount the Employers have the obligation to pay to the Executive under paragraphs 1(e)(i) and (ii) of this Agreement; and

(B) To the maximum extent Section 409A, or any similar or successor provisions, permits within ten days following the Executive's Termination Date, the Employers shall pay the Executive an amount equal to the applicable dollar amount under Section 402(g)(1)(B) for the year in which the Executive's Termination Date occurred; provided that the amount the Employers pay under this sentence may include, and need not be in addition to, the total payment amount this Agreement requires the Employers to pay to the Executive under paragraph 1(b).

(C) For purposes of this Agreement, "Specified Employee" has the meaning given that term in Section 409A or any similar or successor provisions. The Employers' "specified employee identification date" as described in Section 409A will be December 31 of each year, and the Employers' "specified employee effective date" as described in Section 409A or any similar or successor provisions) will be February 1 of each succeeding year.

(f) In the event that the independent registered public accounting firm of either of the Employers or the IRS determines that any payment, coverage or benefit provided to the Executive pursuant to this Agreement is subject to the excise tax imposed by Sections 280G or 4999 or any successor provisions of Sections 280G and 4999 or any interest or penalties the Executive incurs with respect to such excise tax, the Employers, within 30 days thereafter, shall pay to the Executive, in addition to any other payment, coverage or benefit due and owing under this Agreement, an additional amount that will result in the Executive's net after tax position, after taking into account any interest, penalties or taxes imposed on the amounts payable under this paragraph 1(f), upon the receipt of the payments for which this Agreement provides being no less advantageous to the Executive than the net after tax position to the Executive that would have been obtained had Sections 280G and 4999 not been applicable to such payment, coverage or benefits. Except as this Agreement otherwise provides, tax counsel, whose selection shall be reasonably acceptable to the Executive and the Employers and whose fees and costs shall be paid for by the Employers, shall make all determinations this paragraph 1(f) requires.

(g) In the event that the independent registered public accounting firm of either of the Employers or the IRS determines that any payment, coverage or benefit due or owing to the Executive pursuant to this Agreement is subject to the excise tax Section 409A imposes or any successor provision of Section 409A or any interest or penalties, including interest imposed under Section 409(A)(1)(B)(i)(I), the Executive incurs as a result of the application of such provision, the Employers, within 30 days of the date of such impositions,

-7-

shall pay to the Executive, in addition to any other payment, coverage or benefit due and owing under this Agreement, an additional amount that will result in the Executive's net after tax position, after taking into account any interest, penalties or taxes imposed on the amounts paid under this paragraph 1(g), being no less advantageous to the Executive than the net after tax position the Executive would have obtained had Section 409A not been applicable to such payment, coverage or benefits. Except as this Agreement otherwise provides, tax counsel, whose selection shall be reasonably acceptable to the Executive and the Employers and whose fees and costs the Employers shall pay, shall make all determinations this paragraph 1(g) requires.

(h) The Employers and the Executive shall give any notice of termination of this Agreement to the Executive or the Employers, as the case may be, in accordance with the provisions of paragraph 10.

(i) The Employers agree to reimburse the Executive for the reasonable fees and expenses of the Executive's attorneys and for court and related costs in any proceeding to enforce the provisions of this Agreement in which the Executive is successful on the merits.

2. Duties of the Executive.

(a) Subject to the ultimate control and discretion of the Boards, the Executive shall serve in the Position and perform all duties and services commensurate with the Position. Throughout the Term of this Agreement as the same may be extended from time to time, the Executive shall perform all duties reasonably assigned or delegated to the Executive under the By-laws of the Employers or from time to time by the Boards consistent with the Position. Except for travel normally incidental and reasonably necessary to the business of the Employers and the duties of the Executive under this Agreement, the duties of the Executive shall be performed from an office location not greater than 35 miles from Marietta, Pennsylvania.

(b) The Executive shall devote substantially all of the Executive's business time and attention to the performance of the Executive's duties under this Agreement and, during the term of the Executive's employment under this Agreement, the Executive shall not engage in any other business enterprise that requires any significant amount of the Executive's personal time or attention, unless granted the prior permission of the respective Boards. The foregoing provision shall not prevent the Executive's purchase, ownership or sale of any interest in, or the Executive's engaging in, any business that does not compete with the business of the Employers or the Executive's involvement in charitable or community activities, provided, that the time and attention that the Executive devotes to such business and charitable or community activities does not materially interfere with the performance of the Executive's duties under this Agreement and that a material portion of the time the Executive devotes to charitable or community activities are devoted to charitable

-8-

or community activities within the Employers' market area and further provided that such conduct complies in all material respects with applicable policies of the Employers.

(c) The Employers shall accrue earned but unused vacation in accordance with the Employers' vacation policy.

3. Compensation. For all services the Executive renders under this Agreement:

(a) The Employers shall pay the Executive a base salary (the "Base Salary") at an annual rate equal to the annual rate of compensation the Executive is currently receiving from the Employers, plus such other compensation as the Employers may, from time to time, determine. The Employers shall pay such Base Salary and other compensation in accordance with the Employers' normal payroll practices as in effect from time to time.

(b) The Employers agree that the Executive shall be entitled to participate in the annual incentive programs of the Employers, in accordance in all material respects with applicable policies of the Employers relating to incentive compensation for executive officers, based on the objectives set forth in the Employers' Executive Incentive Plan.

(c) The compensation provided for in this paragraph 3 shall be in addition to such rights as the Executive may have, during the Executive's employment under this Agreement or after such employment, to participate in and receive benefits from or under any benefit plans the Employers may in their discretion establish for their employees or executives, including, but not limited to, employee benefit plans and group health insurance, life insurance and disability insurance plans. To the extent the Executive incurs a tax liability as a result of any of such benefits, the Executive shall be solely responsible for such taxes.

(d) The parties acknowledge that Towers Watson is in the process of evaluating the compensation and employee benefit plans the Employers make available to their senior executive officers. To the extent the respective boards of directors of the Employers, based upon the recommendations of Towers Watson, to enhance the compensation and other benefits the Employers make available to their senior executive officers, the Employers and the Executive agree to negotiate in good faith and to execute an amendment to this Agreement that would appropriately reflect such enhancements.

4. Expenses. The Employers shall promptly reimburse the Executive for all reasonable expenses the Executive pays or incurs in connection with the performance of the Executive's duties and responsibilities under this Agreement, upon presentation of expense vouchers or other appropriate documentation therefor.

5. Indemnification. Notwithstanding anything in the Employers' respective certificates or articles of incorporation or their By-laws to the contrary, the Employers shall at all times indemnify the Executive during the Executive's employment by the Employers or while the Executive is providing consulting services to the Employers, and thereafter, to the

-9-

fullest extent applicable law permits for any matter in any way relating to the Executive's employment by, consultation with or other affiliation with the Employers or its subsidiaries; provided, however, that if the Employers shall have terminated the Executive's employment under this Agreement for Cause, then, except to the extent otherwise required by law, the Employers shall have no obligation whatsoever to indemnify the Executive for any claim arising out of the matter for which the Employer shall have terminated the Executive's employment under this Agreement for Cause or for any conduct of the Executive not within the scope of the Executive's duties under this Agreement.

6. Confidential Information. The Executive understands that in the course of the Executive's employment by the Employers the Executive will receive confidential information concerning the business of the Employers and that the Employers desire to protect. The Executive agrees that the Executive will not at any time during or after the period of the Executive's employment by the Employers reveal to anyone outside the Employers, or use for the Executive's own benefit, any such information that the Employers have designated as confidential or that the Executive understood to be confidential without specific designation by the Employers. Upon termination of the employment of the Executive under this Agreement, and upon the request of the Employers, the Executive shall promptly deliver to the Employers any and all written materials, records and documents, including all copies of such written materials, documents and records, the Executive made or that come into the Executive's possession during the Term and the Executive retained that contain or concern confidential information of the Employers and all other written materials the Employers furnished to the Executive for the Executive's use during the Term, including all copies of such written materials, documents and records, whether of a confidential nature or otherwise.

7. Representation and Warranty of the Executive. The Executive represents and warrants that the Executive is not under any obligation, contractual or otherwise, to any other firm or corporation, which would prevent the Executive's performance of the terms of this Agreement.

8. Entire Agreement; Amendment. This Agreement and the Consulting Agreement contain the entire agreement between the Employers and the Executive with respect to the subject matter of this Agreement, and may not be amended, waived, changed, modified or discharged except by an instrument in writing executed by the Employers and the Executive.

9. Assignability. The services of the Executive under this Agreement are personal in nature, and the Employers may not assign their respective rights or obligations under this Agreement, whether by operation of law or otherwise, without the Executive's prior written consent. This Agreement shall be binding upon, and inure to the benefit of, the Employers and their permitted successors and assigns under this Agreement. This Agreement shall not

-10-

be assignable by the Executive, but shall inure to the benefit of the Executive's heirs, executors, administrators and personal representatives.

10. Notice. Any notice that a party to this Agreement may give under this Agreement shall be in writing and be deemed given when hand delivered and acknowledged or, if mailed, one day after mailing by registered or certified mail, return receipt requested, or if delivered by an overnight delivery service, one day after the notice is delivered to such service, to the Employers or the Executive at their respective addresses stated in the preamble to this Agreement, or at such other address as either party may by similar notice designate.

11. Specific Performance. The Employers and the Executive agree that irreparable damage would occur in the event that any of the provisions of paragraph 6 of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Employers and the Executive shall have the right to an injunction or injunctions to prevent breaches of such paragraph 6 and to enforce specifically the terms and provisions of such paragraph 6, this being in addition to any other remedy to which the Employers or the Executive are entitled at law or in equity.

12. No Third Party Beneficiaries. Nothing in this Agreement, express or implied, shall confer upon any person or entity other than the Employers and the Executive (and the Executive's heirs, executors, administrators and personal representatives) any rights or remedies of any nature under or by reason of this Agreement.

13. Successor Liability. The Employers shall require any successor, whether direct or indirect, by purchase, merger, consolidation or otherwise, to all or substantially all of the business or assets of the Employers to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Employers would be required to perform it if no such succession had taken place.

14. Mitigation. The Executive shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise, nor shall the amount of any payment or benefit provided for in this Agreement be reduced by any compensation the Executive earns as the result of employment by another employer or by retirement benefits payable after the termination of this Agreement, except that the Employers shall not be required to provide the Executive and the Executive's eligible dependents with medical insurance coverage as long as the Executive and the Executive's eligible dependents are receiving comparable medical insurance coverage from another employer.

15. Waiver of Breach. The failure at any time to enforce or exercise any right under any of the provisions of this Agreement or to require at any time performance by the other parties of any of the provisions hereof shall in no way be construed to be a waiver of such provisions or to affect either the validity of this Agreement or any part of this Agreement, or

-11-

the right of any party hereafter to enforce or exercise its rights under each and every provision in accordance with the terms of this Agreement.

16. No Attachment. Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge or hypothecation or to execution, attachment, levy or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect; provided, however, that nothing in this paragraph 16 shall preclude the assumption of such rights by executors, administrators or other legal representatives of the Executive or the Executive's estate and their assigning any rights hereunder to the person or persons entitled to such rights.

17. Severability. The invalidity or unenforceability of any term, phrase, clause, paragraph, restriction, covenant, agreement or other provision of this Agreement shall in no way affect the validity or enforceability of any other provision, or any part of this Agreement, but this Agreement shall be construed as if such invalid or unenforceable term, phrase, clause, paragraph, restriction, covenant, agreement or other provision had never been contained in this Agreement unless the deletion of such term, phrase, clause, paragraph, restriction, covenant, agreement or other provision would result in such a material change as to cause the covenants and agreements contained in this Agreement to be unreasonable or would materially and adversely frustrate the objectives of the Employers and the Executive as expressed in this Agreement.

18. Construction. This Agreement shall be governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania, without giving effect to principles of conflict of laws. All headings in this Agreement have been inserted solely for convenience of reference only, are not to be considered a part of this Agreement and shall not affect the interpretation of any of the provisions of this Agreement.

-12-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

DONEGAL MUTUAL INSURANCE
COMPANY

By: /s/ Donald H. Nikolaus
    Donald H. Nikolaus, President and
    Chief Executive Officer

DONEGAL GROUP INC.

By: /s/ Jeffrey D. Miller
    Jeffrey D. Miller, Senior Vice President and
    Chief Financial Officer

/s/ Kevin G. Burke
Kevin G. Burke

-13-

SC 13D 1 w77883sc13d.htm SC 13D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# SCHEDULE 13D

Under the Securities Exchange Act of 1934
(Amendment No. \_\_\_)

# UNION NATIONAL FINANCIAL CORPORATION

(Name of Issuer)

Common stock, par value $.25 per share

(Title of Class of Securities)

907647101

(CUSIP Number)

Jeffrey D. Miller, Senior Vice President and Chief Financial Officer
Donegal Mutual Insurance Company
1195 River Road, Marietta, Pennsylvania 17547
(717) 426-1931

(Name, address and telephone number of person authorized to receive notices and communications)

March 24, 2010

(Date of first event which requires filing of this statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 13d-1(f) or 13d-1(g), check the following box: þ

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act.

CUSIP No. [ 907647101 ]                    SCHEDULE 13D

| | | | |
|---|---|---|---|
| **1** | NAME OF REPORTING PERSON/I.R.S. IDENTIFICATION NO. OF ABOVE PERSON (entities only)<br><br>Donegal Mutual Insurance Company<br>I.R.S. I.D. No. 23-1336198 | | |
| **2** | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (SEE INSTRUCTIONS)<br><br>(a)  o<br>(b)  o    N/A | | |
| **3** | SEC USE ONLY | | |
| **4** | SOURCE OF FUNDS (SEE INSTRUCTIONS)<br><br>OO | | |
| **5** | CHECK IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) OR 2(e)<br><br>N/A | | |
| **6** | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Pennsylvania | | |
| NUMBER OF<br>SHARES<br>BENEFICIALLY<br>OWNED BY<br>EACH<br>REPORTING<br>PERSON<br>WITH | **7** | SOLE VOTING POWER<br><br>248,999 shares | |
| | **8** | SHARED VOTING POWER<br><br>N/A | |
| | **9** | SOLE DISPOSITIVE POWER<br><br>248,999 shares | |
| | **10** | SHARED DISPOSITIVE POWER<br><br>N/A | |
| **11** | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON<br><br>248,999 shares | | |
| | CHECK IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS) | | |

| 12 | |
|---|---|
| | N/A |
| 13 | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11) |
| | 9.8% |
| 14 | TYPE OF REPORTING PERSON (SEE INSTRUCTIONS) |
| | IC    HC |

## Item 1. Security and Issuer.

This Schedule 13D relates to the common stock, par value $.25 per share, of Union National Financial Corporation ("UNNF"). The address of the principal executive offices of UNNF is 570 Lausch Lane, Lancaster, Pennsylvania 17601.

## Item 2. Identity and Background.

The location of the principal place of business and principal office of Donegal Mutual, a Pennsylvania mutual fire insurance company founded in 1889, is 1195 River Road, Marietta, Pennsylvania 17547. As of February 26, 2010, Donegal Mutual owned approximately 41.9% of the Class A common stock and 75.0% of the Class B common stock of Donegal Group Inc. ("DGI"), DGI is a publicly-held insurance holding company whose subsidiaries write property and casualty insurance in certain Mid-Atlantic, Midwest and Southern states. Donegal Mutual owns 51.8% and DGI owns 48.2% of Donegal Financial Services Corporation ("DFSC"), a unitary thrift holding company that owns Province BankFSB ("Province"), a federal savings bank that conducts a banking business primarily in Lancaster and York Counties, Pennsylvania.

The directors of Donegal Mutual are Scott A. Berlucchi, Dennis J. Bixenman, Michael K. Callahan, Frederick W. Dreher, Patricia A. Gilmartin, Philip H. Glatfelter, II, Cyril J. Greenya, Jack L. Hess, John E. Hiestand, Kevin M. Kraft, Sr., Donald H. Nikolaus and R. Richard Sherbahn.

Mr. Berlucchi has been President and Chief Executive Officer of Auburn Memorial Hospital since 2007. From 2004 to 2007, he was President and Chief Executive Officer of Elk Regional Health System. Mr. Berlucchi has been a director of Donegal Mutual and Province since 2006.

Mr. Bixenman has been a Senior Consultant with Williams & Company, a consulting firm, for more than the past ten years. Mr. Bixenman has been a director of Donegal Mutual since 2006.

Mr. Callahan has been a director of Donegal Mutual since December 2009. He has held various positions with Benchmark Construction Company, Inc. since 1985, became Executive Vice President in 1995 and has served as President since 2009.

Mr. Dreher has been a director of Donegal Mutual since 1996 and has been a partner in the law firm of Duane Morris LLP since 1971. Mr. Dreher has been a director of Province since 2000.

Mrs. Gilmartin has been an employee since 1969 of Associated Donegal Insurance Brokers, which has no affiliation with Donegal Mutual, except that Associated Donegal

-3-

Insurance Brokers receives insurance commissions in the ordinary course of business from DGI's insurance subsidiaries and Donegal Mutual in accordance with their standard commission schedules and agency contracts. Mrs. Gilmartin has been a director of Donegal Mutual since 1979.

Mr. Glatfelter retired in 1989 as a vice president of Meridian Bank, a position he held for more than five years prior to his retirement. Mr. Glatfelter has been a director of Donegal Mutual for 29 years. Mr. Glatfelter was Vice Chairman of the Board of Donegal Mutual from 1991 to 2001 and has been the Chairman of the Board of DGI and Chairman of the Board of Donegal Mutual since 2001. Mr. Glatfelter has been a director of Province since 2000.

Mr. Greenya has been Senior Vice President and Chief Underwriting Officer of Donegal Mutual since 2005; was Senior Vice President, Underwriting of Donegal Mutual from December 1997 to 2005; was Vice President, Commercial Underwriting of Donegal Mutual from 1992 until December 1997 and served as Manager, Commercial Underwriting of Donegal Mutual from 1983 to 1992. Mr. Greenya has been a director of Donegal Mutual since 2006.

Mr. Hess has been a director of Donegal Mutual since December 2009. Mr. Hess is a certified public accountant who has been with the firm of Hess & Hess, LLC in Lancaster, Pennsylvania for the past 28 years.

Mr. Hiestand has been a director of Donegal Mutual since 1983 and has been a self-employed provider of insurance administrative services for more than the past five years.

Mr. Kraft has been the chief executive officer of Clyde W. Kraft Funeral Home, Columbia, Pennsylvania since 1995. Mr. Kraft served as a director of Central Savings and Loan Association in Columbia, Pennsylvania from 1980 to 1992. After Farmers First Bank acquired Central Savings and Loan Association, Mr. Kraft served as a member of the regional board of Farmers First Bank. Mr. Kraft currently serves on the board of directors of a Lancaster County-based water utility and Conestoga Title Insurance Company. Mr. Kraft is also registered as an insurance agent with the Commonwealth of Pennsylvania. He has been a director of Donegal Mutual since 2003, of Province since 2005 and of DGI since December 2009.

Mr. Nikolaus has been president and chief executive officer of Donegal Mutual since 1981 and a director of Donegal Mutual since 1972. He has been president and chief executive officer of DGI since 1986. Mr. Nikolaus also serves as the chairman and chief executive officer of Province Bank and as chairman or president of each of DGI's insurance subsidiaries. Prior to the formation of Province Bank, Mr. Nikolaus served as a director of several regional banks. Mr. Nikolaus has also served as chairman of the Insurance Federation of Pennsylvania. Mr. Nikolaus has been a partner in the law firm of Nikolaus & Hohenadel since 1972. Mr. Nikolaus also currently serves as an executive officer and director of several Lancaster County-based water utilities.

-4-

Mr. Sherbahn, who was a certified financial planner for many years, owned and operated Sherbahn Associates, Inc., a life insurance and financial planning firm, from 1974 to 2007 and has been a licensed insurance agent since 1956. Mr. Sherbahn has been a director of Donegal Mutual for 43 years.

Donegal Mutual's executive officers are as follows: Donald H. Nikolaus, Cyril J. Greenya, Jeffrey D. Miller, Robert G. Shenk and Daniel J. Wagner. Such persons can be contacted through Donegal Mutual at 1195 River Road, Marietta, Pennsylvania 17547.

Mr. Greenya's biographical data is stated above.

Mr. Miller has been Senior Vice President and Chief Financial Officer of Donegal Mutual and DGI since 2005; he was Vice President and Controller of Donegal Mutual and DGI from 2000 to 2005 and Controller of Donegal Mutual and DGI from 1995 to 2000.

Mr. Nikolaus' biographical data is stated above.

Mr. Shenk has been Senior Vice President, Claims of Donegal Mutual since December 1997, was Vice President, Claims of Donegal Mutual from 1992 until December 1997 and served as Manager, Casualty Claims of Donegal Mutual from 1985 to 1992.

Mr. Wagner has been Senior Vice President and Treasurer of Donegal Mutual and DGI since 2005, was Vice President and Treasurer of Donegal Mutual from 2000 to 2005, was Treasurer of Donegal Mutual and DGI from 1993 to 2000 and served as Controller of Donegal Mutual for five years prior thereto.

All of the executive officers and directors of Donegal Mutual are citizens of the United States of America. None of Donegal Mutual's executive officers or directors has, during the last five years, been convicted in a criminal proceeding with the exception of traffic violations and similar misdemeanors. None of Donegal Mutual's executive officers or directors has, during the last five years, been subject to any judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws as a result of any civil proceeding of a judicial or administrative body of competent jurisdiction.

Item 3. Source and Amount of Funds or Other Consideration.

The source of funds Donegal Mutual used for the purpose of acquiring shares of UNNF National common stock has been Donegal Mutual's cash on hand.

Item 4. Purpose of Transaction.

-5-

Donegal Mutual effected the purchase of the shares of UNNF common stock that it owns in a series of transactions that it completed in 2007. Donegal Mutual purchased the shares of UNNF common stock for investment.

On March 24, 2010, an affiliate of Donegal Mutual delivered a proposal to UNNF that outlined the principal terms on which an affiliate of Donegal Mutual would have an interest in acquiring UNNF. On March 30, 2010, Donegal Mutual's affiliate delivered a proposed draft of an agreement and plan of merger to UNNF. Representatives of Donegal Mutual and DGI are currently engaged in discussions with UNNF relating to the agreement and plan of merger.

Donegal Mutual cannot predict whether it and UNNF will reach any agreement relating to any form of acquisition.

Item 5.  Interest in Securities of the Issuer.

(a) As of the date of this Schedule 13D, Donegal Mutual owned 248,999 shares of common stock of UNNF, or approximately 9.8% of UNNF's outstanding shares of common stock.

(b) As of the date of this Schedule 13D, none of the persons named in Item 2 of this Schedule 13D beneficially owned any shares of UNNF with the exception of Donegal Mutual, Jay H. Lutz, who owns 99 shares, and Donald H. Nikolaus, who owns 486 shares.

(c) To the knowledge of Donegal Mutual, none of the persons named in Item 5(a) of this Schedule 13D have purchased or disposed of any shares of common stock of UNNF during the 60 days preceding the date of this Schedule 13D.

Item 6.  Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.

None.

Item 7.  Material To Be Filed As Exhibits.

None.

-6-

SIGNATURE

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this Statement is true, complete and correct.

DONEGAL MUTUAL INSURANCE
COMPANY

By: /s/ Jeffrey D. Miller
 Jeffrey D. Miller, Senior Vice President and
 Chief Financial Officer

Dated: April 5, 2010

-7-

# DONEGAL
# GROUP

## There When It Matters Most.

2015 ANNUAL REPORT

# DONEGAL GROUP

Donegal Group Inc. is an insurance holding company that offers property and casualty insurance through its wholly owned insurance subsidiaries. Our insurance subsidiaries and Donegal Mutual Insurance Company have interrelated operations and conduct business together as the Donegal Insurance Group.

The Donegal Insurance Group, which is rated A (Excellent) by A.M. Best Company, offers full lines of personal and commercial insurance products through a network of independent insurance agencies in 21 states.

As an effective acquirer of small to medium-sized "main street" property and casualty insurers, we have grown profitably over the last three decades.

We employ a multi-faceted strategy that includes prudent organic and acquisition growth, conservative underwriting, pricing discipline, state-of-the-art technological capabilities, efficient operations and conservative investing. Our strategy is designed to allow us to achieve our longstanding goal to outperform the property and casualty insurance industry in terms of service, profitability and book value growth. Achieving that goal provides value to the policyholders of our insurance subsidiaries and to our stockholders.

There When It Matters Most.

# FINANCIAL HIGHLIGHTS

| YEAR ENDED DECEMBER 31, | 2 0 1 5 | 2 0 1 4 | 2 0 1 3 | 2 0 1 2 | 2 0 1 1 |
|---|---|---|---|---|---|
| **INCOME STATEMENT DATA** | | | | | |
| Premiums earned | $ 605,640,728 | $ 556,497,535 | $ 515,291,944 | $ 475,002,222 | $ 431,470,184 |
| Investment income, net | 20,949,698 | 18,344,382 | 18,795,239 | 20,168,919 | 20,858,179 |
| Realized investment gains | 1,934,424 | 3,134,081 | 2,423,442 | 6,859,439 | 12,281,267 |
| Total revenues | 636,387,263 | 586,547,742 | 547,110,065 | 514,982,585 | 475,017,619 |
| Income (loss) before income taxes (benefit) | 27,592,268 | 16,282,817 | 32,710,265 | 27,858,260 | (6,739,313) |
| Income taxes (benefit) | 6,602,235 | 1,743,799 | 6,388,273 | 4,765,640 | (7,192,266) |
| Net income | 20,990,033 | 14,539,018 | 26,321,992 | 23,092,620 | 452,953 |
| Basic earnings per share - Class A | 0.78 | 0.56 | 1.04 | 0.92 | 0.02 |
| Diluted earnings per share - Class A | 0.77 | 0.55 | 1.02 | 0.91 | 0.02 |
| Cash dividends per share - Class A | 0.54 | 0.53 | 0.51 | 0.49 | 0.48 |
| Basic earnings per share - Class B | 0.69 | 0.49 | 0.94 | 0.83 | 0.01 |
| Diluted earnings per share - Class B | 0.69 | 0.49 | 0.94 | 0.83 | 0.01 |
| Cash dividends per share - Class B | 0.47 | 0.46 | 0.46 | 0.44 | 0.43 |
| **BALANCE SHEET DATA AT YEAR END** | | | | | |
| Total investments | $ 900,822,274 | $ 832,941,077 | $ 791,808,307 | $ 806,429,032 | $ 785,308,991 |
| Total assets | 1,537,834,415 | 1,458,654,644 | 1,385,410,502 | 1,336,889,187 | 1,290,793,478 |
| Debt obligations | 86,000,000 | 58,500,000 | 63,000,000 | 72,465,000 | 74,965,000 |
| Stockholders' equity | 408,388,568 | 416,134,643 | 396,877,111 | 400,034,094 | 383,451,592 |
| Book value per share | 15.66 | 15.40 | 15.02 | 15.63 | 15.01 |



**TOTAL REVENUES**
[ in millions ]



**NET INCOME**
[ in millions ]



**STOCKHOLDERS' EQUITY**
[ in millions ]

# TO OUR
# STOCKHOLDERS

Donegal Group achieved strong performance across nearly all lines of business in 2015.

The favorable results reinforce our commitment to our regional business approach and conservative underwriting philosophy, while also confirming that we are making meaningful progress toward our long-term objective of outperforming the property and casualty insurance industry in terms of service, profitability and book value growth.

There When it Matters Most.



# Our insurance subsidiaries offer a steadfast commitment to our independent insurance agents and policyholders to be there when it matters most.

We continued to expand our marketing presence in the regional insurance markets we currently serve. Our total net premiums earned increased by 8.8 percent, once again representing a combination of solid organic growth and the ongoing benefits of the premium rate increases we have implemented in the past several years. The higher premiums drove the 8.5 percent growth in our total revenues for 2015 to $636.4 million, compared to $586.5 million for 2014.

Our 2015 net income was $21.0 million, or 77 cents per share of our Class A common stock on a diluted basis, compared to $14.5 million, or 55 cents per share of our Class A common stock on a diluted basis, for 2014. Our statutory combined ratio for 2015 was 97.4 percent, which represented significant improvement from our 2014 statutory combined ratio of 100.5 percent. We attribute our higher level of underwriting profitability in 2015 to lower-than-average weather-related losses and excellent results in our commercial lines segment.

Our insurance subsidiaries offer a steadfast commitment to our independent insurance agents and policyholders to be there when it matters most. We believe that commitment was integral to our continued expansion in 2015, with organic growth across all regions representing the majority of the 8.6 percent increase in our net premiums written for 2015. Throughout 2015, growth in our net premiums written also reflected an additional $19.6 million of net writings from our Michigan

Insurance Company ("MICO") subsidiary. We completed the incremental acquisition strategy we planned when we acquired MICO in December 2010 by terminating MICO's external quota-share reinsurance agreement effective January 1, 2015. Our 2015 consolidated results benefited from MICO retaining a larger portion of its underwriting results, which were more profitable than the underwriting results MICO experienced in the preceding four years. MICO's increased profitability resulted from more favorable weather conditions and a lower incidence of larger casualty losses compared to prior years, as well as expense savings MICO has achieved as a result of its integration into the operations of the Donegal Insurance Group.

We appreciate the ongoing support of all our agents, from some who have recently begun to represent the Donegal Insurance Group to their customers to the many agents who have represented our family of companies for decades. Our commitment to the independent agency distribution system means that our success is dependent on the relationships we build and maintain with each of our agents. We demonstrate our value to our agents by providing them with quality insurance products, responsive service and state-of-the-art technology tools that make it easy for our agents and policyholders to do business with us.

# We execute our business plan with the objective of continued profitable growth in our regional insurance markets in 2016.

We best fulfill our commitment to be there when it matters most by providing responsive claims service to our policyholders. We strive to manage claims efficiently, and routinely receive excellent satisfaction ratings in response to post-claim surveys that we send to our policyholders to monitor the quality of our claims service. We continue to strive to enhance further that efficiency and service quality by our expanding use of automation tools, working with selected vendors to provide value-added services to claimants, providing additional resources and training for our claims personnel and implementing claim cost containment programs.

During 2015, Donegal Mutual began implementing a new policy billing system and a new personal lines rating system, both of which will replace legacy mainframe-based systems and provide an enhanced level of service to our agents and policyholders.

Our book value rose to $15.66 per share of our common stock at December 31, 2015, compared to $15.40 at December 31, 2014. That growth primarily reflected our net income during 2015, partially offset by a decrease in the market value of our available-for-sale fixed-maturity investment portfolio that resulted from increases in market interest rates during the year.

We appreciate the confidence in our business strategy that you have demonstrated by investing in Donegal Group. We execute our business plan with the objective of continued profitable growth in our regional insurance markets in 2016. As we annually strive for prudent growth and increased underwriting profitability, we believe our efforts will result in long-term value for our stockholders.

**Donald H. Nikolaus**
CHAIRMAN OF THE BOARD
OF DIRECTORS

**Kevin G. Burke**
PRESIDENT AND CHIEF
EXECUTIVE OFFICER

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2015**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 0-15341

# DONEGAL GROUP INC.

(Exact name of registrant as specified in its charter)

| Delaware | 23-2424711 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1195 River Road, Marietta, Pennsylvania | 17547 |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: **(888) 877-0600**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Class A Common Stock, $.01 par value** | **The NASDAQ Global Select Market** |
| **Class B Common Stock, $.01 par value** | **The NASDAQ Global Select Market** |

Securities registered pursuant to Section 12(g) of the Act: None.

Indicate by check mark whether the registrant is a well-known seasoned issuer as defined in Rule 405 of the Securities Act: Yes ☐. No ☑.

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act. Yes ☐. No ☑.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☑. No ☐.

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑. No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements we incorporate by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" or "smaller reporting company" in Rule 12b-2 of the Exchange Act (check one):

Non-accelerated filer ☐

Large accelerated filer ☐    Accelerated filer ☑    (Do not check if a smaller reporting company)    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company. Yes ☐. No ☑.

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter. $229,069,047.

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date: 20,570,874 shares of Class A common stock and 5,576,775 shares of Class B common stock outstanding on March 16, 2016.

**Documents Incorporated by Reference**

The registrant incorporates by reference portions of the registrant's definitive proxy statement relating to registrant's annual meeting of stockholders to be held April 21, 2016 into Part III of this report.

DONEGAL GROUP INC.
INDEX TO FORM 10-K REPORT

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 23 |
| Item 1B. | Unresolved Staff Comments | 34 |
| Item 2. | Properties | 34 |
| Item 3. | Legal Proceedings | 34 |
| Item 4. | Mine Safety Disclosures | 34 |
|  | Executive Officers of the Registrant | 35 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 36 |
| Item 6. | Selected Financial Data | 39 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 40 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 54 |
| Item 8. | Financial Statements and Supplementary Data | 57 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 93 |
| Item 9A. | Controls and Procedures | 93 |
| Item 9B. | Other Information | 94 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 96 |
| Item 11. | Executive Compensation | 96 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 96 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 96 |
| Item 14. | Principal Accounting Fees and Services | 96 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 97 |

(i)

PART I

## Item 1.    Business.

### Introduction

Donegal Group Inc., or DGI, is an insurance holding company whose insurance subsidiaries offer personal and commercial lines of property and casualty insurance to businesses and individuals in 21 Mid-Atlantic, Midwestern, New England and Southern states. As used in this Form 10-K Report, the terms "we," "us" and "our" refer to Donegal Group Inc. and its subsidiaries.

Donegal Mutual Insurance Company, or Donegal Mutual, organized us as an insurance holding company on August 26, 1986. At December 31, 2015, Donegal Mutual held approximately 48% of our outstanding Class A common stock and approximately 83% of our outstanding Class B common stock. Donegal Mutual's ownership provides Donegal Mutual with approximately 74% of the aggregate voting power of our outstanding shares of Class A common stock and our outstanding shares of Class B common stock. Our insurance subsidiaries and Donegal Mutual have interrelated operations due to an intercompany pooling agreement and other intercompany agreements and transactions we describe in Note 3 of the Notes to Consolidated Financial Statements. While maintaining the separate corporate existence of each company, our insurance subsidiaries and Donegal Mutual conduct business together as the Donegal Insurance Group. As such, Donegal Mutual and our insurance subsidiaries share the same business philosophy, the same management, the same employees and the same facilities and offer the same types of insurance products.

We have been an effective consolidator of smaller "main street" property and casualty insurance companies, and we expect to pursue opportunities to acquire other insurance companies to expand our business in a given region or to commence operations in a new region. Since 1995, we have completed six acquisitions of property and casualty insurance companies or began to participate in their business through Donegal Mutual's entry into quota-share reinsurance agreements with them.

Our insurance subsidiaries and Donegal Mutual provide their policyholders with a selection of insurance products at competitive rates, while pursuing profitability by adhering to a strict underwriting discipline. Our insurance subsidiaries derive a substantial portion of their insurance business from smaller to mid-sized regional communities. We believe this focus provides our insurance subsidiaries with competitive advantages in terms of local market knowledge, marketing, underwriting, claims servicing and policyholder service. At the same time, we believe our insurance subsidiaries have cost advantages over many smaller regional insurers that result from economies of scale our insurance subsidiaries realize through centralized accounting, administrative, data processing, investment and other services.

We believe we have a substantial opportunity, as a well-capitalized regional insurance holding company with a solid business strategy, to grow profitably and compete effectively with national property and casualty insurers. Our downstream holding company structure, with Donegal Mutual holding approximately 74% of the aggregate voting power of our common stock, has proven its effectiveness and success over the 29 years of our existence. Over that time period, we have grown significantly in terms of revenue and financial strength, and the Donegal Insurance Group has developed an excellent reputation as a regional group of property and casualty insurers.

We own 48.2% of Donegal Financial Services Corporation, or DFSC. DFSC is a grandfathered unitary savings and loan holding company that owns all of the outstanding capital stock of Union Community Bank, a state savings bank, or UCB. UCB has 15 banking offices, substantially all of which are located in Lancaster County, Pennsylvania. Donegal Mutual owns the remaining 51.8% of DFSC. For further information regarding DFSC, we refer to "Business - Donegal Financial Services Corporation" in this Form 10-K Report.

We have four segments: our investment function, our personal lines of insurance, our commercial lines of insurance and our investment in DFSC. We set forth financial information about these segments in Note 19 of the Notes to Consolidated Financial Statements. The personal lines products of our insurance subsidiaries consist primarily of homeowners and private passenger automobile policies. The commercial lines products of our insurance subsidiaries consist primarily of commercial automobile, commercial multi-peril and workers' compensation policies.

**Available Information**

You may obtain our Annual Reports on Form 10-K, including this Form 10-K Report, our quarterly reports on Form 10-Q, our current reports on Form 8-K, our proxy statement and our other filings pursuant to the Securities Exchange Act of 1934, or the Exchange Act, without charge by viewing our website at www.donegalgroup.com. You may also view on our website our Code of Business Conduct and Ethics and the charters of the executive committee, the audit committee, the compensation committee and the nominating committee of our board of directors. Upon request to our corporate secretary, we will also provide printed copies of any of these documents to you without charge. We have provided the address of our website solely for the information of investors. We do not intend the reference to our website address to be an active link or to otherwise incorporate the contents of our website into this Form 10-K Report.

**History and Organizational Structure**

In the mid-1980's, Donegal Mutual, as a mutual insurance company, recognized the desirability of developing additional sources of capital and surplus so it could remain competitive and have the surplus to expand its business and ensure its long-term viability. Accordingly, Donegal Mutual determined to implement a downstream holding company structure as one of its business strategies. Thus, in 1986, Donegal Mutual formed us as a downstream holding company. Initially, Donegal Mutual owned all of our outstanding common stock. After Donegal Mutual formed us, we in turn formed Atlantic States as our wholly owned property and casualty insurance company subsidiary.

In connection with the formation of Atlantic States and the establishment of our downstream insurance holding company system, Donegal Mutual and DGI entered into a proportional reinsurance agreement, or pooling agreement, that became effective October 1, 1986. Under the pooling agreement, Donegal Mutual and Atlantic States pool substantially all of their respective premiums, losses and loss expenses to the reinsurance pool, and the reinsurance pool, acting through Donegal Mutual, then cedes a portion of the pooled business, currently 80%, to Atlantic States. Donegal Mutual and Atlantic States share the underwriting results in proportion to their respective participation in the underwriting pool.

Since we established Atlantic States in 1986, Donegal Mutual and our insurance subsidiaries have conducted business together as the Donegal Insurance Group. As the Donegal Insurance Group, Donegal Mutual and our insurance subsidiaries share a combined business plan to enhance market penetration and underwriting profitability objectives. We believe Donegal Mutual's majority interest in the combined voting power of our Class A common stock and of our Class B common stock fosters our ability to implement our business philosophies, enjoy management continuity, maintain superior employee relations and provide a stable environment within which we can grow our businesses.

The products Donegal Mutual and our insurance subsidiaries offer are generally complementary, which permits the Donegal Insurance Group to offer a broad range of products in a given market and to expand the Donegal Insurance Group's ability to service an entire personal lines or commercial lines account. Distinctions within the products Donegal Mutual and our insurance subsidiaries offer generally relate to specific risk profiles within similar classes of business, such as preferred tier products versus standard tier products. Donegal Mutual and we do not allocate all of the standard risk gradients to one company. As a result, the underwriting profitability of the business the individual companies write directly will vary. However, the underwriting pool homogenizes the risk characteristics of all business Donegal Mutual and Atlantic States write directly. We receive 80% of the results of the underwriting pool because Atlantic States has an 80% participation in the pool. The business Atlantic States derives from the underwriting pool represents a significant percentage of our total consolidated revenues. However, that percentage has gradually decreased over the past few years as we have acquired a number of other property and casualty insurance companies that do not participate in the underwriting pool.

As the capital of Atlantic States and our other insurance subsidiaries has increased, the underwriting capacity of our insurance subsidiaries has increased proportionately. The size of the underwriting pool has also increased substantially. Therefore, as we originally planned in the mid-1980s, Atlantic States has successfully raised the capital necessary to support the growth of its direct business as well as to accept increases in its allocation of business from the underwriting pool. The portion of the underwriting pool allocated to Atlantic States has increased from an initial allocation of 35% in 1986 to an 80% allocation since March 1, 2008. We do not anticipate any further change in the pooling agreement between Atlantic States and Donegal Mutual, including any change in the percentage participation of Atlantic States in the underwriting pool.

In addition to Atlantic States, our insurance subsidiaries are Southern Insurance Company of Virginia, or Southern, Le Mars Insurance Company, or Le Mars, The Peninsula Insurance Company and its wholly owned subsidiary, Peninsula Indemnity Company, or collectively, Peninsula, Sheboygan Falls Insurance Company, or Sheboygan, and Michigan Insurance Company, or MICO. We also benefit from Donegal Mutual's 100% quota-share reinsurance agreement with Southern Mutual

Insurance Company, or Southern Mutual, and Donegal Mutual's placement of its assumed business from Southern Mutual into the underwriting pool.

The following chart depicts our organizational structure, including all of our property and casualty insurance subsidiaries, Southern Mutual and our interest in DFSC:



(1)    Because of the different relative voting power of our Class A common stock and our Class B common stock, our public stockholders hold approximately 26% of the aggregate voting power of our Class A common stock and our Class B common stock and Donegal Mutual holds approximately 74% of the aggregate voting power of our Class A common stock and our Class B common stock.

### Relationship with Donegal Mutual

Donegal Mutual provides facilities, personnel and other services to us and our insurance subsidiaries. Donegal Mutual allocates certain related expenses to Atlantic States in relation to the relative participation of Donegal Mutual and Atlantic States in the underwriting pool they maintain. Our insurance subsidiaries other than Atlantic States reimburse Donegal Mutual for their respective personnel costs and bear their proportionate share of information services costs based on each subsidiaries' respective percentage of the total net written premiums of the Donegal Insurance Group. Charges for these services to Atlantic States and our other insurance subsidiaries totaled $108.5 million, $98.6 million and $94.0 million for 2015, 2014 and 2013, respectively.

Our insurance subsidiaries have various reinsurance arrangements with Donegal Mutual. These agreements include:

- excess of loss reinsurance agreements with Le Mars, MICO, Peninsula, Sheboygan and Southern;

- catastrophe reinsurance agreements with Atlantic States, Le Mars and Southern; and

- quota-share reinsurance agreements with Le Mars, MICO and Peninsula.

The purpose of the excess of loss and catastrophe reinsurance agreements is to lessen the effects of a single large loss, or an accumulation of smaller losses arising from one event, to levels that are appropriate given each subsidiary's size, underwriting profile and amount of surplus.

The purpose of the quota-share reinsurance agreement with Le Mars is to transfer to Le Mars 100% of the premiums and losses related to certain products Donegal Mutual offers in certain Midwest states, which provide the availability of complementary products to Le Mars' commercial accounts.

The purpose of the quota-share reinsurance agreement with Peninsula is to transfer to Donegal Mutual 100% of the premiums and losses related to the workers' compensation product line of Peninsula in certain states, which provides the availability of an additional workers' compensation tier for Donegal Mutual's commercial accounts. Donegal Mutual places its assumed business from Peninsula into the underwriting pool.

The purpose of the quota-share reinsurance agreement with MICO is to transfer to Donegal Mutual 25% of the premiums and losses related to MICO's business. Donegal Mutual places its assumed business from MICO into the underwriting pool.

We and Donegal Mutual have maintained a coordinating committee since our formation in 1986. The coordinating committee consists of two members of our board of directors, neither of whom is a member of Donegal Mutual's board of directors, and two members of Donegal Mutual's board of directors, neither of whom is a member of our board of directors. The purpose of the coordinating committee is to establish and maintain a process for an annual evaluation of the transactions between Donegal Mutual, our insurance subsidiaries and us. The coordinating committee considers the fairness of each intercompany transaction to Donegal Mutual and its policyholders and to us and our stockholders.

A new agreement or any change to a previously approved agreement must receive coordinating committee approval. The approval process for a new agreement between Donegal Mutual and us or one of our insurance subsidiaries or a change in such an agreement is as follows:

- both of our members on the coordinating committee must determine that the new agreement or the change in an existing agreement is fair and equitable to us and in the best interests of our stockholders;

- both of Donegal Mutual's members on the coordinating committee must determine that the new agreement or the change in an existing agreement is fair and equitable to Donegal Mutual and in the best interests of its policyholders;

- our board of directors must approve the new agreement or the change in an existing agreement; and

- Donegal Mutual's board of directors must approve the new agreement or the change in an existing agreement.

The coordinating committee also meets annually to review each existing agreement between Donegal Mutual and us or our insurance subsidiaries, including all reinsurance agreements between Donegal Mutual and our insurance subsidiaries. The purpose of this annual review is to examine the results of the agreements over the past year and, in the case of reinsurance agreements, over several years and to determine if the results of the existing agreements remain fair and equitable to us and our stockholders and fair and equitable to Donegal Mutual and its policyholders or if Donegal Mutual and we should mutually agree to certain adjustments to the terms of the agreements. In the case of these reinsurance agreements, the annual adjustments typically relate to the reinsurance premiums, losses and reinstatement premiums. These agreements are ongoing in nature and will continue in effect throughout 2016 in the ordinary course of our business.

Our members on the coordinating committee, as of the date of this Form 10-K Report, are Robert S. Bolinger and Richard D. Wampler, II. Donegal Mutual's members on the coordinating committee as of such date are Dennis J. Bixenman and John E. Hiestand. We refer to our proxy statement for our annual meeting of stockholders on April 21, 2016 for further information about the members of the coordinating committee.

We believe our relationships with Donegal Mutual offer us and our insurance subsidiaries a number of competitive advantages, including the following:

- enabling our stable management, the consistent underwriting discipline of our insurance subsidiaries, external growth, long-term profitability and financial strength;

- creating operational and expense synergies from the combination of resources and integrated operations of Donegal Mutual and our insurance subsidiaries;

- enhancing our opportunities to expand by acquisition because of the ability of Donegal Mutual to affiliate with and acquire control of other mutual insurance companies and, thereafter, demutualize them and allow us to acquire all of their outstanding stock;

- producing more stable and uniform underwriting results for our insurance subsidiaries over extended periods of time than we could achieve without our relationship with Donegal Mutual;

-4-

- providing opportunities for growth because of the ability of Donegal Mutual to enter into reinsurance agreements with other mutual insurance companies and place the business it assumes into the pooling agreement; and

- providing Atlantic States with a significantly larger underwriting capacity because of the underwriting pool Donegal Mutual and Atlantic States have maintained since 1986.

In the first quarter of 2016, our board of directors and the board of directors of Donegal Mutual each undertook a review of the relationships between Donegal Mutual and DGI and determined that continuing the current relationships and the current corporate structure of Donegal Mutual and DGI is in the best interests of DGI and its various constituencies.

## Business Strategy

Our strategy is designed to allow our insurance subsidiaries to achieve their longstanding goal of outperforming the United States property and casualty insurance industry in terms of profitability and service, thereby providing value to the policyholders of our insurance subsidiaries and, ultimately, providing value to our stockholders. The annual net premiums earned of our insurance subsidiaries have increased from $265.8 million in 2004 to $605.6 million in 2015, a compound annual growth rate of 7.8%.

The combined ratio of our insurance subsidiaries and that of the United States property and casualty insurance industry as computed using United States generally accepted accounting principles, or GAAP, and statutory accounting principles, or SAP, for the years 2011 through 2015 are shown in the following table:

|  | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| Our GAAP combined ratio [1] | 99.0% | 101.7% | 98.8% | 101.6% | 110.6% |
| Our SAP combined ratio | 97.4 | 100.5 | 97.4 | 99.8 | 107.9 |
| Industry SAP combined ratio [2] | 98.0 | 97.4 | 96.4 | 102.5 | 106.5 |

(1) Our GAAP combined ratio for 2011 was adversely affected by accounting adjustments related to the acquisition of MICO.

(2) As reported (projected for 2015) by A.M. Best Company.

We and Donegal Mutual believe we can continue to expand our insurance operations over time through organic growth and acquisitions of, or affiliations with, other insurance companies. We and Donegal Mutual have enhanced the performance of companies we have acquired, while leveraging the acquired companies' core strengths and local market knowledge to expand their operations. Our insurance subsidiaries and Donegal Mutual also seek to increase their premium base by making quality independent agency appointments, enhancing their competitive position within each agency, introducing new and enhanced insurance products and developing and maintaining automated systems to improve service, communications and efficiency.

We translate these initiatives into our book value growth in a number of ways, including the following:

- maintaining a conservative underwriting culture and pricing discipline to sustain our record of underwriting profitability;

- continuing our investment in technology to achieve operating efficiencies that lower expenses, enhance the service we provide to agencies and policyholders and increase the speed of our communications with agencies and policyholders; and

- maintaining a conservative investment approach.

A detailed review of our business strategies follows:

- *Achieving underwriting profitability.*

Our insurance subsidiaries focus on achieving a combined ratio of less than 100%. We remain committed to achieving consistent underwriting profitability. We believe that underwriting profitability is a fundamental component of our long-term financial strength because it allows our insurance subsidiaries to generate profits without relying exclusively on their investment income. Our insurance subsidiaries seek to enhance their underwriting results by:

- carefully selecting the product lines they underwrite;

-5-

- carefully selecting the individual risks they underwrite;

- minimizing their individual exposure to catastrophe-prone areas; and

- evaluating their claims history on a regular basis to ensure the adequacy of their underwriting guidelines and product pricing.

Our insurance subsidiaries have no material exposures to asbestos and environmental liabilities. Our insurance subsidiaries seek to provide more than one policy to a given personal lines or commercial lines customer because this "account selling" strategy diversifies their risk and has historically improved their underwriting results. Our insurance subsidiaries also use reinsurance to manage their exposure and limit their maximum net loss from large single risks or risks in concentrated areas.

- ***Pursuing profitable growth by organic expansion within the traditional operating territories of our insurance subsidiaries through developing and maintaining quality agency representation.***

We believe that continued expansion of our insurance subsidiaries within their existing markets will be a key source of their continued premium growth and that maintaining an effective and growing network of independent agencies is integral to their expansion. Our insurance subsidiaries seek to be among the top three insurers within each of the independent agencies for the lines of business our insurance subsidiaries write by providing a consistent, competitive and stable market for their products. We believe that the consistency of the product offerings of our insurance subsidiaries enables our insurance subsidiaries to compete effectively for independent agents with other insurers whose product offerings may fluctuate based on industry conditions. Our insurance subsidiaries offer a competitive compensation program to their independent agents that rewards them for producing profitable growth for our insurance subsidiaries. Our insurance subsidiaries provide their independent agents with ongoing support to enable them to better attract and service customers, including:

- fully automated underwriting and policy issuance systems for both personal, commercial and farm lines of insurance;

- training programs;

- marketing support;

- availability of a service center that provides comprehensive service for our personal lines policyholders; and

- field visitations by marketing and underwriting personnel and senior management of our insurance subsidiaries.

Our insurance subsidiaries appoint independent agencies with a strong underwriting and growth track record. We believe that our insurance subsidiaries, by carefully selecting, motivating and supporting their independent agencies, will drive continued long-term growth.

- ***Acquiring property and casualty insurance companies to augment the organic growth of our insurance subsidiaries in existing markets and to expand into new geographic regions.***

We have been an effective consolidator of smaller "main street" property and casualty insurance companies, and we expect to continue to acquire other insurance companies to expand our business in a given region or to commence operations in a new region.

Since 1995, we have completed six acquisitions of property and casualty insurance companies or participated in their business through Donegal Mutual's entry into quota-share reinsurance agreements with them. We intend to continue our growth by pursuing affiliations and acquisitions that meet our criteria. Our primary criteria are:

- location in regions where our insurance subsidiaries are currently conducting business or that offer an attractive opportunity to conduct profitable business;

- a mix of business similar to the mix of business of our insurance subsidiaries;

- annual premium volume up to $100.0 million; and

- fair and reasonable transaction terms.

We believe that our relationship with Donegal Mutual assists us in pursuing affiliations with, and subsequent acquisitions of, mutual insurance companies because, through Donegal Mutual, we understand the concerns and issues that mutual insurance companies face. In particular, Donegal Mutual has had success affiliating with underperforming mutual insurance companies, and we have either acquired them following their conversion to a stock company or benefited from their underwriting results as a result of Donegal Mutual's entry into a 100% quota-share reinsurance agreement with them and placement of its assumed business into the pooling agreement. We have utilized our strengths and financial position to improve the operations of those underperforming insurance companies. We evaluate a number of areas for operational synergies when considering acquisitions, including product underwriting, expenses, the cost of reinsurance and technology.

We and Donegal Mutual have the ability to employ a number of acquisition and affiliation methods. Our prior acquisitions and affiliations have taken one of the following forms:

- purchase of all of the outstanding stock of a stock insurance company;

- purchase of a book of business;

- quota-share reinsurance transaction; or

- two-step acquisition of a mutual insurance company in which:

    - as the first step, Donegal Mutual purchases a surplus note from the mutual insurance company, Donegal Mutual enters into a services agreement with the mutual insurance company and Donegal Mutual's designees become a majority of the members of the board of directors of the mutual insurance company; and

    - as the second step, the mutual insurance company enters into a quota-share reinsurance agreement with Donegal Mutual or demutualizes, or converts, into a stock insurance company. Upon the demutualization or conversion, we purchase the surplus note from Donegal Mutual and exchange it for all of the stock of the stock insurance company resulting from the demutualization or conversion.

We believe that our ability to make direct acquisitions of stock insurance companies and to make indirect acquisitions of mutual insurance companies through a sponsored conversion or a quota-share reinsurance agreement provides us with flexibility that is a competitive advantage in making acquisitions. We also believe our historic record clearly demonstrates our ability to acquire control of an underperforming insurance company, re-underwrite its book of business, reduce its cost structure and return it to sustained profitability.

While Donegal Mutual and we generally engage in preliminary discussions with potential direct or indirect acquisition candidates on an almost continuous basis and are so engaged at the date of this Form 10-K Report, neither Donegal Mutual nor we make any public disclosure regarding a proposed acquisition until Donegal Mutual or we have entered into a definitive acquisition agreement.

The following table highlights our history of insurance company acquisitions and affiliations since 1988:

| Company Name | State of Domicile | Year Control Acquired | Method of Acquisition/Affiliation |
|---|---|---|---|
| Southern Mutual Insurance Company and now Southern Insurance Company of Virginia | Virginia | 1984 | Surplus note investment by Donegal Mutual in 1984; demutualization in 1988; acquisition of stock by us in 1988. |
| Pioneer Mutual Insurance Company and then Pioneer Insurance Company [1][2] | Ohio | 1992 | Surplus note investment by Donegal Mutual in 1992; demutualization in 1993; acquisition of stock by us in 1997. |
| Delaware Mutual Insurance Company and then Delaware Atlantic Insurance Company [1][2] | Delaware | 1993 | Surplus note investment by Donegal Mutual in 1993; demutualization in 1994; acquisition of stock by us in 1995. |
| Pioneer Mutual Insurance Company and then Pioneer Insurance Company [1][2] | New York | 1995 | Surplus note investment by Donegal Mutual in 1995; demutualization in 1998; acquisition of stock by us in 2001. |
| Southern Heritage Insurance Company [2] | Georgia | 1998 | Purchase of stock by us in 1998. |
| Le Mars Mutual Insurance Company of Iowa and now Le Mars Insurance Company [1] | Iowa | 2002 | Surplus note investment by Donegal Mutual in 2002; demutualization in 2004; acquisition of stock by us in 2004. |
| Peninsula Insurance Group | Maryland | 2004 | Purchase of stock by us in 2004. |
| Sheboygan Falls Mutual Insurance Company and now Sheboygan Falls Insurance Company [1] | Wisconsin | 2007 | Contribution note investment by Donegal Mutual in 2007; demutualization in 2008; acquisition of stock by us in 2008. |
| Southern Mutual Insurance Company [3] | Georgia | 2009 | Surplus note investment by Donegal Mutual and quota-share reinsurance in 2009. |
| Michigan Insurance Company | Michigan | 2010 | Purchase of stock by us and surplus note investment by Donegal Mutual in 2010. |

(1) Each of these acquisitions initially took the form of an affiliation with Donegal Mutual. Donegal Mutual provided surplus note financing to the insurance company, and, in connection with that financing, sufficient designees of Donegal Mutual were appointed so as to constitute a majority of the members of the board of directors of the insurance company. Donegal Mutual and the insurance company simultaneously entered into a services agreement whereby Donegal Mutual provided services to improve the operations of the insurance company. Once the insurance company's results of operations improved to the satisfaction of Donegal Mutual, Donegal Mutual sponsored the demutualization of the insurance company. Upon the consummation of the demutualization, Donegal Mutual converted the surplus note to capital stock of the newly demutualized insurance company. We then purchased all of the capital stock of the insurance company from Donegal Mutual and made an additional capital contribution in cash to provide adequate surplus to support the insurance company's planned premium growth.

(2) To reduce administrative and compliance costs and expenses, these subsidiaries subsequently merged into one of our existing insurance subsidiaries.

(3) Control acquired by Donegal Mutual.

- ***Providing responsive and friendly customer and agent service to enable our insurance subsidiaries to attract new policyholders and retain existing policyholders.***

We believe that excellent policyholder service is important in attracting new policyholders and retaining existing policyholders. Our insurance subsidiaries work closely with their independent agents to provide a consistently responsive level of claims service, underwriting and customer support. Our insurance subsidiaries seek to respond expeditiously and effectively to address customer and independent agent inquiries in a number of ways, including:

- availability of a customer call center for claims reporting;

-8-

- availability of a secure website for access to policy information and documents, payment processing and other features;

- timely replies to information requests and policy submissions; and

- prompt responses to, and processing of, claims.

Our insurance subsidiaries periodically conduct policyholder surveys to evaluate the effectiveness of their service to policyholders. The management of our insurance subsidiaries meets on a regular basis with the personnel of the independent insurance agents our insurance subsidiaries appoint to seek service improvement recommendations, react to service issues and better understand local market conditions.

- *Maintaining premium rate adequacy to enhance the underwriting results of our insurance subsidiaries, while maintaining their existing book of business and preserving their ability to write new business.*

Our insurance subsidiaries maintain discipline in their pricing by effecting rate increases to sustain or improve their underwriting profitability without unduly affecting their customer retention. In addition to appropriate pricing, our insurance subsidiaries seek to ensure that their premium rates are adequate relative to the amount of risk they insure. Our insurance subsidiaries review loss trends on a periodic basis to identify changes in the frequency and severity of their claims and to assess the adequacy of their rates and underwriting standards. Our insurance subsidiaries also carefully monitor and audit the information they use to price their policies for the purpose of enabling them to receive an adequate level of premiums for the risk they assume. For example, our insurance subsidiaries inspect substantially all commercial lines risks and a substantial number of personal lines property risks before they commit to insure them to determine the adequacy of the insured amount to the value of the insured property, assess property conditions and identify any liability exposures. Our insurance subsidiaries audit the payroll data of their workers' compensation customers to verify that the assumptions used to price a particular policy were accurate. By implementing appropriate rate increases and understanding the risks our insurance subsidiaries agree to insure, our insurance subsidiaries are generally able to achieve consistent underwriting profitability.

- *Focusing on expense controls and utilization of technology to increase the operating efficiency of our insurance subsidiaries.*

Our insurance subsidiaries maintain stringent expense controls under direct supervision of their senior management. We centralize many processing and administrative activities of our insurance subsidiaries to realize operating synergies and better expense control. Our insurance subsidiaries utilize technology to automate much of their underwriting and to facilitate agency and policyholder communications on an efficient, timely and cost-effective basis. We operate on a paperless basis. As a result of our focus on expense control, our insurance subsidiaries have reduced their expense ratio from 36.6% in 1999 to 32.6% in 2015. Our insurance subsidiaries have also increased their annual premium per employee, a measure of efficiency that our insurance subsidiaries use to evaluate their operations, from approximately $470,000 in 1999 to approximately $956,000 in 2015.

Our insurance subsidiaries maintain technology comparable to that of the largest of their competitors. "Ease of doing business" is an increasingly important component of an insurer's value to an independent agency. Our insurance subsidiaries provide a fully automated personal lines underwriting and policy issuance system called "WritePro®." WritePro® is a web-based user interface that substantially eases data entry and facilitates the quoting and issuance of policies for the independent agents of our insurance subsidiaries. Our insurance subsidiaries also provide a similar commercial business system called "WriteBiz®." WriteBiz® is a web-based user interface that provides the independent agents of our insurance subsidiaries with an online ability to quote and issue commercial automobile, workers' compensation, business owners and tradesman policies automatically. WriteFarm® is a web-based user interface that provides the independent agents of our insurance subsidiaries with an online ability to quote and issue farm policies. As a result, applications of the independent agents for our insurance subsidiaries can result in policy issuance without further re-entry of information. These systems also interface with the policy management systems of the independent agents of our insurance subsidiaries.

- *Maintaining a conservative investment approach.*

Return on invested assets is an important element of the financial results of our insurance subsidiaries. The investment strategy of our insurance subsidiaries is to generate an appropriate amount of after-tax income on invested assets while minimizing credit risk through investments in high-quality securities. As a result, our insurance subsidiaries seek to invest a high percentage of their assets in diversified, highly rated and marketable fixed-maturity instruments. The fixed-maturity portfolios of our insurance subsidiaries consist of both taxable and tax-exempt securities. Our insurance subsidiaries maintain a

-9-

portion of their portfolios in short-term securities to provide liquidity for the payment of claims and operation of their respective businesses. Our insurance subsidiaries maintain a small percentage (4.1% at December 31, 2015) of their portfolios in equity securities.

## Competition

The property and casualty insurance industry is highly competitive on the basis of both price and service. Numerous companies compete for business in the geographic areas where our insurance subsidiaries operate. Many of these other insurance companies are substantially larger and have greater financial resources than those of our insurance subsidiaries. In addition, because our insurance subsidiaries and Donegal Mutual market their respective insurance products exclusively through independent insurance agencies, most of which represent more than one insurance company, our insurance subsidiaries face competition within agencies, as well as competition to retain qualified independent agents.

## Products and Underwriting

We report the results of our insurance operations in two segments: personal lines of insurance and commercial lines of insurance. The personal lines our insurance subsidiaries write consist primarily of private passenger automobile and homeowners insurance. The commercial lines our insurance subsidiaries write consist primarily of commercial automobile, commercial multi-peril and workers' compensation insurance. We describe these lines of insurance in greater detail below:

*Personal*

- Private passenger automobile — policies that provide protection against liability for bodily injury and property damage arising from automobile accidents and protection against loss from damage to automobiles owned by the insured.

- Homeowners — policies that provide coverage for damage to residences and their contents from a broad range of perils, including fire, lightning, windstorm and theft. These policies also cover liability of the insured arising from injury to other persons or their property while on the insured's property and under other specified conditions.

*Commercial*

- Commercial automobile — policies that provide protection against liability for bodily injury and property damage arising from automobile accidents and protection against loss from damage to automobiles owned by the insured.

- Commercial multi-peril — policies that provide protection to businesses against many perils, usually combining liability and physical damage coverages.

- Workers' compensation — policies employers purchase to provide benefits to employees for injuries sustained during employment. The workers' compensation laws of each state determine the extent of the coverage we provide.

The following table sets forth the net premiums written of our insurance subsidiaries by line of insurance for the periods indicated:

| | Year Ended December 31, | | | | | |
| | 2015 | | 2014 | | 2013 | |
| (dollars in thousands) | Amount | % | Amount | % | Amount | % |
|---|---|---|---|---|---|---|
| Personal lines: | | | | | | |
| Automobile | $ 214,610 | 34.1% | $ 204,174 | 35.3% | $ 196,363 | 36.8% |
| Homeowners | 119,541 | 19.0 | 113,576 | 19.6 | 106,420 | 20.0 |
| Other | 18,176 | 2.9 | 16,989 | 2.9 | 15,915 | 3.0 |
| Total personal lines | 352,327 | 56.0 | 334,739 | 57.8 | 318,698 | 59.8 |
| Commercial lines: | | | | | | |
| Automobile | 76,729 | 12.2 | 65,552 | 11.3 | 58,165 | 10.9 |
| Commercial multi-peril | 94,219 | 15.0 | 83,413 | 14.4 | 74,516 | 14.0 |
| Workers' compensation | 98,079 | 15.6 | 88,739 | 15.3 | 77,589 | 14.5 |
| Other | 7,483 | 1.2 | 6,758 | 1.2 | 4,463 | 0.8 |
| Total commercial lines | 276,510 | 44.0 | 244,462 | 42.2 | 214,733 | 40.2 |
| Total business | $ 628,837 | 100.0% | $ 579,201 | 100.0% | $ 533,431 | 100.0% |

The personal lines and commercial lines underwriting departments of our insurance subsidiaries evaluate and select those risks that they believe will enable our insurance subsidiaries to achieve an underwriting profit. The underwriting departments have significant interaction with the independent agents regarding the underwriting philosophy and the underwriting guidelines of our insurance subsidiaries. Our underwriting personnel also assist the research and development department in the development of quality products at competitive prices to promote growth and profitability.

In order to achieve underwriting profitability on a consistent basis, our insurance subsidiaries:

- assess and select primarily standard and preferred risks;

- adhere to disciplined underwriting guidelines;

- inspect substantially all commercial lines risks and a substantial number of personal lines property risks; and

- utilize various types of risk management and loss control services.

Our insurance subsidiaries also review their existing policies and accounts to determine whether those risks continue to meet their underwriting guidelines. If a given policy or account no longer meets those underwriting guidelines, our insurance subsidiaries will take appropriate action regarding that policy or account, including raising premium rates or non-renewing the policy to the extent applicable law permits.

As part of the effort of our insurance subsidiaries to maintain acceptable underwriting results, they conduct annual reviews of agencies that have failed to meet their underwriting profitability criteria. The review process includes an analysis of the underwriting and re-underwriting practices of the agency, the completeness and accuracy of the applications the agency submits, the adequacy of the training of the agency's staff and the agency's record of adherence to the underwriting guidelines and service standards of our insurance subsidiaries. Based on the results of this review process, the marketing and underwriting personnel of our insurance subsidiaries develop, together with the agency, a plan to improve its underwriting profitability. Our insurance subsidiaries monitor the agency's compliance with the plan and take other measures as required in the judgment of our insurance subsidiaries, including the termination to the extent applicable law permits of agencies that are unable to achieve acceptable underwriting profitability.

- **Distribution**

- Our insurance subsidiaries market their products primarily in the Mid-Atlantic, Midwestern, New England and Southern regions through approximately 2,400 independent insurance agencies. At December 31, 2015, the Donegal Insurance Group actively wrote business in 21 states (Alabama, Delaware, Georgia, Indiana, Iowa, Maine, Maryland, Michigan, Nebraska, New Hampshire, New York, North Carolina, Ohio, Pennsylvania, South Carolina, South Dakota, Tennessee, Vermont, Virginia, West Virginia and Wisconsin). We believe the relationships of our insurance subsidiaries with their independent agents are valuable in identifying, obtaining and retaining profitable business. Our insurance subsidiaries maintain a stringent agency selection procedure that emphasizes appointing agencies with proven marketing strategies for the development of profitable business, and our insurance subsidiaries only appoint agencies with a strong underwriting history and potential growth capabilities. Our insurance subsidiaries also regularly evaluate the independent agencies that represent them based on their profitability and performance in relation to the objectives of our insurance subsidiaries. Our insurance subsidiaries seek to be among the top three insurers within each of their agencies for the lines of business our insurance subsidiaries write.

The following table sets forth the percentage of direct premiums our insurance subsidiaries write, including 80% of the direct premiums Donegal Mutual and Atlantic States write, in each of the states where they conducted a significant portion of their business in 2015:

| | |
|---|---|
| Pennsylvania | 36.6% |
| Michigan | 16.1 |
| Maryland | 8.8 |
| Virginia | 8.8 |
| Georgia | 6.0 |
| Delaware | 5.6 |
| Ohio | 3.5 |
| Wisconsin | 3.5 |
| Iowa | 2.5 |
| Nebraska | 2.2 |
| Tennessee | 2.2 |
| South Dakota | 1.1 |
| Other | 3.1 |
| Total | 100.0% |

Our insurance subsidiaries employ a number of policies and procedures that we believe enable them to attract, retain and motivate their independent agents. We believe that the consistency of the product offerings of our insurance subsidiaries enables our insurance subsidiaries to compete effectively for independent agents with other insurers whose product offerings may fluctuate based upon industry conditions. Our insurance subsidiaries have a competitive profit-sharing plan for their independent agents, consistent with applicable state laws and regulations, under which the independent agents may earn additional commissions based upon the volume of premiums produced and the profitability of the business our insurance subsidiaries receive from that agency.

Our insurance subsidiaries encourage their independent agents to focus on "account selling," or serving all of a particular insured's property and casualty insurance needs, which our insurance subsidiaries believe generally results in more favorable loss experience than covering a single risk for an individual insured.

**Technology**

Donegal Mutual owns the majority of the technology systems our insurance subsidiaries use. The technology systems consist primarily of an integrated central processing computer system, a series of server-based computer networks and various communication systems that allow the home office of our insurance subsidiaries and their branch offices to utilize the same systems for the processing of business. Donegal Mutual maintains backup facilities and systems at the office of one of our insurance subsidiaries and tests these backup facilities and systems on a regular basis. Our insurance subsidiaries bear their proportionate share of information services expenses based on their respective percentage of the total net written premiums of the Donegal Insurance Group during the preceding calendar year.

. The business strategy of our insurance subsidiaries depends on the use, development and implementation of integrated technology systems. These systems enable our insurance subsidiaries to provide a high level of service to agents and policyholders by processing business in a timely and efficient manner, communicating and sharing data with agents, providing a variety of methods for the payment of premiums and allowing for the accumulation and analysis of information for the management of our insurance subsidiaries.

We believe the availability and use of these technology systems has resulted in improved service to agents and policyholders, increased efficiencies in processing the business of our insurance subsidiaries and lower operating costs. Key components of these integrated technology systems are the agency interface system, the WritePro®, WriteBiz® and WriteFarm® systems, a claims processing system and an imaging system. The agency interface system provides our insurance subsidiaries with a high level of data sharing both to and from agents' systems and also provides agents with an integrated means of processing new business. The WritePro®, WriteBiz® and WriteFarm® systems are fully automated underwriting and policy issuance systems that provide agents with the ability to generate underwritten quotes and automatically issue policies that meet the underwriting guidelines of our insurance subsidiaries with limited or no intervention by their personnel. The claims processing system allows our insurance subsidiaries to process claims efficiently and in an automated environment. The imaging system eliminates the need to handle paper files, while providing greater access to the same information by a variety of personnel. We believe our technology systems compare favorably to those of many national property and casualty insurance carriers in terms of quality and service levels.

**Claims**

The management of claims is a critical component of the philosophy of our insurance subsidiaries to achieve underwriting profitability on a consistent basis and is fundamental to the successful operations of our insurance subsidiaries and their dedication to excellent service. Our senior claims management oversees the claims processing units of each of our insurance subsidiaries to assure consistency in the claims settlement process. The field office staff of our insurance subsidiaries receives support from home office technical, litigation, material damage, subrogation and medical audit personnel.

The claims departments of our insurance subsidiaries rigorously manage claims to assure that they settle legitimate claims quickly and fairly and that they identify questionable claims for defense. In the majority of cases, the personnel of our insurance subsidiaries, who have significant experience in the property and casualty insurance industry and know the service philosophy of our insurance subsidiaries, adjust claims. Our insurance subsidiaries provide various means of claims reporting on a 24-hours a day, seven-days a week basis, including toll-free numbers and electronic reporting through our website and mobile applications. Our insurance subsidiaries strive to respond to notifications of claims promptly, generally within the day reported. Our insurance subsidiaries believe that, by responding promptly to claims, they provide quality customer service and minimize the ultimate cost of the claims. Our insurance subsidiaries engage independent adjusters as needed to handle claims in areas in which the volume of claims is not sufficient to justify the hiring of internal claims adjusters by our insurance subsidiaries. Our insurance subsidiaries also employ private adjusters and investigators, structural experts and various outside legal counsel to supplement their internal staff and to assist in the investigation of claims. Our insurance subsidiaries have a special investigative unit staffed by former law enforcement officers that attempts to identify and prevent fraud and abuse and to investigate questionable claims.

The management of the claims departments of our insurance subsidiaries develops and implements policies and procedures for the establishment of adequate claim reserves. Our insurance subsidiaries employ an actuarial staff that regularly reviews their reserves for incurred but not reported claims. The management and staff of the claims departments resolve policy coverage issues, manage and process reinsurance recoveries and handle salvage and subrogation matters. The litigation and personal injury sections of our insurance subsidiaries manage all claims litigation. Branch office claims above certain thresholds require home office review and settlement authorization. Our insurance subsidiaries provide their claims adjusters reserving and settlement authority based upon their experience and demonstrated abilities. Larger or more complicated claims require consultation and approval of senior claims department management.

**Liabilities for Losses and Loss Expenses**

Liabilities for losses and loss expenses are estimates at a given point in time of the amounts an insurer expects to pay with respect to incurred policyholder claims based on facts and circumstances then known. At the time of establishing its estimates, an insurer recognizes that its ultimate liability for losses and loss expenses will exceed or be less than such estimates. Our insurance subsidiaries base their estimates of liabilities for losses and loss expenses on assumptions as to future loss trends and expected claims severity, judicial theories of liability and other factors. However, during the loss adjustment period, our insurance subsidiaries may learn additional facts regarding individual claims, and, consequently, it often becomes necessary for our insurance subsidiaries to refine and adjust their estimates of liability. We reflect any adjustments to our insurance

-13-

subsidiaries' liabilities for losses and loss expenses in our operating results in the period in which our insurance subsidiaries record the changes in their estimates.

Our insurance subsidiaries maintain liabilities for the payment of losses and loss expenses with respect to both reported and unreported claims. Our insurance subsidiaries establish these liabilities for the purpose of covering the ultimate costs of settling all losses, including investigation and litigation costs. Our insurance subsidiaries base the amount of their liability for reported losses primarily upon a case-by-case evaluation of the type of risk involved, knowledge of the circumstances surrounding each claim and the insurance policy provisions relating to the type of loss their policyholder incurred. Our insurance subsidiaries determine the amount of their liability for unreported claims and loss expenses on the basis of historical information by line of insurance. Our insurance subsidiaries account for inflation in the reserving function through analysis of costs and trends and reviews of historical reserving results. Our insurance subsidiaries closely monitor their liabilities and recompute them periodically using new information on reported claims and a variety of statistical techniques. Our insurance subsidiaries do not discount their liabilities for losses.

Reserve estimates can change over time because of unexpected changes in assumptions related to our insurance subsidiaries' external environment and, to a lesser extent, assumptions as to our insurance subsidiaries' internal operations. For example, our insurance subsidiaries have experienced a decrease in claims frequency on workers' compensation claims during the past several years while claims severity has gradually increased. These trend changes give rise to greater uncertainty as to the pattern of future loss settlements on workers' compensation claims. Related uncertainties regarding future trends include the cost of medical technologies and procedures and changes in the utilization of medical procedures. Assumptions related to our insurance subsidiaries' external environment include the absence of significant changes in tort law and legal decisions that increase liability exposure, consistency in judicial interpretations of insurance coverage and policy provisions and the rate of loss cost inflation. Internal assumptions include consistency in the recording of premium and loss statistics, consistency in the recording of claims, payment and case reserving methodology, accurate measurement of the impact of rate changes and changes in policy provisions, consistency in the quality and characteristics of business written within a given line of business and consistency in reinsurance coverage and the collectability of reinsured losses, among other items. To the extent our insurance subsidiaries determine that underlying factors impacting their assumptions have changed, our insurance subsidiaries attempt to make appropriate adjustments for such changes in their reserves. Accordingly, our insurance subsidiaries' ultimate liability for unpaid losses and loss expenses will likely differ from the amount recorded at December 31, 2015. For every 1% change in our insurance subsidiaries' loss and loss expense reserves, net of reinsurance recoverable, the effect on our pre-tax results of operations would be approximately $3.2 million.

The establishment of appropriate liabilities is an inherently uncertain process, and we can provide no assurance that our insurance subsidiaries' ultimate liability will not exceed our insurance subsidiaries' loss and loss expense reserves and have an adverse effect on our results of operations and financial condition. Furthermore, we cannot predict the timing, frequency and extent of adjustments to our insurance subsidiaries' estimated future liabilities, since the historical conditions and events that serve as a basis for our insurance subsidiaries' estimates of ultimate claim costs may change. As is the case for substantially all property and casualty insurance companies, our insurance subsidiaries have found it necessary in the past to increase their estimated future liabilities for losses and loss expenses in certain periods, and, in other periods, their estimates of future liabilities have exceeded their actual liabilities. Changes in our insurance subsidiaries' estimates of their liability for losses and loss expenses generally reflect actual payments and the evaluation of information received since the prior reporting date. Our insurance subsidiaries recognized an increase in their liability for losses and loss expenses of prior years of $7.2 million, $14.5 million and $10.4 million in 2015, 2014 and 2013, respectively. Our insurance subsidiaries made no significant changes in their reserving philosophy, key reserving assumptions or claims management personnel, and they have made no significant offsetting changes in estimates that increased or decreased their loss and loss expense reserves in these years. The 2015 development represented 2.5% of the December 31, 2014 net carried reserves and resulted primarily from higher-than-expected severity in the private passenger automobile liability, commercial multiple peril and commercial automobile lines of business in accident years prior to 2015. The majority of the 2015 development related to increases in the liability for losses and loss expenses of prior years for Atlantic States and Southern. The 2014 development represented 5.4% of the December 31, 2013 net carried reserves and resulted primarily from higher-than-expected severity in the private passenger automobile liability, commercial multiple peril and commercial automobile lines of business in accident years prior to 2014. The majority of the 2014 development related to increases in the liability for losses and loss expenses of prior years for Atlantic States and Southern. The 2013 development represented 4.1% of the December 31, 2012 net carried reserves and resulted primarily from higher-than-expected severity in the private passenger automobile liability, commercial multiple peril, commercial automobile and workers' compensation lines of business in accident years prior to 2013. The majority of the 2013 development related to increases in the liability for losses and loss expenses of prior years for Atlantic States and Southern.

Excluding the impact of catastrophic weather events, our insurance subsidiaries have noted stable amounts in the number of claims incurred and slight downward trends in the number of claims outstanding at period ends relative to their premium

-14-

base in recent years across most of their lines of business. However, the amount of the average claim outstanding has increased gradually over the past several years as the property and casualty insurance industry has experienced increased litigation trends and economic conditions that have extended the estimated length of disabilities and contributed to increased medical loss costs and a general slowing of settlement rates in litigated claims. Our insurance subsidiaries could be required to make further adjustments to their estimates in the future. However, on the basis of our insurance subsidiaries' internal procedures which analyze, among other things, their prior assumptions, their experience with similar cases and historical trends such as reserving patterns, loss payments, pending levels of unpaid claims and product mix, as well as court decisions, economic conditions and public attitudes, we believe that our insurance subsidiaries have made adequate provision for their liability for losses and loss expenses at December 31, 2015.

Differences between liabilities reported in our financial statements prepared on a GAAP basis and our insurance subsidiaries' financial statements prepared on a SAP basis result from anticipating salvage and subrogation recoveries for GAAP but not for SAP. These differences amounted to $15.3 million, $14.2 million and $13.1 million at December 31, 2015, 2014 and 2013, respectively.

The following table sets forth a reconciliation of the beginning and ending GAAP net liability of our insurance subsidiaries for unpaid losses and loss expenses for the periods indicated:

| (in thousands) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Gross liability for unpaid losses and loss expenses at beginning of year | $ 538,258 | $ 495,619 | $ 458,827 |
| Less reinsurance recoverable | 245,957 | 230,014 | 207,891 |
| Net liability for unpaid losses and loss expenses at beginning of year | 292,301 | 265,605 | 250,936 |
| Provision for net losses and loss expenses for claims incurred in the current year | 391,167 | 373,932 | 332,770 |
| Change in provision for estimated net losses and loss expenses for claims incurred in prior years | 7,200 | 14,469 | 10,358 |
| Total incurred | 398,367 | 388,401 | 343,128 |
| Net losses and loss payments for claims incurred during: | | | |
| The current year | 236,835 | 229,939 | 201,782 |
| Prior years | 131,779 | 131,766 | 126,677 |
| Total paid | 368,614 | 361,705 | 328,459 |
| Net liability for unpaid losses and loss expenses at end of year | 322,054 | 292,301 | 265,605 |
| Plus reinsurance recoverable | 256,151 | 245,957 | 230,014 |
| Gross liability for unpaid losses and loss expenses at end of year | $ 578,205 | $ 538,258 | $ 495,619 |

The following table sets forth the development of the liability for net unpaid losses and loss expenses of our insurance subsidiaries from 2005 to 2015. Loss data in the table includes business Atlantic States received from the underwriting pool.

"Net liability at end of year for unpaid losses and loss expenses" sets forth the estimated liability for net unpaid losses and loss expenses recorded at the balance sheet date for each of the indicated years. This liability represents the estimated amount of net losses and loss expenses for claims arising in the current and all prior years that are unpaid at the balance sheet date, including losses incurred but not reported.

The "Net liability re-estimated as of" portion of the table shows the re-estimated amount of the previously recorded liability based on experience for each succeeding year. The estimate increases or decreases as payments are made and more information becomes known about the severity of the remaining unpaid claims. For example, the 2005 liability has developed a redundancy after ten years because we expect the re-estimated net losses and loss expenses to be $20.9 million less than the estimated liability we initially established in 2005 of $173.0 million.

The "Cumulative (excess) deficiency" shows the cumulative excess or deficiency at December 31, 2015 of the liability estimate shown on the top line of the corresponding column. An excess in liability means that the liability established in prior years exceeded the amount of actual payments and currently re-estimated unpaid liability remaining. A deficiency in liability means that the liability established in prior years was less than the amount of actual payments and currently re-estimated remaining unpaid liability.

The "Cumulative amount of liability paid through" portion of the table shows the cumulative net losses and loss expense payments made in succeeding years for net losses incurred prior to the balance sheet date. For example, the 2005 column indicates that at December 31, 2015 payments equal to $148.9 million of the currently re-estimated ultimate liability for net losses and loss expenses of $152.1 million had been made.

Amounts shown in the 2008 column of the table include information for Sheboygan for all accident years prior to 2008. Amounts shown in the 2010 column of the table include information for MICO for the month of December 2010.

| | | | | | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| (in thousands) | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Net liability at end of year for unpaid losses and loss expenses | $173,009 | $163,312 | $150,152 | $161,307 | $180,262 | $217,896 | $243,015 | $250,936 | $265,605 | $292,301 | $322,054 |
| Net liability re-estimated as of: | | | | | | | | | | | |
| One year later | 159,393 | 153,299 | 152,836 | 171,130 | 177,377 | 217,728 | 250,611 | 261,294 | 280,074 | 299,501 | |
| Two years later | 153,894 | 150,934 | 154,435 | 167,446 | 177,741 | 217,355 | 255,612 | 268,877 | 281,782 | | |
| Three years later | 151,792 | 150,078 | 152,315 | 166,756 | 178,403 | 218,449 | 257,349 | 270,473 | | | |
| Four years later | 150,183 | 148,745 | 151,120 | 166,852 | 179,909 | 218,514 | 256,460 | | | | |
| Five years later | 150,087 | 148,407 | 151,287 | 166,788 | 179,961 | 218,202 | | | | | |
| Six years later | 150,555 | 149,031 | 151,739 | 166,964 | 179,858 | | | | | | |
| Seven years later | 151,161 | 149,487 | 151,790 | 167,425 | | | | | | | |
| Eight years later | 151,243 | 149,700 | 152,240 | | | | | | | | |
| Nine years later | 151,563 | 150,241 | | | | | | | | | |
| Ten years later | 152,110 | | | | | | | | | | |
| Cumulative (excess) deficiency | (20,899) | (13,071) | 2,088 | 6,118 | (404) | 306 | 13,445 | 19,537 | 16,177 | 7,200 | |
| Cumulative amount of liability paid through: | | | | | | | | | | | |
| One year later | $ 71,718 | $ 72,499 | $ 71,950 | $ 79,592 | $ 84,565 | $ 96,202 | $119,074 | $126,677 | $131,766 | $131,779 | |
| Two years later | 107,599 | 104,890 | 105,576 | 116,035 | 123,204 | 148,140 | 181,288 | 191,208 | 194,169 | | |
| Three years later | 125,926 | 121,711 | 124,659 | 136,837 | 147,165 | 178,073 | 217,138 | 225,956 | | | |
| Four years later | 133,805 | 132,698 | 135,392 | 148,243 | 161,363 | 195,948 | 234,392 | | | | |
| Five years later | 139,935 | 138,878 | 140,280 | 155,331 | 169,452 | 203,633 | | | | | |
| Six years later | 143,309 | 141,752 | 143,778 | 160,324 | 173,153 | | | | | | |
| Seven years later | 145,492 | 143,784 | 146,491 | 162,531 | | | | | | | |
| Eight years later | 146,894 | 145,290 | 148,235 | | | | | | | | |
| Nine years later | 147,757 | 146,557 | | | | | | | | | |
| Ten years later | 148,939 | | | | | | | | | | |

| | | | | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| (in thousands) | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Gross liability at end of year | $226,432 | $239,809 | $263,599 | $383,317 | $442,408 | $458,827 | $495,619 | $538,258 | $578,205 |
| Reinsurance recoverable | 76,280 | 78,502 | 83,337 | 165,421 | 199,393 | 207,891 | 230,014 | 245,957 | 256,151 |
| Net liability at end of year | 150,152 | 161,307 | 180,262 | 217,896 | 243,015 | 250,936 | 265,605 | 292,301 | 322,054 |
| Gross re-estimated liability | 230,189 | 250,509 | 201,808 | 363,806 | 459,035 | 483,226 | 492,540 | 512,458 | |
| Re-estimated recoverable | 77,949 | 83,084 | 21,950 | 145,604 | 202,575 | 212,753 | 210,758 | 212,957 | |
| Net re-estimated liability | 152,240 | 167,425 | 179,858 | 218,202 | 256,460 | 270,473 | 281,782 | 299,501 | |
| Gross cumulative deficiency (excess) | 3,757 | 10,700 | (61,791) | (19,511) | 16,627 | 24,399 | (3,079) | (25,800) | |

-16-

• **Third-Party Reinsurance**

Our insurance subsidiaries and Donegal Mutual purchase certain third-party reinsurance on a combined basis. Le Mars, Peninsula, Sheboygan and MICO also have separate reinsurance programs that provide certain coverage that is commensurate with their relative size and exposures. Our insurance subsidiaries use several different reinsurers, all of which, consistent with the requirements of our insurance subsidiaries and Donegal Mutual, have an A.M. Best rating of A- (Excellent) or better or, with respect to foreign reinsurers, have a financial condition that, in the opinion of our management, is equivalent to a company with at least an A- (Excellent) rating from A.M. Best.

The external reinsurance our insurance subsidiaries and Donegal Mutual purchase includes:

- "excess of loss reinsurance," under which the losses of Donegal Mutual and our insurance subsidiaries are automatically reinsured, through a series of contracts, over a set retention (generally $1.0 million); and

- catastrophe reinsurance, under which Donegal Mutual and our insurance subsidiaries recover, through a series of reinsurance agreements, 100% of an accumulation of many losses resulting from a single event, including natural disasters, over a set retention (generally $5.0 million) and after exceeding an annual aggregate deductible ($1.5 million in 2015 and 2014 and $5.0 million in 2013) up to aggregate losses of $149.0 million per occurrence.

The amount of coverage each of these types of reinsurance provides depends upon the amount, nature, size and location of the risk being reinsured.

For property insurance, our insurance subsidiaries have excess of loss treaties that provide for coverage of $4.0 million per loss over a set retention of $1.0 million. For liability insurance, our insurance subsidiaries have excess of loss treaties that provide for coverage of $49.0 million per occurrence over a set retention of $1.0 million. For workers' compensation insurance, our insurance subsidiaries have excess of loss treaties that provide for coverage of $9.0 million on any one life over a set retention of $1.0 million and after exceeding an annual aggregate deductible ($1.0 million in 2015, 2014 and 2013).

Our insurance subsidiaries and Donegal Mutual also purchase facultative reinsurance to cover exposures from property and casualty losses that exceed the limits provided by their respective treaty reinsurance.

For policies effective through December 31, 2014, MICO maintained a quota-share reinsurance agreement with third-party reinsurers to reduce its net exposures. Effective from December 1, 2010 to December 31, 2011, the quota-share reinsurance percentage was 50%. Effective January 1, 2012, MICO reduced the quota-share reinsurance percentage to 40%. Effective January 1, 2013, MICO reduced the quota-share reinsurance percentage to 30%. Effective January 1, 2014, MICO reduced the quota-share reinsurance percentage to 20%. Effective January 1, 2015, MICO no longer maintains a quota-share reinsurance agreement with third-party reinsurers.

**Investments**

At December 31, 2015, 99.8% of all debt securities our insurance subsidiaries held had an investment-grade rating. The investment portfolios of our insurance subsidiaries did not contain any mortgage loans or any non-performing assets at December 31, 2015.

The following table shows the composition of the debt securities (at carrying value) in the investment portfolios of our insurance subsidiaries, excluding short-term investments, by rating at December 31, 2015:

| (dollars in thousands) | December 31, 2015 | |
| --- | --- | --- |
| Rating[1] | Amount | Percent |
| U.S. Treasury and U.S. agency securities[2] | $ 317,862 | 39.2% |
| Aaa or AAA | 24,467 | 3.0 |
| Aa or AA | 266,757 | 32.9 |
| A | 143,164 | 17.6 |
| BBB | 57,395 | 7.1 |
| B | 2,007 | 0.2 |
| Total | $ 811,652 | 100.0% |

(1)  Ratings assigned by Moody's Investors Services, Inc. or Standard & Poor's Corporation.
(2)  Includes mortgage-backed securities of $229.5 million.

Our insurance subsidiaries invest in both taxable and tax-exempt securities as part of their strategy to maximize after-tax income. This strategy considers, among other factors, the alternative minimum tax. Tax-exempt securities made up approximately 40.9%, 50.2% and 59.0% of the fixed-maturity securities in the combined investment portfolios of our insurance subsidiaries at December 31, 2015, 2014 and 2013, respectively.

The following table shows the classification of our investments and the investments of our insurance subsidiaries at December 31, 2015, 2014 and 2013 (at carrying value):

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | | 2014 | | 2013 | |
| (dollars in thousands) | Amount | Percent of Total | Amount | Percent of Total | Amount | Percent of Total |
| Fixed maturities[1]: | | | | | | |
| Held to maturity: | | | | | | |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 51,194 | 5.7% | $ 53,619 | 6.4% | $ 47,946 | 6.1% |
| Obligations of states and political subdivisions | 119,115 | 13.2 | 110,999 | 13.3 | 108,435 | 13.7 |
| Corporate securities | 65,307 | 7.2 | 52,226 | 6.3 | 14,875 | 1.9 |
| Mortgage-backed securities | 74,643 | 8.3 | 90,548 | 10.9 | 69,114 | 8.7 |
| Total held to maturity | 310,259 | 34.4 | 307,392 | 36.9 | 240,370 | 30.4 |
| Available for sale: | | | | | | |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | 37,189 | 4.1 | 21,259 | 2.5 | 14,334 | 1.8 |
| Obligations of states and political subdivisions | 236,556 | 26.3 | 266,242 | 32.0 | 277,547 | 35.1 |
| Corporate securities | 72,812 | 8.1 | 53,945 | 6.5 | 40,672 | 5.1 |
| Mortgage-backed securities | 154,836 | 17.2 | 93,704 | 11.2 | 71,099 | 8.9 |
| Total available for sale | 501,393 | 55.7 | 435,150 | 52.2 | 403,652 | 50.9 |
| Total fixed maturities | 811,652 | 90.1 | 742,542 | 89.1 | 644,022 | 81.3 |
| Equity securities[2] | 37,261 | 4.1 | 30,822 | 3.7 | 12,423 | 1.6 |
| Investment in affiliate[3] | 38,477 | 4.3 | 39,284 | 4.7 | 35,685 | 4.5 |
| Short-term investments[4] | 13,432 | 1.5 | 20,293 | 2.5 | 99,678 | 12.6 |
| Total investments | $ 900,822 | 100.0% | $ 832,941 | 100.0% | $ 791,808 | 100.0% |

(1)  We refer to Notes 1 and 4 to our Consolidated Financial Statements. We value those fixed maturities we classify as held to maturity at amortized cost; we value those fixed maturities we classify as available for sale at fair value. The total fair value of fixed maturities we classified as held to maturity was $322.8 million at December 31, 2015, $322.2 million at December 31, 2014 and $238.8 million at December 31, 2013. The amortized cost of fixed maturities we classified as available for sale was $489.0 million at December 31, 2015, $414.2 million at December 31, 2014 and $390.3 million at December 31, 2013.

(2)  We value equity securities at fair value. Total cost of equity securities was $35.8 million at December 31, 2015, $30.0 million at December 31, 2014 and $12.2 million at December 31, 2013.

(3)  We value our investment in our affiliate at cost, adjusted for our share of earnings and losses of our affiliate as well as changes in equity of our affiliate due to unrealized gains and losses.

(4)  We value short-term investments at cost, which approximates fair value.

• , The following table sets forth the maturities (at carrying value) in the fixed maturity portfolio of our insurance subsidiaries at December 31, 2015, 2014 and 2013:

| | December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | | 2014 | | 2013 | |
| (dollars in thousands) | Amount | Percent of Total | Amount | Percent of Total | Amount | Percent of Total |
| Due in[1]: | | | | | | |
| One year or less | $ 20,990 | 2.6% | $ 32,886 | 4.4% | $ 8,257 | 1.3% |
| Over one year through three years | 66,505 | 8.2 | 45,967 | 6.2 | 22,424 | 3.5 |
| Over three years through five years | 66,410 | 8.2 | 62,417 | 8.4 | 40,234 | 6.2 |
| Over five years through ten years | 202,122 | 24.9 | 189,082 | 25.5 | 190,440 | 29.6 |
| Over ten years through fifteen years | 172,429 | 21.2 | 169,182 | 22.8 | 166,186 | 25.8 |
| Over fifteen years | 53,717 | 6.6 | 58,756 | 7.9 | 76,267 | 11.8 |
| Mortgage-backed securities | 229,479 | 28.3 | 184,252 | 24.8 | 140,214 | 21.8 |
| | $ 811,652 | 100.0% | $ 742,542 | 100.0% | $ 644,022 | 100.0% |

(1)  Based on stated maturity dates with no prepayment assumptions. Actual maturities will differ because borrowers may have the right to call or prepay obligations with or without call or prepayment penalties.

As shown above, our insurance subsidiaries held investments in mortgage-backed securities having a carrying value of $229.5 million at December 31, 2015. The mortgage-backed securities consist primarily of investments in governmental agency balloon pools with stated maturities between one and 35 years. The stated maturities of these investments limit the exposure of our insurance subsidiaries to extension risk in the event that interest rates rise and prepayments decline. Our insurance subsidiaries perform an analysis of the underlying loans when evaluating a mortgage-backed security for purchase, and they select those securities that they believe will provide a return that properly reflects the prepayment risk associated with the underlying loans.

The following table sets forth the investment results of our insurance subsidiaries for the years ended December 31, 2015, 2014 and 2013:

| | Year Ended December 31, | | |
|---|---|---|---|
| (dollars in thousands) | 2015 | 2014 | 2013 |
| Invested assets[1] | $ 866,882 | $ 812,375 | $ 799,119 |
| Investment income[2] | 20,950 | 18,344 | 18,795 |
| Average yield | 2.4% | 2.3% | 2.4% |
| Average tax-equivalent yield | 3.1 | 3.1 | 3.3 |

(1)  Average of the aggregate invested amounts at the beginning and end of the period.
(2)  Investment income is net of investment expenses and does not include realized investment gains or losses or provision for income taxes.

## A.M. Best Rating

Donegal Mutual and our insurance subsidiaries have an A.M. Best rating of A (Excellent), based upon the respective current financial condition and historical statutory results of operations of Donegal Mutual and our insurance subsidiaries. We believe that the A.M. Best rating of Donegal Mutual and our insurance subsidiaries is an important factor in their marketing of their products to their agents and customers. A.M. Best's ratings are industry ratings based on a comparative analysis of the financial condition and operating performance of insurance companies. A.M. Best's classifications are A++ and A+ (Superior), A and A- (Excellent), B++ and B+ (Good), B and B- (Fair), C++ and C+ (Marginal), C and C- (Weak), D (Poor) and E (Under Regulatory Supervision), F (Liquidation) and S (Suspended). A.M. Best bases its ratings upon factors relevant to the payment of claims of policyholders and are not directed toward the protection of investors in insurance companies. According to A.M. Best, the "Excellent" rating that the Donegal Insurance Group maintains is assigned to those companies that, in A.M. Best's opinion, have an excellent ability to meet their ongoing obligations to policyholders.

### Regulation

The supervision and regulation of insurance companies consists primarily of the laws and regulations of the various states in which the insurance companies transact business, with the primary regulatory authority being the insurance regulatory authorities in the state of domicile of the insurance company. Such supervision and regulation relate to numerous aspects of an insurance company's business and financial condition. The primary purpose of such supervision and regulation is the protection of policyholders. The authority of the state insurance departments includes the establishment of standards of solvency that insurers must meet and maintain, the licensing of insurers and insurance agents to do business, the nature of, and limitations on, investments, premium rates for property and casualty insurance, the provisions that insurers must make for current losses and future liabilities, the deposit of securities for the benefit of policyholders, the approval of policy forms, notice requirements for the cancellation of policies and the approval of certain changes in control. State insurance departments also conduct periodic examinations of the affairs of insurance companies and require the filing of annual and other reports relating to the financial condition of insurance companies.

In addition to state-imposed insurance laws and regulations, the National Association of Insurance Commissioners, or the NAIC, maintains a risk-based capital system, or RBC, for assessing the adequacy of the statutory capital and surplus of insurance companies that augments the states' current fixed dollar minimum capital requirements for insurance companies. At December 31, 2015, our insurance subsidiaries and Donegal Mutual each exceeded by a substantial margin the minimum levels of statutory capital the RBC rules require.

Generally, every state has guaranty fund laws under which insurers licensed to do business in that state can be assessed on the basis of premiums written by the insurer in that state in order to fund policyholder liabilities of insolvent insurance companies. Under these laws in general, an insurer is subject to assessment, depending upon its market share of a given line of business, to assist in the payment of policyholder claims against insolvent insurers. Our insurance subsidiaries and Donegal Mutual have made accruals for their portion of assessments related to such insolvencies based upon the most current information furnished by the guaranty associations.

We are part of an insurance holding company system of which Donegal Mutual is the ultimate controlling person. All of the states in which our insurance companies and Donegal Mutual maintain a domicile have legislation that regulates insurance holding company systems. Each insurance company in the insurance holding company system must register with the insurance supervisory agency of its state of domicile and furnish information concerning the operations of companies within the insurance holding company system that may materially affect the operations, management or financial condition of the insurers within the system. Pursuant to these laws, the respective insurance departments in which our subsidiaries and Donegal Mutual maintain a domicile may examine our insurance subsidiaries or Donegal Mutual at any time, require disclosure of material transactions by the holding company with another member of the insurance holding company system and require prior notice or prior approval of certain transactions, such as "extraordinary dividends" from the insurance subsidiaries to the holding company. We have insurance subsidiaries domiciled in Iowa, Maryland, Michigan, Pennsylvania, Virginia and Wisconsin.

The Pennsylvania Insurance Holding Companies Act, which generally applies to Donegal Mutual, us and our insurance subsidiaries, requires that all transactions within an insurance holding company system to which an insurer is a party must be fair and reasonable and that any charges or fees for services performed must be reasonable. Any management agreement, service agreement, cost sharing arrangement and material reinsurance agreement must be filed with the Pennsylvania Insurance Department, or the Department, and is subject to the Department's review. We have filed with the Department the pooling agreement between Donegal Mutual and Atlantic States that established the underwriting pool and all material agreements between Donegal Mutual and our insurance subsidiaries.

Approval of the applicable insurance commissioner is also required prior to consummation of transactions affecting the control of an insurer. In virtually all states, including the states where our insurance subsidiaries are domiciled, the acquisition of 10% or more of the outstanding capital stock of an insurer or its holding company or the intent to acquire such an interest creates a rebuttable presumption of a change in control. Pursuant to an order issued in April 2003, the Department approved Donegal Mutual's ownership of up to 70% of our outstanding Class A common stock and Donegal Mutual's ownership of up to 100% of our outstanding Class B common stock.

Our insurance subsidiaries have the legal obligation under state insurance laws to participate in involuntary insurance programs for automobile insurance, as well as other property and casualty insurance lines, in the states in which they conduct business. These programs include joint underwriting associations, assigned risk plans, fair access to insurance requirements plans, reinsurance facilities, windstorm plans and tornado plans. Legislation establishing these programs requires all companies that write lines covered by these programs to provide coverage, either directly or through reinsurance, for insureds who are unable to obtain insurance in the voluntary market. The legislation creating these programs usually allocates a pro rata portion

of risks attributable to such insureds to each company on the basis of the direct premiums it has written in that state or the number of automobiles it insures in that state. Generally, state law requires participation in these programs as a condition to obtaining a certificate of authority. Our loss ratio on insurance we write under these involuntary programs has traditionally been significantly greater than our loss ratio on insurance we voluntarily write in those states.

Regulatory requirements, including RBC requirements, may impact our insurance subsidiaries' ability to pay dividends. The amount of statutory capital and surplus necessary for our insurance subsidiaries to satisfy regulatory requirements, including RBC requirements, was not significant in relation to our insurance subsidiaries' statutory capital and surplus at December 31, 2015. Generally, the maximum amount that one of our insurance subsidiaries may pay to us as ordinary dividends during any year after notice to, but without prior approval of, the insurance commissioner of its domiciliary state is limited to a stated percentage of that subsidiary's statutory capital and surplus at December 31 of the preceding fiscal year or the net income of that subsidiary for its preceding fiscal year. Our insurance subsidiaries paid dividends to us of $3.9 million, $11.5 million and $12.5 million in 2015, 2014 and 2013, respectively. At December 31, 2015, the amount of dividends our insurance subsidiaries could pay to us during 2016, without the prior approval of their respective domiciliary insurance commissioners, is shown in the following table.

| Name of Insurance Subsidiary | Ordinary Dividend Amount | |
|---|---|---|
| Atlantic States | $ | 20,763,682 |
| Le Mars | | 2,616,887 |
| MICO | | 4,619,953 |
| Peninsula | | 4,183,814 |
| Sheboygan | | 1,325,412 |
| Southern | | 2,301,009 |
| Total | $ | 35,810,757 |

## Donegal Mutual Insurance Company

Donegal Mutual organized as a mutual fire insurance company in Pennsylvania in 1889. At December 31, 2015, Donegal Mutual had admitted assets of $431.2 million and policyholders' surplus of $209.4 million. At December 31, 2015, Donegal Mutual had total liabilities of $221.7 million, including reserves for net losses and loss expenses of $59.8 million and unearned premiums of $50.0 million. Donegal Mutual's investment portfolio of $261.6 million at December 31, 2015 consisted primarily of investment-grade bonds of $21.2 million, its investment in DFSC's common stock and its investment in our Class A common stock and our Class B common stock. At December 31, 2015, Donegal Mutual owned 9,851,025 shares, or approximately 48%, of our Class A common stock, which Donegal Mutual carried on its books at $131.1 million, and 4,647,038 shares, or approximately 83%, of our Class B common stock, which Donegal Mutual carried on its books at $61.9 million. We present Donegal Mutual's financial information in accordance with SAP as the NAIC Accounting Practices and Procedures Manual requires. Donegal Mutual does not, nor is it required to, prepare financial statements in accordance with GAAP.

## Donegal Financial Services Corporation

In 2000, we and Donegal Mutual formed DFSC as a unitary thrift holding company and its wholly owned subsidiary, Province Bank FSB, as a federal savings bank. In May 2011, DFSC merged with Union National Financial Corporation, or UNNF, with DFSC as the surviving company in the merger. Under the merger agreement, Province Bank FSB and Union National Community Bank, which UNNF owned, also merged to form UCB. UCB is a state savings bank with 15 banking offices, substantially all of which are located in Lancaster County, Pennsylvania, and approximately $507.8 million in assets at December 31, 2015.

Because Donegal Mutual and we together own all of the outstanding capital stock of DFSC, the Board of Governors of the Federal Reserve System, or the FRB, regulates Donegal Mutual, DFSC and us as grandfathered savings and loan holding companies. As a result, Donegal Mutual, DFSC and we are subject to regulation by the FRB under the holding company provisions of the federal Home Owners' Loan Act. However, if any of Donegal Mutual, DFSC or we were to lose this grandfathered status, they or we would become a bank holding company regulated by the FRB under the Bank Holding Company Act. UCB, as a state-chartered stock savings bank, is subject to regulation and supervision by the Pennsylvania Department of Banking and by the Federal Deposit Insurance Corporation. The primary purpose of the statutory and regulatory

supervision of financial institutions is to protect depositors, the financial institutions and the financial system as a whole rather than the stockholders of financial institutions or their holding companies.

Sections 23A and 23B of the Federal Reserve Act impose quantitative and qualitative restrictions on transactions between a savings association and its "affiliates." Affiliates of a savings association include, among other entities, the savings association's holding company and non-banking companies under common control with the savings association such as Donegal Mutual and us and our respective subsidiaries. These restrictions on transactions with affiliates apply to transactions between DFSC and UCB, on the one hand, and Donegal Mutual and us and our insurance subsidiaries, on the other hand. These restrictions also apply to transactions among DFSC, UCB and Donegal Mutual. Because DFSC directly controls UCB and Donegal Mutual and we indirectly control UCB, DFSC, Donegal Mutual and we are subject to the Change in Bank Control Act.

### Cautionary Statement Regarding Forward-Looking Statements

This Form 10-K Report and the documents we incorporate by reference in this Form 10-K Report contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include certain discussions relating to underwriting, premium and investment income volumes, business strategies, reserves, profitability and business relationships and our other business activities during 2015 and beyond. In some cases, you can identify forward-looking statements by terms such as "may," "will," "should," "could," "would," "expect," "plan," "intend," "anticipate," "believe," "estimate," "objective," "project," "predict," "potential," "goal" and similar expressions. These forward-looking statements reflect our current views about future events and our current assumptions, and are subject to known and unknown risks and uncertainties that may cause our results, performance or achievements to differ materially from those we anticipate or imply by our forward-looking statements. We cannot control or predict many of the factors that could determine our future financial condition or results of operations. Such factors may include those we describe under "Risk Factors." The forward-looking statements contained in this Form 10-K Report reflect our views and assumptions only as of the date of this Form 10-K Report. Except as required by law, we do not intend to update, and we assume no responsibility for updating, any forward-looking statements we have made. We qualify all of our forward-looking statements by these cautionary statements.

### Item 1A.    Risk Factors.

### Risk Factors

#### *Risks Relating to Us and Our Business*

***Donegal Mutual is our controlling stockholder. Donegal Mutual and its directors and executive officers have potential conflicts of interest between the best interests of our stockholders and the best interests of the policyholders of Donegal Mutual.***

Donegal Mutual controls the election of all of the members of our board of directors. Six of the eleven members of our board of directors are also directors of Donegal Mutual. Donegal Mutual and we share the same executive officers. These common directors and executive officers have a fiduciary duty to our stockholders and also have a fiduciary duty to the policyholders of Donegal Mutual. Among the potential conflicts of interest that could arise from these separate fiduciary duties are the following:

- We and Donegal Mutual periodically review the percentage participation of Atlantic States and Donegal Mutual in the underwriting pool that Donegal Mutual and Atlantic States have maintained since 1986;

- Our insurance subsidiaries and Donegal Mutual annually review and then establish the terms of certain reinsurance agreements between our insurance subsidiaries and Donegal Mutual. Our objective, over the long-term, is for these agreements to have approximately an equal balance between payments and recoveries;

- We and Donegal Mutual periodically allocate certain shared expenses among ourselves and our insurance subsidiaries in accordance with various inter-company expense-sharing agreements; and

- We and our insurance subsidiaries may enter into other transactions or contractual relationships with Donegal Mutual, including, for example, our purchases from time to time from Donegal Mutual of the surplus note of a mutual insurance company that will subsequently convert into a stock insurance company and ultimately become one of our wholly owned subsidiaries.

-23-

*Donegal Mutual has sufficient voting power to determine the outcome of all matters submitted to our stockholders for approval.*

Each share of our Class A common stock has one-tenth of a vote per share and generally votes as a single class with our Class B common stock. Each share of our Class B common stock has one vote per share and generally votes as a single class with our Class A common stock. Donegal Mutual has the right to vote approximately 74% of the aggregate voting power of our Class A common stock and our Class B common stock and has sufficient voting control to:

- elect all of the members of our board of directors, who determine our management and policies; and

- control the outcome of any corporate transaction or other matter submitted to a vote of our stockholders for approval, including mergers or other acquisition proposals and the sale of all or substantially all of our assets, in each case regardless of how all of our stockholders other than Donegal Mutual vote their shares.

The interests of Donegal Mutual in maintaining this greater-than-majority voting control of us may have an adverse effect on the price of our Class A common stock and the price of our Class B common stock because of the absence of any potential "takeover" premium and may, therefore, be inconsistent with the interests of our stockholders other than Donegal Mutual.

*Donegal Mutual's majority voting control of us, certain provisions of our certificate of incorporation and by-laws and certain provisions of Delaware law make it remote that anyone could acquire actual control of us unless Donegal Mutual were in favor of another person's acquisition of control of us.*

Donegal Mutual's majority voting control of us, certain anti-takeover provisions in our certificate of incorporation and by-laws and certain provisions of the Delaware General Corporation Law, or the DGCL, could delay or prevent the removal of members of our board of directors and could make a merger, tender offer or proxy contest involving us more expensive as well as unlikely to succeed, even if such events were in the best interests of our stockholders other than Donegal Mutual. These factors could also discourage a third party from attempting to acquire control of us. In particular, our certificate of incorporation and by-laws include the following anti-takeover provisions:

- our board of directors is classified into three classes, so that our stockholders elect only one-third of the members of our board of directors each year;

- our stockholders may remove our directors only for cause;

- our stockholders may not take stockholder action except at an annual or special meeting of our stockholders;

- the request of stockholders holding at least 20% of the aggregate voting power of our Class A common stock and our Class B common stock is required for a stockholder to call a special meeting of our stockholders;

- our by-laws require that stockholders provide advance notice to us to nominate candidates for election to our board of directors or to propose any other item of stockholder business at a stockholders' meeting;

- we do not permit cumulative voting rights in the election of our directors;

- our certificate of incorporation does not provide for preemptive rights in connection with any issuance of securities by us; and

- our board of directors may issue, without stockholder approval unless otherwise required by law, preferred stock with such terms as our board of directors may determine.

*We have authorized preferred stock that we could issue without stockholder approval to make it more difficult for a third party to acquire us.*

We have 2.0 million authorized shares of preferred stock that we could issue in one or more series without further stockholder approval, unless the DGCL or the rules of the NASDAQ Global Select Market otherwise require, and upon such terms and conditions, and having such rights, privileges and preferences, as our board of directors may determine. Our potential issuance of preferred stock may make it more difficult for a third party to acquire control of us.

-24-

*Because we are an insurance holding company, no person can acquire or seek to acquire a 10% or greater interest in us without first obtaining approval of the insurance commissioners of the states of domicile of each of our insurance subsidiaries.*

We own insurance subsidiaries domiciled in the states of Iowa, Maryland, Michigan, Pennsylvania, Virginia and Wisconsin, and Donegal Mutual controls an insurance company domiciled in Georgia. The insurance laws of each of these states provide that no person can acquire or seek to acquire a 10% or greater interest in us without first filing specified information with the insurance commissioners of those states and obtaining the prior approval of the proposed acquisition of a 10% or greater interest in us by each of the state insurance commissioners based on statutory standards designed to protect the safety and soundness of us and our insurance subsidiaries.

*Because we are a grandfathered unitary savings and loan holding company, no person can acquire or seek to acquire more than a 10% interest in either class of our common stock without first obtaining approval of, or an exemption from, the FRB.*

We own 48.2% of the outstanding stock of DFSC, which owns all of the outstanding stock of UCB. As a result of our ownership interest in DFSC, we are a grandfathered unitary savings and loan holding company regulated by the FRB under HOLA. No person may lawfully acquire more than 10% of any class of voting security of a unitary savings and loan holding company registered under the Exchange Act, as we are, without first filing specified information with the FRB and obtaining the FRB's prior approval of the proposed acquisition or an exemption from the FRB for such acquisition.

*Our insurance subsidiaries currently conduct business in a limited number of states, with a concentration of business in Pennsylvania, Michigan, Maryland and Virginia. Any single catastrophe occurrence or other condition affecting losses in these states could adversely affect the results of operations of our insurance subsidiaries.*

Our insurance subsidiaries conduct business in 21 states located primarily in the Mid-Atlantic, Midwestern, New England and Southern states. A substantial portion of their business consists of private passenger and commercial automobile, homeowners and workers' compensation insurance in Pennsylvania, Michigan, Maryland and Virginia. While our insurance subsidiaries and Donegal Mutual actively manage their respective exposure to catastrophes through their underwriting processes and the purchase of reinsurance, a single catastrophic occurrence, destructive weather pattern, general economic trend, terrorist attack, regulatory development or other condition affecting one or more of the states in which our insurance subsidiaries conduct substantial business could materially adversely affect their business, financial condition and results of operations. Common catastrophic events include hurricanes, earthquakes, tornadoes, wind and hail storms, fires, explosions and severe winter storms.

*If the independent agents who market the products of our insurance subsidiaries do not maintain their current levels of premium writing with us, fail to comply with established underwriting guidelines of our insurance subsidiaries or otherwise inappropriately market the products of our insurance subsidiaries, the business, financial condition and results of operations of our insurance subsidiaries could be adversely affected.*

Our insurance subsidiaries market their insurance products solely through a network of approximately 2,400 independent insurance agencies. This agency distribution system is one of the most important components of the competitive profile of our insurance subsidiaries. As a result, our insurance subsidiaries depend to a material extent upon their independent agents, each of whom has the authority to bind one or more of our insurance subsidiaries to insurance coverage. To the extent that such independent agents' marketing efforts fail to result in the maintenance of their current levels of volume and quality or they bind our insurance subsidiaries to unacceptable insurance risks, fail to comply with the established underwriting guidelines of our insurance subsidiaries or otherwise inappropriately market the products of our insurance subsidiaries, the business, financial condition and results of operations of our insurance subsidiaries could suffer.

*The business of our insurance subsidiaries may not continue to grow and may be materially adversely affected if our insurance subsidiaries cannot retain existing, and attract new, independent agents or if insurance consumers increase their use of insurance marketing systems other than independent agents.*

Our insurance subsidiaries' ability to retain existing, and to attract new, independent agents is essential to the continued growth of the business of our insurance subsidiaries. If independent agents find it easier to do business with the competitors of our insurance subsidiaries, our insurance subsidiaries could find it difficult to retain their existing business or to attract new business. While our insurance subsidiaries believe they maintain good relationships with the independent agents they have appointed, our insurance subsidiaries cannot be certain that these independent agents will continue to sell the products of our

-25-

insurance subsidiaries to the consumers these independent agents represent. Some of the factors that could adversely affect the ability of our insurance subsidiaries to retain existing, and attract new, independent agents include:

- the significant competition among insurance companies to attract independent agents;

- the labor-intensive and time-consuming process of selecting new independent agents;

- the insistence of our insurance subsidiaries that independent agents adhere to consistent underwriting standards; and

- the ability of our insurance subsidiaries to pay competitive and attractive commissions, bonuses and other incentives to independent agents.

While our insurance subsidiaries sell insurance to policyholders solely through their network of independent agencies, many competitors of our insurance subsidiaries sell insurance through a variety of delivery methods, including independent agencies, captive agencies, the Internet and direct sales. To the extent that current and potential policyholders change their marketing system preference, the business, financial condition and results of operations of our insurance subsidiaries may be adversely affected.

*We are dependent on dividends from our insurance subsidiaries for the payment of our operating expenses, our debt service and dividends to our stockholders; however, there are regulatory restrictions and business considerations that may limit the amount of dividends our insurance subsidiaries may pay to us.*

As a holding company, we rely primarily on dividends from our insurance subsidiaries as a source of funds to meet our corporate obligations and to pay dividends to our stockholders. The amount of dividends our insurance subsidiaries can pay to us is subject to regulatory restrictions and depends on the amount of surplus our insurance subsidiaries maintain. From time to time, the NAIC and various state insurance regulators consider modifying the method of determining the amount of dividends that an insurance company may pay without prior regulatory approval. The maximum amount of ordinary dividends that our insurance subsidiaries can pay to us in 2016 without prior regulatory approval is approximately $35.8 million. Other business and regulatory considerations, such as the impact of dividends on surplus that could affect the ratings of our insurance subsidiaries, competitive conditions, RBC requirements, the investment results of our insurance subsidiaries and the amount of premiums that our insurance subsidiaries write could also adversely impact the ability of our insurance subsidiaries to pay dividends to us.

*If A.M. Best downgrades the rating it has assigned to Donegal Mutual or any of our insurance subsidiaries, it would adversely affect their competitive position.*

Industry ratings are a factor in establishing and maintaining the competitive position of insurance companies. A.M. Best, an industry-accepted source of insurance company financial strength ratings, rates Donegal Mutual and our insurance subsidiaries. A.M. Best ratings provide an independent opinion of an insurance company's financial health and its ability to meet its obligations to its policyholders. We believe that the financial strength rating of A.M. Best is material to the operations of Donegal Mutual and our insurance subsidiaries. Currently, Donegal Mutual and our insurance subsidiaries each have an A (Excellent) rating from A.M. Best. If A.M. Best were to downgrade the rating of Donegal Mutual or any of our insurance subsidiaries, it would adversely affect the competitive position of Donegal Mutual or that insurance subsidiary and make it more difficult for it to market its products and retain its existing policyholders.

*Our strategy to grow in part through acquisitions of smaller insurance companies exposes us to risks that could adversely affect our results of operations and financial condition.*

The affiliation with, and acquisition of, smaller, and often undercapitalized, insurance companies involves risks that could adversely affect our results of operations and financial condition. The risks associated with these affiliations and acquisitions include:

- the potential inadequacy of reserves for losses and loss expenses of the other insurer;

- the need to supplement management of the other insurer with additional experienced personnel;

- conditions imposed by regulatory agencies that make the realization of cost-savings through integration of the operations of the other insurer with our operations more difficult;

-26-

- the need of the other insurer for additional capital that we did not anticipate at the time of the acquisition or affiliation; and

- the use of more of our management's time in improving the operations of the other insurer than we originally anticipated.

***If we cannot obtain sufficient capital to fund the organic growth of our insurance subsidiaries and to make acquisitions, we may not be able to expand our business.***

Our strategy is to expand our business through the organic growth of our insurance subsidiaries and through our strategic acquisitions of regional insurance companies. Our insurance subsidiaries will require additional capital in the future to support this strategy. If we cannot obtain sufficient capital on satisfactory terms and conditions, we may not be able to expand the business of our insurance subsidiaries or to make future acquisitions. Our ability to obtain additional financing will depend on a number of factors, many of which are beyond our control. For example, we may not be able to obtain additional debt or equity financing because we or our insurance subsidiaries may already have substantial debt at the time, because we or our insurance subsidiaries do not have sufficient cash flow to service or repay our existing or additional debt or because financial institutions are not making financing available. In addition, any equity capital we obtain in the future could be dilutive to our existing stockholders.

***A number of the competitors of our insurance subsidiaries have greater financial strength than our insurance subsidiaries, and these competitors may be able to offer their products at lower prices than our insurance subsidiaries can afford to offer their products.***

The property and casualty insurance industry is intensely competitive. Competition can be based on many factors, including:

- the perceived financial strength of the insurer;

- premium rates;

- policy terms and conditions;

- policyholder service;

- reputation; and

- experience.

Our insurance subsidiaries compete with many regional and national property and casualty insurance companies, including direct sellers of insurance products, insurers having their own agency organizations and other insurers represented by independent agents. Many of these insurers have greater capital than our insurance subsidiaries, have substantially greater financial, technical and operating resources and have equal or higher ratings from A.M. Best than our insurance subsidiaries. In addition, our competitors may become increasingly better capitalized in the future as the property and casualty insurance industry continues to consolidate.

The greater capitalization of many of the competitors of our insurance subsidiaries enables them to operate with lower profit margins and, therefore, allows them to market their products more aggressively, to take advantage more quickly of new marketing opportunities and to offer lower premium rates. Our insurance subsidiaries may not be able to maintain their current competitive position in the markets in which they operate if their competitors offer prices for their products that are lower than the prices our insurance subsidiaries are prepared to offer. Moreover, if these competitors lower the price of their products and our insurance subsidiaries meet their pricing, the profit margins and revenues of our insurance subsidiaries may decrease and their ratios of claims and expenses to premiums may increase. All of these factors could materially adversely affect the financial condition and results of operations of our insurance subsidiaries and their A.M. Best ratings.

*Because the investment portfolios of our insurance subsidiaries consist primarily of fixed-income securities, their investment income and the fair value of their investment portfolios could decrease as a result of a number of factors.*

Our insurance subsidiaries invest the premiums they receive from their policyholders and maintain investment portfolios that consist primarily of fixed-income securities. The management of these investment portfolios is an important component of the profitability of our insurance subsidiaries. Our insurance subsidiaries derive a significant portion of their operating income from the income they receive on their invested assets. A number of factors may affect the quality and/or yield of their investment portfolios, including the general economic and business environment, government monetary policy, changes in the credit quality of the issuers of the fixed-income securities our insurance subsidiaries own, changes in market conditions and regulatory changes. The fixed-income securities our insurance subsidiaries own consist primarily of securities issued by domestic entities that are backed either by the credit or collateral of the underlying issuer. Factors such as an economic downturn, disruption in the credit market or the availability of credit, a regulatory change pertaining to a particular issuer's industry, a significant deterioration in the cash flows of the issuer or a change in the issuer's marketplace may adversely affect the ability of our insurance subsidiaries to collect principal and interest from the issuer in which they invest.

The investments of our insurance subsidiaries are also subject to risk resulting from interest rate fluctuations. Increasing interest rates or a widening in the spread between interest rates available on U.S. Treasury securities and corporate debt or asset-backed securities, for example, will typically have an adverse impact on the market values of fixed-rate securities. If interest rates remain at historically low levels, our insurance subsidiaries will generally have a lower overall rate of return on investments of cash their operations generate. In addition, in the event of the call or maturity of investments in a low interest rate environment, our insurance subsidiaries may not be able to reinvest the proceeds in securities with comparable interest rates. Changes in interest rates may reduce both the profitability and the return on the invested capital of our insurance subsidiaries.

*We and our insurance subsidiaries depend on key personnel. The loss of any member of our executive management or the senior management of our insurance subsidiaries could negatively affect the continuation of our business strategies and achievement of our growth objectives.*

The loss of, or failure to attract, key personnel could significantly impede our financial plans, growth, marketing and other objectives and those of our insurance subsidiaries. The continued success of our insurance subsidiaries depends to a substantial extent on the ability and experience of their senior management. Our insurance subsidiaries and we believe that our future success is dependent on our ability to attract and retain additional skilled and qualified personnel and to expand, train and manage our employees. We and Donegal Mutual have two to five year automatically renewing employment agreements with our senior officers, including all of our named executive officers.

*The reinsurance agreements on which our insurance subsidiaries rely do not relieve our insurance subsidiaries from their primary liability to their policyholders, and our insurance subsidiaries face a risk of non-payment from their reinsurers as well as the non-availability of reinsurance in the future.*

Our insurance subsidiaries rely on reinsurance agreements to limit their maximum net loss from large single catastrophic risks or excess of loss risks in areas where our insurance subsidiaries may have a concentration of policyholders. Reinsurance also enables our insurance subsidiaries to increase their capacity to write insurance because it has the effect of leveraging the surplus of our insurance subsidiaries. Although the reinsurance our insurance subsidiaries maintain provides that the reinsurer is liable to them for any reinsured losses, the reinsurance agreements do not generally relieve our insurance subsidiaries from their primary liability to their policyholders if the reinsurer fails to pay the reinsurance claims of our insurance subsidiaries. To the extent that a reinsurer is unable to pay losses for which it is liable to our insurance subsidiaries, our insurance subsidiaries remain liable for such losses. At December 31, 2015, our insurance subsidiaries had approximately $115.3 million of reinsurance receivables from third-party reinsurers relating to paid and unpaid losses. Any insolvency or inability of these reinsurers to make timely payments to our insurance subsidiaries under the terms of their reinsurance agreements would adversely affect the results of operations of our insurance subsidiaries.

Michigan law requires MICO to provide unlimited lifetime medical benefits under the personal injury protection, or PIP, coverage of the personal automobile and commercial automobile policies it writes in the State of Michigan. Michigan law also requires MICO to be a member of the Michigan Catastrophic Claims Association, or MCCA, in order to write automobile insurance. The MCCA receives funding through assessments that its members collect from policyholders in the state and provides reinsurance for PIP claims that exceed a set retention. At December 31, 2015, MICO had approximately $53.5 million of reinsurance receivables from MCCA relating to paid and unpaid losses. The MCCA has generated significant operating deficits in recent years. Although we currently consider the risk to be remote, should the MCCA be unable to fulfill its payment obligations to MICO in the future, MICO's financial condition and results of operations could be adversely affected.

In addition, our insurance subsidiaries face a risk of the non-availability of reinsurance or an increase in reinsurance costs that could adversely affect their ability to write business or their results of operations. Market conditions beyond the control of our insurance subsidiaries, such as the amount of surplus in the reinsurance market and the frequency and severity of natural and man-made catastrophes, affect both the availability and the cost of the reinsurance our insurance subsidiaries purchase. If our insurance subsidiaries cannot maintain their current level of reinsurance or purchase new reinsurance protection in amounts that our insurance subsidiaries consider sufficient, our insurance subsidiaries would either have to accept an increase in their net risk retention or reduce their insurance writings, either of which could adversely affect them.

***Our equity investment in DFSC subjects us to certain risks inherent to community banking organizations.***

Our equity in the earnings of DFSC primarily reflects the underlying results of operations of UCB. UCB is subject to a number of risks, which include, but are not limited to, the following:

- variations in interest rates that may negatively affect UCB's financial performance;

- inherent risks associated with UCB's lending activities;

- a significant decline in general economic conditions in the specific markets in which UCB operates;

- the potential adverse impact of extensive federal and state regulation and supervision of banking organizations;

- potential declines in the value of UCB's investments that are considered other than temporary;

- competition for loans and deposits with numerous regional and national banks and other financial institutions; and

- UCB's inability to attract and retain qualified key personnel.

***The growth and profitability of our insurance subsidiaries depend, in part, on the effective maintenance and ongoing development of Donegal Mutual's information technology systems.***

Our insurance subsidiaries utilize Donegal Mutual's information technology systems to conduct their insurance business, including policy quoting and issuance, claims processing, processing of incoming premium payments and other important functions. As a result, the ability of our insurance subsidiaries to grow their business and conduct profitable operations depends on Donegal Mutual's ability to maintain its existing information technology systems and to develop new technology systems that will support the business of Donegal Mutual and our insurance subsidiaries in a cost-efficient manner and provide information technology capabilities equivalent to those of our competitors. The allocation among our insurance subsidiaries and Donegal Mutual of the costs of developing and maintaining Donegal Mutual's information technology systems may impact adversely our insurance subsidiaries' expense ratio and underwriting profitability, and such costs may exceed Donegal Mutual's and our expectations. In addition, while Donegal Mutual is committed to developing and maintaining information technology systems that will allow Donegal Mutual and our insurance subsidiaries to compete effectively, Donegal Mutual's information technology systems may not deliver the benefits Donegal Mutual and we expect and may fail to keep pace with our competitors' information technology systems. As a result, Donegal Mutual and our insurance subsidiaries may not have the ability to grow their business and meet their profitability objectives.

***Our insurance subsidiaries rely on Donegal Mutual's information technology systems, and the disruption or failure of these systems or the compromise of the security of those systems that results in the theft or misuse of confidential information could materially impact adversely the business of Donegal Mutual and our insurance subsidiaries.***

Our insurance subsidiaries' business operations depend significantly upon the availability and successful operation of Donegal Mutual's information technology systems in order to process new and renewal business, service their policies, process and settle claims and facilitate processing of premium payments. In addition, in the normal course of their operations, Donegal Mutual and our insurance subsidiaries collect, utilize and maintain confidential information regarding individuals and businesses. While Donegal Mutual has established various security measures to protect its information technology systems and confidential data, unanticipated computer viruses, malware, power outages, unauthorized access or other cyberattacks could disrupt those systems or result in the misappropriation or loss of confidential data. Disruption in the availability of Donegal Mutual's information technology systems could impact the ability of Donegal Mutual and our insurance subsidiaries to underwrite and process their policies timely, process and settle claims promptly and provide expected levels of customer service to agents and policyholders.

'While Donegal Mutual has identified threats to the security of its information technology systems, Donegal Mutual and we are unaware of any significant breach of the security measures Donegal Mutual maintains. A significant breach of the security of Donegal Mutual's information technology systems that results in the misappropriation or misuse of confidential information could damage the business reputation of Donegal Mutual and our insurance subsidiaries and could expose Donegal Mutual and our insurance subsidiaries to litigation. The financial impact to Donegal Mutual, us and our insurance subsidiaries of a significant breach could be material.

### Risks Relating to the Property and Casualty Insurance Industry

*Industry trends, such as increased litigation against the insurance industry and individual insurers, the willingness of courts to expand covered causes of loss, rising jury awards, escalating medical costs and increasing loss severity may contribute to increased costs and result in the deterioration of the reserves of our insurance subsidiaries.*

Loss severity in the property and casualty insurance industry has increased in recent years, principally driven by larger court judgments and increasing medical costs. In addition, many classes of complainants have brought legal actions and proceedings that tend to increase the size of judgments. The propensity of policyholders and third-party claimants to litigate and the willingness of courts to expand causes of loss and the size of awards to eliminate exclusions and to increase coverage limits may make the loss reserves of our insurance subsidiaries inadequate for current and future losses.

*Loss or significant restriction of the use of credit scoring in the pricing and underwriting of the personal lines insurance products by our insurance subsidiaries could adversely affect their future profitability.*

Our insurance subsidiaries use credit scoring as a factor in making risk selection and pricing decisions for personal lines insurance products where allowed by state law. Recently, some consumer groups and regulators have questioned whether the use of credit scoring unfairly discriminates against people with low incomes, minority groups and the elderly. These consumer groups and regulators often call for the prohibition or restriction on the use of credit scoring in underwriting and pricing. Laws or regulations enacted in a number of states that significantly curtail the use of credit scoring in the underwriting process could reduce the future profitability of our insurance subsidiaries.

*Changes in applicable insurance laws or regulations or changes in the way insurance regulators administer those laws or regulations could adversely affect the operating environment of our insurance subsidiaries and increase their exposure to loss or put them at a competitive disadvantage.*

Property and casualty insurers are subject to extensive supervision in their domiciliary states and in the states in which they do business. This regulatory oversight includes matters relating to:

- licensing and examination;

- approval of premium rates;

- market conduct;

- policy forms;

- limitations on the nature and amount of certain investments;

- claims practices;

- mandated participation in involuntary markets and guaranty funds;

- reserve adequacy;

- insurer solvency;

- transactions between affiliates;

- the amount of dividends that insurers may pay; and

- restrictions on underwriting standards.

-30-

·  ,  Such regulation and supervision are primarily for the benefit and protection of policyholders rather than stockholders. For instance, our insurance subsidiaries are subject to involuntary participation in specified markets in various states in which they operate and the premium rates our insurance subsidiaries may charge do not always correspond with the underlying costs of providing that coverage.

The NAIC and state insurance regulators are re-examining existing laws and regulations, specifically focusing on:

- insurance company investments;

- issues relating to the solvency of insurance companies;

- risk-based capital guidelines;

- restrictions on the terms and conditions included in insurance policies;

- certain methods of accounting;

- reserves for unearned premiums, losses and other purposes;

- the values at which insurance companies may carry investment securities and the definition of other-than-temporary impairment of investment securities; and

- interpretations of existing laws and the development of new laws.

Changes in state laws and regulations, as well as changes in the way state regulators view related-party transactions in particular, could change the operating environment of our insurance subsidiaries and have an adverse effect on their business. The state insurance regulatory framework has recently come under increased federal scrutiny. Congress is considering proposals that it should create an optional federal charter for insurers. Federal chartering has the potential to create an uneven playing field for insurers by subjecting federally-chartered and state-chartered insurers to different regulatory requirements. Federal chartering also raises the possibility of duplicative or conflicting federal and state requirements. In addition, if federal legislation repeals the partial exemption for the insurance industry from federal antitrust laws, our ability to collect and share loss cost data with the industry could adversely affect the results of operations of our insurance subsidiaries.

***Insurance companies are subject to assessments, based on their market share in a given line of business, to assist in the payment of unpaid claims and related costs of insolvent insurance companies. Such assessments could adversely affect the financial condition of our insurance subsidiaries.***

Our insurance subsidiaries are subject to assessments pursuant to the guaranty fund laws of the various states in which they conduct business. Generally, under these laws, our insurance subsidiaries can be assessed, depending upon the market share of our insurance subsidiaries in a given line of insurance business, to assist in the payment of unpaid claims and related costs of insolvent insurance companies in those states. We cannot predict the number and magnitude of future insurance company failures in the states in which our insurance subsidiaries conduct business, but future assessments could adversely affect the business, financial condition and results of operations of our insurance subsidiaries.

***Our insurance subsidiaries must establish premium rates and loss and loss expense reserves from forecasts of the ultimate costs they expect will arise from risks underwritten during the policy period, and the profitability of our insurance subsidiaries could be adversely affected if their premium rates or reserves are insufficient to satisfy their ultimate costs.***

One of the distinguishing features of the property and casualty insurance industry is that it prices its products before it knows its costs, since insurers generally establish their premium rates before they know the amount of losses they will incur. Accordingly, our insurance subsidiaries establish premium rates from forecasts of the ultimate costs they expect to arise from risks they have underwritten during the policy period. These premium rates may not be sufficient to cover the ultimate losses our insurance subsidiaries incur. Further, our insurance subsidiaries must establish reserves for losses and loss expenses as balance sheet liabilities based upon estimates involving actuarial and statistical projections at a given time of what our insurance subsidiaries expect their ultimate liability to be. Significant periods of time often elapse between the occurrence of an insured loss and the reporting of the loss and the payment of that loss. It is possible that our insurance subsidiaries' ultimate liability could exceed these estimates because of the future development of known losses, the existence of losses that have occurred but are currently unreported and larger than historical settlements of pending and unreported claims. The process of estimating reserves is inherently judgmental and can be influenced by a number of factors, including the following:

- trends in claim frequency and severity;

- changes in operations;

- emerging economic and social trends;

- inflation; and

- changes in the regulatory and litigation environments.

If our insurance subsidiaries have insufficient premium rates or reserves, insurance regulatory authorities may require increases to these reserves. An increase in reserves results in an increase in losses and a reduction in net income for the period in which our insurance subsidiaries recognize a deficiency in reserves. Accordingly, an increase in reserves may adversely impact the business, liquidity, financial condition and results of operations of our insurance subsidiaries.

***The financial results of our insurance subsidiaries depend primarily on their ability to underwrite risks effectively and to charge adequate rates to policyholders.***

The financial condition, cash flows and results of operations of our insurance subsidiaries depend on their ability to underwrite and set rates accurately for a full spectrum of risks across a number of lines of insurance. Rate adequacy is necessary to generate sufficient premium to pay losses, loss adjustment expenses and underwriting expenses and to realize a profit.

The ability to underwrite and set rates effectively is subject to a number of risks and uncertainties, including:

- the availability of sufficient, reliable data;

- the ability to conduct a complete and accurate analysis of available data;

- the ability to recognize in a timely manner changes in trends and to project both the severity and frequency of losses with reasonable accuracy;

- uncertainties generally inherent in estimates and assumptions;

- the ability to project changes in certain operating expense levels with reasonable certainty;

- the development, selection and application of appropriate rating formulae or other pricing methodologies;

- the use of modeling tools to assist with correctly and consistently achieving the intended results in underwriting and pricing;

- the ability to innovate with new pricing strategies and the success of those innovations on implementation;

- the ability to secure regulatory approval of premium rates on an adequate and timely basis;

- the ability to predict policyholder retention accurately;

- unanticipated court decisions, legislation or regulatory action;

- unanticipated changes in our claim settlement practices;

- changes in driving patterns for auto exposures;

- changes in weather patterns for property exposures;

- changes in the medical sector of the economy;

- unanticipated changes in auto repair costs, auto parts prices and used car prices;

-32-

- the impact of inflation and other factors on the cost of construction materials and labor;

- the ability to monitor property concentration in catastrophe-prone areas, such as hurricane, earthquake and wind/hail regions; and

- the general state of the economy in the states in which our insurance subsidiaries operate.

Such risks may result in the premium rates of our insurance subsidiaries being based on inadequate or inaccurate data or inappropriate assumptions or methodologies and may cause our estimates of future changes in the frequency or severity of claims to be incorrect. As a result, our insurance subsidiaries could underprice risks, which would negatively affect our margins, or our insurance subsidiaries could overprice risks, which could reduce their volume and competitiveness. In either event, underpricing or overpricing risks could adversely impact our operating results, financial condition and cash flows.

*The cyclical nature of the property and casualty insurance industry may reduce the revenues and profit margins of our insurance subsidiaries.*

The property and casualty insurance industry is highly cyclical with respect to both individual lines of business and the overall insurance industry. Premium rate levels relate to the availability of insurance coverage, which varies according to the level of surplus available in the insurance industry. The level of surplus in the industry varies with returns on invested capital and regulatory barriers to withdrawal of surplus. Increases in surplus may result in increased price competition among property and casualty insurers. If our insurance subsidiaries find it necessary to reduce premiums or limit premium increases due to these competitive pressures on pricing, our insurance subsidiaries may experience a reduction in their profit margins and revenues, an increase in their ratios of losses and expenses to premiums and, therefore, lower profitability.

***Risks Relating to Our Common Stock***

*The price of our common stock may be adversely affected by its low trading volume.*

Our Class A common stock and our Class B common stock have limited liquidity. Reported average daily trading volume for our Class A common stock and our Class B common stock for the year ended December 31, 2015 was approximately 21,447 shares and approximately 115 shares, respectively. This limited liquidity could subject our shares of Class A common stock and our shares of Class B common stock to greater price volatility.

*Donegal Mutual's majority voting control of our stock, anti-takeover provisions of our certificate of incorporation and by-laws and certain state laws make it unlikely anyone could acquire control of us unless Donegal Mutual were in favor of the acquisition of control.*

Donegal Mutual's ownership of our Class A common stock and Class B common stock, certain anti-takeover provisions of our certificate of incorporation and by-laws, certain provisions of Delaware law and the insurance laws and regulations of Iowa, Georgia, Maryland, Michigan, Pennsylvania, Virginia and Wisconsin could delay or prevent the removal of members of our board of directors and could make it more difficult for a merger, tender offer or proxy contest involving us to succeed, even if our stockholders other than Donegal Mutual believed any of such events would be beneficial to them. These factors could also discourage a third party from attempting to acquire control of us. The classification of our board of directors could also have the effect of delaying or preventing a change in our control.

In addition, we have 2,000,000 authorized shares of preferred stock that we could issue in one or more series without stockholder approval, to the extent applicable law permits, and upon such terms and conditions, and having such rights, privileges and preferences, as our board of directors may determine. Our ability to issue preferred stock could make it difficult for a third party to acquire us. We have no current plans to issue any preferred stock.

Moreover, the DGCL contains provisions that prohibit certain business combination transactions under certain circumstances. In addition, state insurance laws and regulations generally prohibit any person from acquiring, or seeking to acquire, a 10% or greater interest in an insurance company without the prior approval of the state insurance commissioner of the state of domicile of the insurer. Because of our indirect control of UCB, HOLA also prohibits the acquisition of a 10% or greater interest in either our Class A common stock or our Class B common stock without the prior approval of the FRB or the granting of an exemption by the FRB.

-33-

**Item 1B.  Unresolved Staff Comments.**

We have no unresolved written comments from the Securities and Exchange Commission ("SEC") staff regarding our filings under the Exchange Act.

**Item 2.    Properties.**

We and our insurance subsidiaries share administrative headquarters with Donegal Mutual in a building in Marietta, Pennsylvania that Donegal Mutual owns. Donegal Mutual charges us and our insurance subsidiaries for an appropriate portion of the building expenses under an inter-company allocation agreement. The Marietta headquarters has approximately 235,000 square feet of office space. Southern owns a facility of approximately 10,000 square feet in Glen Allen, Virginia. Le Mars owns a facility of approximately 25,500 square feet in Le Mars, Iowa, Peninsula owns a facility of approximately 14,600 square feet in Salisbury, Maryland and Sheboygan owns a facility of approximately 8,800 square feet in Sheboygan Falls, Wisconsin.

**Item 3.    Legal Proceedings.**

Our insurance subsidiaries are parties to routine litigation that arises in the ordinary course of their insurance business. We believe that the resolution of these lawsuits will not have a material adverse effect on the financial condition or results of operations of our insurance subsidiaries.

**Item 4.    Mine Safety Disclosures.**

Not applicable.

**Executive Officers of the Registrant**

The following table sets forth information regarding the executive officers of Donegal Mutual and the Registrant as of December 31, 2015, each of whom has served with us for more than 10 years:

| Name | Age | Position |
|---|---|---|
| Donald H. Nikolaus | 73 | President and Chief Executive Officer of Donegal Mutual since 1981; President and Chief Executive Officer of us from 1986 to 2015. Chairman of our board of directors since April 2012. |
| Kevin G. Burke | 50 | President and Chief Executive Officer of us since 2015; Executive Vice President and Chief Operating Officer of Donegal Mutual since 2014; Senior Vice President of Human Resources of Donegal Mutual and us from 2005 to 2014; Vice President of Human Resources of Donegal Mutual and us from 2001 to 2005; other positions from 2000 to 2001. |
| Jeffrey D. Miller | 51 | Executive Vice President and Chief Financial Officer of Donegal Mutual and us since 2014; Senior Vice President and Chief Financial Officer of Donegal Mutual and us from 2005 to 2014; Vice President and Controller of Donegal Mutual and us from 2000 to 2005; other positions from 1995 to 2000. |
| Cyril J. Greenya | 71 | Senior Vice President and Chief Underwriting Officer of Donegal Mutual and us since 2005; Senior Vice President, Underwriting, of Donegal Mutual from 1997 to 2005; other positions from 1986 to 1997. |
| Sanjay Pandey | 49 | Senior Vice President and Chief Information Officer of Donegal Mutual and us since 2013; Vice President and Chief Information Officer of Donegal Mutual and us from 2009 to 2013; other positions from 2000 to 2009. |
| Robert G. Shenk | 62 | Senior Vice President, Claims, of Donegal Mutual and us since 1997; other positions from 1986 to 1997. |
| Daniel J. Wagner | 55 | Senior Vice President and Treasurer of Donegal Mutual and us since 2005; Vice President and Treasurer of Donegal Mutual and us from 2000 to 2005; other positions from 1993 to 2000. |

-35-

## PART II

Item 5.    **Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

Our Class A common stock and Class B common stock trade on the NASDAQ Global Select Market under the symbols "DGICA" and "DGICB," respectively. The following table shows the dividends declared per share and the stock price range for both classes of stock for each quarter during 2015 and 2014:

| Quarter | High | Low | Cash Dividend Declared Per Share |
|---|---|---|---|
| **2015 - Class A** | | | |
| 1st | $ 16.47 | $ 14.53 | $  — |
| 2nd | 15.99 | 14.29 | 0.1350 |
| 3rd | 15.48 | 13.45 | 0.1350 |
| 4th | 14.87 | 13.05 | 0.2700 |
| **2015 - Class B** | | | |
| 1st | $ 27.00 | $ 18.95 | $  — |
| 2nd | 20.95 | 18.00 | 0.1175 |
| 3rd | 21.60 | 18.54 | 0.1175 |
| 4th | 18.72 | 16.00 | 0.2350 |
| **2014 - Class A** | | | |
| 1st | $ 15.96 | $ 13.84 | $  — |
| 2nd | 15.90 | 14.05 | 0.1315 |
| 3rd | 16.18 | 15.00 | 0.1315 |
| 4th | 16.10 | 14.96 | 0.2630 |
| **2014 - Class B** | | | |
| 1st | $ 26.01 | $ 21.14 | $  — |
| 2nd | 27.75 | 18.26 | 0.1160 |
| 3rd | 24.90 | 21.00 | 0.1160 |
| 4th | 23.88 | 21.00 | 0.2320 |

At the close of business on March 16, 2016, we had approximately 1,891 holders of record of our Class A common stock and approximately 316 holders of record of our Class B common stock.

We declared dividends of $0.54 per share on our Class A common stock and $0.47 per share on our Class B common stock in 2015, compared to $0.526 per share on our Class A common stock and $0.464 per share on our Class B common stock in 2014.

·  Between October 1, 2015 and December 31, 2015, we and Donegal Mutual purchased shares of our Class A common stock and Class B common stock as set forth in the table below:

| Period | (a) Total Number of Shares (or Units Purchased | (b) Average Price Paid per Share (or Unit) | (c) Total Number of Shares (or Units) Purchased as Part of Publicly Announced Plans or Programs | (d) Maximum Number (or Approximate Dollar Value) of Shares (or Units) that May Yet Be Purchased Under the Plans or Programs [1] |
|---|---|---|---|---|
| Month #1 October 1-31, 2015 | Class A — — Class B — — | Class A — $— Class B — $— | Class A — — Class B — — | |
| Month #2 November 1-30, 2015 | Class A — — Class B — — | Class A — $— Class B — $— | Class A — — Class B — — | |
| Month #3 December 1-31, 2015 | Class A — 3,675,000 Class B — 400,000 | Class A — $16.50 Class B — $23.50 | Class A — — Class B — — | (1) (1) |
| Total | Class A — 3,675,000 Class B — 400,000 | Class A — $16.50 Class B — $23.50 | Class A — — Class B — — | |

(1) On December 22, 2015, we repurchased 2,000,000 shares of our Class A common stock in a private transaction that was unrelated to our share repurchase program. As part of the same transaction, Donegal Mutual purchased 1,675,000 shares of our Class A common stock and 400,000 shares of our Class B common stock.

**Stock Performance Chart.**

The following graph provides an indicator of cumulative total stockholder returns on our Class A common stock and our Class B common stock for the period beginning on December 31, 2010 and ending on December 31, 2015, compared to the Russell 2000 Index and a peer group comprised of seven property and casualty insurance companies over the same period. The peer group consists of Cincinnati Financial Corp., EMC Insurance Group Inc., Hanover Insurance, Horace Mann Educators, Selective Insurance Group Inc., State Auto Financial Corp. and United Fire and Casualty Co. The graph shows the change in value of an initial $100 investment on December 31, 2010, assuming reinvestment of all dividends.



| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| Donegal Group Inc. Class A | $100.00 | $101.52 | $104.25 | $122.26 | $127.18 | $116.09 |
| Donegal Group Inc. Class B | 100.00 | 95.63 | 107.39 | 144.07 | 133.54 | 105.02 |
| Russell 2000 Index | 100.00 | 94.55 | 108.38 | 148.49 | 153.73 | 144.95 |
| Peer Group | 100.00 | 92.82 | 117.61 | 168.17 | 180.24 | 209.88 |

Value Line Publishing LLC prepared the foregoing performance graph and data. The performance graph and accompanying data shall not be deemed "filed" as part of this Form 10-K Report for purposes of Section 18 of the Exchange Act or otherwise subject to the liabilities of that section and should not be deemed incorporated by reference into any other filing we make under the Securities Act of 1933 or the Securities Exchange Act of 1934, except to the extent we specifically incorporate the performance graph and accompanying data by reference into such filing.

**Item 6.   Selected Financial Data.**

| Year Ended December 31, | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **Income Statement Data** | | | | | |
| Premiums earned | $ 605,640,728 | $ 556,497,535 | $ 515,291,944 | $ 475,002,222 | $ 431,470,184 |
| Investment income, net | 20,949,698 | 18,344,382 | 18,795,239 | 20,168,919 | 20,858,179 |
| Realized investment gains | 1,934,424 | 3,134,081 | 2,423,442 | 6,859,439 | 12,281,267 |
| Total revenues | 636,387,263 | 586,547,742 | 547,110,065 | 514,982,585 | 475,017,619 |
| Income (loss) before income taxes (benefit) | 27,592,268 | 16,282,817 | 32,710,265 | 27,858,260 | (6,739,313) |
| Income taxes (benefit) | 6,602,235 | 1,743,799 | 6,388,273 | 4,765,640 | (7,192,266) |
| Net income | 20,990,033 | 14,539,018 | 26,321,992 | 23,092,620 | 452,953 |
| Basic earnings per share - Class A | 0.78 | 0.56 | 1.04 | 0.92 | 0.02 |
| Diluted earnings per share - Class A | 0.77 | 0.55 | 1.02 | 0.91 | 0.02 |
| Cash dividends per share - Class A | 0.54 | 0.53 | 0.51 | 0.49 | 0.48 |
| Basic earnings per share - Class B | 0.69 | 0.49 | 0.94 | 0.83 | 0.01 |
| Diluted earnings per share - Class B | 0.69 | 0.49 | 0.94 | 0.83 | 0.01 |
| Cash dividends per share - Class B | 0.47 | 0.46 | 0.46 | 0.44 | 0.43 |
| **Balance Sheet Data at Year End** | | | | | |
| Total investments | $ 900,822,274 | $ 832,941,077 | $ 791,808,307 | $ 806,429,032 | $ 785,308,991 |
| Total assets | 1,537,834,415 | 1,458,654,644 | 1,385,410,502 | 1,336,889,187 | 1,290,793,478 |
| Debt obligations | 86,000,000 | 58,500,000 | 63,000,000 | 72,465,000 | 74,965,000 |
| Stockholders' equity | 408,388,568 | 416,134,643 | 396,877,111 | 400,034,094 | 383,451,592 |
| Book value per share | 15.66 | 15.40 | 15.02 | 15.63 | 15.01 |

**Item 7.    Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Overview**

Donegal Mutual Insurance Company ("Donegal Mutual") organized us as an insurance holding company on August 26, 1986. See "Business - History and Organizational Structure" for more information. Our insurance subsidiaries, Atlantic States Insurance Company ("Atlantic States"), Southern Insurance Company of Virginia ("Southern"), Le Mars Insurance Company ("Le Mars"), The Peninsula Insurance Company and Peninsula Indemnity Company (collectively, "Peninsula"), Sheboygan Falls Insurance Company ("Sheboygan Falls") and Michigan Insurance Company ("MICO") write personal and commercial lines of property and casualty coverages exclusively through a network of independent insurance agents in certain Mid-Atlantic, Midwest, New England and Southern states. The personal lines products of our insurance subsidiaries consist primarily of homeowners and private passenger automobile policies. The commercial lines products of our insurance subsidiaries consist primarily of commercial automobile, commercial multi-peril and workers' compensation policies. We also own 48.2% of the outstanding stock of Donegal Financial Services Corporation ("DFSC"), a grandfathered unitary savings and loan holding company. Donegal Mutual owns the remaining 51.8% of the outstanding stock of DFSC.

At December 31, 2015, Donegal Mutual held approximately 48% of our outstanding Class A common stock and approximately 83% of our outstanding Class B common stock. This ownership provides Donegal Mutual with approximately 74% of the aggregate voting power of our outstanding shares of Class A common stock and our outstanding shares of Class B common stock.

Donegal Mutual and Atlantic States entered into a proportional reinsurance agreement, or pooling agreement, effective October 1, 1986. Under this pooling agreement, Donegal Mutual and Atlantic States pool and then share proportionately substantially all of their respective premiums, losses and expenses. Atlantic States' participation in the pool has been 80% since March 1, 2008. The operations of our insurance subsidiaries and Donegal Mutual are interrelated due to the pooling agreement and other factors. While maintaining the separate corporate existence of each company, our insurance subsidiaries and Donegal Mutual conduct business together as the Donegal Insurance Group. As such, Donegal Mutual and our insurance subsidiaries share the same business philosophy, the same management, the same employees and the same facilities and offer the same types of insurance products. See "Business - History and Organizational Structure" for more information regarding the pooling agreement and other transactions with our affiliates.

In February 2009, our board of directors authorized a share repurchase program, pursuant to which we may purchase up to 300,000 shares of our Class A common stock at prices prevailing from time to time in the open market subject to the provisions of Securities and Exchange Commission ("SEC") Rule 10b-18 and in privately negotiated transactions. We purchased 3,222 and 846 shares of our Class A common stock under this program during 2015 and 2014, respectively. As of December 31, 2015, we had no remaining authority to purchase shares under this program.

On July 18, 2013, our board of directors authorized a share repurchase program pursuant to which we have the authority to purchase up to 500,000 additional shares of our Class A common stock at prices prevailing from time to time in the open market subject to the provisions of the SEC Rule 10b-18 and in privately negotiated transactions. We purchased 57,658 shares of our Class A common stock under this program during 2015. We did not purchase any shares of our Class A common stock under this program during 2014. We have purchased a total of 57,658 shares of our Class A common stock under this program from its inception through December 31, 2015.

On December 18, 2015, we and Donegal Mutual entered into a Stock Purchase and Standstill Agreement (the "Purchase Agreement") with Gregory M. Shepard ("Mr. Shepard"). Under the terms of the Purchase Agreement, we purchased 2,000,000 shares of our Class A common stock from Mr. Shepard on December 22, 2015 for a price of $33.0 million, or $16.50 per share, representing a premium of approximately $5.8 million from the market price of our Class A common stock on the date of the Purchase Agreement. We reported this premium in excess of the market price as an expense in our consolidated statements of income and comprehensive income that we include in this Form 10-K Report. We borrowed $33.0 million under our existing line of credit with M&T Bank to fund the purchase. The Purchase Agreement contains a number of typical "standstill" provisions pursuant to which Mr. Shepard and any affiliate of Mr. Shepard agree not to take a number of "control-seeking" actions with respect to us for a period of 25 years from the date of the Purchase Agreement.

**Critical Accounting Policies and Estimates**

We combine our financial statements with those of our insurance subsidiaries and present them on a consolidated basis in accordance with GAAP.

Our insurance subsidiaries make estimates and assumptions that can have a significant effect on amounts and disclosures we report in our financial statements. The most significant estimates relate to the reserves of our insurance subsidiaries for property and casualty insurance unpaid losses and loss expenses, valuation of investments and determination of other-than-temporary investment impairments and the policy acquisition costs of our insurance subsidiaries. While we believe our estimates and the estimates of our insurance subsidiaries are appropriate, the ultimate amounts may differ from the estimates we provided. We regularly review our methods for making these estimates, and we reflect any adjustment we consider necessary in our results of operations for the period in which we make an adjustment.

*Liability for Losses and Loss Expenses*

Liabilities for losses and loss expenses are estimates at a given point in time of the amounts an insurer expects to pay with respect to policyholder claims based on facts and circumstances then known to the insurer. At the time of establishing its estimates, an insurer recognizes that its ultimate liability for losses and loss expenses will exceed or be less than such estimates. Our insurance subsidiaries base their estimates of liabilities for losses and loss expenses on assumptions as to future loss trends, expected claims severity, judicial theories of liability and other factors. However, during the loss adjustment period, our insurance subsidiaries may learn additional facts regarding individual claims, and, consequently, it often becomes necessary for our insurance subsidiaries to refine and adjust their estimates of liability. We reflect any adjustments to our insurance subsidiaries' liabilities for losses and loss expenses in our consolidated results of operations in the period in which our insurance subsidiaries make the changes in estimates.

Our insurance subsidiaries maintain liabilities for the payment of losses and loss expenses with respect to both reported and unreported claims. Our insurance subsidiaries establish these liabilities for the purpose of covering the ultimate costs of settling all losses, including investigation and litigation costs. Our insurance subsidiaries base the amount of their liability for reported losses primarily upon a case-by-case evaluation of the type of risk involved, knowledge of the circumstances surrounding each claim and the insurance policy provisions relating to the type of loss the policyholder incurred. Our insurance subsidiaries determine the amount of their liability for unreported claims and loss expenses on the basis of historical information by line of insurance. Our insurance subsidiaries account for inflation in the reserving function through analysis of costs and trends and reviews of historical reserving results. Our insurance subsidiaries closely monitor their liabilities and recompute them periodically using new information on reported claims and a variety of statistical techniques. Our insurance subsidiaries do not discount their liabilities for losses.

Reserve estimates can change over time because of unexpected changes in assumptions related to our insurance subsidiaries' external environment and, to a lesser extent, assumptions related to our insurance subsidiaries' internal operations. For example, our insurance subsidiaries have experienced a decrease in claims frequency on workers' compensation claims during the past several years while claims severity has gradually increased. These trend changes give rise to greater uncertainty as to the pattern of future loss settlements on workers' compensation claims. Related uncertainties regarding future trends include the cost of medical technologies and procedures and changes in the utilization of medical procedures. Assumptions related to our insurance subsidiaries' external environment include the absence of significant changes in tort law and the legal environment that increase liability exposure, consistency in judicial interpretations of insurance coverage and policy provisions and the rate of loss cost inflation. Internal assumptions include consistency in the recording of premium and loss statistics, consistency in the recording of claims, payment and case reserving methodology, accurate measurement of the impact of rate changes and changes in policy provisions, consistency in the quality and characteristics of business written within a given line of business and consistency in reinsurance coverage and collectability of reinsured losses, among other items. To the extent our insurance subsidiaries determine that underlying factors impacting their assumptions have changed, our insurance subsidiaries attempt to make appropriate adjustments for such changes in their reserves. Accordingly, our insurance subsidiaries' ultimate liability for unpaid losses and loss expenses will likely differ from the amount recorded at December 31, 2015. For every 1% change in our insurance subsidiaries' estimate for loss and loss expense reserves, net of reinsurance recoverable, the effect on our pre-tax results of operations would be approximately $3.2 million.

The establishment of appropriate liabilities is an inherently uncertain process and we can provide no assurance that our insurance subsidiaries' ultimate liability will not exceed our insurance subsidiaries' loss and loss expense reserves and have an adverse effect on our results of operations and financial condition. Furthermore, we cannot predict the timing, frequency and extent of adjustments to our insurance subsidiaries' estimated future liabilities, since the historical conditions and events that serve as a basis for our insurance subsidiaries' estimates of ultimate claim costs may change. As is the case for substantially all

property and casualty insurance companies, our insurance subsidiaries have found it necessary in the past to increase their estimated future liabilities for losses and loss expenses in certain periods and, in other periods, their estimates of future liabilities have exceeded their actual liabilities. Changes in our insurance subsidiaries' estimate of their liability for losses and loss expenses generally reflect actual payments and their evaluation of information received since the prior reporting date. Our insurance subsidiaries recognized an increase in their liability for losses and loss expenses of prior years of $7.2 million, $14.5 million and $10.4 million in 2015, 2014 and 2013, respectively. Our insurance subsidiaries made no significant changes in their reserving philosophy, key reserving assumptions or claims management personnel, and have made no significant offsetting changes in estimates that increased or decreased their loss and loss expense reserves in these years. The 2015 development represented 2.5% of the December 31, 2014 net carried reserves and resulted primarily from higher-than-expected severity in the private passenger automobile liability, commercial multiple peril and commercial automobile lines of business in accident years prior to 2015.

Excluding the impact of weather events, our insurance subsidiaries have noted stable amounts in the number of claims incurred and a slight downward trend in the number of claims outstanding at period ends relative to their premium base in recent years across most of their lines of business. However, the amount of the average claim outstanding has increased gradually over the past several years as the United States property and casualty insurance industry has experienced increased litigation trends and economic conditions that have extended the estimated length of disabilities and contributed to increased medical loss costs. We have also experienced a general slowing of settlement rates in litigated claims. Our insurance subsidiaries could have to make further adjustments to their estimates in the future. However, on the basis of our insurance subsidiaries' internal procedures, which analyze, among other things, their prior assumptions, their experience with similar cases and historical trends such as reserving patterns, loss payments, pending levels of unpaid claims and product mix, as well as court decisions, economic conditions and public attitudes, we believe that our insurance subsidiaries have made adequate provision for their liability for losses and loss expenses at December 31, 2015.

Atlantic States' participation in the pool with Donegal Mutual exposes it to adverse loss development on the business of Donegal Mutual that the pool includes. However, pooled business represents the predominant percentage of the net underwriting activity of both companies, and Donegal Mutual and Atlantic States proportionately share any adverse risk development of the pooled business. The business in the pool is homogeneous and each company has a pro-rata share of the entire pool. Since substantially all of the business of Atlantic States and Donegal Mutual is pooled and the results shared by each company according to its participation level under the terms of the pooling agreement, the intent of the underwriting pool is to produce a more uniform and stable underwriting result from year to year for each company than either would experience individually and to spread the risk of loss between the companies.

Our insurance subsidiaries' liability for losses and loss expenses by major line of business at December 31, 2015 and 2014 consisted of the following:

|  | 2015 | 2014 |
|---|---|---|
|  | (in thousands) | |
| Commercial lines: |  |  |
| Automobile | $ 53,938 | $ 44,270 |
| Workers' compensation | 99,212 | 89,995 |
| Commercial multi-peril | 54,395 | 48,499 |
| Other | 3,119 | 2,679 |
| Total commercial lines | 210,664 | 185,443 |
| Personal lines: |  |  |
| Automobile | 93,923 | 90,207 |
| Homeowners | 15,816 | 15,053 |
| Other | 1,651 | 1,598 |
| Total personal lines | 111,390 | 106,858 |
| Total commercial and personal lines | 322,054 | 292,301 |
| Plus reinsurance recoverable | 256,151 | 245,957 |
| Total liability for losses and loss expenses | $ 578,205 | $ 538,258 |

We have evaluated the effect on our insurance subsidiaries' loss and loss expense reserves and our stockholders' equity in the event of reasonably likely changes in the variables we consider in establishing loss and loss expense reserves. We established the range of reasonably likely changes based on a review of changes in accident year development by line of business and applied it to our insurance subsidiaries' loss reserves as a whole. The selected range does not necessarily indicate what could be the potential best or worst case or the most-likely scenario. The following table sets forth the effect on our insurance subsidiaries' loss and loss expense reserves and our stockholders' equity in the event of reasonably likely changes in the variables considered in establishing loss and loss expense reserves:

| Change in Loss and Loss Expense Reserves Net of Reinsurance | Adjusted Loss and Loss Expense Reserves Net of Reinsurance at December 31, 2015 | Percentage Change in Equity at December 31, 2015(1) | Adjusted Loss and Loss Expense Reserves Net of Reinsurance at December 31, 2014 | Percentage Change in Equity at December 31, 2014(1) |
|---|---|---|---|---|
| | (dollars in thousands) | | | |
| -10.0% | $289,849 | 5.1% | $263,071 | 4.6% |
| -7.5 | 297,900 | 3.8 | 270,378 | 3.4 |
| -5.0 | 305,951 | 2.6 | 277,686 | 2.3 |
| -2.5 | 314,003 | 1.3 | 284,993 | 1.1 |
| Base | 322,054 | — | 292,301 | — |
| 2.5 | 330,105 | -1.3 | 299,609 | -1.1 |
| 5.0 | 338,157 | -2.6 | 306,916 | -2.3 |
| 7.5 | 346,208 | -3.8 | 314,224 | -3.4 |
| 10.0 | 354,259 | -5.1 | 321,531 | -4.6 |

(1)  Net of income tax effect.

Our insurance subsidiaries base their reserves for unpaid losses and loss expenses on current trends in loss and loss expense development and reflect their best estimates for future amounts needed to pay losses and loss expenses with respect to incurred events currently known to them plus incurred but not reported ("IBNR") claims. Our insurance subsidiaries develop their reserve estimates based on an assessment of known facts and circumstances, review of historical loss settlement patterns, estimates of trends in claims severity, frequency, legal and regulatory changes and other assumptions. Our insurance subsidiaries consistently apply actuarial loss reserving techniques and assumptions, which rely on historical information as adjusted to reflect current conditions, including consideration of recent case reserve activity. Our insurance subsidiaries use the most-likely number their actuaries determine. For the year ended December 31, 2015, the actuaries developed a range from a low of $293.3 million to a high of $353.7 million and with a most-likely number of $322.1 million. The actuaries' range of estimates for commercial lines in 2015 was $191.9 million to $231.3 million, and the actuaries selected the most-likely number of $210.7 million. The actuaries' range of estimates for personal lines in 2015 was $101.4 million to $122.4 million, and the actuaries selected the most-likely number of $111.4 million. For the year ended December 31, 2014, the actuaries developed a range from a low of $266.3 million to a high of $320.9 million and with a most-likely number of $292.3 million. The actuaries' range of estimates for commercial lines in 2014 was $169.0 million to $203.5 million, and the actuaries selected the most-likely number of $185.4 million. The actuaries' range of estimates for personal lines in 2014 was $97.3 million to $117.4 million, and the actuaries selected the most-likely number of $106.9 million.

Our insurance subsidiaries seek to enhance their underwriting results by carefully selecting the product lines they underwrite. For personal lines products, our insurance subsidiaries insure standard and preferred risks in private passenger automobile and homeowners lines. For commercial lines products, the commercial risks that our insurance subsidiaries primarily insure are business offices, wholesalers, service providers, contractors, artisans and light manufacturing operations. Our insurance subsidiaries have limited exposure to asbestos and other environmental liabilities. Our insurance subsidiaries write no medical malpractice liability risks. Through the consistent application of this disciplined underwriting philosophy, our insurance subsidiaries have avoided many of the "long-tail" issues other insurance companies have faced. We consider workers' compensation to be a "long-tail" line of business, in that workers' compensation claims tend to be settled over a longer time frame than those in the other lines of business of our insurance subsidiaries.

• ,  The following table presents 2015 and 2014 claim count and payment amount information for workers' compensation. Workers' compensation losses primarily consist of indemnity and medical costs for injured workers.

| | For the Year Ended December 31, | |
| | --- | --- |
| (dollars in thousands) | 2015 | 2014 |
| Number of claims pending, beginning of period | 2,682 | 2,609 |
| Number of claims reported | 6,136 | 6,165 |
| Number of claims settled or dismissed | 6,124 | 6,092 |
| Number of claims pending, end of period | 2,694 | 2,682 |
| | | |
| Losses paid | $ 35,262 | $ 36,753 |
| Loss expenses paid | 8,782 | 7,602 |

### Investments

We make estimates concerning the valuation of our investments and the recognition of other-than-temporary declines in the value of our investments. For equity securities, when we consider a decline in the value of an individual investment to be other than temporary, we write down the investment to its fair value and reflect the amount of the write-down as a realized loss in our results of operations. We individually monitor all investments for other-than-temporary declines in value. Generally, we assume there has been an other-than-temporary decline in value if an individual equity security has depreciated in value by more than 20% of original cost and has been in such an unrealized loss position for more than six months. We held 17 equity securities that were in an unrealized loss position at December 31, 2015. Based upon our analysis of general market conditions and underlying factors impacting these equity securities, we considered these declines in value to be temporary. With respect to a debt security that is in an unrealized loss position, we first assess if we intend to sell the debt security. If we determine we intend to sell the debt security, we recognize the impairment loss in our results of operations. If we do not intend to sell the debt security, we determine whether it is more likely than not that we will be required to sell the security prior to recovery. If we determine it is more likely than not that we will be required to sell the debt security prior to recovery, we recognize an impairment loss in our results of operations. If we determine it is more likely than not that we will not be required to sell the debt security prior to recovery, we then evaluate whether a credit loss has occurred. We determine whether a credit loss has occurred by comparing the amortized cost of the debt security to the present value of the cash flows we expect to collect. If we expect a cash flow shortfall, we consider that a credit loss has occurred. If we determine that a credit loss has occurred, we consider the impairment to be other than temporary. We then recognize the amount of the impairment loss related to the credit loss in our results of operations, and we recognize the remaining portion of the impairment loss in our other comprehensive income, net of applicable taxes. In addition, we may write down securities in an unrealized loss position based on a number of other factors, including when the fair value of an investment is significantly below its cost, when the financial condition of the issuer of a security has deteriorated, the occurrence of industry, company or geographic events that have negatively impacted the value of a security and rating agency downgrades. We held 216 debt securities that were in an unrealized loss position at December 31, 2015. Based upon our analysis of general market conditions and underlying factors impacting these debt securities, we considered these declines in value to be temporary. We did not recognize any impairment losses in 2015, 2014 or 2013.

We held fixed maturities and equity securities with unrealized losses representing declines that we considered temporary at December 31, 2015 as follows:

| | Less than 12 months | | 12 months or longer | |
| | --- | --- | --- | --- |
| | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 10,168,014 | $ 50,819 | $ — | $ — |
| Obligations of states and political subdivisions | 19,437,469 | 483,022 | — | — |
| Corporate securities | 69,481,645 | 1,615,369 | 11,323,819 | 957,678 |
| Mortgage-backed securities | 105,299,953 | 875,658 | 7,538,257 | 168,806 |
| Equity securities | 9,245,342 | 772,848 | — | — |
| Totals | $ 213,632,423 | $ 3,797,716 | $ 18,862,076 | $ 1,126,484 |

We held fixed maturities and equity securities with unrealized losses representing declines that we considered temporary at December 31, 2014 as follows:

|  | Less than 12 months | | 12 months or longer | |
|---|---|---|---|---|
|  | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 6,821,013 | $ 18,511 | $ 937,448 | $ 1,482 |
| Obligations of states and political subdivisions | 4,145,920 | 15,356 | 1,309,285 | 3,686 |
| Corporate securities | 26,854,423 | 499,697 | 2,397,635 | 35,866 |
| Mortgage-backed securities | 13,360,859 | 71,730 | 9,025,795 | 132,134 |
| Equity securities | 7,511,808 | 815,628 | — | — |
| Totals | $ 58,694,023 | $ 1,420,922 | $13,670,163 | $ 173,168 |

We present our investments in available-for-sale fixed maturity and equity securities at estimated fair value. The estimated fair value of a security may differ from the amount that we could realize if we sold the security in a forced transaction. In addition, the valuation of fixed maturity investments is more subjective when markets are less liquid, increasing the potential that the estimated fair value does not reflect the price at which an actual transaction would occur. We utilize nationally recognized independent pricing services to estimate fair values or obtain market quotations for substantially all of our fixed maturity and equity investments. We generally obtain two prices per security. The pricing services utilize market quotations for fixed maturity and equity securities that have quoted prices in active markets. For fixed maturity securities that generally do not trade on a daily basis, the pricing services prepare estimates of fair value measurements based predominantly on observable market inputs. The pricing services do not use broker quotes in determining the fair values of our investments. Our investment personnel review the estimates of fair value the pricing services provide to determine if the estimates we obtain are representative of fair values based upon their general knowledge of the market, their research findings related to unusual fluctuations in value and their comparison of such values to execution prices for similar securities. Our investment personnel monitor the market and are familiar with current trading ranges for similar securities and pricing of specific investments. Our investment personnel review all pricing estimates that we receive from the pricing services against the expectations of our investment personnel with respect to pricing based on fair market curves, security ratings, coupon rates, security type and recent trading activity. Our investment personnel review documentation with respect to the pricing services' pricing methodology that they obtain periodically to determine if the primary pricing sources, market inputs and pricing frequency for various security types are reasonable. At December 31, 2015, we received two estimates per security from the pricing services, and we priced substantially all of our Level 1 and Level 2 investments using those prices. In our review of the estimates the pricing services provided at December 31, 2015, we did not identify any material discrepancies, and we did not make any adjustments to the estimates the pricing services provided.

We had no sales or transfers from the held to maturity portfolio in 2015, 2014 or 2013.

### *Policy Acquisition Costs*

We defer our insurance subsidiaries' policy acquisition costs, consisting primarily of commissions, premium taxes and certain other underwriting costs, reduced by ceded commissions, that vary with and relate directly to the production of business. We amortize these costs over the period in which our insurance subsidiaries earn the premiums on that business. The method our insurance subsidiaries follow in computing deferred policy acquisition costs limits the amount of such deferred costs to their estimated realizable value, which gives effect to the premium to be earned, related investment income, losses and loss expenses and certain other costs we expect to incur as our insurance subsidiaries earn the premium.

### *Management Evaluation of Operating Results*

Despite economic uncertainty, challenging insurance market conditions and unusually adverse weather conditions that affected our results in recent years, we believe that our focused business strategy, including our insurance subsidiaries' disciplined underwriting practices, have positioned us well for 2016 and beyond.

The property and casualty insurance industry is highly cyclical, and individual lines of business experience their own cycles within the overall property and casualty insurance industry cycle. Premium rate levels relate to the availability of insurance coverage, which varies according to the level of surplus in the insurance industry and other factors. The level of surplus in the industry varies with returns on capital and regulatory barriers to the withdrawal of surplus. Increases in surplus

-45-

have generally been accompanied by increased price competition among property and casualty insurers. If our insurance subsidiaries were to find it necessary to reduce premiums or limit premium increases due to competitive pressures on pricing, our insurance subsidiaries could experience a reduction in profit margins and revenues, an increase in ratios of losses and expenses to premiums and, therefore, lower profitability. The cyclicality of the insurance market and its potential impact on our results is difficult to predict with any significant reliability. We evaluate the performance of our commercial lines and personal lines segments primarily based upon the underwriting results of our insurance subsidiaries as determined under statutory accounting practices ("SAP"), which our management uses to measure performance for the total business of our insurance subsidiaries.

We use the following financial data to monitor and evaluate our operating results:

| | Year Ended December 31, | | |
|---|---|---|---|
| (in thousands) | 2015 | 2014 | 2013 |
| Net premiums written: | | | |
| Personal lines: | | | |
| Automobile | $ 214,610 | $ 204,174 | $ 196,363 |
| Homeowners | 119,541 | 113,576 | 106,420 |
| Other | 18,176 | 16,989 | 15,915 |
| Total personal lines | 352,327 | 334,739 | 318,698 |
| Commercial lines: | | | |
| Automobile | 76,729 | 65,552 | 58,165 |
| Workers' compensation | 98,079 | 88,739 | 77,589 |
| Commercial multi-peril | 94,219 | 83,413 | 74,516 |
| Other | 7,483 | 6,758 | 4,463 |
| Total commercial lines | 276,510 | 244,462 | 214,733 |
| Total net premiums written | $ 628,837 | $ 579,201 | $ 533,431 |
| Components of GAAP combined ratio: | | | |
| Loss ratio | 65.8% | 69.8% | 66.6% |
| Expense ratio | 32.6 | 31.4 | 31.8 |
| Dividend ratio | 0.6 | 0.5 | 0.4 |
| GAAP combined ratio | 99.0% | 101.7% | 98.8% |
| Revenues: | | | |
| Premiums earned: | | | |
| Personal lines | $ 344,355 | $ 325,442 | $ 312,309 |
| Commercial lines | 261,286 | 231,056 | 202,983 |
| GAAP premiums earned | 605,641 | 556,498 | 515,292 |
| Net investment income | 20,950 | 18,344 | 18,795 |
| Realized investment gains | 1,934 | 3,134 | 2,423 |
| Equity in earnings of DFSC | 1,277 | 1,243 | 2,908 |
| Other | 6,585 | 7,329 | 7,692 |
| Total revenues | $ 636,387 | $ 586,548 | $ 547,110 |

| (in thousands) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Components of net income: | | | |
| Underwriting income (loss): | | | |
| Personal lines | $ (6,414) | $ (6,383) | $ 1,654 |
| Commercial lines | 9,259 | (9,434) | (524) |
| SAP underwriting income (loss) | 2,845 | (15,817) | 1,130 |
| GAAP adjustments | 3,344 | 6,312 | 5,175 |
| GAAP underwriting income (loss) | 6,189 | (9,505) | 6,305 |
| Net investment income | 20,950 | 18,344 | 18,795 |
| Realized investment gains | 1,934 | 3,134 | 2,423 |
| Equity in earnings of DFSC | 1,277 | 1,243 | 2,908 |
| Premium paid on purchase of treasury stock | (5,780) | — | — |
| Other | 3,022 | 3,067 | 2,279 |
| Income before income tax | 27,592 | 16,283 | 32,710 |
| Income tax | (6,602) | (1,744) | (6,388) |
| Net income | $ 20,990 | $ 14,539 | $ 26,322 |

### *Statutory Combined Ratios*

We evaluate our insurance operations by monitoring certain key measures of growth and profitability. In addition to using GAAP-based performance measurements, we also utilize certain non-GAAP financial measures that we believe are valuable in managing our business and for comparison to our peers. These non-GAAP measures are underwriting income (loss), statutory combined ratio and net premiums written. An insurance company's statutory combined ratio is a standard measure of underwriting profitability. This ratio is the sum of the ratio of calendar-year incurred losses and loss expenses to premiums earned; the ratio of expenses incurred for commissions, premium taxes and underwriting expenses to premiums written and the ratio of dividends to policyholders to premiums earned. The statutory combined ratio does not reflect investment income, federal income taxes or other non-operating income or expense. A ratio of less than 100 percent generally indicates underwriting profitability. The statutory combined ratio differs from the GAAP combined ratio. In calculating the GAAP combined ratio, we do not deduct installment payment fees from incurred expenses, and we base the expense ratio on premiums earned instead of premiums written. The following table sets forth our insurance subsidiaries' statutory combined ratios by major line of business for the years ended December 31, 2015, 2014 and 2013:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Commercial lines: | | | |
| Automobile | 109.5% | 115.0% | 104.9% |
| Workers' compensation | 87.6 | 91.1 | 96.9 |
| Commercial multi-peril | 90.8 | 102.9 | 92.9 |
| Total commercial lines | 92.8 | 99.8 | 95.7 |
| Personal lines: | | | |
| Automobile | 104.3 | 102.8 | 103.2 |
| Homeowners | 97.6 | 97.8 | 93.0 |
| Total personal lines | 100.9 | 101.0 | 98.8 |
| Total commercial and personal lines | 97.4 | 100.5 | 97.4 |

## Results of Operations

### YEAR ENDED DECEMBER 31, 2015 COMPARED TO YEAR ENDED DECEMBER 31, 2014

#### Net Premiums Written

Our insurance subsidiaries' 2015 net premiums written increased 8.6% to $628.8 million, compared to $579.2 million for 2014. We primarily attribute the increase to a reduction in MICO's quota-share reinsurance, the impact of premium rate increases and an increase in the writing of commercial lines of insurance. Effective January 1, 2015, MICO terminated its external quota-share reinsurance with third-party reinsurers. Commercial lines net premiums written increased $32.0 million, or 13.1%, for 2015 compared to 2014. The increase included $11.9 million related to the reduction in the amount of premium MICO reinsured in 2015, with the remainder attributable to premium rate increases and increased writings of new accounts in the commercial automobile, commercial multi-peril and workers' compensation lines of business. Personal lines net premiums written increased $17.6 million, or 5.3%, for 2015 compared to 2014. The increase included $7.7 million resulting from the reduction in the amount of premium MICO reinsured in 2015, with the remainder primarily attributable to premium rate increases.

#### Net Premiums Earned

Our insurance subsidiaries' net premiums earned increased to $605.6 million for 2015, an increase of $49.1 million, or 8.8%, over 2014, reflecting increases in net premiums written during 2014 and 2015. Our insurance subsidiaries earn premiums and recognize them as income over the terms of the policies they issue. Such terms are generally one year or less in duration. Therefore, increases or decreases in net premiums earned generally reflect increases or decreases in net premiums written in the preceding twelve-month period compared to the same period one year earlier.

#### Investment Income

For 2015, our net investment income increased to $20.9 million, an increase of $2.6 million, or 14.2%, over 2014. We attribute the increase primarily to an increase in average invested assets and a decrease in our allocation of expenses to our investment function.

#### Installment Payment Fees

Our insurance subsidiaries' installment fees decreased primarily as a result of their customers' increased usage of payment plans that have lower installment payment fees during 2015.

#### Net Realized Investment Gains

Our net realized investment gains in 2015 and 2014 were $1.9 million and $3.1 million, respectively. The net realized investment gains in 2015 and 2014 resulted from normal turnover within our investment portfolio. We did not recognize any impairment losses during 2015 or 2014.

#### Equity in Earnings of DFSC

Our equity in the earnings of DFSC in 2015 and 2014 was $1.3 million and $1.2 million, respectively.

#### Losses and Loss Expenses

Our insurance subsidiaries' loss ratio, which is the ratio of incurred losses and loss expenses to premiums earned, was 65.8% in 2015, compared to 69.8% in 2014. Our insurance subsidiaries' commercial lines loss ratio decreased to 62.3% in 2015, compared to 72.0% in 2014. This decrease resulted primarily from the workers' compensation loss ratio decreasing to 56.7% in 2015, compared to 64.7% in 2014, and the commercial multi-peril loss ratio decreasing to 58.2% in 2015, compared to 73.5% in 2014. The personal lines loss ratio was 68.5% in 2015, virtually unchanged from 68.2% in 2014. Our insurance subsidiaries experienced unfavorable loss reserve development of approximately $7.2 million during 2015 in their reserves for prior accident years, improved from unfavorable loss reserve development of approximately $14.5 million during 2014. The change in loss reserve development patterns occurred primarily within our insurance subsidiaries' private passenger automobile liability, workers' compensation and commercial automobile lines of business.

-48-

*Underwriting Expenses*

Our insurance subsidiaries' expense ratio, which is the ratio of policy acquisition and other underwriting expenses to premiums earned, was 32.6% in 2015, compared to 31.4% in 2014. We attribute the increase to higher underwriting-based incentives in 2015.

**Combined Ratio**

Our insurance subsidiaries' combined ratio was 99.0% and 101.7% in 2015 and 2014, respectively. The combined ratio represents the sum of the loss ratio, the expense ratio and the dividend ratio, which is the ratio of workers' compensation policy dividends incurred to premiums earned. We attribute the decrease in our combined ratio primarily to the decrease in our loss ratio.

**Interest Expense**

Our interest expense in 2015 decreased to $1.1 million, compared to $1.5 million in 2014. The decrease was related to our utilization in 2015 of borrowings under Atlantic States' line of credit with the FHLB of Pittsburgh to repay borrowings under our line of credit with M&T that carried a higher interest rate.

**Income Taxes**

Our income tax expense was $6.6 million in 2015, compared to $1.7 million in 2014. Our effective tax rate for 2015 was 23.9%, compared to 10.7% for 2014. The increase in our 2015 effective tax rate was primarily due to tax-exempt interest income representing a smaller proportion of income before income tax expense and non-deductible expenses we incurred in 2015 compared to 2014.

**Net Income and Earnings Per Share**

Our net income in 2015 was $21.0 million, or $.77 per share of Class A common stock on a diluted basis and $.69 per share of Class B common stock, compared to $14.5 million, or $.55 per share of Class A common stock on a diluted basis and $.49 per share of Class B common stock, in 2014. We had 20.5 million and 21.4 million Class A shares outstanding at December 31, 2015 and 2014, respectively. We had 5.6 million Class B shares outstanding for both periods. There are no outstanding securities that dilute our shares of Class B common stock.

**Book Value Per Share and Return on Equity**

Our stockholders' equity decreased by $7.7 million in 2015. We attribute the decrease primarily to our repurchase of 2.0 million shares of our Class A common stock in a private transaction in December 2015. Book value per share increased to $15.66 at December 31, 2015, compared to $15.40 a year earlier. Our return on average equity was 5.1% for 2015, compared to 3.6% for 2014.

### YEAR ENDED DECEMBER 31, 2014 COMPARED TO YEAR ENDED DECEMBER 31, 2013

*Net Premiums Written*

Our insurance subsidiaries' 2014 net premiums written increased 8.6% to $579.2 million, compared to $533.4 million for 2013. We primarily attribute the increase to a reduction in MICO's quota-share reinsurance, the impact of premium rate increases and an increase in the writing of commercial lines of insurance. Effective January 1, 2014, MICO reduced its external quota-share reinsurance percentage from 30% to 20%. Commercial lines net premiums written increased $29.7 million, or 13.8%, for 2014 compared to 2013. The increase included $5.6 million related to the reduction in the amount of premium MICO reinsured in 2014, with the remainder attributable to premium rate increases and increased writings of new accounts in the commercial automobile, commercial multi-peril and workers' compensation lines of business. Personal lines net premiums written increased $16.0 million, or 5.0%, for 2014 compared to 2013. The increase included $4.1 million resulting from the reduction in the amount of premium MICO reinsured in 2014, with the remainder primarily attributable to premium rate increases.

### Net Premiums Earned

Our insurance subsidiaries' net premiums earned increased to $556.5 million for 2014, an increase of $41.2 million, or 8.0%, over 2013, reflecting increases in net premiums written during 2013 and 2014. Our insurance subsidiaries earn premiums and recognize them as income over the terms of the policies they issue. Such terms are generally one year or less in duration. Therefore, increases or decreases in net premiums earned generally reflect increases or decreases in net premiums written in the preceding twelve-month period compared to the same period one year earlier.

### Investment Income

For 2014, our net investment income was $18.3 million, representing a slight decrease from 2013. An increase in our average invested assets from $799.1 million in 2013 to $812.4 million in 2014 was offset by a decrease in our annualized average rate of return to 2.3% in 2014, compared to 2.4% in 2013.

### Installment Payment Fees

Our insurance subsidiaries' installment fees decreased primarily as a result of their customers' increased usage of payment plans that have lower installment payment fees during 2014.

### Net Realized Investment Gains

Our net realized investment gains in 2014 and 2013 were $3.1 million and $2.4 million, respectively. The net realized investment gains in 2014 and 2013 resulted from normal turnover within our investment portfolio. We did not recognize any impairment losses during 2014 or 2013.

### Equity in Earnings of DFSC

Our equity in the earnings of DFSC in 2014 and 2013 was $1.2 million and $2.9 million, respectively. The decrease in DFSC's earnings during 2014 compared to 2013 resulted from a lesser benefit from acquisition accounting adjustments and a charge to terminate a lease obligation related to UCB's former main office.

### Losses and Loss Expenses

Our insurance subsidiaries' loss ratio, which is the ratio of incurred losses and loss expenses to premiums earned, was 69.8% in 2014, compared to 66.6% in 2013. Our insurance subsidiaries' commercial lines loss ratio increased to 72.0% in 2014, compared to 67.1% in 2013. This increase resulted primarily from the commercial automobile loss ratio increasing to 83.2% in 2014, compared to 73.0% in 2013, and the commercial multi-peril loss ratio increasing to 73.5% in 2014, compared to 61.5% in 2013. The personal lines loss ratio increased to 68.2% in 2014, compared to 66.3% in 2013, primarily as a result of a increase in the homeowners loss ratio to 60.4% in 2014, compared to 57.7% in 2013, primarily as a result of an increase in weather-related claims. Our insurance subsidiaries experienced unfavorable loss reserve development of approximately $14.5 million during 2014 in their reserves for prior accident years, compared to unfavorable loss reserve development of approximately $10.4 million during 2013. The change in loss reserve development patterns occurred primarily within our insurance subsidiaries' commercial automobile, commercial multi-peril and personal automobile reserves.

### Underwriting Expenses

Our insurance subsidiaries' expense ratio, which is the ratio of policy acquisition and other underwriting expenses to premiums earned, was 31.4% in 2014, compared to 31.8% in 2013.

### Combined Ratio

Our insurance subsidiaries' combined ratio was 101.7% and 98.8% in 2014 and 2013, respectively. The combined ratio represents the sum of the loss ratio, the expense ratio and the dividend ratio, which is the ratio of workers' compensation policy dividends incurred to premiums earned. We attribute the increase in our combined ratio primarily to the increase in our loss ratio.

*Interest Expense*

Our interest expense in 2014 decreased slightly to $1.5 million, compared to $1.6 million in 2013.

*Income Taxes*

Our income tax expense was $1.7 million in 2014, compared to $6.4 million in 2013. Our effective tax rate for 2014 was 10.7%, compared to 19.5% for 2013. The decrease in our 2014 effective tax rate was primarily due to tax-exempt interest income representing a larger proportion of income before income tax expense in 2014 compared to 2013.

*Net Income and Earnings Per Share*

Our net income in 2014 was $14.5 million, or $.55 per share of Class A common stock on a diluted basis and $.49 per share of Class B common stock, compared to $26.3 million, or $1.02 per share of Class A common stock on a diluted basis and $.94 per share of Class B common stock, in 2013. We had 21.4 million and 20.8 million Class A shares outstanding at December 31, 2014 and 2013, respectively. We had 5.6 million Class B shares outstanding for both periods. There are no outstanding securities that dilute our shares of Class B common stock.

*Book Value Per Share and Return on Equity*

Our stockholders' equity increased by $19.3 million in 2014. We attribute the increase primarily to net after-tax unrealized gains within our available-for-sale fixed maturity investment portfolio during 2014. Book value per share increased to $15.40 at December 31, 2014, compared to $15.02 a year earlier. Our return on average equity was 3.6% for 2014, compared to 6.6% for 2013.

**Financial Condition**

*Liquidity and Capital Resources*

Liquidity is a measure of an entity's ability to secure enough cash to meet its contractual obligations and operating needs as they arise. Our major sources of funds from operations are the net cash flows generated from our insurance subsidiaries' underwriting results, investment income and maturing investments.

We have historically generated sufficient net positive cash flow from our operations to fund our commitments and build our investment portfolio, thereby increasing future investment returns. The pooling agreement with Donegal Mutual historically has been cash flow positive because of the profitability of the underwriting pool. Because we settle the pool monthly, our cash flows are substantially similar to the cash flows that would result from the underwriting of direct business. We maintain a high degree of liquidity in our investment portfolio in the form of marketable fixed maturities, equity securities and short-term investments. We structure our fixed-maturity investment portfolio following a "laddering" approach so that projected cash flows from investment income and principal maturities are evenly distributed from a timing perspective. This laddering approach provides an additional measure of liquidity to meet our obligations and the obligations of our insurance subsidiaries should an unexpected variation occur in the future. Net cash flows provided by operating activities in 2015, 2014 and 2013 were $66.4 million, $44.5 million and $46.0 million, respectively.

In June 2015, we renewed our existing credit agreement with Manufacturers and Traders Trust Company ("M&T") relating to a $60.0 million unsecured, revolving line of credit. The line of credit now expires in July 2018. We have the right to request a one-year extension of the credit agreement as of each anniversary date of the agreement. At December 31, 2015, we had $46.0 million in outstanding borrowings and had the ability to borrow an additional $14.0 million at interest rates equal to M&T's current prime rate or the then-current LIBOR rate plus 2.25%. The interest rate on our outstanding borrowings is adjustable quarterly. At December 31, 2015, the interest rate on our outstanding borrowings was 2.68%. We pay a fee of 0.2% per annum on the loan commitment amount regardless of usage. The credit agreement requires our compliance with certain covenants. These covenants include minimum levels of our net worth, leverage ratio, statutory surplus and the A.M. Best ratings of our insurance subsidiaries. We complied with all requirements of the credit agreement during 2015.

MICO has an agreement with the FHLB of Indianapolis. Through its membership, MICO has the ability to issue debt to the FHLB of Indianapolis in exchange for cash advances. There were no outstanding borrowings at December 31, 2015 or 2014.

-51-

Atlantic States is a member of the FHLB of Pittsburgh. Through its membership, Atlantic States has the ability to issue debt to the FHLB of Pittsburgh in exchange for cash advances. During 2013, Atlantic States issued secured debt in the principal amount of $15.0 million to the FHLB of Pittsburgh in exchange for cash advances in the amount of $15.0 million. Atlantic States then loaned $15.0 million to us. We used the proceeds of our loan from Atlantic States to fund our prepayment of subordinated debentures. In July 2015, Atlantic States issued secured debt in the principal amount of $20.0 million to the FHLB of Pittsburgh in exchange for cash advances in the amount of $20.0 million. Atlantic States then loaned $20.0 million to us. We used the proceeds of our loan from Atlantic States to repay borrowings under our line of credit with M&T. The interest rate on the advances was .38% at December 31, 2015.

The following table shows expected payments for our significant contractual obligations at December 31, 2015:

| (in thousands) | Total | Less than 1 year | 1-3 years | 4-5 years | After 5 years |
|---|---|---|---|---|---|
| Net liability for unpaid losses and loss expenses of our insurance subsidiaries | $ 322,054 | $ 150,297 | $ 145,702 | $ 12,247 | $ 13,808 |
| Subordinated debentures | 5,000 | — | — | — | 5,000 |
| Borrowings under lines of credit | 81,000 | 35,000 | 46,000 | — | — |
| Total contractual obligations | $ 408,054 | $ 185,297 | $ 191,702 | $ 12,247 | $ 18,808 |

We estimated the timing of the amounts for the net liability for unpaid losses and loss expenses of our insurance subsidiaries based on historical experience and expectations of future payment patterns. We have shown the liability net of reinsurance recoverable on unpaid losses and loss expenses to reflect expected future cash flows related to such liability. Assumed amounts from the underwriting pool with Donegal Mutual represent a substantial portion of our insurance subsidiaries' gross liability for unpaid losses and loss expenses, and ceded amounts to the underwriting pool represent a substantial portion of our insurance subsidiaries' reinsurance recoverable on unpaid losses and loss expenses. We include cash settlements of Atlantic States' assumed liability from the pool in our monthly settlements of pooled activity. In these monthly settlements, we net amounts ceded to and assumed from the pool. Donegal Mutual and Atlantic States do not anticipate any further changes in the pool participation levels in the foreseeable future. However, any such change would be prospective in nature and therefore would not impact the timing of expected payments for Atlantic States' proportionate liability for pooled losses occurring in periods prior to the effective date of such change.

We estimated the timing of the amounts for the borrowings under our lines of credit based on their contractual maturities that we discuss in Note 9 - Borrowings. Our borrowings under our lines of credit carry interest rates that vary as discussed in Note 9 - Borrowings. Based upon the interest rates in effect at December 31, 2015, our annual interest cost associated with our borrowings under our lines of credit is approximately $1.4 million. For every 1% change in the interest rate associated with our borrowings under our lines of credit, the effect on our annual interest cost would be approximately $810,000.

The cash dividends we declared to our stockholders totaled $14.5 million, $13.7 million and $13.0 million in 2015, 2014 and 2013, respectively. There are no regulatory restrictions on our payment of dividends to our stockholders, although there are state law restrictions on the payment of dividends from our insurance subsidiaries to us. Our insurance subsidiaries are required by law to maintain certain minimum surplus on a statutory basis and are subject to regulations under which their payment of dividends from statutory surplus is restricted and may require prior approval of their domiciliary insurance regulatory authorities. Our insurance subsidiaries are also subject to risk-based capital ("RBC") requirements. The amount of statutory capital and surplus necessary for our insurance subsidiaries to satisfy regulatory requirements, including the RBC requirements, was not significant in relation to our insurance subsidiaries' statutory capital and surplus at December 31, 2015. Amounts available for distribution to us as dividends from our insurance subsidiaries without prior approval of insurance regulatory authorities in 2016 are $20.8 million from Atlantic States, $2.3 million from Southern, $2.6 million from Le Mars, $4.2 million from Peninsula, $1.3 million from Sheboygan and $4.6 million from MICO, or a total of approximately $35.8 million.

*Investments*

At December 31, 2015 and 2014, our investment portfolio of primarily investment-grade bonds, common stock, short-term investments and cash totaled $929.0 million and $868.5 million, respectively, representing 60.4% and 59.5%, respectively, of our total assets. See "Business - Investments" for more information.

| | December 31, | | | |
| | 2015 | | 2014 | |
| | | Percent of | | Percent of |
| (dollars in thousands) | Amount | Total | Amount | Total |
| Fixed maturities: | | | | |
| Total held to maturity | $ 310,259 | 34.4% | $ 307,392 | 36.9% |
| Total available for sale | 501,393 | 55.7 | 435,150 | 52.2 |
| Total fixed maturities | 811,652 | 90.1 | 742,542 | 89.1 |
| Equity securities | 37,261 | 4.1 | 30,822 | 3.7 |
| Investment in affiliate | 38,477 | 4.3 | 39,284 | 4.7 |
| Short-term investments | 13,432 | 1.5 | 20,293 | 2.5 |
| Total investments | $ 900,822 | 100.0% | $ 832,941 | 100.0% |

The carrying value of our fixed maturity investments represented 90.1% and 89.1% of our total invested assets at December 31, 2015 and 2014, respectively.

Our fixed maturity investments consisted of high-quality marketable bonds, of which 99.8% and 99.7% were rated at investment-grade levels at December 31, 2015 and 2014, respectively.

At December 31, 2015, the net unrealized gain on our available-for-sale fixed maturity investments, net of deferred taxes, amounted to $8.0 million, compared to $13.6 million at December 31, 2014.

At December 31, 2015, the net unrealized gain on our equity securities, net of deferred taxes, amounted to $972,264, compared to $543,526 at December 31, 2014.

*Impact of Inflation*

Our insurance subsidiaries establish their property and casualty insurance premium rates before they know the amount of losses and loss settlement expenses or the extent to which inflation may impact such expenses. Consequently, our insurance subsidiaries attempt, in establishing rates, to anticipate the potential future impact of inflation. Our insurance subsidiaries account for inflation in the reserving function through analysis of costs and trends and reviews of historical reserving results.

*Impact of New Accounting Standards*

In May 2014, the Financial Accounting Standards Board (the "FASB") issued guidance that requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. While the guidance will replace most existing GAAP revenue recognition guidance, the scope of the guidance excludes insurance contracts. The new standard is effective on January 1, 2018. The standard permits the use of either the retrospective or the cumulative effect transition method. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

In February 2015, the FASB issued a new standard that amends the current consolidation guidance affecting both the variable interest entity ("VIE") and voting interest entity ("VOE") consolidation models. The standard does not add or remove any of the characteristics in determining if an entity is a VIE or VOE, but rather, the standard enhances assessment of some of these characteristics. The new standard is effective on January 1, 2017. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

In May 2015, the FASB issued guidance that removes the requirement to categorize within the fair value hierarchy all investments for which fair value is measured using the net asset value per share practical expedient. The guidance also removes the requirement to make certain disclosures for all investments that are eligible to be measured at fair value using the net asset value per share practical expedient. The guidance instead limits disclosure to investments for which the entity has elected to measure fair value using that practical expedient. The guidance is effective for annual reporting periods beginning after December 15, 2015, and interim reporting periods within those annual reporting periods. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

In May 2015, the FASB issued guidance that requires entities to provide additional disclosures about their liability for unpaid claims and claim adjustment expenses to increase the transparency of their significant estimates. The guidance also requires entities to disclose information about significant changes in methodologies and assumptions used to calculate their liability for unpaid claims and claim adjustment expenses, including the reasons for the changes and the effects on the entities' financial statements, and the timing, frequency and severity of claims. The guidance also requires entities to disclose a rollforward of the liability for unpaid claims and claim adjustment expenses for annual and interim reporting periods. The guidance is effective for annual reporting periods beginning after December 15, 2015, and interim reporting periods within annual reporting periods beginning after December 15, 2016. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

In January 2016, the FASB issued guidance that generally requires entities to measure equity investments at fair value and recognize changes in fair value in net income. The guidance also simplifies the impairment assessment of equity investments without readily determinable fair values by requiring entities to perform a qualitative assessment to identify impairment. The FASB issued other disclosure and presentation improvements related to financial instruments within the new issued guidance. The guidance is effective for annual and interim reporting periods beginning after December 15, 2017. As a result of this guidance, we will reflect changes in the fair value of our equity investments in our results of operations beginning January 1, 2018.

In February 2016, the FASB issued guidance that requires lessees to recognize leases, including operating leases, on the balance sheet, unless a lease is considered a short-term lease. The guidance also requires entities to make new judgments to identify leases. The guidance is effective for annual and interim reporting periods beginning after December 15, 2018 and permits early adoption. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

### Item 7A.   Quantitative and Qualitative Disclosures About Market Risk.

We are exposed to the impact of interest rate changes, to changes in fair values of investments and to credit risk.

In the normal course of business, we employ established policies and procedures to manage our exposure to changes in interest rates, fluctuations in the fair market value of our debt and equity securities and credit risk. We seek to mitigate these risks by various actions we describe below.

### *Interest Rate Risk*

Our exposure to market risk for a change in interest rates is concentrated in our investment portfolio. We monitor this exposure through periodic reviews of our asset and liability positions. We regularly monitor estimates of cash flows and the impact of interest rate fluctuations relating to our investment portfolio. Generally, we do not hedge our exposure to interest rate risk because we have the capacity to, and do, hold fixed-maturity investments to maturity.

Principal cash flows and related weighted-average interest rates by stated maturity dates for the financial instruments we held at December 31, 2015 that are sensitive to interest rates are as follows:

| (in thousands) | Principal Cash Flows | Weighted-Average Interest Rate |
|---|---|---|
| Fixed-maturity and short-term investments: | | |
| 2016 | $ 34,627 | 2.65% |
| 2017 | 30,750 | 4.13 |
| 2018 | 32,722 | 4.54 |
| 2019 | 33,557 | 2.96 |
| 2020 | 34,794 | 2.93 |
| Thereafter | 646,633 | 3.47 |
| Total | $ 813,083 | |
| Fair value | $ 837,625 | |
| | | |
| Debt: | | |
| 2016 | $ 35,000 | 0.38% |
| 2017 | 46,000 | 2.68 |
| Thereafter | 5,000 | 5.00 |
| Total | $ 86,000 | |
| Fair value | $ 86,000 | |

Actual cash flows from investments may differ from those depicted above as a result of calls and prepayments.

### Equity Price Risk

Our portfolio of equity securities, which we carry on our consolidated balance sheets at estimated fair value, has exposure to price risk, which is the risk of potential loss in estimated fair value resulting from an adverse change in prices. Our objective is to mitigate this risk and to earn competitive relative returns by investing in a diverse portfolio of high-quality, liquid securities.

### Credit Risk

Our objective is to earn competitive returns by investing in a diversified portfolio of securities. Our portfolio of fixed maturity securities and, to a lesser extent, short-term investments is subject to credit risk. We define this risk as the potential loss in fair value resulting from adverse changes in the borrower's ability to repay the debt. We manage this risk by performing an analysis of prospective investments and through regular reviews of our portfolio by our investment staff. We also limit the amount of our total investment portfolio that we invest in any one security.

Our insurance subsidiaries provide property and liability insurance coverages through independent insurance agencies located throughout their operating areas. Our insurance subsidiaries bill the majority of this business directly to the insured, although our insurance subsidiaries bill a portion of their commercial business through their agents, to whom they extend credit in the normal course of business.

Because the pooling agreement does not relieve Atlantic States of primary liability as the originating insurer, Atlantic States is subject to a concentration of credit risk arising from the business Atlantic States cedes to Donegal Mutual. Our insurance subsidiaries maintain reinsurance agreements with Donegal Mutual and with a number of other major unaffiliated authorized reinsurers.

Through November 30, 2010, MICO and West Bend Mutual Insurance Company ("West Bend") were parties to quota-share reinsurance agreements whereby MICO ceded 75% of its business to West Bend. MICO and West Bend terminated the reinsurance agreement in effect at November 30, 2010 on a run-off basis. West Bend's obligations related to all past reinsurance agreements with MICO remain in effect for all policies with effective dates prior to December 1, 2010. West Bend and MICO entered into a trust agreement on December 1, 2010. Under the terms of the trust agreement, West Bend placed into

trust, for the sole benefit of MICO, assets with a fair value equal to the amount of unearned premiums and unpaid losses and loss expenses, reduced by any net premium balances not yet paid by MICO, that West Bend had assumed pursuant to such reinsurance agreements at November 30, 2010. The amount of assets required to be held in trust adjusts monthly based upon the remaining net obligations of West Bend. West Bend may terminate the trust agreement on the earlier of December 1, 2020 or the date on which the obligations of West Bend are equal to or less than $5.0 million. As of December 31, 2015, West Bend's net obligations under the reinsurance agreements were approximately $9.4 million, and the fair value of assets held in trust was approximately $9.7 million.

**Item 8.   Financial Statements and Supplementary Data.**

| | |
|---|---|
| Consolidated Balance Sheets | 58 |
| Consolidated Statements of Income and Comprehensive Income | 59 |
| Consolidated Statements of Stockholders' Equity | 60 |
| Consolidated Statements of Cash Flows | 61 |
| Notes to Consolidated Financial Statements | 62 |
| Report of Independent Registered Public Accounting Firm | 92 |

**Donegal Group Inc.**
**Consolidated Balance Sheets**

| | December 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Assets** | | |
| Investments | | |
| Fixed maturities | | |
| Held to maturity, at amortized cost (fair value $322,799,167 and $322,155,079 ) | $ 310,258,704 | $ 307,391,699 |
| Available for sale, at fair value (amortized cost $489,010,066 and $414,201,436) | 501,393,559 | 435,149,784 |
| Equity securities, available for sale, at fair value (cost $35,765,030 and $29,985,828) | 37,260,821 | 30,822,022 |
| Investment in affiliate | 38,476,708 | 39,283,924 |
| Short-term investments, at cost, which approximates fair value | 13,432,482 | 20,293,648 |
| Total investments | 900,822,274 | 832,941,077 |
| Cash | 28,139,144 | 35,578,509 |
| Accrued investment income | 5,991,197 | 5,751,376 |
| Premiums receivable | 141,267,411 | 133,306,961 |
| Reinsurance receivable | 259,728,113 | 253,635,890 |
| Deferred policy acquisition costs | 52,108,388 | 48,298,608 |
| Deferred tax asset, net | 19,443,807 | 17,146,303 |
| Prepaid reinsurance premiums | 113,522,505 | 115,871,783 |
| Property and equipment, net | 7,027,143 | 7,668,340 |
| Federal income taxes recoverable | 1,487,656 | 581,477 |
| Goodwill | 5,625,354 | 5,625,354 |
| Other intangible assets | 958,010 | 958,010 |
| Other | 1,713,413 | 1,290,956 |
| Total assets | $1,537,834,415 | $1,458,654,644 |
| **Liabilities and Stockholders' Equity** | | |
| Liabilities | | |
| Losses and loss expenses | $ 578,205,109 | $ 538,258,406 |
| Unearned premiums | 429,493,203 | 408,646,363 |
| Accrued expenses | 22,460,475 | 19,429,627 |
| Reinsurance balances payable | 3,480,406 | 7,841,172 |
| Borrowings under lines of credit | 81,000,000 | 53,500,000 |
| Cash dividends declared to stockholders | 3,511,881 | 3,467,273 |
| Subordinated debentures | 5,000,000 | 5,000,000 |
| Accounts payable - securities | 582,560 | — |
| Due to affiliate | 3,557,177 | 2,409,347 |
| Drafts payable | 439,282 | 1,950,765 |
| Other | 1,715,754 | 2,017,048 |
| Total liabilities | 1,129,445,847 | 1,042,520,001 |
| Stockholders' Equity | | |
| Preferred stock, $.01 par value, authorized 2,000,000 shares; none issued | — | — |
| Class A common stock, $.01 par value, authorized 40,000,000 shares, issued 23,501,805 and 22,389,369 shares and outstanding 20,499,217 and 21,447,661 shares | 235,018 | 223,894 |
| Class B common stock, $.01 par value, authorized 10,000,000 shares, issued 5,649,240 shares and outstanding 5,576,775 shares | 56,492 | 56,492 |
| Additional paid-in capital | 219,525,301 | 200,348,783 |
| Accumulated other comprehensive income | 773,744 | 5,353,269 |
| Retained earnings | 229,024,370 | 223,253,887 |
| Treasury stock, at cost | (41,226,357) | (13,101,682) |
| Total stockholders' equity | 408,388,568 | 416,134,643 |
| Total liabilities and stockholders' equity | $1,537,834,415 | $1,458,654,644 |

See accompanying notes to consolidated financial statements.

## Donegal Group Inc.
## Consolidated Statements of Income and Comprehensive Income

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| **Statements of Income** | | | |
| Revenues | | | |
| Net premiums earned (includes affiliated reinsurance of $175,024,905, $167,070,235 and $156,938,714 - see note 3) | $605,640,728 | $556,497,535 | $515,291,944 |
| Investment income, net of investment expenses | 20,949,698 | 18,344,382 | 18,795,239 |
| Installment payment fees | 5,834,897 | 6,473,288 | 6,841,778 |
| Lease income | 750,287 | 855,546 | 849,795 |
| Net realized investment gains (includes $1,934,424, $3,134,081 and $2,423,442 accumulated other comprehensive income reclassification) | 1,934,424 | 3,134,081 | 2,423,442 |
| Equity in earnings of DFSC | 1,277,229 | 1,242,910 | 2,907,867 |
| Total revenues | 636,387,263 | 586,547,742 | 547,110,065 |
| Expenses | | | |
| Net losses and loss expenses (includes affiliated reinsurance of $100,110,773, $108,847,508 and $86,962,750 - see note 3) | 398,366,874 | 388,401,182 | 343,127,951 |
| Amortization of deferred policy acquisition costs | 99,513,000 | 90,146,000 | 81,753,000 |
| Other underwriting expenses | 97,709,656 | 84,659,364 | 82,196,700 |
| Policyholder dividends | 3,862,606 | 2,795,515 | 1,909,569 |
| Interest | 1,111,441 | 1,516,983 | 1,635,323 |
| Premium paid on purchase of treasury stock | 5,780,000 | — | — |
| Other | 2,451,418 | 2,745,881 | 3,777,257 |
| Total expenses | 608,794,995 | 570,264,925 | 514,399,800 |
| Income before income tax expense | 27,592,268 | 16,282,817 | 32,710,265 |
| Income tax expense (includes $677,048, $1,065,588 and $823,970 income tax expense from reclassification items) | 6,602,235 | 1,743,799 | 6,388,273 |
| Net income | $ 20,990,033 | $ 14,539,018 | $ 26,321,992 |
| Basic earnings per common share: | | | |
| Class A common stock | $ 0.78 | $ 0.56 | $ 1.04 |
| Class B common stock | $ 0.69 | $ 0.49 | $ 0.94 |
| Diluted earnings per common share: | | | |
| Class A common stock | $ 0.77 | $ 0.55 | $ 1.02 |
| Class B common stock | $ 0.69 | $ 0.49 | $ 0.94 |
| **Statements of Comprehensive Income** | | | |
| Net income | $ 20,990,033 | $ 14,539,018 | $ 26,321,992 |
| Other comprehensive (loss) income, net of tax | | | |
| Unrealized (loss) gain on securities: | | | |
| Unrealized holding (loss) gain arising during the period, net of income tax (benefit) expense of ($1,788,852), $5,193,522 and ($14,633,895) | (3,322,149) | 9,734,652 | (27,107,995) |
| Reclassification adjustment for gains included in net income, net of income tax of $677,048, $1,065,588 and $823,970 | (1,257,376) | (2,068,493) | (1,599,472) |
| Other comprehensive (loss) income | (4,579,525) | 7,666,159 | (28,707,467) |
| Comprehensive income (loss) | $ 16,410,508 | $ 22,205,177 | $ (2,385,475) |

See accompanying notes to consolidated financial statements.

-59-

## Donegal Group Inc.
## Consolidated Statements of Stockholders' Equity

| | Common Stock | | | | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Treasury Stock | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Class A Shares | Class B Shares | Class A Amount | Class B Amount | | | | | |
| Balance, January 1, 2013 | 20,941,821 | 5,649,240 | $209,419 | $56,492 | $176,416,585 | $ 26,394,577 | $ 209,670,214 | $ (12,713,193) | $400,034,094 |
| Issuance of common stock (stock compensation plans) | 844,944 | | 8,449 | | 12,108,468 | | | | 12,116,917 |
| Net income | | | | | | | 26,321,992 | | 26,321,992 |
| Cash dividends | | | | | | | (13,043,121) | | (13,043,121) |
| Grant of stock options | | | | | 60,198 | | (60,198) | | — |
| Tax benefit on exercise of stock options | | | | | 531,159 | | | | 531,159 |
| Purchase of treasury stock | | | | | | | | (376,463) | (376,463) |
| Other comprehensive loss | | | | | | (28,707,467) | | | (28,707,467) |
| Balance, December 31, 2013 | 21,786,765 | 5,649,240 | $217,868 | $56,492 | $189,116,410 | $ (2,312,890) | $ 222,888,887 | $ (13,089,656) | $396,877,111 |
| Issuance of common stock (stock compensation plans) | 602,604 | | 6,026 | | 10,497,881 | | | | 10,503,907 |
| Net income | | | | | | | 14,539,018 | | 14,539,018 |
| Cash dividends | | | | | | | (13,744,059) | | (13,744,059) |
| Grant of stock options | | | | | 429,959 | | (429,959) | | — |
| Tax benefit on exercise of stock options | | | | | 304,533 | | | | 304,533 |
| Purchase of treasury stock | | | | | | | | (12,026) | (12,026) |
| Other comprehensive income | | | | | | 7,666,159 | | | 7,666,159 |
| Balance, December 31, 2014 | 22,389,369 | 5,649,240 | 223,894 | 56,492 | 200,348,783 | 5,353,269 | 223,253,887 | (13,101,682) | 416,134,643 |
| Issuance of common stock (stock compensation plans) | 1,112,436 | | 11,124 | | 18,192,824 | | | | 18,203,948 |
| Net income | | | | | | | 20,990,033 | | 20,990,033 |
| Cash dividends | | | | | | | (14,499,775) | | (14,499,775) |
| Grant of stock options | | | | | 719,775 | | (719,775) | | — |
| Tax benefit on exercise of stock options | | | | | 263,919 | | | | 263,919 |
| Purchase of treasury stock | | | | | | | | (28,124,675) | (28,124,675) |
| Other comprehensive loss | | | | | | (4,579,525) | | | (4,579,525) |
| Balance, December 31, 2015 | 23,501,805 | 5,649,240 | $235,018 | $56,492 | $219,525,301 | $ 773,744 | $ 229,024,370 | $ (41,226,357) | $408,388,568 |

See accompanying notes to consolidated financial statements.

-60-

Donegal Group Inc.
Consolidated Statements of Cash Flows

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2015 | 2014 | 2013 |
| Cash Flows from Operating Activities: | | | |
| Net income | $ 20,990,033 | $ 14,539,018 | $ 26,321,992 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation, amortization and other non-cash items | 6,740,346 | 3,523,692 | 3,049,101 |
| Net realized investment gains | (1,934,424) | (3,134,081) | (2,423,442) |
| Equity in earnings of DFSC | (1,277,229) | (1,242,910) | (2,907,867) |
| Changes in Assets and Liabilities: | | | |
| Losses and loss expenses | 39,946,703 | 42,639,137 | 36,791,874 |
| Unearned premiums | 20,846,840 | 25,911,721 | 19,646,539 |
| Accrued expenses | 3,030,848 | 164,530 | 2,124,265 |
| Premiums receivable | (7,960,450) | (9,402,332) | (6,708,151) |
| Deferred policy acquisition costs | (3,809,780) | (4,671,098) | (3,505,813) |
| Deferred income taxes | 168,395 | (963,679) | 1,414,843 |
| Reinsurance receivable | (6,092,223) | (9,396,777) | (28,345,791) |
| Accrued investment income | (239,821) | (327,845) | 908,554 |
| Amounts due to affiliate | 1,147,830 | 239,122 | (2,409,212) |
| Reinsurance balances payable | (4,360,766) | (10,107,636) | 4,007,471 |
| Prepaid reinsurance premiums | 2,349,278 | (3,207,841) | (1,507,780) |
| Current income taxes | (906,179) | (160,525) | (1,004,929) |
| Other, net | (2,235,228) | 111,941 | 556,815 |
| Net adjustments | 45,414,140 | 29,975,419 | 19,686,477 |
| Net cash provided by operating activities | 66,404,173 | 44,514,437 | 46,008,469 |
| Cash Flows from Investing Activities: | | | |
| Purchases of fixed maturities: | | | |
| Held to maturity | (31,310,026) | (103,654,684) | — |
| Available for sale | (181,106,519) | (89,585,027) | (148,486,404) |
| Purchases of equity securities | (14,759,861) | (23,607,077) | (47,156,954) |
| Sales of fixed maturities: | | | |
| Available for sale | 40,321,838 | 26,816,642 | 133,890,611 |
| Maturity of fixed maturities: | | | |
| Held to maturity | 28,575,153 | 36,832,890 | 13,767,271 |
| Available for sale | 66,744,045 | 38,417,972 | 52,675,833 |
| Sales of equity securities | 8,761,474 | 8,337,461 | 43,204,703 |
| Net decrease in investment in affiliates | 1,783,700 | — | 1,139,800 |
| Net purchases of property and equipment | (151,536) | (2,127,311) | (1,254,767) |
| Net sales (purchases) of short-term investments | 6,861,166 | 79,384,147 | (75,851,568) |
| Net cash used in investing activities | (74,280,566) | (29,184,987) | (28,071,475) |
| Cash Flows from Financing Activities: | | | |
| Issuance of common stock | 15,516,870 | 10,700,637 | 12,550,066 |
| Cash dividends paid | (14,455,167) | (13,575,968) | (12,810,471) |
| Purchases of treasury stock | (28,124,675) | (12,026) | (376,463) |
| Payments on subordinated debentures | — | — | (15,465,000) |
| Payments on line of credit | (9,500,000) | (7,500,000) | (15,500,000) |
| Borrowings under lines of credit | 37,000,000 | 3,000,000 | 21,500,000 |
| Net cash provided by (used in) financing activities | 437,028 | (7,387,357) | (10,101,868) |
| Net (decrease) increase in cash | (7,439,365) | 7,942,093 | 7,835,126 |
| Cash at beginning of year | 35,578,509 | 27,636,416 | 19,801,290 |
| Cash at end of year | $ 28,139,144 | $ 35,578,509 | $ 27,636,416 |

See accompanying notes to consolidated financial statements.

-61-

**Donegal Group Inc.**
**Notes to Consolidated Financial Statements**

### 1 - Summary of Significant Accounting Policies

#### Organization and Business

Donegal Mutual Insurance Company ("Donegal Mutual") organized us as an insurance holding company on August 26, 1986. Our insurance subsidiaries, Atlantic States Insurance Company ("Atlantic States"), Southern Insurance Company of Virginia ("Southern"), Le Mars Insurance Company ("Le Mars"), the Peninsula Insurance Group ("Peninsula"), which consists of Peninsula Indemnity Company and The Peninsula Insurance Company, Sheboygan Falls Insurance Company ("Sheboygan") and Michigan Insurance Company ("MICO"), write personal and commercial lines of property and casualty coverages exclusively through a network of independent insurance agents in certain Mid-Atlantic, Midwestern, New England and Southern states. We also own 48.2% of the outstanding stock of Donegal Financial Services Corporation ("DFSC"), a grandfathered unitary savings and loan holding company that owns Union Community Bank ("UCB"), a state savings bank. UCB has 15 banking offices, substantially all of which are located in Lancaster County, Pennsylvania. Donegal Mutual owns the remaining 51.8% of the outstanding stock of DFSC.

We have four segments: our investment function, our personal lines of insurance, our commercial lines of insurance and our investment in DFSC. The personal lines products of our insurance subsidiaries consist primarily of homeowners and private passenger automobile policies. The commercial lines products of our insurance subsidiaries consist primarily of commercial automobile, commercial multi-peril and workers' compensation policies.

At December 31, 2015, Donegal Mutual held approximately 48% of our outstanding Class A common stock and approximately 83% of our outstanding Class B common stock. This ownership provides Donegal Mutual with approximately 74% of the total voting power of our common stock. Our insurance subsidiaries and Donegal Mutual have interrelated operations due to a pooling agreement and other intercompany agreements and transactions. While each company maintains its separate corporate existence, our insurance subsidiaries and Donegal Mutual conduct business together as the Donegal Insurance Group. As such, Donegal Mutual and our insurance subsidiaries share the same business philosophy, the same management, the same employees and the same facilities and offer the same types of insurance products.

Atlantic States, our largest subsidiary, participates in a pooling agreement with Donegal Mutual. Under the pooling agreement, the two companies pool their insurance business and each company receives an allocated percentage of the pooled business. Atlantic States has an 80% share of the results of the pooled business, and Donegal Mutual has a 20% share of the results of the pooled business.

The same executive management and underwriting personnel administer products, classes of business underwritten, pricing practices and underwriting standards of Donegal Mutual and our insurance subsidiaries. In addition, as the Donegal Insurance Group, Donegal Mutual and our insurance subsidiaries share a combined business plan to achieve market penetration and underwriting profitability objectives. The products our insurance subsidiaries and Donegal Mutual market are generally complementary, thereby allowing the Donegal Insurance Group to offer a broader range of products to a given market and to expand the Donegal Insurance Group's ability to service an entire personal lines or commercial lines account. Distinctions within the products of Donegal Mutual and our insurance subsidiaries generally relate to specific risk profiles targeted within similar classes of business, such as preferred tier versus standard tier products, but we do not allocate all of the standard risk gradients to one company. Therefore, the underwriting profitability of the business the individual companies write directly will vary. However, as the risk characteristics of all business Donegal Mutual and Atlantic States write directly are homogenized within the underwriting pool, Donegal Mutual and Atlantic States share the underwriting results in proportion to their respective participation in the pool. Pooled business represents the predominant percentage of the net underwriting activity of both Donegal Mutual and Atlantic States. We refer to Note 3 - Transactions with Affiliates for more information regarding the pooling agreement.

#### Basis of Consolidation

Our consolidated financial statements, which we have prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"), include our accounts and those of our wholly owned subsidiaries. We have eliminated all significant inter-company accounts and transactions in consolidation. The terms "we," "us," "our" or the "Company" as we use them in the notes to our consolidated financial statements refer to the consolidated entity.

**Use of Estimates**

In preparing our consolidated financial statements, our management makes estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the balance sheet and revenues and expenses for the period then ended. Actual results could differ significantly from those estimates.

We make estimates and assumptions that could have a significant effect on amounts and disclosures we report in our consolidated financial statements. The most significant estimates relate to our insurance subsidiaries' reserves for property and casualty insurance unpaid losses and loss expenses, valuation of investments and determination of other-than-temporary impairment of investment securities and our insurance subsidiaries' policy acquisition costs. While we believe our estimates and the estimates of our insurance subsidiaries are appropriate, the ultimate amounts may differ from the estimates provided. We regularly review our methods for making these estimates as well as the continuing appropriateness of the estimated amounts, and we reflect any adjustment we consider necessary in our current results of operations.

**Investments**

We classify our debt and equity securities into the following categories:

Held to Maturity - Debt securities that we have the positive intent and ability to hold to maturity; reported at amortized cost.

Available for Sale - Debt and equity securities not classified as held to maturity; reported at fair value, with unrealized gains and losses excluded from income and reported as a separate component of stockholders' equity (net of tax effects).

Short-term investments carried at amortized cost, which approximates fair value.

We make estimates concerning the valuation of our investments and the recognition of other-than-temporary declines in the value of our investments. For equity securities, we write down the investment to its fair value and we reflect the amount of the write-down as a realized loss in our results of operations when we consider the decline in value of an individual investment to be other than temporary. We individually monitor all of our investments for other-than-temporary declines in value. Generally, we assume there has been an other-than-temporary decline in value if an individual equity security has depreciated in value by more than 20% of original cost and has been in such an unrealized loss position for more than six months. With respect to a debt security that is in an unrealized loss position, we first assess if we intend to sell the debt security. If we determine we intend to sell the debt security, we recognize the impairment loss in our results of operations. If we do not intend to sell the debt security, we determine whether it is more likely than not that we will be required to sell the debt security prior to recovery. If we determine it is more likely than not that we will be required to sell the debt security prior to recovery, we recognize an impairment loss in our results of operations. If we determine it is more likely than not that we will not be required to sell the debt security prior to recovery, we then evaluate whether a credit loss has occurred. We determine whether a credit loss has occurred by comparing the amortized cost of the debt security to the present value of the cash flows we expect to collect. If we expect a cash flow shortfall, we consider that a credit loss has occurred. If we determine that a credit loss has occurred, we consider the impairment to be other than temporary. We then recognize the amount of the impairment loss related to the credit loss in our results of operations, and we recognize the remaining portion of the impairment loss in our other comprehensive income, net of applicable taxes. In addition, we may write down securities in an unrealized loss position based on a number of other factors, including when the fair value of an investment is significantly below its cost, when the financial condition of the issuer of a security has deteriorated, the occurrence of industry, company or geographic events that have negatively impacted the value of a security and rating agency downgrades.

We amortize premiums and discounts on debt securities over the life of the security as an adjustment to yield using the effective interest method. We compute realized investment gains and losses using the specific identification method.

We amortize premiums and discounts for mortgage-backed debt securities using anticipated prepayments.

We account for our investment in affiliate using the equity method of accounting. Under the equity method, we record our investment at cost, with adjustments for our share of the affiliate's earnings and losses as well as changes in the affiliate's equity due to unrealized gains and losses.

-63-

## Fair Values of Financial Instruments

We use the following methods and assumptions in estimating our fair value disclosures:

Investments - We present our investments in available-for-sale fixed maturity and equity securities at estimated fair value. The estimated fair value of a security may differ from the amount that we could realize if we sold the security in a forced transaction. In addition, the valuation of fixed maturity investments is more subjective when markets are less liquid, increasing the potential that the estimated fair value does not reflect the price at which an actual transaction would occur. We utilize nationally recognized independent pricing services to estimate fair values for our fixed maturity and equity investments. We generally obtain two prices per security. The pricing services utilize market quotations for fixed maturity and equity securities that have quoted prices in active markets. For fixed maturity securities that generally do not trade on a daily basis, the pricing services prepare estimates of fair value measurements based predominantly on observable market inputs. The pricing services do not use broker quotes in determining the fair values of our investments. Our investment personnel review the estimates of fair value the pricing services provide to determine if the estimates we obtain are representative of fair values based upon the general knowledge of our investment personnel of the market, their research findings related to unusual fluctuations in value and their comparison of such values to execution prices for similar securities. Our investment personnel monitor the market and are familiar with current trading ranges for similar securities and the pricing of specific investments. Our investment personnel review all pricing estimates that we receive from the pricing services against their expectations with respect to pricing based on fair market curves, security ratings, coupon rates, security type and recent trading activity. Our investment personnel review documentation with respect to the pricing services' pricing methodology that they obtain periodically to determine if the primary pricing sources, market inputs and pricing frequency for various security types are reasonable. We refer to Note 5 - Fair Value Measurements for more information regarding our methods and assumptions in estimating fair values.

Cash and Short-Term Investments - The carrying amounts we report in the balance sheet for these instruments approximate their fair values.

Premiums and Reinsurance Receivables and Payables - The carrying amounts we report in the balance sheet for these instruments related to premiums and paid losses and loss expenses approximate their fair values.

Subordinated Debentures - The carrying amounts we report in the balance sheet for these instruments approximate their fair values.

## Revenue Recognition

Our insurance subsidiaries recognize insurance premiums as income over the terms of the policies they issue. Our insurance subsidiaries calculate unearned premiums on a daily pro-rata basis.

## Policy Acquisition Costs

We defer our insurance subsidiaries' policy acquisition costs, consisting primarily of commissions, premium taxes and certain other underwriting costs, reduced by ceding commissions, that vary with and relate directly to the production of business. We amortize these deferred policy acquisition costs over the period in which our insurance subsidiaries earn the premiums. The method we follow in computing deferred policy acquisition costs limits the amount of such deferred costs to their estimated realizable value, which gives effect to the premium to be earned, related investment income, losses and loss expenses and certain other costs we expect to incur as our insurance subsidiaries earn the premium. Estimates in the calculation of policy acquisition costs have not shown material variability because of uncertainties in applying accounting principles or as a result of sensitivities to changes in key assumptions.

## Property and Equipment

We report property and equipment at depreciated cost that we compute using the straight-line method based upon estimated useful lives of the assets.

## Losses and Loss Expenses

Liabilities for losses and loss expenses are estimates at a given point in time of the amounts an insurer expects to pay with respect to policyholder claims based on facts and circumstances then known to the insurer. At the time of establishing its estimates, an insurer recognizes that its ultimate liability for losses and loss expenses will exceed or be less than such estimates.

Our insurance subsidiaries base their estimates of liabilities for losses and loss expenses on assumptions as to future loss trends and expected claims severity, judicial theories of liability and other factors. However, during the loss adjustment period, our insurance subsidiaries may learn additional facts regarding certain claims, and, consequently, it often becomes necessary for our insurance subsidiaries to refine and adjust their estimates of liability. We reflect any adjustments to our insurance subsidiaries' liabilities for losses and loss expenses in our operating results in the period in which our insurance subsidiaries record the changes in estimates.

Our insurance subsidiaries maintain liabilities for the payment of losses and loss expenses with respect to both reported and unreported claims. Our insurance subsidiaries establish these liabilities for the purpose of covering the ultimate costs of settling all losses, including investigation and litigation costs. Our insurance subsidiaries base the amount of their liability for reported losses primarily upon a case-by-case evaluation of the type of risk involved, knowledge of the circumstances surrounding each claim and the insurance policy provisions relating to the type of loss their policyholder incurred. Our insurance subsidiaries determine the amount of their liability for unreported claims and loss expenses on the basis of historical information by line of insurance. Our insurance subsidiaries account for inflation in the reserving function through analysis of costs and trends and reviews of historical reserving results. Our insurance subsidiaries closely monitor their liabilities and recompute them periodically using new information on reported claims and a variety of statistical techniques. Our insurance subsidiaries do not discount their liabilities for losses.

Reserve estimates can change over time because of unexpected changes in assumptions related to our insurance subsidiaries' external environment and, to a lesser extent, assumptions as to our insurance subsidiaries' internal operations. For example, our insurance subsidiaries have experienced a decrease in claims frequency on workers' compensation claims during the past several years while claims severity has gradually increased. These trend changes give rise to greater uncertainty as to the pattern of future loss settlements on workers' compensation claims. Related uncertainties regarding future trends include the cost of medical technologies and procedures and changes in the utilization of medical procedures. Assumptions related to our insurance subsidiaries' external environment include the absence of significant changes in tort law and the legal environment that increase liability exposure, consistency in judicial interpretations of insurance coverage and policy provisions and the rate of loss cost inflation. Internal assumptions include consistency in the recording of premium and loss statistics, consistency in the recording of claims, payment and case reserving methodology, accurate measurement of the impact of rate changes and changes in policy provisions, consistency in the quality and characteristics of business written within a given line of business and consistency in reinsurance coverage and collectibility of reinsured losses, among other items. To the extent our insurance subsidiaries determine that underlying factors impacting their assumptions have changed, our insurance subsidiaries attempt to make appropriate adjustments for such changes in their reserves. Accordingly, our insurance subsidiaries' ultimate liability for unpaid losses and loss expenses will likely differ from the amount recorded.

Our insurance subsidiaries seek to enhance their underwriting results by carefully selecting the product lines they underwrite. Our insurance subsidiaries' personal lines products primarily include standard and preferred risks in private passenger automobile and homeowners lines. Our insurance subsidiaries' commercial lines products primarily include business offices, wholesalers, service providers, contractors, artisans and light manufacturing operations. Our insurance subsidiaries have limited exposure to asbestos and other environmental liabilities. Our insurance subsidiaries write no medical malpractice liability risks.

**Income Taxes**

We currently file a consolidated federal income tax return.

We account for income taxes using the asset and liability method. The objective of the asset and liability method is to establish deferred tax assets and liabilities for the temporary differences between the financial reporting basis and the tax basis of our assets and liabilities at enacted tax rates we expect to be in effect when we realize or settle such amounts.

**Credit Risk**

Our objective is to earn competitive returns by investing in a diversified portfolio of securities. Our portfolio of fixed maturity securities and, to a lesser extent, short-term investments is subject to credit risk. We define this risk as the potential loss in fair value resulting from adverse changes in the borrower's ability to repay its debt to us. We manage this risk by performing an analysis of prospective investments and through regular reviews of our portfolio by our investment staff. We also limit the amount of our total investment portfolio that we invest in any one security.

Our insurance subsidiaries provide property and liability insurance coverages through independent insurance agencies located throughout their operating areas. Our insurance subsidiaries bill the majority of this business directly to their

policyholders, although our insurance subsidiaries bill a portion of their commercial business through their agents, to whom they extend credit in the normal course of business.

Our insurance subsidiaries have reinsurance agreements with Donegal Mutual and with a number of major unaffiliated reinsurers.

### Reinsurance Accounting and Reporting

Our insurance subsidiaries rely upon reinsurance agreements to limit their maximum net loss from large single risks or risks in concentrated areas and to increase their capacity to write insurance. Reinsurance does not relieve our insurance subsidiaries from liability to their respective policyholders. To the extent that a reinsurer cannot pay losses for which it is liable under the terms of a reinsurance agreement with one or more of our insurance subsidiaries, our insurance subsidiaries retain continued liability for such losses. However, in an effort to reduce the risk of non-payment, our insurance subsidiaries require all of their reinsurers to have an A.M. Best rating of A- or better or, with respect to foreign reinsurers, to have a financial condition that, in the opinion of our management, is equivalent to a company with an A.M. Best rating of A- or better. We refer to Note 10 - Reinsurance for more information regarding the reinsurance agreements of our insurance subsidiaries.

### Stock-Based Compensation

We measure all share-based payments to our directors and the directors and employees of our subsidiaries and affiliates, including grants of stock options, using a fair-value-based method and record such expense in our results of operations. In determining the expense we record for stock options we grant to our directors and the directors and employees of our subsidiaries and affiliates, we estimate the fair value of each option award on the date of grant using the Black-Scholes option pricing model. The significant assumptions we utilize in applying the Black-Scholes option pricing model are the risk-free interest rate, expected term, dividend yield and expected volatility.

In 2015, 2014 and 2013, we realized $437,474, $304,533 and $531,159, respectively, in tax benefits upon the exercise of stock options.

### Earnings per Share

We calculate basic earnings per share by dividing net income by the weighted-average number of common shares outstanding for the period. Diluted earnings per share reflects the dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock.

We have two classes of common stock, which we refer to as Class A common stock and Class B common stock. Our Class A common stock is entitled to the declaration and payment of cash dividends that are at least 10% higher than those we declare and pay on our Class B common stock. Accordingly, we use the two-class method for the computation of earnings per common share. The two-class method is an earnings allocation formula that determines earnings per share separately for each class of common stock based on dividends declared and an allocation of remaining undistributed earnings using a participation percentage that reflects the dividend rights of each class.

### Goodwill and Other Intangible Assets

Goodwill represents the excess of the purchase price over the underlying fair value of acquired entities. When completing acquisitions, we seek also to identify separately identifiable intangible assets that we have acquired. We assess goodwill and intangible assets with an indefinite useful life for impairment annually. We also assess goodwill and other intangible assets for impairment upon the occurrence of certain events. In making our assessment, we consider a number of factors including operating results, business plans, economic projections, anticipated future cash flows and current market data. Inherent uncertainties exist with respect to these factors and to our judgment in applying them when we make our assessment. Impairment of goodwill and other intangible assets could result from changes in economic and operating conditions in future periods.

### 2 - Impact of New Accounting Standards

In May 2014, the Financial Accounting Standards Board (the "FASB") issued guidance that requires an entity to recognize the amount of revenue to which it expects to be entitled for the transfer of promised goods or services to customers. While the guidance will replace most existing GAAP revenue recognition guidance, the scope of the guidance excludes insurance contracts. The new standard is effective on January 1, 2018. The standard permits the use of either the retrospective or the

•cumulative effect transition method. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

In February 2015, the FASB issued a new standard that amends the current consolidation guidance affecting both the variable interest entity ("VIE") and voting interest entity ("VOE") consolidation models. The standard does not add or remove any of the characteristics in determining if an entity is a VIE or a VOE, but rather, the standard enhances assessment of some of these characteristics. The new standard is effective on January 1, 2017. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

In May 2015, the FASB issued guidance that removes the requirement to categorize within the fair value hierarchy all investments for which fair value is measured using the net asset value per share practical expedient. The guidance also removes the requirement to make certain disclosures for all investments that are eligible to be measured at fair value using the net asset value per share practical expedient. The guidance instead limits disclosure to investments for which the entity has elected to measure fair value using that practical expedient. The guidance is effective for annual reporting periods beginning after December 15, 2015, and interim reporting periods within those annual reporting periods. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

In May 2015, the FASB issued guidance that requires entities to provide additional disclosures about their liability for unpaid claims and claim adjustment expenses to increase the transparency of significant estimates. The guidance also requires entities to disclose information about significant changes in methodologies and assumptions used to calculate the liability for unpaid claims and claim adjustment expenses, including the reasons for the changes and the effects on the entities' financial statements, and the timing, frequency and severity of claims. The guidance also requires entities to disclose a rollforward of the liability for unpaid claims and claim adjustment expenses for annual and interim reporting periods. The guidance is effective for annual reporting periods beginning after December 15, 2015, and interim reporting periods within annual reporting periods beginning after December 15, 2016. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

In January 2016, the FASB issued guidance that generally requires entities to measure equity investments at fair value and recognize changes in fair value in net income. The guidance also simplifies the impairment assessment of equity investments without readily determinable fair values by requiring entities to perform a qualitative assessment to identify impairment. The FASB issued other disclosure and presentation improvements related to financial instruments within the new issued guidance. The guidance is effective for annual and interim reporting periods beginning after December 15, 2017. As a result of this guidance, we will reflect changes in the fair value of our equity investments in our results of operations beginning January 1, 2018.

In February 2016, the FASB issued guidance that requires lessees to recognize leases, including operating leases, on the balance sheet, unless a lease is considered a short-term lease. The guidance also requires entities to make new judgments to identify leases. The guidance is effective for annual and interim reporting periods beginning after December 15, 2018 and permits early adoption. We do not expect the adoption of this new guidance to have a significant impact on our financial position, results of operations or cash flows.

## 3 - Transactions with Affiliates

Our insurance subsidiaries conduct business and have various agreements with Donegal Mutual that we describe in the following subparagraphs:

### a. Reinsurance Pooling and Other Reinsurance Arrangements

Atlantic States, our largest insurance subsidiary, and Donegal Mutual have a pooling agreement under which both companies contribute all of their direct written business to the pool and receive an allocated percentage of the pooled underwriting results, excluding certain reinsurance Donegal Mutual assumes from our insurance subsidiaries. Atlantic States has an 80% share of the results of the pool, and Donegal Mutual has a 20% share of the results of the pool. The intent of the pooling agreement is to produce more uniform and stable underwriting results from year to year for each pool participant than they would experience individually and to spread the risk of loss between the participants based on each participant's relative amount of surplus and relative access to capital. Each participant in the pool has at its disposal the capacity of the entire pool, rather than being limited to policy exposures of a size commensurate with its own capital and surplus.

-67-

The following amounts represent reinsurance Atlantic States ceded to the pool during 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Premiums earned | $ 170,418,931 | $ 158,221,567 | $ 145,678,744 |
| Losses and loss expenses | 115,029,244 | 116,193,967 | 95,037,273 |
| Prepaid reinsurance premiums | 87,780,338 | 82,144,290 | 75,232,651 |
| Liability for losses and loss expenses | 108,672,769 | 98,873,924 | 88,035,924 |

The following amounts represent reinsurance Atlantic States assumed from the pool during 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Premiums earned | $ 396,098,036 | $ 372,001,855 | $ 337,548,492 |
| Losses and loss expenses | 240,197,659 | 257,682,215 | 198,785,775 |
| Unearned premiums | 199,966,888 | 190,470,447 | 176,845,395 |
| Liability for losses and loss expenses | 216,194,945 | 196,781,007 | 175,497,405 |

Donegal Mutual and Le Mars have a quota-share reinsurance agreement under which Le Mars assumes 100% of the premiums and losses related to certain products Donegal Mutual offers in certain Midwestern states, which provide the availability of complementary products to Le Mars' commercial accounts. Until October 31, 2012, Donegal Mutual and Southern had a quota-share reinsurance agreement whereby Southern assumed 100% of the premiums and losses related to personal lines products Donegal Mutual offered in Virginia through the use of its automated policy quoting and issuance system. The following amounts represent reinsurance Southern and Le Mars assumed from Donegal Mutual pursuant to the quota-share reinsurance agreements during 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Premiums earned | $ 880,787 | $ 4,265,196 | $ 12,170,155 |
| Losses and loss expenses | 1,492,673 | 4,002,879 | 10,839,444 |
| Unearned premiums | — | 514,297 | 1,831,672 |
| Liability for losses and loss expenses | 5,722,000 | 7,360,792 | 7,838,274 |

Donegal Mutual and MICO have a quota-share reinsurance agreement under which Donegal Mutual assumes 25% of the premiums and losses related to the business of MICO. Donegal Mutual and Peninsula have a quota-share reinsurance agreement under which Donegal Mutual assumes 100% of the premiums and losses related to the workers' compensation product line of Peninsula in certain states. The business Donegal Mutual assumes under the reinsurance agreements is subject to the pooling agreement between Donegal Mutual and Atlantic States.

The following amounts represent reinsurance ceded to Donegal Mutual pursuant to these quota-share reinsurance agreements during 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Premiums earned | $ 37,299,760 | $ 36,007,453 | $ 34,992,435 |
| Losses and loss expenses | 19,735,479 | 24,951,662 | 25,301,470 |
| Prepaid reinsurance premiums | 17,172,112 | 16,396,417 | 16,032,985 |
| Liability for losses and loss expenses | 29,968,948 | 28,172,373 | 25,298,464 |

Atlantic States, Southern and Le Mars each have a catastrophe reinsurance agreement with Donegal Mutual that provides coverage under any one catastrophic occurrence above a set retention ($2,000,000, $1,500,000 and $750,000 for Atlantic States, Southern and Le Mars, respectively), with a combined retention of $4,000,000 for a catastrophe involving a combination of these subsidiaries, up to the amount Donegal Mutual and our insurance subsidiaries retain under catastrophe reinsurance agreements with unaffiliated reinsurers. The set retention for Le Mars was $500,000 in 2014 and 2013. Donegal Mutual and Southern have an excess of loss reinsurance agreement in which Donegal Mutual assumes up to $500,000 of Southern's losses in excess of $500,000.

The following amounts represent reinsurance that our insurance subsidiaries ceded to Donegal Mutual pursuant to these reinsurance agreements during 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Premiums earned | $ 14,235,227 | $ 14,967,796 | $ 12,108,754 |
| Losses and loss expenses | 6,814,836 | 11,691,957 | 2,323,726 |
| Liability for losses and loss expenses | 4,485,201 | 3,981,351 | 2,366,370 |

The following amounts represent the effect of affiliated reinsurance transactions on net premiums our insurance subsidiaries earned during 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Assumed | $ 396,978,823 | $ 376,267,051 | $ 349,718,647 |
| Ceded | (221,953,918) | (209,196,816) | (192,779,933) |
| Net | $ 175,024,905 | $ 167,070,235 | $ 156,938,714 |

The following amounts represent the effect of affiliated reinsurance transactions on net losses and loss expenses our insurance subsidiaries incurred during 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Assumed | $ 241,690,332 | $ 261,685,094 | $ 209,625,219 |
| Ceded | (141,579,559) | (152,837,586) | (122,662,469) |
| Net | $ 100,110,773 | $ 108,847,508 | $ 86,962,750 |

## b. Expense Sharing

Donegal Mutual provides facilities, management and other services to us and our insurance subsidiaries. Donegal Mutual allocates certain related expenses to Atlantic States in relation to the relative participation of Atlantic States and Donegal Mutual in the pooling agreement. Our insurance subsidiaries other than Atlantic States reimburse Donegal Mutual for their personnel costs and bear their proportionate share of information services costs based on their percentage of the total written premiums of the Donegal Insurance Group. Charges for these services totalled $108,473,146, $98,634,816 and $94,021,056 for 2015, 2014 and 2013, respectively.

## c. Lease Agreement

We lease office equipment and automobiles with terms ranging from 3 to 10 years to Donegal Mutual under a 10-year lease agreement dated January 1, 2011.

## d. Legal Services

Donald H. Nikolaus, our Chairman of the Board and one of our directors, is a partner in the law firm of Nikolaus & Hohenadel. Such firm has served as our general counsel since 1986, principally in connection with the defense of claims litigation arising in Lancaster, Dauphin and York counties of Pennsylvania. We pay such firm its customary fees for such services.

## e. Union Community Bank

At December 31, 2015 and 2014, we had $24,030,780 and $28,868,418, respectively, in checking accounts with UCB, a wholly owned subsidiary of DFSC. We earned $3,317, $2,757 and $1,954 in interest on these accounts during 2015, 2014 and 2013, respectively.

## 4 - Investments

The amortized cost and estimated fair values of our fixed maturities and equity securities at December 31, 2015 and 2014 are as follows:

| | 2015 | | | |
|---|---|---|---|---|
| **Held to Maturity** | **Amortized Cost** | **Gross Unrealized Gains** | **Gross Unrealized Losses** | **Estimated Fair Value** |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 51,193,849 | $ 1,544,520 | $ — | $ 52,738,369 |
| Obligations of states and political subdivisions | 119,115,002 | 10,827,728 | 119,350 | 129,823,380 |
| Corporate securities | 65,306,517 | 816,408 | 1,560,891 | 64,562,034 |
| Mortgage-backed securities | 74,643,336 | 1,180,745 | 148,697 | 75,675,384 |
| Totals | $ 310,258,704 | $ 14,369,401 | $ 1,828,938 | $ 322,799,167 |

| | 2015 | | | |
|---|---|---|---|---|
| **Available for Sale** | **Amortized Cost** | **Gross Unrealized Gains** | **Gross Unrealized Losses** | **Estimated Fair Value** |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 37,080,117 | $ 159,510 | $ 50,819 | $ 37,188,808 |
| Obligations of states and political subdivisions | 223,768,856 | 13,151,235 | 363,672 | 236,556,419 |
| Corporate securities | 73,474,433 | 350,140 | 1,012,156 | 72,812,417 |
| Mortgage-backed securities | 154,686,660 | 1,045,022 | 895,767 | 154,835,915 |
| Fixed maturities | 489,010,066 | 14,705,907 | 2,322,414 | 501,393,559 |
| Equity securities | 35,765,030 | 2,268,639 | 772,848 | 37,260,821 |
| Totals | $ 524,775,096 | $ 16,974,546 | $ 3,095,262 | $ 538,654,380 |

| | 2014 | | | |
|---|---|---|---|---|
| **Held to Maturity** | **Amortized Cost** | **Gross Unrealized Gains** | **Gross Unrealized Losses** | **Estimated Fair Value** |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 53,619,146 | $ 1,693,994 | $ 127 | $ 55,313,013 |
| Obligations of states and political subdivisions | 110,998,967 | 10,312,987 | 4,892 | 121,307,062 |
| Corporate securities | 52,225,691 | 1,234,527 | 460,523 | 52,999,695 |
| Mortgage-backed securities | 90,547,895 | 2,098,995 | 111,581 | 92,535,309 |
| Totals | $ 307,391,699 | $ 15,340,503 | $ 577,123 | $ 322,155,079 |

| | 2014 | | | |
|---|---|---|---|---|
| **Available for Sale** | **Amortized Cost** | **Gross Unrealized Gains** | **Gross Unrealized Losses** | **Estimated Fair Value** |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 21,152,999 | $ 125,609 | $ 19,866 | $ 21,258,742 |
| Obligations of states and political subdivisions | 248,045,899 | 18,210,313 | 14,150 | 266,242,062 |
| Corporate securities | 53,210,731 | 809,207 | 75,040 | 53,944,898 |
| Mortgage-backed securities | 91,791,807 | 2,004,558 | 92,283 | 93,704,082 |
| Fixed maturities | 414,201,436 | 21,149,687 | 201,339 | 435,149,784 |
| Equity securities | 29,985,828 | 1,651,822 | 815,628 | 30,822,022 |
| Totals | $ 444,187,264 | $ 22,801,509 | $ 1,016,967 | $ 465,971,806 |

At December 31, 2015, our holdings of obligations of states and political subdivisions included general obligation bonds with an aggregate fair value of $256.9 million and an amortized cost of $241.1 million. Our holdings also included special revenue bonds with an aggregate fair value of $109.5 million and an amortized cost of $101.8 million. With respect to both categories of bonds, we held no securities of any issuer that comprised more than 10% of that category at December 31, 2015. Education bonds and water and sewer utility bonds represented 57% and 26%, respectively, of our total investments in special revenue bonds based on their carrying values at December 31, 2015. Many of the issuers of the special revenue bonds we held at December 31, 2015 have the authority to impose ad valorem taxes. In that respect, many of the special revenue bonds we held are similar to general obligation bonds.

At December 31, 2014, our holdings of obligations of states and political subdivisions included general obligation bonds with an aggregate fair value of $279.7 million and an amortized cost of $259.8 million. Our holdings also included special revenue bonds with an aggregate fair value of $107.8 million and an amortized cost of $99.2 million. With respect to both categories of bonds, we held no securities of any issuer that comprised more than 10% of that category at December 31, 2014. Education bonds and water and sewer utility bonds represented 55% and 27%, respectively, of our total investments in special revenue bonds based on their carrying values at December 31, 2014. Many of the issuers of the special revenue bonds we held at December 31, 2014 have the authority to impose ad valorem taxes. In that respect, many of the special revenue bonds we held are similar to general obligation bonds.

We made reclassifications from available for sale to held to maturity of fixed maturities at fair value on November 30, 2013. We present the impact of the transfers at November 30, 2013, summarized by type of securities, in the following table:

| | Amortized Cost | Estimated Fair Value |
|---|---|---|
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 50,627,225 | $ 47,914,311 |
| Obligations of states and political subdivisions | 88,456,842 | 79,866,801 |
| Corporate securities | 15,745,976 | 14,879,294 |
| Mortgage-backed securities | 72,465,250 | 69,567,883 |
| Totals | $ 227,295,293 | $ 212,228,289 |

We have segregated within accumulated other comprehensive income the net unrealized losses of $15.1 million arising prior to the November 30, 2013 reclassification date for fixed maturities reclassified from available for sale to held to maturity. We will amortize this balance over the remaining life of the related securities as an adjustment of yield in a manner consistent with the accretion of discount on the same fixed maturities. During 2015, we recorded amortization of $1.3 million in accumulated other comprehensive income. At December 31, 2015 and 2014, net unrealized losses of $12.3 million and $13.6 million, respectively, remained within accumulated other comprehensive income.

We set forth below the amortized cost and estimated fair value of fixed maturities at December 31, 2015 by contractual maturity. Expected maturities may differ from contractual maturities because borrowers may have the right to call or prepay obligations with or without call or prepayment penalties.

| | Amortized Cost | Estimated Fair Value |
|---|---|---|
| **Held to maturity** | | |
| Due in one year or less | $ 2,493,562 | $ 2,488,554 |
| Due after one year through five years | 35,862,800 | 36,313,522 |
| Due after five years through ten years | 79,335,315 | 81,223,850 |
| Due after ten years | 117,923,691 | 127,097,857 |
| Mortgage-backed securities | 74,643,336 | 75,675,384 |
| Total held to maturity | $ 310,258,704 | $ 322,799,167 |
| **Available for sale** | | |
| Due in one year or less | $ 18,226,200 | $ 18,495,967 |
| Due after one year through five years | 94,535,097 | 97,051,851 |
| Due after five years through ten years | 119,028,240 | 122,786,982 |
| Due after ten years | 102,533,869 | 108,222,844 |
| Mortgage-backed securities | 154,686,660 | 154,835,915 |
| Total available for sale | $ 489,010,066 | $ 501,393,559 |

The amortized cost of fixed maturities on deposit with various regulatory authorities at December 31, 2015 and 2014 amounted to $9,625,807 and $10,458,585, respectively.

Our investment in affiliate represented our 48.2% investment in DFSC in the amount of $38,476,708 and $39,283,924 at December 31, 2015 and 2014, respectively. We account for our investment in DFSC using the equity method of accounting. Under this method, we record our investment at cost, with adjustments for our share of DFSC's earnings and losses as well as changes in DFSC's equity due to its unrealized gains and losses.

We include our share of DFSC's net income in our results of operations. We have compiled the following summary financial information for DFSC at December 31, 2015 and 2014 from the financial statements of DFSC.

| | December 31, | |
|---|---|---|
| Balance sheets: | 2015 | 2014 |
| Total assets | $ 507,138,740 | $ 505,934,003 |
| Total liabilities | $ 427,422,661 | $ 424,266,891 |
| Stockholders' equity | 79,716,079 | 81,667,112 |
| Total liabilities and stockholders' equity | $ 507,138,740 | $ 505,934,003 |

| | Year Ended December 31, | | |
|---|---|---|---|
| Income statements: | 2015 | 2014 | 2013 |
| Net income | $ 2,372,650 | $ 2,853,576 | $ 6,030,292 |

Other comprehensive (loss) income in our statements of comprehensive income includes net unrealized (losses) gains of ($263,991), $1.5 million and ($2.2 million) for 2015, 2014 and 2013, respectively, representing our share of DFSC's unrealized investment gains or losses.

We derive net investment income, consisting primarily of interest and dividends, from the following sources:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Fixed maturities | $ 23,636,468 | $ 22,910,621 | $ 23,621,977 |
| Equity securities | 707,703 | 528,453 | 122,603 |
| Short-term investments | 181,154 | 139,243 | 98,817 |
| Other | 33,450 | 34,675 | 41,608 |
| Investment income | 24,558,775 | 23,612,992 | 23,885,005 |
| Investment expenses | (3,609,077) | (5,268,610) | (5,089,766) |
| Net investment income | $ 20,949,698 | $ 18,344,382 | $ 18,795,239 |

We present below gross realized gains and losses from investments, including those we classified as held to maturity, and the change in the difference between fair value and cost of investments:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Gross realized gains: |  |  |  |
| Fixed maturities | $ 2,259,045 | $ 1,811,295 | $ 4,774,437 |
| Equity securities | 1,088,467 | 1,455,076 | 1,634,315 |
|  | 3,347,512 | 3,266,371 | 6,408,752 |
| Gross realized losses: |  |  |  |
| Fixed maturities | 105,432 | 37,449 | 3,091,538 |
| Equity securities | 1,307,656 | 94,841 | 893,772 |
|  | 1,413,088 | 132,290 | 3,985,310 |
| Net realized gains | $ 1,934,424 | $ 3,134,081 | $ 2,423,442 |
| Change in difference between fair value and cost of investments: |  |  |  |
| Fixed maturities | $(10,787,772) | $ 23,893,815 | $(29,153,645) |
| Equity securities | 659,597 | 581,467 | 160,652 |
| Totals | $(10,128,175) | $ 24,475,282 | $(28,992,993) |

We held fixed maturities and equity securities with unrealized losses representing declines that we considered temporary at December 31, 2015 as follows:

|  | Less than 12 months | | 12 months or longer | |
|---|---|---|---|---|
|  | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 10,168,014 | $ 50,819 | $ — | $ — |
| Obligations of states and political subdivisions | 19,437,469 | 483,022 | — | — |
| Corporate securities | 69,481,645 | 1,615,369 | 11,323,819 | 957,678 |
| Mortgage-backed securities | 105,299,953 | 875,658 | 7,538,257 | 168,806 |
| Equity securities | 9,245,342 | 772,848 | — | — |
| Totals | $213,632,423 | $ 3,797,716 | $ 18,862,076 | $ 1,126,484 |

We held fixed maturities and equity securities with unrealized losses representing declines that we considered temporary at December 31, 2014 as follows:

| | Less than 12 months | | 12 months or longer | |
| --- | --- | --- | --- | --- |
| | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 6,821,013 | $ 18,511 | $ 937,448 | $ 1,482 |
| Obligations of states and political subdivisions | 4,145,920 | 15,356 | 1,309,285 | 3,686 |
| Corporate securities | 26,854,423 | 499,697 | 2,397,635 | 35,866 |
| Mortgage-backed securities | 13,360,859 | 71,730 | 9,025,795 | 132,134 |
| Equity securities | 7,511,808 | 815,628 | — | — |
| Totals | $ 58,694,023 | $ 1,420,922 | $ 13,670,163 | $ 173,168 |

We make estimates concerning the valuation of our investments and the recognition of other-than-temporary declines in the value of our investments. For equity securities, we write down the investment to its fair value, and we reflect the amount of the write-down as a realized loss in our results of operations when we consider the decline in value of an individual investment to be other than temporary. We individually monitor all investments for other-than-temporary declines in value. Generally, we assume there has been an other-than-temporary decline in value if an individual equity security has depreciated in value by more than 20% of original cost and has been in such an unrealized loss position for more than six months. We held 17 equity securities that were in an unrealized loss position at December 31, 2015. Based upon our analysis of general market conditions and underlying factors impacting these equity securities, we considered these declines in value to be temporary. With respect to a debt security that is in an unrealized loss position, we first assess if we intend to sell the debt security. If we determine we intend to sell the debt security, we recognize the impairment loss in our results of operations. If we do not intend to sell the debt security, we determine whether it is more likely than not that we will be required to sell the debt security prior to recovery. If we determine it is more likely than not that we will be required to sell the debt security prior to recovery, we recognize an impairment loss in our results of operations. If we determine it is more likely than not that we will not be required to sell the debt security prior to recovery, we then evaluate whether a credit loss has occurred. We determine whether a credit loss has occurred by comparing the amortized cost of the debt security to the present value of the cash flows we expect to collect. If we expect a cash flow shortfall, we consider that a credit loss has occurred. If we determine that a credit loss has occurred, we consider the impairment to be other than temporary. We then recognize the amount of the impairment loss related to the credit loss in our results of operations, and we recognize the remaining portion of the impairment loss in our other comprehensive income, net of applicable taxes. In addition, we may write down securities in an unrealized loss position based on a number of other factors, including when the fair value of an investment is significantly below its cost, when the financial condition of the issuer of a security has deteriorated, the occurrence of industry, company or geographic events that have negatively impacted the value of a security and rating agency downgrades. We held 216 debt securities that were in an unrealized loss position at December 31, 2015. Based upon our analysis of general market conditions and underlying factors impacting these debt securities, we considered these declines in value to be temporary.

We did not recognize any impairment losses in 2015, 2014 or 2013. We had no sales or transfers from our held to maturity portfolio in 2015, 2014 or 2013. We had no derivative instruments or hedging activities during 2015, 2014 or 2013.

**5 - Fair Value Measurements**

We account for financial assets using a framework that establishes a hierarchy that ranks the quality and reliability of inputs, or assumptions, used in the determination of fair value, and we classify financial assets and liabilities carried at fair value in one of the following three categories:

Level 1 - quoted prices in active markets for identical assets and liabilities;

Level 2 - directly or indirectly observable inputs other than Level 1 quoted prices; and

Level 3 - unobservable inputs not corroborated by market data.

•  • For investments that have quoted market prices in active markets, we use the quoted market price as fair value and include these investments in Level 1 of the fair value hierarchy. We classify publicly traded equity securities as Level 1. When quoted market prices in active markets are not available, we base fair values on quoted market prices of comparable instruments or price estimates we obtain from independent pricing services. We classify our fixed maturity investments as Level 2. Our fixed maturity investments consist of U.S. Treasury securities and obligations of U.S. government corporations and agencies, obligations of states and political subdivisions, corporate securities and mortgage-backed securities. We also classify a portion of our equity securities as Level 2.

We present our investments in available-for-sale fixed maturity and equity securities at estimated fair value. The estimated fair value of a security may differ from the amount that we could realize if we sold the security in a forced transaction. In addition, the valuation of fixed maturity investments is more subjective when markets are less liquid, increasing the potential that the estimated fair value does not reflect the price at which an actual transaction would occur. We utilize nationally recognized independent pricing services to estimate fair values or obtain market quotations for substantially all of our fixed maturity and equity investments. We generally obtain two prices per security. The pricing services utilize market quotations for fixed maturity and equity securities that have quoted prices in active markets. For fixed maturity securities that generally do not trade on a daily basis, the pricing services prepare estimates of fair value measurements based predominantly on observable market inputs. The pricing services do not use broker quotes in determining the fair values of our investments. Our investment personnel review the estimates of fair value the pricing services provide to determine if the estimates we obtain are representative of fair values based upon the general knowledge of the market of our investment personnel, their research findings related to unusual fluctuations in value and their comparison of such values to execution prices for similar securities. Our investment personnel monitor the market and are familiar with current trading ranges for similar securities and pricing of specific investments. Our investment personnel review all pricing estimates that we receive from the pricing services against their expectations with respect to pricing based on fair market curves, security ratings, coupon rates, security type and recent trading activity. Our investment personnel review documentation with respect to the pricing services' pricing methodology that they obtain periodically to determine if the primary pricing sources, market inputs and pricing frequency for various security types are reasonable. At December 31, 2015, we received two estimates per security from the pricing services, and we priced substantially all of our Level 1 and Level 2 investments using those prices. In our review of the estimates the pricing services provided at December 31, 2015, we did not identify any material discrepancies, and we did not make any adjustments to the estimates the pricing services provided.

We present our cash and short-term investments at estimated fair value. The carrying values in our balance sheet for premium receivables and reinsurance receivables and payables for premiums and paid losses and loss expenses approximate their fair values. The carrying amounts reported in the balance sheet for our subordinated debentures and borrowings under lines of credit approximate their fair values. We classify these items as Level 3.

We evaluate our assets and liabilities on a regular basis to determine the appropriate level at which to classify them for each reporting period. Based on our review of the methodology and summary of inputs the pricing services use, we have concluded that our Level 1 and Level 2 investments were classified properly at December 31, 2015 and 2014.

The following table presents our fair value measurements for our investments in available-for-sale fixed maturity and equity securities at December 31, 2015:

| | | Fair Value Measurements Using | | |
| | Fair Value | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 37,188,808 | $ — | $ 37,188,808 | $ — |
| Obligations of states and political subdivisions | 236,556,419 | — | 236,556,419 | — |
| Corporate securities | 72,812,417 | — | 72,812,417 | — |
| Mortgage-backed securities | 154,835,915 | — | 154,835,915 | — |
| Equity securities | 26,726,924 | 26,726,924 | — | — |
| Total investments in the fair value hierarchy | 528,120,483 | 26,726,924 | 501,393,559 | — |
| Investment measured at net asset value | 10,533,897 | — | — | — |
| Totals | $ 538,654,380 | $ 26,726,924 | $ 501,393,559 | $ — |

The following table presents our fair value measurements for our investments in available-for-sale fixed maturity and equity securities at December 31, 2014:

| | | Fair Value Measurements Using | | |
| | Fair Value | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| U.S. Treasury securities and obligations of U.S. government corporations and agencies | $ 21,258,742 | $ — | $ 21,258,742 | $ — |
| Obligations of states and political subdivisions | 266,242,062 | — | 266,242,062 | — |
| Corporate securities | 53,944,898 | — | 53,944,898 | — |
| Mortgage-backed securities | 93,704,082 | — | 93,704,082 | — |
| Equity securities | 20,767,600 | 20,767,600 | — | — |
| Total investments in the fair value hierarchy | 455,917,384 | 20,767,600 | 435,149,784 | — |
| Investment measured at net asset value | 10,054,422 | — | — | — |
| Totals | $ 465,971,806 | $ 20,767,600 | $ 435,149,784 | $ — |

## 6 - Deferred Policy Acquisition Costs

Changes in our insurance subsidiaries' deferred policy acquisition costs are as follows:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| Balance, January 1 | $ 48,298,608 | $ 43,627,510 | $ 40,121,697 |
| Acquisition costs deferred | 103,322,780 | 94,817,098 | 85,258,813 |
| Amortization charged to earnings | (99,513,000) | (90,146,000) | (81,753,000) |
| Balance, December 31 | $ 52,108,388 | $ 48,298,608 | $ 43,627,510 |

## 7 - Property and Equipment

Property and equipment at December 31, 2015 and 2014 consisted of the following:

| | 2015 | 2014 | Estimated Useful Life |
|---|---|---|---|
| Office equipment | $ 9,118,021 | $ 9,458,444 | 3-15 years |
| Automobiles | 1,685,483 | 2,069,761 | 5 years |
| Real estate | 7,323,868 | 7,183,312 | 5-50 years |
| Software | 2,794,864 | 2,776,141 | 5 years |
| | 20,922,236 | 21,487,658 | |
| Accumulated depreciation | (13,895,093) | (13,819,318) | |
| | $ 7,027,143 | $ 7,668,340 | |

Depreciation expense for 2015, 2014 and 2013 amounted to $792,733, $883,674 and $783,897, respectively.

## 8 - Liability for Losses and Loss Expenses

The establishment of an appropriate liability for losses and loss expenses is an inherently uncertain process, and we can provide no assurance that our insurance subsidiaries' ultimate liability will not exceed their loss and loss expense reserves and have an adverse effect on our results of operations and financial condition. Furthermore, we cannot predict the timing, frequency and extent of adjustments to our insurance subsidiaries' estimated future liabilities, because the historical conditions and events that serve as a basis for our insurance subsidiaries' estimates of ultimate claim costs may change. As is the case for substantially all property and casualty insurance companies, our insurance subsidiaries have found it necessary in the past to increase their estimated future liabilities for losses and loss expenses in certain periods, and, in other periods, their estimates

have exceeded their actual liabilities. Changes in our insurance subsidiaries' estimate of their liability for losses and loss expenses generally reflect actual payments and their evaluation of information received since the prior reporting date.

We summarize activity in our insurance subsidiaries' liability for losses and loss expenses as follows:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Balance at January 1 | $ 538,258,406 | $ 495,619,269 | $ 458,827,395 |
| Less reinsurance recoverable | (245,957,364) | (230,014,037) | (207,891,560) |
| Net balance at January 1 | 292,301,042 | 265,605,232 | 250,935,835 |
| Incurred related to: | | | |
| Current year | 391,166,740 | 373,932,058 | 332,770,088 |
| Prior years | 7,200,134 | 14,469,124 | 10,357,863 |
| Total incurred | 398,366,874 | 388,401,182 | 343,127,951 |
| Paid related to: | | | |
| Current year | 236,834,666 | 229,939,627 | 201,781,955 |
| Prior years | 131,779,001 | 131,765,745 | 126,676,599 |
| Total paid | 368,613,667 | 361,705,372 | 328,458,554 |
| Net balance at December 31 | 322,054,249 | 292,301,042 | 265,605,232 |
| Plus reinsurance recoverable | 256,150,860 | 245,957,364 | 230,014,037 |
| Balance at December 31 | $ 578,205,109 | $ 538,258,406 | $ 495,619,269 |

Our insurance subsidiaries recognized an increase in their liability for losses and loss expenses of prior years of $7.2 million, $14.5 million and $10.4 million in 2015, 2014 and 2013, respectively. Our insurance subsidiaries made no significant changes in their reserving philosophy, key reserving assumptions or claims management personnel, and they have made no significant offsetting changes in estimates that increased or decreased their loss and loss expense reserves in those years. The 2015 development represented 2.5% of the December 31, 2014 net carried reserves and resulted primarily from higher-than-expected severity in the private passenger automobile liability, commercial multiple peril and commercial automobile lines of business in accident years prior to 2015. The majority of the 2015 development related to increases in the liability for losses and loss expenses of prior years for Atlantic States and Southern. The 2014 development represented 5.4% of the December 31, 2013 net carried reserves and resulted primarily from higher-than-expected severity in the private passenger automobile liability, commercial multiple peril and commercial automobile lines of business in accident years prior to 2014. The majority of the 2014 development related to increases in the liability for losses and loss expenses of prior years for Atlantic States and Southern. The 2013 development represented 4.1% of the December 31, 2012 net carried reserves and resulted primarily from higher-than-expected severity in the private passenger automobile liability, commercial multiple peril, commercial automobile and workers' compensation lines of business in accident years prior to 2013. The majority of the 2013 development related to increases in the liability for losses and loss expenses of prior years for Atlantic States and Southern.

## 9 - Borrowings

### Lines of Credit

In June 2015, we renewed our existing credit agreement with Manufacturers and Traders Trust Company ("M&T") relating to a $60.0 million unsecured, revolving line of credit. The line of credit now expires in July 2018. We have the right to request a one-year extension of the credit agreement as of each anniversary date of the agreement. At December 31, 2015, we had $46.0 million in outstanding borrowings and had the ability to borrow an additional $14.0 million at interest rates equal to M&T's current prime rate or the then-current LIBOR rate plus 2.25%. The interest rate on our outstanding borrowings is adjustable quarterly. At December 31, 2015, the interest rate on our outstanding borrowings was 2.68%. We pay a fee of 0.2% per annum on the loan commitment amount regardless of usage. The credit agreement requires our compliance with certain covenants. These covenants include minimum levels of our net worth, leverage ratio, statutory surplus and the A.M. Best ratings of our insurance subsidiaries. We complied with all requirements of the credit agreement during 2015.

MICO has an agreement with the Federal Home Loan Bank ("FHLB") of Indianapolis. Through its membership, MICO has the ability to issue debt to the FHLB of Indianapolis in exchange for cash advances. There were no outstanding borrowings

at December 31, 2015 or 2014. The table below presents the amount of FHLB of Indianapolis stock MICO purchased, collateral pledged and assets related to MICO's agreement at December 31, 2015.

| | | |
|---|---|---|
| FHLB stock purchased and owned as part of the agreement | $ | 201,100 |
| Collateral pledged, at par (carrying value $2,529,748) | | 2,552,250 |
| Borrowing capacity currently available | | 2,437,379 |

Atlantic States is a member of the FHLB of Pittsburgh. Through its membership, Atlantic States has the ability to issue debt to the FHLB of Pittsburgh in exchange for cash advances. During 2013, Atlantic States issued secured debt in the principal amount of $15.0 million to the FHLB of Pittsburgh in exchange for cash advances in the amount of $15.0 million. Atlantic States then loaned $15.0 million to us. We used the proceeds of our loan from Atlantic States to fund our prepayment of subordinated debentures. In July 2015, Atlantic States issued secured debt in the principal amount of $20.0 million to the FHLB of Pittsburgh in exchange for cash advances in the amount of $20.0 million. Atlantic States then loaned $20.0 million to us. We used the proceeds of our loan from Atlantic States to repay borrowings under our line of credit with M&T. The interest rate on the advances was .38% at December 31, 2015. The table below presents the amount of FHLB of Pittsburgh stock Atlantic States purchased, collateral pledged and assets related to Atlantic States' membership in the FHLB of Pittsburgh at December 31, 2015.

| | | |
|---|---|---|
| FHLB stock purchased and owned as part of the agreement | $ | 1,540,300 |
| Collateral pledged, at par (carrying value $36,893,743) | | 37,325,137 |
| Borrowing capacity currently available | | 569,727 |

**Subordinated Debentures**

In January 2002, West Bend purchased a surplus note from MICO for $5.0 million to increase MICO's statutory surplus. On December 1, 2010, Donegal Mutual purchased the surplus note from West Bend at face value. The surplus note carries an interest rate of 5.00%, and any repayment of principal or interest requires prior insurance regulatory approval. Upon receipt of regulatory approval, MICO paid $250,000 in interest to Donegal Mutual during each of 2015, 2014 and 2013.

**10 - Reinsurance**

**Unaffiliated Reinsurers**

Our insurance subsidiaries and Donegal Mutual purchase certain third-party reinsurance on a combined basis. Le Mars, MICO, Peninsula and Sheboygan also have separate third-party reinsurance programs that provide certain coverage that is commensurate with their relative size and exposures. Our insurance subsidiaries use several different reinsurers, all of which, consistent with the requirements of our insurance subsidiaries and Donegal Mutual, have an A.M. Best rating of A- (Excellent) or better, or, with respect to foreign reinsurers, have a financial condition that, in the opinion of our management, is equivalent to a company with at least an A- rating from A.M. Best. The external reinsurance our insurance subsidiaries and Donegal Mutual purchase includes "excess of loss reinsurance," under which their losses are automatically reinsured, through a series of contracts, over a set retention (generally $1.0 million), and "catastrophic reinsurance," under which they recover, through a series of contracts, 100% of an accumulation of many losses resulting from a single event, including natural disasters, over a set retention (generally $5.0 million) and after exceeding an annual aggregate deductible ($1.5 million in 2015 and 2014 and $5.0 million in 2013) up to aggregate losses of $149.0 million per occurrence. For property insurance, our insurance subsidiaries have excess of loss treaties that provide for coverage up to $5.0 million per loss. For liability insurance, our insurance subsidiaries have excess of loss treaties that provide for coverage up to $50.0 million per occurrence. For workers' compensation insurance, our insurance subsidiaries have excess of loss treaties that provide for coverage up to $10.0 million on any one life. Our insurance subsidiaries and Donegal Mutual have property catastrophe coverage through a series of layered treaties up to aggregate losses of $154.0 million for any single event. As many as 25 reinsurers provided coverage for 2015 on any one treaty with no reinsurer taking more than 40% of any one treaty. The amount of coverage provided under each of these types of reinsurance depends upon the amount, nature, size and location of the risks being reinsured. Donegal Mutual and our insurance subsidiaries also purchased facultative reinsurance to cover exposures from losses that exceeded the limits provided by the treaty reinsurance Donegal Mutual and our insurance subsidiaries purchased. In order to write automobile insurance in the State of Michigan, MICO is required to be a member of the Michigan Catastrophic Claims Association ("MCCA"). The

MCCA provides reinsurance to MICO for personal automobile and commercial automobile personal injury claims in the State of Michigan over a set retention.

Through December 1, 2010, MICO and West Bend were parties to quota-share reinsurance agreements whereby MICO ceded 75% of its business to West Bend. MICO and West Bend agreed to terminate the reinsurance agreement in effect at November 30, 2010 on a run-off basis. West Bend's obligations related to all past reinsurance agreements with MICO remain in effect for all policies effective prior to December 1, 2010.

For policies effective through December 31, 2014, MICO maintained a quota-share reinsurance agreement with third-party reinsurers to reduce its net exposures. Effective from December 1, 2010 to December 31, 2011, the quota-share reinsurance percentage was 50%. Effective January 1, 2012, MICO reduced the quota-share reinsurance percentage to 40%. Effective January 1, 2013, MICO reduced the quota-share reinsurance percentage to 30%. Effective January 1, 2014, MICO reduced the quota-share reinsurance percentage to 20%. Effective January 1, 2015, MICO no longer maintains a quota-share reinsurance agreement with third-party reinsurers.

The following amounts represent ceded reinsurance transactions with unaffiliated reinsurers during 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Premiums written | $ 40,997,351 | $ 62,351,702 | $ 69,776,461 |
| Premiums earned | 49,758,371 | 66,418,933 | 73,504,433 |
| Losses and loss expenses | 30,722,807 | 78,912,356 | 58,556,283 |
| Prepaid reinsurance premiums | 8,570,055 | 17,331,076 | 21,398,306 |
| Liability for losses and loss expenses | 113,023,942 | 114,929,716 | 114,313,279 |

**Total Reinsurance**

The following amounts represent total ceded reinsurance transactions with both affiliated and unaffiliated reinsurers during 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Premiums earned | $ 271,712,289 | $ 275,615,749 | $ 266,284,366 |
| Losses and loss expenses | 172,302,366 | 231,749,942 | 181,218,752 |
| Prepaid reinsurance premiums | 113,522,505 | 115,871,783 | 112,663,942 |
| Liability for losses and loss expenses | 256,150,860 | 245,957,364 | 230,014,037 |

The following amounts represent the effect of reinsurance on premiums written for 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Direct | $ 492,073,587 | $ 469,274,692 | $ 441,469,330 |
| Assumed | 406,126,275 | 388,750,312 | 359,753,517 |
| Ceded | (269,363,012) | (278,823,589) | (267,792,144) |
| Net premiums written | $ 628,836,850 | $ 579,201,415 | $ 533,430,703 |

The following amounts represent the effect of reinsurance on premiums earned for 2015, 2014 and 2013:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Direct | $ 480,210,534 | $ 455,689,137 | $ 431,788,593 |
| Assumed | 397,142,483 | 376,424,147 | 349,787,717 |
| Ceded | (271,712,289) | (275,615,749) | (266,284,366) |
| Net premiums earned | $ 605,640,728 | $ 556,497,535 | $ 515,291,944 |

-79-

## 11 - Income Taxes

Our provision for income tax for 2015, 2014 and 2013 consisted of the following:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Current | $ 5,621,367 | $ 2,707,478 | $ 4,973,430 |
| Deferred | 980,868 | (963,679) | 1,414,843 |
| Federal income tax provision | $ 6,602,235 | $ 1,743,799 | $ 6,388,273 |

Our effective tax rate is different from the amount computed at the statutory federal rate of 35% for 2015, 2014 and 2013. The reasons for such difference and the related tax effects are as follows:

|  | 2015 | 2014 | 2013 |
|---|---|---|---|
| Income before income taxes | $ 27,592,268 | $ 16,282,817 | $ 32,710,265 |
| Computed "expected" taxes | 9,657,294 | 5,698,986 | 11,448,593 |
| Tax-exempt interest | (4,806,855) | (5,063,140) | (5,789,963) |
| Proration | 737,644 | 766,334 | 868,306 |
| Other, net | 1,014,152 | 341,619 | (138,663) |
| Federal income tax provision | $ 6,602,235 | $ 1,743,799 | $ 6,388,273 |

The tax effects of temporary differences that give rise to significant portions of our deferred tax assets and deferred tax liabilities at December 31, 2015 and 2014 are as follows:

|  | 2015 | 2014 |
|---|---|---|
| Deferred tax assets: | | |
| Unearned premium | $ 22,174,971 | $ 20,548,545 |
| Loss reserves | 6,615,751 | 6,677,129 |
| Net operating loss carryforward - Le Mars | 1,402,857 | 1,534,303 |
| Alternative minimum tax credit carryforward | 10,336,593 | 11,880,197 |
| Other | 2,565,340 | 1,451,017 |
| Total gross deferred tax assets | 43,095,512 | 42,091,191 |
| Less valuation allowance | (440,778) | (440,778) |
| Net deferred tax assets | 42,654,734 | 41,650,413 |
| Deferred tax liabilities: | | |
| Deferred policy acquisition costs | 18,237,936 | 16,904,513 |
| Net unrealized gains | 416,635 | 2,882,534 |
| Other | 4,556,356 | 4,717,063 |
| Total gross deferred tax liabilities | 23,210,927 | 24,504,110 |
| Net deferred tax asset | $ 19,443,807 | $ 17,146,303 |

We provide a valuation allowance when we believe it is more likely than not that we will not realize some portion of a deferred tax asset. At December 31, 2015 and 2014, we established a valuation allowance of $440,778 related to a portion of the net operating loss carryforward of Le Mars that we acquired on January 1, 2004. We determined that we were not required to establish a valuation allowance for the other net deferred tax assets of $42.7 million and $41.7 million at December 31, 2015 and 2014, respectively, since it is more likely than not that we will realize these deferred tax assets through reversals of existing temporary differences, future taxable income and our implementation of tax-planning strategies.

Tax years 2012 through 2015 remained open for examination at December 31, 2015. The net operating loss carryforward of $4.0 million of Le Mars will begin to expire in 2020 if not utilized and is subject to an annual limitation of approximately

$376,000. We also had an alternative minimum tax credit carryforward of $10.3 million at December 31, 2015 with an indefinite life.

## 12 - Stockholders' Equity

On April 19, 2001, our stockholders approved an amendment to our certificate of incorporation. Among other things, the amendment reclassified our common stock as Class B common stock and effected a one-for-three reverse split of our Class B common stock effective April 19, 2001. The amendment also authorized a new class of common stock with one-tenth of a vote per share designated as Class A common stock. Our board of directors also declared a dividend of two shares of Class A common stock for each share of Class B common stock, after the one-for-three reverse split, held of record at the close of business April 19, 2001.

At our annual meeting of stockholders on April 18, 2013, our stockholders approved an amendment to our certificate of incorporation that increased the number of shares of our Class A common stock we have the authority to issue from 30.0 million shares to 40.0 million shares.

Each share of our Class A common stock outstanding at the time of the declaration of any dividend or other distribution payable in cash upon the shares of our Class B common stock is entitled to a dividend or distribution payable at the same time and to stockholders of record on the same date in an amount at least 10% greater than any dividend declared upon each share of our Class B common stock. In the event of our merger or consolidation with or into another entity, the holders of our Class A common stock and the holders of our Class B common stock are entitled to receive the same per share consideration in such merger or consolidation. In the event of our liquidation, dissolution or winding-up, any assets available to common stockholders will be distributed pro-rata to the holders of our Class A common stock and our Class B common stock after payment of all of our obligations.

In February 2009, our board of directors authorized a share repurchase program, pursuant to which we may purchase up to 300,000 shares of our Class A common stock at prices prevailing from time to time in the open market subject to the provisions of Securities and Exchange Commission ("SEC") Rule 10b-18 and in privately negotiated transactions. We purchased 3,222 and 846 shares of our Class A common stock under this program during 2015 and 2014, respectively. As of December 31, 2015, we had no remaining authority to purchase shares under this program.

On July 18, 2013, our board of directors authorized a share repurchase program pursuant to which we have the authority to purchase up to 500,000 additional shares of our Class A common stock at prices prevailing from time to time in the open market subject to the provisions of the SEC Rule 10b-18 and in privately negotiated transactions. We purchased 57,658 shares of our Class A common stock under this program during 2015. We did not purchase any shares of our Class A common stock under this program during 2013 or 2014. We have purchased a total of 57,658 shares of our Class A common stock under this program from its inception through December 31, 2015.

On December 18, 2015, we and Donegal Mutual entered into a Stock Purchase and Standstill Agreement (the "Purchase Agreement") with Gregory M. Shepard ("Mr. Shepard"). Under the terms of the Purchase Agreement, we purchased 2,000,000 shares of our Class A common stock from Mr. Shepard on December 22, 2015 for a price of $33.0 million, or $16.50 per share, representing a premium of approximately $5.8 million from the market price of our Class A common stock on the date of the Purchase Agreement. We reported this premium in excess of the market price as an expense in our consolidated statements of income and comprehensive income that we include in this Form 10-K Report. We borrowed $33.0 million under our existing line of credit with M&T Bank to fund the purchase. The Purchase Agreement contains a number of typical "standstill" provisions pursuant to which Mr. Shepard and any affiliate of Mr. Shepard agree not to take a number of "control-seeking" actions with respect to us for a period of 25 years from the date of the Purchase Agreement.

At December 31, 2015, our treasury stock consisted of 3,002,588 and 72,465 shares of Class A common stock and Class B common stock, respectively. At December 31, 2014, our treasury stock consisted of 941,708 and 72,465 shares of Class A common stock and Class B common stock, respectively.

**13 - Stock Compensation Plans**

**Equity Incentive Plans**

Since 1996, we have maintained an Equity Incentive Plan for Employees. During 2015, we adopted a plan that made a total of 4,500,000 shares of Class A common stock available for issuance to employees of our subsidiaries and affiliates. The plan provides for the granting of awards by our board of directors in the form of stock options, stock appreciation rights, restricted stock or any combination of the above. The plan provides that stock options may become exercisable up to five years from their date of grant, with an option price not less than fair market value on the date preceding the date of grant. We have not granted any stock appreciation rights.

Since 1996, we have maintained an Equity Incentive Plan for Directors. During 2015, we adopted a plan that made 500,000 shares of Class A common stock available for issuance to our directors and the directors of our subsidiaries and affiliates. We may make awards in the form of stock options. The plan also provides for the issuance of 500 shares of restricted stock on the first business day of January in each year to each of our directors and each director of Donegal Mutual who does not serve as one of our directors. We issued 7,200, 6,800 and 6,800 shares of restricted stock on January 2, 2015, 2014 and 2013 under our director plan.

We measure all share-based payments to employees, including grants of employee stock options, using a fair-value-based method and record such expense in our results of operations. In determining the expense we record for stock options granted to directors and employees of our subsidiaries and affiliates, we estimate the fair value of each option award on the date of grant using the Black-Scholes option pricing model. The significant assumptions we utilize in applying the Black-Scholes option pricing model are the risk-free interest rate, expected term, dividend yield and expected volatility. The risk-free interest rate is the implied yield currently available on U.S. Treasury zero coupon issues with a remaining term equal to the expected term used as the assumption in the model. We base the expected term of an option award on our historical experience for similar awards. We determine the dividend yield by dividing the per share dividend by the grant date stock price. We base the expected volatility on the volatility of our stock price over a historical period comparable to the expected term.

The weighted-average grant date fair value of options we granted during 2015 was $1.55. We calculated this fair value based upon a risk-free interest rate of 1.86%, an expected life of three years, an expected volatility of 23% and an expected dividend yield of 4%.

The weighted-average grant date fair value of options we granted during 2014 was $1.69. We calculated this fair value based upon a risk-free interest rate of 1.76%, an expected life of five years, an expected volatility of 18% and an expected dividend yield of 3%.

The weighted-average grant date fair value of options we granted during 2013 was $2.20. We calculated this fair value based upon a risk-free interest rate of 1.63%, an expected life of five years, an expected volatility of 23% and an expected dividend yield of 3%.

We charged compensation expense for our stock compensation plans against income before income taxes of $2.6 million, $2.1 million and $599,179 for the years ended December 31, 2015, 2014 and 2013, respectively, with a corresponding income tax benefit of $896,753, $700,487 and $203,721. At December 31, 2015 and 2014, our total unrecognized compensation cost related to non-vested share-based compensation granted under our stock compensation plans was $4.0 million and $4.6 million, respectively. We expect to recognize this cost over a weighted average period of 1.3 years.

During 2015, we received cash from option exercises under all stock compensation plans of $13.7 million. We realized actual tax benefits for the tax deductions from option exercises of share-based compensation of $437,474 for 2015. During 2014, we received cash from option exercises under all stock compensation plans of $6.5 million. We realized actual tax benefits for the tax deductions from option exercises of share-based compensation of $304,533 for 2014. During 2013, we received cash from option exercises under all stock compensation plans of $9.7 million. We realized actual tax benefits for the tax deductions from option exercises of share-based compensation of $531,159 for 2013. No further shares are available for future option grants for plans in effect prior to 2015.

Information regarding activity in our stock option plans follows:

| | Number of Options | Weighted-Average Exercise Price Per Share |
|---|---|---|
| Outstanding at December 31, 2012 | 6,700,825 | $14.27 |
| Granted - 2013 | 2,543,500 | 15.90 |
| Exercised - 2013 | (722,322) | 13.45 |
| Forfeited - 2013 | (116,669) | 13.65 |
| Expired - 2013 | (1,204,000) | 17.52 |
| Outstanding at December 31, 2013 | 7,201,334 | 14.39 |
| Granted - 2014 | 1,574,500 | 15.80 |
| Exercised - 2014 | (474,893) | 13.64 |
| Forfeited - 2014 | (112,511) | 15.23 |
| Expired - 2014 | (5,000) | 17.50 |
| Outstanding at December 31, 2014 | 8,183,430 | 14.69 |
| Granted - 2015 | 1,710,500 | 13.64 |
| Exercised - 2015 | (983,370) | 13.91 |
| Forfeited - 2015 | (114,967) | 15.30 |
| Expired - 2015 | (641) | 14.00 |
| Outstanding at December 31, 2015 | 8,794,952 | $14.57 |
| Exercisable at: | | |
| December 31, 2013 | 3,028,619 | $13.47 |
| December 31, 2014 | 4,477,240 | $13.88 |
| December 31, 2015 | 5,250,338 | $14.42 |

Shares available for future option grants at December 31, 2015 totaled 3,289,500 shares under all plans.

The following table summarizes information about stock options outstanding at December 31, 2015:

| Exercise Price | Number of Options Outstanding | Weighted-Average Remaining Contractual Life | Number of Options Exercisable |
|---|---|---|---|
| $14.00 | 20,000 | 0.5 years | 20,000 |
| 12.50 | 1,668,148 | 6.0 years | 1,668,148 |
| 14.50 | 1,433,303 | 7.0 years | 1,433,303 |
| 15.90 | 2,423,667 | 8.0 years | 1,615,776 |
| 15.80 | 1,539,334 | 9.0 years | 513,111 |
| 13.64 | 1,710,500 | 5.0 years | — |
| Total | 8,794,952 | | 5,250,338 |

**Employee Stock Purchase Plan**

Since 1996, we have maintained an Employee Stock Purchase Plan. During 2011, we adopted a plan that made 300,000 shares of our Class A common stock available for issuance. The plan extends over a 10-year period and provides for shares to be offered to all eligible employees at a purchase price equal to the lesser of 85% of the fair market value of our Class A common stock on the last day before the first day of each enrollment period (June 1 and December 1 of each year) under the plan or 85% of the fair market value of our Class A common stock on the last day of each subscription period (June 30 and December 31 of each year).

· A summary of plan activity follows:

|  | Shares Issued | |
|  | Price | Shares |
| --- | --- | --- |
| January 1, 2013 | 11.93 | 16,485 |
| July 1, 2013 | 11.76 | 19,805 |
| January 1, 2014 | 12.58 | 16,964 |
| July 1, 2014 | 13.01 | 19,627 |
| January 1, 2015 | 12.40 | 17,662 |
| July 1, 2015 | 12.95 | 20,006 |

On January 1, 2016, we issued 18,387 shares at a price of $11.97 per share under this plan.

**Agency Stock Purchase Plan**

Since 1996, we have maintained an Agency Stock Purchase Plan. During 2015, we adopted a plan that made 350,000 shares of our Class A common stock available for issuance to agents of our insurance subsidiaries and Donegal Mutual. The plan permits an agent to invest up to $12,000 per subscription period (April 1 to September 30 and October 1 to March 31 of each year) under various methods. We issue stock at the end of each subscription period at a price equal to 90% of the average market price during the last ten trading days of each subscription period. During 2015, 2014 and 2013, we issued 84,198, 84,320 and 79,532 shares, respectively, under this plan. The expense we recognized under the plan was not material.

-84-

14 - Statutory Net Income, Capital and Surplus and Dividend Restrictions

The following table presents selected information, as filed with insurance regulatory authorities, for our insurance subsidiaries as determined in accordance with accounting practices prescribed or permitted by such insurance regulatory authorities:

| | 2015 | 2014 | 2013 |
|---|---|---|---|
| **Atlantic States:** | | | |
| Statutory capital and surplus | $ 207,636,824 | $ 191,195,309 | $ 186,606,655 |
| Statutory unassigned surplus | 149,257,062 | 134,473,661 | 131,028,806 |
| Statutory net income | 13,352,784 | 6,054,186 | 12,596,844 |
| **Southern:** | | | |
| Statutory capital and surplus | 61,742,861 | 60,061,445 | 62,702,432 |
| Statutory unassigned surplus | 10,459,840 | 8,946,329 | 11,701,045 |
| Statutory net income | 2,301,009 | 987,335 | 4,195,635 |
| **Le Mars:** | | | |
| Statutory capital and surplus | 26,168,865 | 27,251,245 | 27,627,914 |
| Statutory unassigned surplus | 13,367,321 | 14,571,069 | 15,032,372 |
| Statutory net (loss) income | (600,608) | (591,242) | 790,147 |
| **Peninsula:** | | | |
| Statutory capital and surplus | 41,838,137 | 42,065,153 | 41,891,487 |
| Statutory unassigned surplus | 23,813,003 | 24,170,534 | 24,089,092 |
| Statutory net income | 1,976,093 | 3,240,015 | 1,481,670 |
| **Sheboygan:** | | | |
| Statutory capital and surplus | 13,254,117 | 11,553,018 | 12,085,839 |
| Statutory unassigned surplus (deficit) | 1,107,421 | (525,782) | 52,211 |
| Statutory net income (loss) | 1,719,703 | (707,321) | 1,374,543 |
| **MICO:** | | | |
| Statutory capital and surplus | 46,199,534 | 41,989,986 | 41,594,701 |
| Statutory unassigned surplus | 19,894,850 | 15,860,855 | 15,588,110 |
| Statutory net income (loss) | 3,562,536 | (276,023) | 1,170,008 |

Our principal source of cash for payment of dividends is dividends from our insurance subsidiaries. State insurance laws require our insurance subsidiaries to maintain certain minimum capital and surplus amounts on a statutory basis. Our insurance subsidiaries are subject to regulations that restrict the payment of dividends from statutory surplus and may require prior approval of their domiciliary insurance regulatory authorities. Our insurance subsidiaries are also subject to risk-based capital ("RBC") requirements that may further impact their ability to pay dividends. Our insurance subsidiaries' statutory capital and surplus at December 31, 2015 exceeded the amount of statutory capital and surplus necessary to satisfy regulatory requirements, including the RBC requirements, by a significant margin. Amounts available for distribution to us as dividends from our insurance subsidiaries without prior approval of insurance regulatory authorities in 2016 are $20.8 million from Atlantic States, $2.3 million from Southern, $2.6 million from Le Mars, $4.2 million from Peninsula, $1.3 million from Sheboygan and $4.6 million from MICO, or a total of approximately $35.8 million.

15 - Reconciliation of Statutory Filings to Amounts Reported Herein

Our insurance subsidiaries must file financial statements with state insurance regulatory authorities using accounting principles and practices prescribed or permitted by those authorities. We refer to these accounting principles and practices as statutory accounting principles ("SAP"). Accounting principles used to prepare these SAP financial statements differ from those used to prepare financial statements on the basis of GAAP.

Reconciliations of statutory net income and capital and surplus, as determined using SAP, to the amounts included in the accompanying GAAP financial statements are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Statutory net income of insurance subsidiaries | $ 22,311,517 | $ 8,706,950 | $ 21,608,847 |
| Increases (decreases): | | | |
| Deferred policy acquisition costs | 3,809,780 | 4,671,098 | 3,505,813 |
| Deferred federal income taxes | (168,395) | 963,679 | (1,414,843) |
| Salvage and subrogation recoverable | 1,082,800 | 1,132,000 | 1,059,400 |
| Consolidating eliminations and adjustments | (3,679,277) | (11,075,829) | (10,648,834) |
| Parent-only net (loss) income | (2,366,392) | 10,141,120 | 12,211,609 |
| Net income as reported herein | $ 20,990,033 | $ 14,539,018 | $ 26,321,992 |

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Statutory capital and surplus of insurance subsidiaries | $ 396,840,338 | $ 374,116,156 | $ 372,509,028 |
| Increases (decreases): | | | |
| Deferred policy acquisition costs | 52,108,388 | 48,298,608 | 43,627,510 |
| Deferred federal income taxes | (16,930,202) | (17,639,443) | (12,251,398) |
| Salvage and subrogation recoverable | 15,274,800 | 14,192,000 | 13,060,000 |
| Non-admitted assets and other adjustments, net | 2,441,591 | 2,236,021 | 2,363,038 |
| Fixed maturities | 957,401 | 7,637,828 | (1,465,363) |
| Parent-only equity and other adjustments | (42,303,748) | (12,706,527) | (20,965,704) |
| Stockholders' equity as reported herein | $ 408,388,568 | $ 416,134,643 | $ 396,877,111 |

## 16 - Supplementary Cash Flow Information

The following table reflects net income taxes and interest we paid during 2015, 2014 and 2013:

| | 2015 | 2014 | 2013 |
| --- | --- | --- | --- |
| Income taxes | $ 7,100,000 | $ 2,550,000 | $ 5,450,000 |
| Interest | 870,675 | 1,252,194 | 1,527,037 |

## 17 - Earnings Per Share

We have two classes of common stock, which we refer to as Class A common stock and Class B common stock. Our Class A common stock is entitled to be paid cash dividends that are at least 10% higher than the cash dividends we pay on our Class B common stock. Accordingly, we use the two-class method for the computation of earnings per common share. The two-class method is an earnings allocation formula that determines earnings per share separately for each class of common stock based on dividends declared and an allocation of remaining undistributed earnings using a participation percentage reflecting the dividend rights of each class.

We present below a reconciliation of the numerators and denominators we used in the basic and diluted per share computations for our Class A common stock:

| (dollars in thousands, except per share data) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Basic earnings per share: | | | |
| Numerator: | | | |
| Allocation of net income | $ 17,155 | $ 11,797 | $ 21,110 |
| Denominator: | | | |
| Weighted-average shares outstanding | 22,045,999 | 21,099,861 | 20,363,677 |
| Basic earnings per share | $ 0.78 | $ 0.56 | $ 1.04 |
| Diluted earnings per share: | | | |
| Numerator: | | | |
| Allocation of net income | $ 17,155 | $ 11,797 | $ 21,110 |
| Denominator: | | | |
| Number of shares used in basic computation | 22,045,999 | 21,099,861 | 20,363,677 |
| Weighted-average effect of dilutive securities | | | |
| Add: Director and employee stock options | 348,122 | 464,595 | 398,708 |
| Number of shares used in per share computations | 22,394,121 | 21,564,456 | 20,762,385 |
| Diluted earnings per share | $ 0.77 | $ 0.55 | $ 1.02 |

We used the following information in the basic and diluted per share computations for our Class B common stock:

| (dollars in thousands, except per share data) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Basic and diluted earnings per share: | | | |
| Numerator: | | | |
| Allocation of net income | $ 3,835 | $ 2,742 | $ 5,212 |
| Denominator: | | | |
| Weighted-average shares outstanding | 5,576,775 | 5,576,775 | 5,576,775 |
| Basic and diluted earnings per share | $ 0.69 | $ 0.49 | $ 0.94 |

During 2014 and 2013, we did not include certain options to purchase shares of our Class A common stock in the computation of diluted earnings per share because the exercise price of the options was greater than the average market price of our Class A common stock. The following table reflects the options we did not include:

| | 2014 | 2013 |
| --- | --- | --- |
| Options excluded from diluted earnings per share | 4,030,500 | 2,548,500 |

-87-

18 - Condensed Financial Information of Parent Company

**Condensed Balance Sheets**
(in thousands)

| December 31, | | 2015 | | 2014 |
|---|---|---|---|---|
| **Assets** | | | | |
| Investment in subsidiaries/affiliates (equity method) | $ | 493,600 | $ | 472,903 |
| Short-term investments | | 32 | | 530 |
| Cash | | 1,153 | | 1,543 |
| Property and equipment | | 619 | | 948 |
| Other | | 649 | | 429 |
| Total assets | $ | 496,053 | $ | 476,353 |
| **Liabilities and Stockholders' Equity** | | | | |
| Liabilities | | | | |
| Cash dividends declared to stockholders | $ | 3,512 | $ | 3,467 |
| Borrowings under lines of credit | | 81,000 | | 53,500 |
| Other | | 3,152 | | 3,251 |
| Total liabilities | | 87,664 | | 60,218 |
| Stockholders' equity | | 408,389 | | 416,135 |
| Total liabilities and stockholders' equity | $ | 496,053 | $ | 476,353 |

**Condensed Statements of Income and Comprehensive Income**
(in thousands)

| Year Ended December 31, | | 2015 | | 2014 | | 2013 |
|---|---|---|---|---|---|---|
| **Statements of Income** | | | | | | |
| Revenues | | | | | | |
| Dividends from subsidiaries | $ | 3,875 | $ | 11,500 | $ | 12,500 |
| Other | | 2,028 | | 2,099 | | 3,758 |
| Total revenues | | 5,903 | | 13,599 | | 16,258 |
| Expenses | | | | | | |
| Operating expenses | | 2,451 | | 2,746 | | 3,777 |
| Premium paid on purchase of treasury stock | | 5,780 | | — | | — |
| Interest | | 1,066 | | 1,367 | | 1,488 |
| Total expenses | | 9,297 | | 4,113 | | 5,265 |
| (Loss) income before income tax benefit and equity in undistributed net income of subsidiaries | | (3,394) | | 9,486 | | 10,993 |
| Income tax benefit | | 1,028 | | 655 | | 1,219 |
| (Loss) income before equity in undistributed net income of subsidiaries | | (2,366) | | 10,141 | | 12,212 |
| Equity in undistributed net income of subsidiaries | | 23,356 | | 4,398 | | 14,110 |
| Net income | $ | 20,990 | $ | 14,539 | $ | 26,322 |
| **Statements of Comprehensive Income** | | | | | | |
| Net income | $ | 20,990 | $ | 14,539 | $ | 26,322 |
| Other comprehensive (loss) income, net of tax | | | | | | |
| Unrealized (loss) gain - subsidiaries | | (4,579) | | 7,666 | | (28,707) |
| Other comprehensive (loss) income, net of tax | | (4,579) | | 7,666 | | (28,707) |
| Comprehensive income (loss) | $ | 16,411 | $ | 22,205 | $ | (2,385) |

-88-

### Condensed Statements of Cash Flows
(in thousands)

| Year Ended December 31, | 2015 | 2014 | 2013 |
|---|---:|---:|---:|
| Cash flows from operating activities: | | | |
| Net income | $ 20,990 | $ 14,539 | $ 26,322 |
| Adjustments: | | | |
| Equity in undistributed net income of subsidiaries | (23,356) | (4,398) | (14,110) |
| Other | 539 | (432) | (2,200) |
| Net adjustments | (22,817) | (4,830) | (16,310) |
| Net cash (used) provided | (1,827) | 9,709 | 10,012 |
| Cash flows from investing activities: | | | |
| Net sale (purchase) of short-term investments | 498 | (381) | 176 |
| Net purchase of property and equipment | (23) | (426) | (420) |
| Investment in subsidiaries | (2,427) | (1,710) | 990 |
| Other | — | 26 | 44 |
| Net cash (used) provided | (1,952) | (2,491) | 790 |
| Cash flows from financing activities: | | | |
| Cash dividends paid | (14,454) | (13,575) | (12,809) |
| Issuance of common stock | 18,468 | 10,808 | 12,648 |
| Payments on subordinated debentures | — | — | (15,465) |
| Payments on line of credit | (9,500) | (7,500) | (15,500) |
| Borrowings under lines of credit | 37,000 | 3,000 | 21,500 |
| Purchase of treasury stock | (28,125) | (12) | (377) |
| Net cash provided (used) | 3,389 | (7,279) | (10,003) |
| Net change in cash | (390) | (61) | 799 |
| Cash at beginning of year | 1,543 | 1,604 | 805 |
| Cash at end of year | $ 1,153 | $ 1,543 | $ 1,604 |

## 19 - Segment Information

We have four reportable segments, which consist of our investment function, our personal lines of insurance, our commercial lines of insurance and our investment in DFSC. Using independent agents, our insurance subsidiaries market personal lines of insurance to individuals and commercial lines of insurance to small and medium-sized businesses.

We evaluate the performance of the personal lines and commercial lines primarily based upon our insurance subsidiaries' underwriting results as determined under SAP for our total business.

We do not allocate assets to the personal and commercial lines and review the two segments in total for purposes of decision-making. We operate only in the United States, and no single customer or agent provides 10 percent or more of our revenues.

Financial data by segment is as follows:

| | | 2015 | | 2014 | | 2013 |
|---|---|---|---|---|---|---|
| | | | | (in thousands) | | |
| **Revenues:** | | | | | | |
| Premiums earned: | | | | | | |
| Commercial lines | $ | 261,286 | $ | 231,056 | $ | 202,983 |
| Personal lines | | 344,355 | | 325,442 | | 312,309 |
| GAAP premiums earned | | 605,641 | | 556,498 | | 515,292 |
| Net investment income | | 20,950 | | 18,344 | | 18,795 |
| Realized investment gains | | 1,934 | | 3,134 | | 2,423 |
| Equity in earnings of DFSC | | 1,277 | | 1,243 | | 2,908 |
| Other | | 6,585 | | 7,329 | | 7,692 |
| Total revenues | $ | 636,387 | $ | 586,548 | $ | 547,110 |

| | | 2015 | | 2014 | | 2013 |
|---|---|---|---|---|---|---|
| | | | | (in thousands) | | |
| **Income before income taxes:** | | | | | | |
| Underwriting income (loss): | | | | | | |
| Commercial lines | $ | 9,259 | $ | (9,434) | $ | (524) |
| Personal lines | | (6,414) | | (6,383) | | 1,654 |
| SAP underwriting income (loss) | | 2,845 | | (15,817) | | 1,130 |
| GAAP adjustments | | 3,344 | | 6,312 | | 5,175 |
| GAAP underwriting income (loss) | | 6,189 | | (9,505) | | 6,305 |
| Net investment income | | 20,950 | | 18,344 | | 18,795 |
| Realized investment gains | | 1,934 | | 3,134 | | 2,423 |
| Equity in earnings of DFSC | | 1,277 | | 1,243 | | 2,908 |
| Premium paid on purchase of treasury stock | | (5,780) | | — | | — |
| Other | | 3,022 | | 3,067 | | 2,279 |
| Income before income taxes | $ | 27,592 | $ | 16,283 | $ | 32,710 |

## 20 - Guaranty Fund and Other Insurance-Related Assessments

Our insurance subsidiaries' liabilities for guaranty fund and other insurance-related assessments were $1,348,427 and $1,440,845 at December 31, 2015 and 2014, respectively. These liabilities included $400,690 and $472,665 related to surcharges collected by our insurance subsidiaries on behalf of regulatory authorities for 2015 and 2014, respectively.

## 21 - Interim Financial Data (unaudited)

| | 2015 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net premiums earned | $ 146,529,816 | $ 150,457,785 | $ 153,096,075 | $ 155,557,052 |
| Total revenues | 154,772,448 | 158,016,954 | 159,801,784 | 163,796,077 |
| Net losses and loss expenses | 95,939,312 | 97,839,291 | 102,233,708 | 102,354,563 |
| Net income | 6,854,336 | 6,465,027 | 5,686,831 | 1,983,839 |
| Net earnings per common share: | | | | |
| Class A common stock - basic | 0.26 | 0.24 | 0.21 | 0.07 |
| Class A common stock - diluted | 0.25 | 0.24 | 0.21 | 0.07 |
| Class B common stock - basic and diluted | 0.23 | 0.21 | 0.18 | 0.07 |

| | 2014 | | | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Net premiums earned | $ 133,548,261 | $ 136,589,156 | $ 142,149,561 | $ 144,210,557 |
| Total revenues | 140,339,087 | 145,481,928 | 149,135,383 | 151,591,344 |
| Net losses and loss expenses | 97,632,392 | 97,887,449 | 91,003,905 | 101,877,436 |
| Net (loss) income | (634,414) | 1,938,670 | 8,748,711 | 4,486,051 |
| Net (loss) earnings per common share: | | | | |
| Class A common stock - basic | (0.02) | 0.08 | 0.33 | 0.17 |
| Class A common stock - diluted | (0.02) | 0.07 | 0.33 | 0.17 |
| Class B common stock - basic and diluted | (0.02) | 0.07 | 0.30 | 0.14 |

.Report of Independent Registered Public Accounting Firm

**To the Stockholders and Board of Directors of Donegal Group Inc.**

We have audited the accompanying consolidated balance sheets of Donegal Group Inc. and subsidiaries (the Company) as of December 31, 2015 and 2014, and the related consolidated statements of income and comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2015. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We did not audit the financial statements of Donegal Financial Services Corporation (a 48.2 percent owned investee company). The Company's investment in Donegal Financial Services Corporation at December 31, 2015 and 2014 was $38,476,708 and $39,283,924, respectively, and its equity in earnings of Donegal Financial Services Corporation was $1,277,229, $1,242,910 and $2,907,867 for the years ended December 31, 2015, 2014 and 2013, respectively. The financial statements of Donegal Financial Services Corporation were audited by other auditors whose report has been furnished to us, and our opinion, insofar as it relates to the amounts included for Donegal Financial Services Corporation, is based solely on the report of the other auditors.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, based on our audits and the report of the other auditors, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Donegal Group Inc. and subsidiaries as of December 31, 2015 and 2014, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2015, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Donegal Group Inc.'s internal control over financial reporting as of December 31, 2015, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 18, 2016 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

KPMG LLP

Philadelphia, Pennsylvania
March 18, 2016

**Item 9.    Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.**

None.

**Item 9A.    Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of December 31, 2015, the end of the period covered by this Form 10-K Report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as a result of the material weakness in internal control over financial reporting we describe below, our disclosure controls and procedures were not effective as of December 31, 2015.

Disclosure controls and procedures are controls and other procedures that are designed to provide reasonable assurance that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, on a timely basis, and that the information disclosed in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as that term is defined in Rule 13a-15(f) under the Exchange Act. Under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, our management has conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Framework"). Based on our evaluation under the COSO Framework, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2015 due to the material weakness we describe below.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

The identified material weakness in our internal control over financial reporting pertains to our control activities over the accounting for a significant and unusual transaction related to the purchase of a large block of our Class A common stock in December 2015. The control activities were not designed appropriately to ensure that our related accounting conclusions were sufficiently documented and reviewed for compliance with U.S. generally accepted accounting principles ("GAAP"). The material weakness resulted in a material misstatement of the cost of our treasury stock and amounts within our statement of operations that were corrected prior to the issuance of our consolidated financial statements.

Notwithstanding this material weakness, our management concluded that our consolidated financial statements we include in this Form 10-K Report present fairly, in all material respects, our financial position and our results of operations and cash flows in conformity with GAAP, and KPMG LLP, our independent registered public accounting firm, has issued an unqualified opinion on our consolidated financial statements as of December 31, 2015 and 2014 and for each of the years in the three-year period ended December 31, 2015. This material weakness has no impact on our consolidated financial statements for prior years.

The effectiveness of our internal control over financial reporting as of December 31, 2015 has been audited by KPMG LLP, as stated in their adverse report, which we include elsewhere in this Form 10-K Report.

**Management Remediation Plan**

To remediate the material weakness we describe above, our management is enhancing and revising the design of existing controls and procedures over our accounting for significant and unusual transactions. These controls relate to enhanced documentation of our manzment's evaluation of the facts and circumstances supporting our management's judgments and conclusions, and may include consultation with third-party experts with relevant knowledge and experience to assist our management with the evaluation of our accounting for significant and unusual transactions.

**Changes in Internal Control over Financial Reporting**

There were no changes to our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the fourth quarter of 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.    Other Information.**

None.

.Report of Independent Registered Public Accounting Firm

To the Stockholders and Board of Directors of Donegal Group Inc.

We have audited Donegal Group Inc.'s (the Company) internal control over financial reporting as of December 31, 2015, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Donegal Group Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting in Item 9A. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A material weakness relating to control activities over the accounting for a significant and unusual transaction has been identified and included in management's assessment.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Donegal Group Inc. and subsidiaries as of December 31, 2015 and 2014, and the related consolidated statements of income and comprehensive income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2015. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2015 consolidated financial statements, and this report does not affect our report dated March 18, 2016, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weakness on the achievement of the objectives of the control criteria, Donegal Group Inc. has not maintained effective internal control over financial reporting as of December 31, 2015, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

KPMG LLP

Philadelphia, Pennsylvania
March 18, 2016

**PART III**

**Item 10.    Directors, Executive Officers and Corporate Governance.**

We incorporate the response to this Item 10 by reference to our proxy statement we will file with the SEC on or about March 21, 2016 relating to our annual meeting of stockholders that we will hold on April 21, 2016, or our Proxy Statement. We respond to this Item with respect to our executive officers by reference to Part I of this Form 10-K Report.

We incorporate the full text of our Code of Business Conduct and Ethics by reference to Exhibit 14 to this Form 10-K Report.

**Item 11.    Executive Compensation.**

We incorporate the response to this Item 11 by reference to our Proxy Statement. Neither the Report of our Compensation Committee nor the Report of our Audit Committee included in our Proxy Statement shall constitute or be deemed to constitute a filing with the SEC under the Securities Act or the Exchange Act or be deemed to have been incorporated by reference into any filing we make under the Securities Act or the Exchange Act, except to the extent we specifically incorporate the Report of Our Compensation Committee or the Report of Our Audit Committee by reference.

**Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

We incorporate the response to this Item 12 by reference to our Proxy Statement.

**Item 13.    Certain Relationships and Related Transactions, and Director Independence.**

We incorporate the response to this Item 13 by reference to our Proxy Statement.

**Item 14.    Principal Accounting Fees and Services.**

We incorporate the response to this Item 14 by reference to our Proxy Statement.

**Item 15.    Exhibits, Financial Statement Schedules.**

(a)  Financial statements, financial statement schedule and exhibits filed:

(a)  Consolidated Financial Statements

|  | Page |
|---|---|
| Reports of Independent Registered Public Accounting Firm | 92 |
| Donegal Group Inc. and Subsidiaries: | |
| Consolidated Balance Sheets at December 31, 2015 and 2014 | 58 |
| Consolidated Statements of Income and Comprehensive Income for each of the years in the three-year period ended December 31, 2015, 2014 and 2013 | 59 |
| Consolidated Statements of Stockholders' Equity for each of the years in the three-year period ended December 31, 2015, 2014 and 2013 | 60 |
| Consolidated Statements of Cash Flows for each of the years in the three-year period ended December 31, 2015, 2014 and 2013 | 61 |
| Notes to Consolidated Financial Statements | 62 |

Report and Consent of Independent Registered Public Accounting Firm

(Filed as Exhibit 23.1)

Consent of Independent Registered Public Accounting Firm

(Filed as Exhibit 23.2)

(b)  Financial Statement Schedule

| | |
|---|---|
| Schedule III — Supplementary Insurance Information | Filed herewith |
| Consolidated Financial Statements of Donegal Financial Services Corporation | Filed herewith |

We have omitted all other schedules since they are not required, not applicable or the information is included in the financial statements or notes to the financial statements.

(c)  Exhibits

| Exhibit No. | Description of Exhibits | Reference |
|---|---|---|
| 3.1 | Certificate of Incorporation of Donegal Group Inc., as amended. | (a) |
| 3.2 | Amended and Restated By-laws of Donegal Group Inc. | (i) |
| Management Contracts and Compensatory Plans or Arrangements | | |
| 10.1 | Donegal Group Inc. 2013 Equity Incentive Plan for Employees. | (c) |
| 10.2 | Donegal Group Inc. 2013 Equity Incentive Plan for Directors. | (c) |
| 10.3 | Donegal Group Inc. 2011 Employee Stock Purchase Plan. | (c) |
| 10.4 | Donegal Group Inc. 2011 Equity Incentive Plan for Employees. | (c) |
| 10.5 | Donegal Group Inc. 2011 Equity Incentive Plan for Directors. | (c) |
| 10.6 | Employment Agreement dated as of July 29, 2011 among Donegal Mutual Insurance Company, Donegal Group Inc. and Donald H. Nikolaus. | (d) |
| 10.7 | Consulting Agreement dated as of July 29, 2011 among Donegal Mutual Insurance Company, Donegal Group Inc. and Donald H. Nikolaus. | (d) |

| 10.8 | Employment Agreement dated as of July 29, 2011 among Donegal Mutual Insurance Company, Donegal Group Inc. and Kevin G. Burke. | (d) |
|---|---|---|
| 10.9 | Employment Agreement dated as of July 29, 2011 among Donegal Mutual Insurance Company, Donegal Group Inc. and Cyril J. Greenya. | (d) |
| 10.10 | Employment Agreement dated as of July 29, 2011 among Donegal Mutual Insurance Company, Donegal Group Inc. and Jeffrey D. Miller. | (d) |
| 10.11 | Employment Agreement dated as of July 18, 2013 among Donegal Mutual Insurance Company, Donegal Group Inc. and Sanjay Pandey. | (s) |
| 10.12 | Employment Agreement dated as of July 29, 2011 among Donegal Mutual Insurance Company, Donegal Group Inc. and Robert G. Shenk. | (d) |
| 10.13 | Employment Agreement dated as of July 29, 2011 among Donegal Mutual Insurance Company, Donegal Group Inc. and Daniel J. Wagner. | (d) |
| 10.14 | Donegal Mutual Insurance Company 401(k) Plan. | (e) |
| 10.15 | Amendment No. 1 effective January 1, 2000 to Donegal Mutual Insurance Company 401(k) Plan. | (e) |
| 10.16 | Amendment No. 2 effective January 6, 2000 to Donegal Mutual Insurance Company 401(k) Plan. | (b) |
| 10.17 | Amendment No. 3 effective July 23, 2001 to Donegal Mutual Insurance Company 401(k) Plan. | (b) |
| 10.18 | Amendment No. 4 effective January 1, 2002 to Donegal Mutual Insurance Company 401(k) Plan. | (b) |
| 10.19 | Amendment No. 5 effective December 31, 2001 to Donegal Mutual Insurance Company 401(k) Plan. | (b) |
| 10.20 | Amendment No. 6 effective July 1, 2002 to Donegal Mutual Insurance Company 401(k) Plan. | (h) |
| 10.21 | Donegal Group Inc. Cash Incentive Bonus Plan. | (j) |
| 10.22 | Donegal Group Inc. 2015 Equity Incentive Plan for Employees. | (t) |
| 10.23 | Donegal Group Inc. 2015 Equity Incentive Plan for Directors. | (t) |

Other Material Contracts

| 10.24 | Reinsurance and Retrocession Agreement dated May 21, 1996 between Donegal Mutual Insurance Company and Southern Insurance Company of Virginia. | (f) |
|---|---|---|
| 10.25 | Surplus Note Purchase Agreement dated September 8, 2009 between Donegal Mutual Insurance Company and Southern Mutual Insurance Company. | (k) |
| 10.26 | Quota-share Reinsurance Agreement dated October 30, 2009 but effective 11:59 p.m. on October 31, 2009 between Donegal Mutual Insurance Company and Southern Mutual Insurance Company. | (k) |
| 10.27 | Services and Affiliation Agreement dated October 30, 2009 between Donegal Mutual Insurance Company and Southern Mutual Insurance Company. | (k) |
| 10.28 | Technology License Agreement dated October 30, 2009 between Donegal Mutual Insurance Company and Southern Mutual Insurance Company. | (k) |
| 10.29 | Amended and Restated Proportional Reinsurance Agreement dated March 1, 2010 between Donegal Mutual Insurance Company and Atlantic States Insurance Company. | (k) |
| 10.30 | Agreement and Plan of Merger dated April 19, 2010, and as amended May 20, 2010, among Donegal Acquisition Inc., Donegal Financial Services Corporation, Donegal Group Inc. and Union National Financial Corporation; amended dated September 1, 2010; amended dated December 8, 2010. | (l) |
| 10.31 | Amended and Restated Agreement and Plan of Merger dated December 6, 2010 among Michigan Insurance Company, West Bend Mutual Insurance Company, Donegal Group Inc. and DGI Acquisition Corp. | (m) |

| 10.32 | Amended and Restated Tax Sharing Agreement dated December 1, 2010 among Donegal Group Inc., Atlantic States Insurance Company, Southern Insurance Company of Virginia, Le Mars Insurance Company, The Peninsula Insurance Company, Peninsula Indemnity Company and Michigan Insurance Company. | (n) |
| 10.33 | Amended and Restated Services Allocation Agreement dated December 1, 2010 among Donegal Group Inc., Atlantic States Insurance Company, Southern Insurance Company of Virginia, Le Mars Insurance Company, The Peninsula Insurance Company, Peninsula Indemnity Company and Michigan Insurance Company. | (n) |
| 10.34 | Quota-share Reinsurance Agreement dated December 1, 2010 between Donegal Mutual Insurance Company and Michigan Insurance Company. | (n) |
| 10.35 | Donegal Group Inc. 2015 Agency Stock Purchase Plan. | (o) |
| 10.36 | Credit Agreement dated June 21, 2010 between Donegal Group Inc. and Manufacturers and Traders Trust Company, First Amendment to Credit Agreement dated October 12, 2010 and Second Amendment to Credit Agreement dated June 1, 2011. | (p) |
| 10.37 | Third Amendment to Credit Agreement between Donegal Group Inc. and Manufacturers and Traders Trust Company dated June 1, 2012 and Fourth Amendment to Credit Agreement dated December 5, 2012. | (q) |
| 10.38 | Fifth Amendment to Credit Agreement between Donegal Group Inc. and Manufacturers and Traders Trust Company dated June 1, 2013. | (r) |
| 10.39 | Sixth Amendment to Credit Agreement between Donegal Group Inc. and Manufacturers and Traders Trust Company dated June 1, 2014. | (s) |
| 10.40 | Seventh Amendment to Credit Agreement between Donegal Group Inc. and Manufacturers and Traders Trust Company dated June 1, 2015. | Filed herewith |
| 10.41 | Stock Purchase and Standstill Agreement dated as of December 18, 2015 among Donegal Mutual Insurance Company, Donegal Group Inc. and Gregory M. Shepard. | (u) |
| 14 | Code of Business Conduct and Ethics. | (g) |
| 21 | Subsidiaries of Registrant. | Filed herewith |
| 23.1 | Report and Consent of Independent Registered Public Accounting Firm. | Filed herewith |
| 23.2 | Consent of Independent Registered Public Accounting Firm. | Filed herewith |
| 31.1 | Rule 13a-14(a)/15(d)-14(a) Certification of Chief Executive Officer. | Filed herewith |
| 31.2 | Rule 13a-14(a)/15(d)-14(a) Certification of Chief Financial Officer. | Filed herewith |
| 32.1 | Section 1350 Certification of Chief Executive Officer. | Filed herewith |
| 32.2 | Section 1350 Certification of Chief Financial Officer. | Filed herewith |
| Exhibit 101.INS | XBRL Instance Document | Filed herewith |
| Exhibit 101.SCH | XBRL Taxonomy Extension Schema Document | Filed herewith |
| Exhibit 101.PRE | XBRL Taxonomy Presentation Linkbase Document | Filed herewith |
| Exhibit 101.CAL | XBRL Taxonomy Calculation Linkbase Document | Filed herewith |
| Exhibit 101.LAB | XBRL Taxonomy Label Linkbase Document | Filed herewith |

| Exhibit 10 | | | Filed |
|---|---|---|---|
| 1.DEF | XBRL Taxonomy Extension Definition Linkbase Document | | herewith |

---

(a) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-Q for the quarterly period ended March 31, 2013.

(b) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 2001.

(c) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 8-K Report dated April 22, 2011.

(d) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 8-K Report dated August 3, 2011.

(e) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 1999.

(f) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 1996.

(g) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 2003.

(h) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 2002.

(i) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 8-K Report dated July 18, 2008.

(j) We incorporate such exhibit by reference to the description of such plan in Registrant's definitive proxy statement for its Annual Meeting of Stockholders held on April 17, 2014 filed on March 17, 2014.

(k) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 2009.

(l) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form S-4 registration statement filed June 25, 2010, Registrant's Form 8-K Report dated September 1, 2010 and Registrant's Form 8-K Report dated December 8, 2010.

(m) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 8-K Report dated December 8, 2010.

(n) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 2010.

(o) We incorporate such exhibit by reference to the like-described exhibit filed in Registrant's Form S-3 registration statement filed on April 28, 2015.

(p) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 2011.

(q) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 2012.

(r) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 2013.

(s) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 10-K Report for the year ended December 31, 2014.

(t) We incorporate such exhibit by reference to the description of such plan in Registrant's definitive proxy statement for its Annual Meeting of Stockholders held on April 16, 2015 filed on March 16, 2015.

(u) We incorporate such exhibit by reference to the like-described exhibit in Registrant's Form 8-K Report dated December 22, 2015.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

DONEGAL GROUP INC.

By:  /s/ Kevin G. Burke

Kevin G. Burke, President and Chief Executive Officer

Date: March 18, 2016

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Kevin G. Burke<br>Kevin G. Burke | President and Chief Executive Officer<br>(principal executive officer) | March 18, 2016 |
| /s/ Jeffrey D. Miller<br>Jeffrey D. Miller | Executive Vice President and Chief Financial Officer<br>(principal financial and accounting officer) | March 18, 2016 |
| /s/ Scott A. Berlucchi<br>Scott A. Berlucchi | Director | March 18, 2016 |
| /s/ Robert S. Bolinger<br>Robert S. Bolinger | Director | March 18, 2016 |
| /s/ Patricia A. Gilmartin<br>Patricia A. Gilmartin | Director | March 18, 2016 |
| /s/ Philip H. Glatfelter, II<br>Philip H. Glatfelter, II | Director | March 18, 2016 |
| /s/ Jack L. Hess<br>Jack L. Hess | Director | March 18, 2016 |
| /s/ Barry C. Huber<br>Barry C. Huber | Director | March 18, 2016 |
| /s/ Kevin M. Kraft, Sr.<br>Kevin M. Kraft, Sr. | Director | March 18, 2016 |
| /s/ Jon M. Mahan<br>Jon M. Mahan | Director | March 18, 2016 |
| /s/ S. Trezevant Moore, Jr.<br>S. Trezevant Moore, Jr. | Director | March 18, 2016 |
| /s/ Donald H. Nikolaus<br>Donald H. Nikolaus | Director | March 18, 2016 |
| /s/ Richard D. Wampler, II<br>Richard D. Wampler, II | Director | March 18, 2016 |

[THIS PAGE INTENTIONALLY LEFT BLANK]

# CORPORATE INFORMATION

## ANNUAL MEETING

April 21, 2016 at 10:00 a.m. at the:
Heritage Hotel Lancaster
500 Centerville Road
Lancaster, Pennsylvania 17601

## CORPORATE OFFICES

1195 River Road
P.O. Box 302
Marietta, Pennsylvania 17547-0302
(800) 877-0600
E-mail Address: info@donegalgroup.com
Donegal Web Site: www.donegalgroup.com

## TRANSFER AGENT

Computershare Trust Company, N.A.
P.O. Box 30170
College Station, Texas 77842-3170
(800) 317-4445
Web Site: www.computershare.com
Hearing Impaired: TDD: 800-952-9245

## DIVIDEND REINVESTMENT AND STOCK PURCHASE PLAN

We offer a dividend reinvestment and stock purchase plan through our transfer agent. For information contact:
Donegal Group Inc.
Dividend Reinvestment and
Stock Purchase Plan
Computershare Trust Company, N.A.
P.O. Box 30170
College Station, Texas 77842-3170

## STOCKHOLDERS

The following represent the number of our common stockholders of record as of December 31, 2015:

| | |
|---|---|
| Class A common stock | 1,890 |
| Class B common stock | 317 |

## BOARD OF DIRECTORS

| | |
|---|---|
| Donald H. Nikolaus | Chairman of the Board and a Director |
| Scott A. Berlucchi | Director |
| Robert S. Bolinger | Director |
| Patricia A. Gilmartin | Director |
| Philip H. Glatfelter, II | Director |
| Barry C. Huber | Director |
| Jack L. Hess | Director |
| Kevin M. Kraft, Sr. | Director |
| Jon M. Mahan | Director |
| S. Trezevant Moore, Jr. | Director |
| Richard D. Wampler, II | Director |

## OFFICERS

| | |
|---|---|
| Kevin G. Burke | President and Chief Executive Officer |
| Jeffrey D. Miller | Executive Vice President and Chief Financial Officer |
| Cyril J. Greenya | Senior Vice President |
| Sanjay Pandey | Senior Vice President and Chief Information Officer |
| Robert G. Shenk | Senior Vice President |
| Christina M. Springer | Senior Vice President |
| V. Anthony Viozzi | Senior Vice President and Chief Investment Officer |
| Daniel J. Wagner | Senior Vice President and Treasurer |
| Jason M. Crumbling | Vice President and Controller |
| Jerry W. Demastus | Vice President and Assistant Treasurer |
| Sheri O. Smith | Vice President and Secretary |
| Michelle M. Post | Assistant Secretary |

There When It Matters Most.

1195 River Road, P.O. Box 302
Marietta, PA 17547-0302
(717) 426-1931

www.donegalgroup.com



Full-Text Search    Filing Company ▾

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): June 11, 2018

# NORTHWEST BANCSHARES, INC.

(Exact Name of Registrant as Specified in its Charter)

| Maryland | 001-34582 | 27-0950358 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File No.) | (I.R.S. Employer Identification No.) |

| 100 Liberty Street, Warren, Pennsylvania | 16365 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code:    (814) 726-2140

Not Applicable
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

- ¨ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

- ¨ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

- ¨ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

- ¨ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ¨

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ¨

**Item 1.01        Entry into a Material Definitive Agreement**

On June 11, 2018, Northwest Bancshares, Inc. (the "Company") entered into an Agreement and Plan of Merger (the "Merger Agreement") by and among Donegal Mutual Insurance Company, Donegal Group Inc., Donegal Financial Services Corporation ("DFSC", and together with Donegal Mutual Insurance Company and Donegal Group Inc., "Donegal") and the Company. Pursuant to the Merger Agreement, DFSC will merge with and into the Company, with the Company as the surviving entity. Immediately thereafter, Union Community Bank, the wholly owned subsidiary of DFSC, will merge with and into Northwest Bank, the wholly owned subsidiary of the Company, with Northwest Bank as the surviving entity.

Under the terms of the Merger Agreement, payment will be 50% cash and 50% stock. Specifically, each share of DFSC common stock will be converted into the right to receive $2,379.09 per share in cash plus 137.84 shares of Company common stock, for total consideration valued at approximately $85 million. Immediately prior to the closing of the merger, DFSC will also pay a dividend of approximately $30 million to its two shareholders, Donegal Group Inc. and Donegal Mutual Insurance Company.

The Merger Agreement provides that the exchange ratio will switch to a floating basis if the value of the Company's shares during a period ending the fifth trading day prior to closing is less than $15.53 or greater than $18.99, such that the total purchase price shall not be less than $80.75 million or more than $89.25 million. The Company also has the right to alter the mix of cash and stock to be received if the value of the Company's shares during the calculation period is less than $15.53.

The transaction has been approved by the Boards of Directors of the Company, DFSC, Donegal Mutual Insurance Company and Donegal Group Inc. and by the stockholders of DFSC. Completion of the transaction is subject to customary closing conditions, including the receipt of required regulatory approvals.

The Merger Agreement includes customary representations, warranties and covenants of the Company and Donegal made to each other as of specific dates. The assertions embodied in those representations and warranties were made solely for purposes of the contract by and among the Company and Donegal and are not intended to provide factual, business, or financial information about the Company or Donegal. Moreover, some of those representations and warranties may not be accurate or complete as of any specified date, may be subject to a contractual standard of materiality different from those generally applicable to shareholders or different from what a shareholder might view as material, may have been used for purposes of allocating risk between the Company and Donegal rather than establishing matters as facts, may have been qualified by certain disclosures not reflected in the Merger Agreement that were made to the other party in connection with the negotiation of the Merger Agreement and generally were solely for the benefit of the parties to that agreement. DFSC has agreed to operate its business in the ordinary course consistent with past practice until the closing of the transaction and not to engage in certain kinds of transactions during such period (without the prior written consent of the Company).

· Donegal has also agreed not to (i) solicit proposals relating to alternative business combination transactions involving DFSC or Union Community Bank or (ii) enter into discussions or an agreement concerning, or to provide confidential information in connection with, any proposals for alternative business combination transactions involving DFSC or Union Community Bank.

The foregoing description of the Merger Agreement is included to provide information regarding its terms and does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement, which is filed as Exhibit 2.1 to this Current Report on Form 8-K, and is incorporated into this report by reference.

**Forward-Looking Statements**

This Current Report on Form 8-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, statements about (1) the benefits of the merger between the Company and DFSC, including anticipated future results, cost savings and accretion to reported earnings that may be realized from the merger; (2) the Company's and DFSC's plans, objectives, expectations and intentions and other statements contained in this presentation that are not historical facts; and (3) other statements identified by words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates" or words of similar meaning.

Forward-looking statements involve risks and uncertainties that may cause actual results to differ materially from those in such statements. The following factors, among others, could cause actual results to differ materially from the anticipated results expressed in the forward-looking statements: the businesses of the Company and DFSC may not be combined successfully, or such combination may take longer than expected; the cost savings from the merger may not be fully realized or may take longer than expected; operating costs, customer loss and business disruption following the merger may be greater than expected; governmental approvals of the merger may not be obtained, or adverse regulatory conditions may be imposed in connection with governmental approvals of the merger or otherwise; the stockholders of Donegal may revise their approval of the merger; credit and interest rate risks associated with the Company's and DFSC's respective businesses; and difficulties associated with achieving expected future financial results. Additional factors that could cause actual results to differ materially from those expressed in the forward-looking statements are discussed in the Company's reports (such as the Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K) filed with the SEC and available at the SEC's Internet website (www.sec.gov). All subsequent written and oral forward-looking statements concerning the proposed transaction or other matters attributable to the Company or Donegal or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements above. Except as required by law, the Company and Donegal do not undertake any obligation to update any forward-looking statement to reflect circumstances or events that occur after the date the forward-looking statement is made.

Annualized, pro forma, projected and estimated numbers are used for illustrative purpose only, are not forecasts and may not reflect actual results.

**Item 7.01**        Regulation FD Disclosure

On June 12, 2018, the Company issued a press release announcing the execution of the Merger Agreement, which is filed as Exhibit 99.1 to this Current Report on Form 8-K. The Company's investor presentation relating to this transaction is attached as Exhibit 99.2 to this Current Report on Form 8-K.

**Item 9.01.**        **Financial Statements and Exhibits**

(a)    Financial statements of businesses acquired.  Not Applicable.

(b)    Pro forma financial information.  Not Applicable.

(c)    Shell company transactions: Not Applicable.

(d)    Exhibits.

| Exhibit No. | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger dated as of June 11, 2018, by and among Donegal Mutual Insurance Company, Donegal Group Inc., Donegal Financial Services Corporation and Northwest Bancshares, Inc.* |
| 99.1 | Press Release dated June 12, 2018 |
| 99.2 | Investor Presentation dated June 12, 2018 |

* Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, hereunto duly authorized.

**NORTHWEST BANCSHARES, INC.**

DATE: June 12, 2018

By:  /s/ William W. Harvey, Jr.

William W. Harvey, Jr.

Chief Financial Officer

---

**Exhibit 2.1**

EXECUTION VERSION

AGREEMENT AND PLAN OF MERGER

By and Among

DONEGAL MUTUAL INSURANCE COMPANY,

DONEGAL GROUP INC.,

DONEGAL FINANCIAL SERVICES CORPORATION

and

NORTHWEST BANCSHARES, INC.
dated as of

June 11, 2018

---

TABLE OF CONTENTS

|  |  | Page |
| --- | --- | --- |
| **ARTICLE I DEFINITIONS** |  | 2 |
| **ARTICLE II THE MERGER** |  | 8 |
| 2.1 | The Merger | 8 |
| 2.2 | Pre-Closing Dividends | 9 |
| 2.3 | Closing | 9 |
| 2.4 | Effects of the Merger | 9 |
| 2.5 | Effect on Outstanding Shares of Company Common Stock | 10 |
| 2.6 | Effect on Outstanding Shares of Buyer Common Stock | 11 |
| 2.7 | Directors of Surviving Corporation After Effective Time | 11 |
| 2.8 | Articles of Incorporation and Bylaws | 11 |
| 2.9 | Bank Merger | 12 |
| 2.10 | Alternative Structure | 12 |
| 2.11 | Absence of Control | 12 |
| **ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** |  | 12 |
| 3.1 | Organization, Incorporation and Authority of each Acquired Company | 12 |
| 3.2 | Capitalization | 13 |
| 3.3 | Subsidiaries | 14 |
| 3.4 | Consents | 14 |
| 3.5 | Financial Statements | 14 |
| 3.6 | Litigation | 15 |
| 3.7 | Compliance with Laws | 15 |
| 3.8 | Benefit Plans | 18 |
| 3.9 | Labor Matters | 20 |
| 3.10 | Environmental Matters | 20 |
| 3.11 | Taxes | 21 |
| 3.12 | Contracts | 23 |
| 3.13 | Insurance | 25 |
| 3.14 | Real and Personal Property | 25 |
| 3.15 | Intellectual Property; Company IT Systems | 25 |
| 3.16 | Brokers | 26 |
| 3.17 | Intercompany and Affiliate Agreements | 26 |
| 3.18 | Derivative Instruments and Transactions | 27 |
| 3.19 | Trust Business | 27 |
| 3.20 | Loan Matters | 27 |
| 3.21 | Community Reinvestment Act Compliance | 28 |
| 3.22 | Allowance For Loan Losses | 28 |

| 3.23 | Deposits | 28 |
| 3.24 | Sufficiency of Assets | 29 |
| 3.25 | Corporate Documents and Records | 29 |
| 3.26 | No Violations | 29 |
| 3.27 | No Additional Representations | 29 |

**ARTICLE IV ADDITIONAL REPRESENTATIONS AND WARRANTIES OF DMIC AND DGI** | | 30 |

| 4.1 | Authority, Validity and Effect | 30 |
| 4.2 | Title to Shares of Company Common Stock | 30 |
| 4.3 | No Shareholder or Policyholder Voting | 30 |

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER** | | 30 |

| 5.1 | Incorporation and Authority of Buyer | 30 |
| 5.2 | No Conflicts; Consents | 31 |
| 5.3 | Capital Structure | 31 |
| 5.4 | Brokers | 32 |
| 5.5 | Sufficiency of Funds | 32 |
| 5.6 | Legal Proceedings | 32 |
| 5.7 | Registration Eligibility | 32 |
| 5.8 | No Other Representations and Warranties | 32 |

**ARTICLE VI COVENANTS** | | 32 |

| 6.1 | Conduct of Business | 32 |
| 6.2 | Negative Covenants | 32 |
| 6.3 | Current Information | 36 |
| 6.4 | Regulatory Filings | 36 |
| 6.5 | Commercially Reasonable Efforts | 37 |
| 6.6 | Director and Officer Indemnification | 37 |
| 6.7 | Confidentiality | 38 |
| 6.8 | Public Announcements | 38 |
| 6.9 | Further Assurances | 38 |
| 6.10 | No Solicitation | 39 |
| 6.11 | Tax Returns | 40 |
| 6.12 | Registration Rights | 41 |
| 6.13 | Employment Agreements | 41 |
| 6.14 | Severance Benefits | 42 |

| ARTICLE VII CONDITIONS TO CLOSING | | | 42 |
|---|---|---|---|
| 7.1 | Conditions to Obligations of All Parties | | 42 |
| 7.2 | Conditions to Obligations of Buyer | | 43 |
| 7.3 | Conditions to Obligations of Sellers | | 44 |

| ARTICLE VIII INDEMNIFICATION | | | 45 |
|---|---|---|---|
| 8.1 | Survival of Representations, Warranties and Agreements | | 45 |
| 8.2 | Indemnification by Sellers | | 46 |
| 8.3 | Indemnification by Buyer | | 46 |
| 8.4 | Certain Limitations | | 46 |
| 8.5 | Indemnification Procedures | | 47 |
| 8.6 | Tax Treatment of Indemnification Payments | | 49 |
| 8.7 | Mitigation | | 49 |
| 8.8 | Net Losses; Subrogation | | 49 |
| 8.9 | Exclusive Remedies | | 50 |

| ARTICLE IX TERMINATION | | | 50 |
|---|---|---|---|
| 9.1 | Termination | | 50 |
| 9.2 | Effect of Termination | | 51 |

| ARTICLE X MISCELLANEOUS | | | 52 |
|---|---|---|---|
| 10.1 | Expenses | | 52 |
| 10.2 | Notices | | 52 |
| 10.3 | Interpretation | | 53 |
| 10.4 | Headings | | 53 |
| 10.5 | Severability | | 53 |
| 10.6 | Entire Agreement | | 53 |
| 10.7 | Successors and Assigns | | 54 |
| 10.8 | No Third-Party Beneficiaries | | 54 |
| 10.9 | No Recourse | | 54 |
| 10.10 | Amendment and Modification; Waiver | | 54 |
| 10.11 | Governing Law; Submission to Jurisdiction; Waiver of Jury Trial | | 55 |
| 10.12 | Specific Performance | | 56 |
| 10.13 | Counterparts | | 56 |
| 10.14 | Attorney-Client Relationship | | 56 |
| 10.15 | Several Obligations | | 57 |

AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of June 11, 2018, is entered into among Donegal Mutual Insurance Company, a Pennsylvania-domiciled mutual insurance company ("DMIC"), Donegal Group Inc., a Delaware corporation ("DGI"), Donegal Financial Services Corporation, a Delaware corporation (the "Company") (DMIC, DGI and the Company, each a "Seller" and collectively "Sellers"), and Northwest Bancshares, Inc., a Maryland corporation ("Buyer"). Sellers and Buyer are sometimes referred to in this Agreement individually as a "Party" and collectively as the "Parties." The Company shall not be considered a Seller for purposes of any obligation to be fulfilled or action taken after the Closing.

RECITALS

WHEREAS, DMIC and DGI collectively own all of the issued and outstanding common stock, $0.01 par value per share, of the Company (the "Company Common Stock"), and the Company owns all of the issued and outstanding common stock, par value $0.01 per share, of Union Community Bank, a Pennsylvania-chartered savings bank (the "Bank");

WHEREAS, Buyer owns all the issued and outstanding common stock of Northwest Bank, a Pennsylvania-chartered savings bank ("Northwest Bank");

WHEREAS, the Boards of Directors of each of Buyer and Sellers have determined that this Agreement and the business combination and related transactions contemplated hereby are advisable and in the best interests of Buyer and Sellers, respectively, and in the best interests of their respective stockholders and policyholders, as applicable;

WHEREAS, the Parties hereto intend that the Merger (as defined herein) shall qualify as a reorganization under the provisions of Section 368(a) of the Code (as defined herein) for federal income tax purposes and that this Agreement be and is hereby adopted as a "plan of reorganization" within the meaning of Sections 354 and 361 of the Code; provided, however, that notwithstanding the foregoing, in the event the Merger cannot qualify under Section 368(a) of the Code, the Parties agree that, subject to the terms of this Agreement, the Parties shall consummate the Merger, if it qualifies as a liquidation under Section 332 of the Code;

WHEREAS, Buyer and Sellers each desire to make certain representations, warranties and agreements in connection with the Merger and related transactions provided for herein and to prescribe various conditions to such transactions; and

WHEREAS, concurrently with the execution of this Agreement, DMIC and DGI have each executed a written consent whereby they have voted in favor of this Agreement, the Merger and the transactions contemplated hereby, and have provided such consents to Buyer.

-1-

NOW, THEREFORE, in consideration of the mutual covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the Parties to this Agreement agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"Acquisition Proposal" means an offer or proposal, whether or not in writing, involving the Bank or the Company with respect to: (i) any merger, reorganization, consolidation, share exchange, share issuance, recapitalization, business combination, liquidation, dissolution or other similar transaction involving any sale, issuance, lease, exchange, mortgage, pledge, transfer or other disposition of, all or a material portion of the assets or equity securities of the Bank or the Company or deposits of the Bank in a single transaction or series of related transactions; (ii) any tender offer or exchange offer for any portion of the outstanding shares of capital stock of the Bank or the Company; (iii) any transaction that is similar in form, substance or purpose to any of the foregoing transactions, or any combination of the foregoing; or (iv) any public announcement of a proposal, plan or intention to do any of the foregoing or any agreement to engage in any of the foregoing.

"Action" has the meaning set forth in Section 3.6.

"Affiliate" means, with respect to any Person, a Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the first mentioned Person, where "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of stock or other securities, as trustee or executor, by contract or otherwise for purposes of the BHCA or the CIBC Act.

"Aggregate Transaction Value" means the sum of (i) the Per Share Cash Consideration multiplied by the outstanding shares of Company Common Stock and (ii) the Exchange Ratio multiplied by the Per Share Trading Price, and further multiplied by the outstanding shares of Company Common Stock.

"Agreement" has the meaning set forth in the Preamble.

"Bank" has the meaning set forth in the Preamble.

"Bank Merger" has the meaning set forth in Section 2.9.

"Bank Secrecy Act" means the Bank Secrecy Act of 1970, as amended.

"Bank Special Dividend" has the meaning set forth in Section 2.2(a).

-2-

"Benefit Plans" has the meaning set forth in Section 3.8(a).

"BHCA" means the Bank Holding Company Act of 1956.

"Business Day" means a day, other than a Saturday or Sunday, on which banks in Pennsylvania are open for the general transaction of business.

"Buyer Common Stock" has the meaning set forth in Section 5.3(a).

"CIBC Act" means the Change in Bank Control Act of 1978.

"Closing" has the meaning set forth in Section 2.3.

"Closing Date" has the meaning set forth in Section 2.3.

"Code" means the Internal Revenue Code of 1986, as amended, and its successor, and all rules and regulations promulgated under the Code.

"Company" has the meaning set forth in the Recitals.

"Company Annual Financial Statements" has the meaning set forth in Section 3.5(a).

"Company Common Stock" has the meaning set forth in the Recitals.

"Company Financial Statements" has the meaning set forth in Section 3.5(a).

"Company IT Systems" has the meaning set forth in Section 3.15(d).

"Company Special Dividend" has the meaning set forth in Section 2.2(b).

"Confidentiality Agreement" means the confidentiality agreement entered into by Buyer with Keefe, Bruyette & Woods, Inc., acting as financial advisor on behalf of DMIC, dated March 13, 2018.

"Contracts" means all binding contracts, agreements, commitments, instruments or obligations, whether written or oral, contingent or otherwise, to which the Company or the Bank is a party or its properties or assets is bound.

"Copyrights" means original and published and unpublished works of authorship, including website content, advertising content, and promotional materials (and all registrations, applications, renewals and extensions of any of the foregoing), and all amendments, alternations, modifications, restorations and reversions of any of the foregoing.

"CRA" has the meaning set forth in Section 3.7(a).

"Department" means the Pennsylvania Department of Banking and Securities.

-3-

Case 3:22-cv-01467-ZNQ-LHG    Document 1    Filed 03/16/22    Page 178 of 253 PageID: 178

"Derivative Transaction" means any swap transaction, option, warrant, forward purchase or sale transaction, futures transaction, cap transaction, floor transaction or collar transaction relating to one or more currencies, commodities, bonds, equity securities, loans, interest rates, catastrophe events, weather-related events, credit-related events or conditions or any indexes, or any other similar transaction, including any option with respect to any of these transactions, or combination of any of these transactions, including collateralized mortgage obligations or other similar instruments or any debt or equity instruments evidencing or embedding any such types of transactions, and any related credit support, collateral or other similar arrangements related to such transactions.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to the Bank, any trade or business that together with the Bank would be deemed a "single employer" within the meaning of Section 4001(a)(14) of ERISA.

"Environmental Law" means any Law relating to (i) the protection, preservation or restoration of the environment, including air, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource, or (ii) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Substances, including the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation, and Liability Act, the Clean Water Act, the Clean Air Act and the Occupational Safety and Health Act; regulations promulgated thereunder, and state counterparts to the foregoing.

"Exchange Ratio" has the meaning set forth in Section 2.5(a).

"FDIC" means the Federal Deposit Insurance Corporation.

"Fixed Exchange Ratio Value Range" has the meaning set forth in Section 2.5(a)(i).

"Form S-3" has the meaning set forth in Section 5.7.

"FRB" means the Board of Governors of the Federal Reserve System.

"Fundamental Representations" has the meaning set forth in Section 8.1(a)(i).

"GAAP" means U.S. generally accepted accounting principles.

"Governmental Entity" means any court, administrative agency, arbitrator or commission or other governmental or regulatory authority or instrumentality, whether federal, state, local, or foreign and any applicable industry self-regulatory organization or securities exchange.

-4-

"Hazardous Substance" means any substance listed, defined, designated, classified or regulated as a waste, pollutant or contaminant or as hazardous, toxic, radioactive or dangerous or any other term of similar import under any Environmental Law, including petroleum.

"Indemnified Party" has the meaning set forth in Section 8.1(c).

"Indemnifying Party" has the meaning set forth in Section 8.5(a).

"Interim Financial Statements" has the meaning set forth in Section 3.5(a).

"Knowledge" means, with respect to the Company or the Bank, the actual knowledge of Gregory E. Diehl, Kevin T. Hersh, Catharine E. Krugh or Peter J. Miklos after due and reasonable inquiry, and, with respect to Buyer, the actual knowledge of William J. Wagner or William W. Harvey, Jr., after due and reasonable inquiry.

"Law" means any federal, state, county, municipal or local ordinance, permit, concession, grant, franchise, law, statute, code, rule or regulation or any judgment, ruling, order, writ, injunction or decree promulgated by any Governmental Entity.

"Liens" mean security interests, liens, claims, pledges, defaults of title, encumbrances, hypothecations, mortgages, restrictions, adverse rights or interests, charges and other encumbrances of any nature whatsoever.

"Loans" has the meaning set forth in Section 3.20(a)(i).

"Losses" has the meaning set forth in Section 8.2.

"Marks" means all trademarks, trade names, trade dress, service marks, service names, brand names, logos, symbols, slogans, tag lines, or account names, including any social networking names and media names (and all registrations, applications, renewals and extensions of any of the foregoing), together with all goodwill associated with any of the foregoing.

"Material Adverse Effect" means any event, circumstance, change or occurrence that, individually or in the aggregate with all other events, circumstances, changes and occurrences, has had or would reasonably be expected to have:

(i)     a material and adverse effect on the business, assets, liabilities, financial condition or results of operations of the Bank or the Company, or

(ii)     any adverse impairment on the ability of any of Sellers, the Company or the Bank to perform its obligations under this Agreement or to consummate the Merger or Bank Merger;

-5-

provided, however, that no effect (taken by itself or when aggregated with any and all other effects) directly or indirectly resulting from, arising out of, or attributable to or related to any of the following shall be deemed to be or constitute a "Material Adverse Effect" for purposes of clause (i) above:

(A)    changes in banking and similar Laws or other Laws of general applicability or enforcement or interpretations thereof by any applicable Governmental Entity;

(B)    reflecting or resulting from changes in GAAP or regulatory accounting requirements or published interpretations thereof, in each case after the date hereof applicable to banks and their holding companies generally;

(C)    general changes in national or Pennsylvania's economic, monetary, market or financial conditions, including changes in prevailing interest rates, inflation, credit markets, capital market conditions or real estate price appreciation/depreciation trends, or in the banking industry;

(D)    the effects of any action or omission taken by a Party with the prior written consent of the other Party;

(E)    changes in global or national political conditions, including the outbreak or escalation of acts of terrorism, sabotage or acts of war or military actions;

(F)    any natural disasters, weather or other acts of God, or any outbreaks of a disease or pandemic;

(G)    any failure of the Bank to meet any projections or forecasts, provided, that this clause (G) shall not prevent a determination that any event, circumstance, change or occurrence underlying such failure to meet projections or forecasts has resulted in a Material Adverse Effect so long as such event, circumstance, change or occurrence is not otherwise excluded from determining whether there is a Material Adverse Effect; or

(H)    the announcement or pendency of the Merger, the fulfillment of the Parties' obligations under this Agreement or the consummation of the Merger;

except, with respect to clauses (A), (B), (C), (E) and (F), to the extent that the effects of such change are disproportionally adverse to the business of the Bank and the Company as compared to other similarly situated banks and their holding companies generally.

"Material Contract" has the meaning set forth in Section 3.12(a).

"Merger" has the meaning set forth in Section 2.1.

-6-

"Merger Consideration" means the Per Share Merger Consideration multiplied by the number of outstanding shares of Company Common Stock.

"MGCL" means the Maryland General Corporations Law.

"Minimum Aggregate Liability Amount" has the meaning set forth in Section 8.4(a).

"Non-Party Affiliates" has the meaning set forth in Section 10.9.

"Northwest Price Utilized to Calculate the Exchange Ratio" has the meaning set forth in Section 2.5(a).

"Ordinary Course of Business" means the ordinary, usual and customary course of business, consistent with past practice, of the Company and the Bank.

"Outside Date" has the meaning set forth in Section 9.1(b)(i).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Per Share Cash Consideration" has the meaning set forth in Section 2.5(a).

"Per Share Merger Consideration" has the meaning set forth in Section 2.5(a).

"Per Share Stock Consideration" has the meaning set forth in Section 2.5(a).

"Per Share Trading Price" has the meaning set forth in Section 2.5(a).

"Permits" has the meaning set forth in Section 3.7(c).

"Permitted Liens" means (a) Liens for Taxes not yet due or payable or that are being contested in good faith and by appropriate proceedings, (b) mechanics', materialmens', carriers', workmens', warehousemens', repairmens', landlords' or other similar Liens, in each case arising in the Ordinary Course of Business for sums not yet due and payable or that are being contested in good faith and by appropriate proceedings, and (c) restrictions of general applicability on the transfer of securities imposed by state or federal securities Laws.

"Person" means an individual, corporation, partnership, limited liability company, trust, business trust, association, joint stock company, joint venture, sole proprietorship, unincorporated organization, Governmental Entity or any other form of entity not specifically listed in this Agreement.

"Phase I" has the meaning set forth in Section 6.2(s).

"Registered IP" has the meaning set forth in Section 3.15(a).

"Registrable Securities" has the meaning set forth in Section 6.12.

-7-

"Registration Statement" has the meaning set forth in Section 6.12.

"Regulatory Agreement" has the meaning set forth in Section 3.7(d).

"Regulatory Approval" has the meaning set forth in Section 3.4.

"Representatives" means, with respect to any Person, any director, officer, employee, investment banker, financial advisor, attorney, accountant or other advisor, agent or representative of such Person.

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller Law Firm" has the meaning set forth in Section 10.14(a).

"Surviving Corporation" has the meaning set forth in Section 2.1.

"Tax" or "Taxes" any federal, state, local or foreign income, gross receipts, property, sales, use, license, excise, franchise, employment, payroll, withholding, alternative or add on minimum, ad valorem, transfer or excise tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or penalty, imposed by any Governmental Entity.

"Tax Return" means any return, declaration, report or similar statement filed or required to be filed with respect to any Tax, including any attached schedules, including, without limitation, any information return, claim for refund, amended return or declaration of estimated Tax.

## ARTICLE II
## THE MERGER

2.1     The Merger.   Upon the terms and subject to the conditions set forth in this Agreement, the Company will merge with and into Buyer (the "Merger") at the Effective Time. At the Effective Time, the separate corporate existence of the Company shall cease. Buyer shall be the surviving corporation (hereinafter sometimes referred to in such capacity as the "Surviving Corporation") in the Merger and shall continue to be governed by the Maryland General Corporation Law (the "MGCL") and its name and separate corporate existence, with all of its rights, privileges, immunities, powers and franchises, shall continue unaffected by the Merger.

-8-

2.2    Pre-Closing Dividends.

(a)    Immediately prior to the Closing, the Bank shall declare and pay a cash dividend to the Company of $30,000,000 less an adjustment for the amount, if any, by which the aggregate contract termination charges incurred by the Bank in connection with the Merger as set forth on Section 2.2 of the Seller Disclosure Schedules exceed $4,000,000, with the difference net of a 21% federal income tax effect (the "Bank Special Dividend"). Sellers shall prepare and deliver to Buyer, for Buyer's review and approval a good faith estimate of the aggregate charges incurred by the Bank in connection with the Merger as set forth on Section 2.2 of the Seller Disclosure Schedules. Such good faith estimate shall be provided not less than fifteen (15) Business Days prior to the proposed Closing Date, or if Buyer establishes a proposed Closing Date less than fifteen (15) Business Days prior to proposed Closing Date, within two (2) Business Days following notification by Buyer of the Closing Date. If Buyer notifies Sellers in writing of its disagreement with any such good faith estimates, then Buyer and Sellers shall make good faith efforts to resolve such disagreements within five (5) Business Days of such notification. If any such items remain in dispute, such items (and only such items) shall be determined by a nationally recognized independent accounting firm selected by mutual agreement of the Parties, and such determination shall be final and binding. Such accounting firm shall be instructed to resolve the disputed items within ten (10) Business Days of engagement, to the extent reasonably practicable. The cost of engaging any such accounting firm shall be payable 50% by Sellers and 50% by Buyer.

(b)    Immediately prior to the Closing, the Company shall declare and pay a cash dividend in the same aggregate amount as the Bank Special Dividend payable to Sellers (the "Company Special Dividend").

2.3    Closing.  The closing of the Merger (the "Closing") will take place by the electronic (PDF), facsimile or overnight courier exchange of executed documents or at a location and at a time as agreed to by the Parties hereto on the date designated by Buyer following satisfaction or waiver (subject to applicable law) of the conditions to Closing set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing), or such later date as the Parties may otherwise agree (the "Closing Date"); provided, however, that if the conditions to Closing set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing) are satisfied on or prior to February 15, 2019, Buyer shall designate a Closing Date not later than March 1, 2019 and if the conditions to the Closing set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing) are satisfied after February 15, 2019, Buyer shall designate a Closing Date within twenty (20) Business Days following such satisfaction or waiver.

2.4    Effects of the Merger. The Merger will have the effects set forth in this Agreement and in the MGCL. Without limiting the generality of the foregoing, and subject thereto, from and after the Effective Time, Buyer shall possess all of the properties, rights, privileges, powers and franchises of the Company and be subject to all of the debts, liabilities and obligations of the Company.

-9-

2.5     Effect on Outstanding Shares of Company Common Stock.

(a)     By virtue of the Merger, automatically and without any action on the part of the holder thereof, each share of Company Common Stock issued and outstanding at the Effective Time shall become and be converted into the right to receive (A) $2,379.09 per share in cash (the "Per Share Cash Consideration") plus (B) 137.84 shares of Buyer Common Stock (the "Per Share Stock Consideration," and, together with the Per Share Cash Consideration, the "Per Share Merger Consideration"); provided that no fractional shares of Buyer Common Stock will be issued in the Merger as set forth herein.

For purposes hereof:

"Northwest Price Utilized to Calculate the Exchange Ratio" means the per share average closing price of Buyer's Common Stock on the NASDAQ Global Select Market for the ten (10) trading days ending on the fifth trading day immediately preceding the date of the Agreement.

"Exchange Ratio" means 137.84.

"Per Share Trading Price" means the per share average closing price of the Buyer Common Stock on the NASDAQ Global Select Market for the ten (10) trading days ending on the fifth trading day immediately preceding the Closing Date.

(i)     If the Per Share Trading Price is greater than or equal to 90% of the Northwest Price Utilized to Calculate the Exchange Ratio and less than or equal to 110% of the Northwest Price Utilized to Calculate the Exchange Ratio ("Fixed Exchange Ratio Value Range"), the Exchange Ratio shall remain 137.84, and the Cash portion of the Per Share Merger Consideration shall remain $2,379.09, such that the Aggregate Transaction Value will be no less than $80,750,000.00 and no more than $89,250,000.00.

(ii)     If the Per Share Trading Price is greater than the Fixed Exchange Ratio Value Range (i.e., greater than 110% of the Northwest Price Utilized to Calculate the Exchange Ratio), the Exchange Ratio will be adjusted such that the Aggregate Transaction Value will equal $89,250,000.00.

(iii)     If the Per Share Trading Price is less than the Fixed Exchange Ratio Value Range (i.e., less than 90% of the Northwest Price Utilized to Calculate the Exchange Ratio), Buyer shall, at its sole discretion, revise the Exchange Ratio and/or the Per Share Cash Consideration such that the Aggregate Transaction Value will equal $80,750,000.00. This discretion by Buyer would include the ability to increase the Per Share Cash Consideration to 100% of the Per Share Merger Consideration.

-10-

(b)     Notwithstanding any other provision of this Agreement, no fraction of a share of Buyer Common Stock and no certificates or scrip therefor will be issued in the Merger; instead, Buyer shall pay to each holder of Company Common Stock who would otherwise be entitled to a fraction of a share of Buyer Common Stock an amount in cash, rounded to the nearest cent, determined by multiplying such fraction by the Per Share Trading Price.

(c)     If, between the date of this Agreement and the Effective Time, the outstanding shares of Buyer Common Stock shall have been changed into a different number of shares or into a different class by reason of any stock dividend, subdivision, reclassification, recapitalization, split, combination or exchange of shares, or there shall be any extraordinary dividend or distribution paid, the Exchange Ratio shall be adjusted appropriately to provide the holders of Company Common Stock the same economic effect as contemplated by this Agreement prior to such event.

(d)     As of the Effective Time, all shares of Buyer Common Stock that are held by the Company, if any, other than shares held in a fiduciary capacity or in satisfaction of a debt previously contracted, shall be canceled and shall constitute authorized but unissued shares.

(e)     The stock transfer books of the Company shall be closed immediately upon the Effective Time and from and after the Effective Time there shall be no transfers on the stock transfer records of the Company of any shares of Company Common Stock. If, after the Effective Time, Certificates are presented to Buyer, they shall be canceled and exchanged for the Merger Consideration deliverable in respect thereof pursuant to this Agreement in accordance with the procedures set forth in this Section 2.5.

2.6     Effect on Outstanding Shares of Buyer Common Stock.  At the Effective Time, and except as provided in Section 2.5(d), each share of Buyer Common Stock issued and outstanding immediately prior to the Effective Time shall remain an issued and outstanding share of common stock of the Surviving Corporation and shall not be affected by the Merger.

2.7     Directors of Surviving Corporation After Effective Time.  Immediately after the Effective Time, until their respective successors are duly elected or appointed and qualified, the directors of the Surviving Corporation shall consist of the directors of Buyer serving immediately prior to the Effective Time.

2.8     Articles of Incorporation and Bylaws.  The articles of incorporation of Buyer, as in effect immediately prior to the Effective Time, shall be the articles of incorporation of the Surviving Corporation until thereafter amended in accordance with applicable law and the terms thereof. The bylaws of Buyer, as in effect immediately prior to the Effective Time, shall be the bylaws of the Surviving Corporation until thereafter amended in accordance with applicable law and the terms of such bylaws.

-11-

2.9  Bank Merger. It is the intent of Buyer that Northwest Bank, a wholly owned subsidiary of Buyer, and Union Community Bank, a wholly owned subsidiary of the Company, shall enter into a Plan of Bank Merger pursuant to which Union Community Bank will merge with and into Northwest Bank, with Northwest Bank as a resulting entity (the "Bank Merger"). The timing of execution of the Plan of Bank Merger and the timing of the Bank Merger, which shall not occur prior to Closing but may occur concurrently, shall be determined exclusively by Buyer, taking into consideration the intended tax treatment of the Bank Merger. Nonetheless, Buyer intends that the Bank Merger will become effective either simultaneously with or as soon as practicable following the Effective Time.

2.10  Alternative Structure. Notwithstanding anything to the contrary contained in this Agreement, prior to the Effective Time, Buyer may propose that the structure of the transactions contemplated by this Agreement be revised, which revised structure shall be subject to approval of Sellers, which approval shall not be unreasonably withheld or delayed. In the event that the Parties agree upon a revised structure, the Parties shall negotiate in good faith such alternative structure and the Parties agree to negotiate in good faith and execute appropriate documents to reflect the revised structure. Sellers may withhold consent in their sole discretion if such revised structure would (i) alter or change the amount or kind of the Merger Consideration, (ii) materially impede or delay consummation of the transactions contemplated by this Agreement or (iii) adversely limit or impact the qualification of the Merger as a reorganization under the provisions of Section 368(a) of the Code or a liquidation under Section 332 of the Code. No such consent of Sellers shall be required in the event that Buyer elects to form a new wholly owned subsidiary and cause the new subsidiary to be merged with and into the Company, with the resulting entity subsequently merging immediately thereafter into Buyer.

2.11  Absence of Control. It is the intent of the Parties to this Agreement that Buyer by reason of this Agreement shall not be deemed (until consummation of the transactions contemplated hereby) to control, directly or indirectly, the Company or to exercise, directly or indirectly, a controlling influence over the management or policies of the Company.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Seller Disclosure Schedules, Sellers jointly and severally represent and warrant to Buyer that the statements contained in this Article III are true and correct as of the date of this Agreement.

3.1  Organization, Incorporation and Authority of each Acquired Company.

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has all necessary corporate power and authority to carry on its business as now conducted. The Company is qualified to do business in Pennsylvania.

-12-

(b) The Bank is a savings bank duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania. The Bank has all necessary corporate power and authority to carry on its business as now conducted. The Bank has all necessary power and authority, including all material licenses, franchises, permits and other governmental authorizations which are legally required, to own, lease and operate its properties and to engage in the business and activities it conducts as of the date of this Agreement. The Bank's deposits are insured by the FDIC through the Deposit Insurance Fund to the fullest extent permitted by law. The Bank is a member in good standing of the Federal Home Loan Bank of Pittsburgh and owns the requisite amount of stock therein.

 3.2 Capitalization.

 (a) The authorized capital stock of the Company consists of 17,864 shares of Company Common Stock, of which DMIC owns 9,253 shares and DGI owns 8,611 shares. All the shares of Company Common Stock have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by Sellers in the amounts set forth above, free and clear of all Liens and dissenters' rights. The shares of Company Common Stock represent 100% of the issued and outstanding shares of capital stock of the Company.

 (b) The authorized capital stock of the Bank consists of 1,000 shares of common stock, par value $0.01 per share, all of which shares are issued to the Company and outstanding. All of such shares have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by the Company, free and clear of all Liens. Such shares represent 100% of the issued and outstanding shares of capital stock of the Bank.

 (c) There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of the Company or obligating Sellers or the Company to issue or sell any shares of capital stock of, or any other interest in, the Company. The Company is not subject to any option or obligation, contingent or otherwise, to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock. None of the capital stock of the Company is subject to, or was issued in violation of, any purchase option, call option, right of first refusal or offer, co-sale or participation right, preemptive right, subscription right or similar right or any agreement or applicable Law. The Company has not issued or authorized any stock appreciation, phantom stock, profit participation or similar rights. There are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the shares of Company Common Stock.

-13-

(d)     There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of the Bank or obligating the Company or the Bank to issue or sell any shares of capital stock of, or any other interest in, the Bank. The Bank is not subject to any option or obligation, contingent or otherwise, to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock. None of the capital stock of the Bank is subject to, or was issued in violation of, any purchase option, call option, right of first refusal or offer, co-sale or participation right, preemptive right, subscription right or similar right or any agreement or applicable Law. The Bank does not have outstanding or authorized any stock appreciation, phantom stock, profit participation or similar rights. There are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the shares of the Bank's common stock.

3.3     Subsidiaries.  Except for the Bank or as set forth on Section 3.3 of the Seller Disclosure Schedules, the Company does not own or hold the right to acquire any shares of stock or any other equity security in any other Person. The Bank does not own or hold the right to acquire any shares of stock or any other equity security in any other Person.

3.4     Consents.  No consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with this Agreement except as provided in Section 3.4 of the Seller Disclosure Schedules (together, the "Regulatory Approvals").

3.5     Financial Statements.

(a)     The Company has previously made available to Buyer true and complete copies of (i) the audited financial statements of the Company and the Bank, including the related notes thereto, for the fiscal years ended 2015, 2016 and 2017 (collectively, the "Company Annual Financial Statements") and (ii) the unaudited balance sheet of the Company as of March 31, 2018 and related unaudited statements of operations for the three months then ended and the unaudited balance sheet of the Bank as of April 30, 2018 and related unaudited statements of operations for the four months then ended (the "Interim Financial Statements" and, together with the Company Annual Financial Statements, the "Company Financial Statements"). The Company Financial Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved, except that the Interim Financial Statements do not include footnote disclosures and are subject to normal and recurring year-end adjustments, and fairly present in all material respects the financial position of the Company and the Bank as of the dates thereof and their respective results of operations, changes in shareholders' equity and changes in cash flows for the periods then ended, in each case in accordance with GAAP.

(b)     Except as set forth in Section 3.5(b) of the Seller Disclosure Schedules, the Bank and the Company do not have any liabilities required by GAAP to be set forth on a balance sheet of the Company or the Bank, except (i) liabilities reflected, reserved for or disclosed in the most recent balance sheet included in the Company Financial Statements, (ii) liabilities incurred or accrued in the Ordinary Course of Business since the date of such balance sheet and (iii) liabilities incurred in connection with the Merger.

-14-

(c)    The Company and the Bank have implemented and maintain a system of internal accounting controls effective to provide reasonable assurances that:

(i)    transactions are executed in accordance with its management's general or specific authorizations; and

(ii)    transactions are recorded in conformity with GAAP consistently applied and applicable Law.

3.6    Litigation.    There is no material suit, claim, action, arbitration, administrative or other proceeding or investigation or inquiry (each, an "Action") pending, or, to the Knowledge of the Company or the Bank, threatened, against the Company or the Bank or any of their respective properties or assets, or, to the Knowledge of the Company or the Bank, any present or former officer, director or employee of the Company or the Bank in such individual's capacity as such. Neither the Company nor the Bank nor any of their respective properties or assets is subject to any outstanding judgment, order, injunction, ruling or decree of any Governmental Entity.

3.7    Compliance with Laws.

(a)    The Company and the Bank are and, at all times since December 31, 2015, have been, in compliance in all material respects with all Laws applicable to their businesses, operations, properties or assets, including the Sarbanes-Oxley Act of 2002, Sections 23A and 23B of the Federal Reserve Act, the Equal Credit Opportunity Act, the Fair Housing Act, the Community Reinvestment Act of 1977 ("CRA"), the Home Mortgage Disclosure Act, the Truth in Lending Act, the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Real Estate Settlement Procedures Act, the Electronic Fund Transfer Act, all agency requirements relating to the origination, sale and servicing of mortgage and consumer loans and all other applicable fair lending Laws and other Laws relating to discriminatory business practices, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, the Bank Secrecy Act, and any sanctions administered by the Office of Foreign Assets Control of the United States Treasury Department.

(b)    Since December 31, 2015: (i) the Bank has properly certified all foreign deposit accounts and made all necessary Tax withholdings on all such deposit accounts; (ii) the Bank has timely and properly filed and maintained in all material respects all requisite Currency Transaction Reports and other related forms, including any requisite reports required by any agency of the United States Treasury Department such as the Internal Revenue Service and (iii) the Bank has properly followed in all material respects its established policies on filing Suspicious Activity Reports with the Financial Crimes Enforcement Network required to be filed by it, which policies and filings in each case are and were in compliance in all material respects with the applicable Laws and regulations referenced in this Section 3.7.

-15-

(c)     The Company and the Bank have in effect, and at all relevant times since December 31, 2015 have held, all material permits, licenses, variances, exemptions, authorizations, operating certificates, franchises, orders and approvals of all Governmental Entities (collectively, "Permits") necessary for them to own, lease or operate their properties and assets and to carry on their businesses and operations as now conducted, and to the Company's and the Bank's Knowledge, no suspension or cancellation of any such Permits is threatened and there has occurred no violation of, default, with or without notice or lapse of time or both, under or event giving to others any right of revocation, non-renewal, adverse modification or cancellation of, with or without notice or lapse of time or both, any such Permit.

(d)     Since December 31, 2015, neither the Company nor the Bank has received any notification or communication from any Governmental Entity (i) threatening to revoke any Permits, (ii) requiring the Company or the Bank to enter into or consent to the issuance of a cease and desist order, formal or written agreement, directive, commitment, memorandum of understanding, board resolution, extraordinary supervisory letter or other formal or informal enforcement action of any kind that imposes any restrictions on the conduct of the Company's or the Bank's business or that relates to its capital adequacy, its credit or risk management policies, its dividend policy, its management, its business or its operations (any of the foregoing, a "Regulatory Agreement") or (iii) threatening or contemplating revocation or limitation of, or which would have the effect of revoking or limiting, FDIC insurance coverage, and neither the Company nor the Bank has been advised by any Governmental Entity that such Governmental Entity is contemplating issuing or requesting, or is considering the appropriateness of issuing or requesting, any such judgment, order, injunction, rule, agreement, memorandum of understanding, commitment letter, supervisory letter, decree or similar submission.

(e)     Since December 31, 2015, the operations of the Company or the Bank are, and have been conducted at all times, in compliance in all material respects with applicable anti-money laundering and terrorist financing Laws, and to the Company's or the Bank's Knowledge, no Action by or before any Governmental Entity involving the Company or the Bank with respect to such Laws is pending or threatened. The Company and the Bank have established and maintain a system of internal controls reasonably designed to ensure compliance in all material respects with applicable financial recordkeeping and reporting requirements of the anti-money laundering and terrorist financing Laws.

-16-

(f)      Since December 31, 2015, to the Company's or the Bank's Knowledge, neither the Company nor the Bank nor any of their respective directors, executives, or any of their respective agents or employees acting on their behalf:

(i)      has used or is using any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity,

(ii)     has used or is using any corporate funds for any direct or indirect unlawful payments to any foreign or domestic governmental officials or employees or to foreign or domestic political parties or campaigns,

(iii)    has violated or is violating any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any similar Law,

(iv)     has established or maintained, or is maintaining, any unlawful fund of corporate monies or other properties, or

(v)      has made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature to any Person, private or public, regardless of form, whether in money, property or services, to obtain favorable treatment in securing business on behalf of the Company or the Bank, to obtain special concessions for the Company or the Bank, to pay for favorable treatment for business on behalf of the Company or the Bank secured or to pay for special concessions already obtained for the Company or the Bank, or is currently subject to any United States sanctions administered by the Office of Foreign Assets Control of the United States Department of the Treasury.

The Company and the Bank have established and maintained a system of internal controls designed to provide reasonable assurances regarding compliance in all material respects by the Company and the Bank with the foregoing.

(g)      Since December 31, 2015, the Company and the Bank have complied in all material respects with applicable privacy and customer information requirements contained in any applicable federal and state privacy Law as well as with any posted or internal privacy policies relating to data protection or privacy, including the protection of personal information.

(h)      The Company and the Bank have timely filed all material reports, forms, schedules, registrations, statements and other documents, together with any amendments required to be made with respect thereto, that they were required to file since December 31, 2015 with any Governmental Entity and have paid all fees and assessments due and payable in connection therewith. As of their respective filing dates, and without giving effect to any amendments or modifications filed after the date of this Agreement with respect to reports and documents filed before the date of this Agreement, such reports, forms, schedules, registrations, statements and other documents complied with applicable Law in all material respects. There is no material unresolved violation or exception by any Governmental Entity with respect to any report, form, schedule, registration, statement or other document filed by, or relating to any examinations by any such Governmental Entity of, the Company or the Bank.

-17-

(i)    The Bank's deposits are insured by the FDIC in the manner and to the full extent provided by applicable Law, and all premiums and assessments required to be paid in connection therewith have been paid by the Bank when due.

3.8    Benefit Plans.

(a)    All employee benefit plans within the meaning of Section 3(3) of ERISA (i) contributed to, sponsored by or maintained by the Company or the Bank, (ii) under which any current or former employee, director, officer, independent contractor or consultant of the Company or the Bank has any present or future right to benefits or (iii) under which the Company or the Bank has any present or future liability are referred to in this Agreement as the "Benefit Plans."

(b)    With respect to each Benefit Plan, the Bank has furnished or made available to Buyer a current, accurate and complete copy thereof and, to the extent applicable: (i) any related trust agreement or other funding instrument, (ii) the most recent determination or opinion letter of the Internal Revenue Service, if applicable, (iii) the most recent summary plan description, and (iv) for the most recent two years (A) the Form 5500 and attached schedules, (B) audited financial statements and (C) actuarial valuation reports. The Company also has furnished and made available to Buyer copies of the most current 280G calculation prepared (whether or not final) with respect to any employee, director or independent contractor of the Company or the Bank who is a "disqualified individual" under Section 280G(c) of the Code in connection with the Merger, together with the underlying documentation on which such calculation is based.

(c)    With respect to each Benefit Plan:

(i)    each Benefit Plan has been established and administered in accordance with its terms and in compliance in all material respects with the applicable provisions of ERISA and the Code, and other applicable Law, and all contributions required to be made under the terms of any Benefit Plan have been timely made;

(ii)    each Benefit Plan intended to be qualified under Section 401(a) of the Code (A) has received a favorable determination, advisory or opinion letter, as applicable, from the Internal Revenue Service that it is so qualified or (B) is a volume submitter or prototype plan whose sponsor obtained a favorable opinion letter and on which letter the Bank is permitted to rely, and, to the Knowledge of the Company or the Bank, nothing has occurred since the date of such letter that would reasonably be expected to cause the loss of such qualified status of such Benefit Plan;

-18-

(iii)    there is no Action, including any investigation, audit or other administrative proceeding, by the Department of Labor, the PBGC, the Internal Revenue Service or any other Governmental Entity or by any plan participant or beneficiary pending or, to the Knowledge of the Company or the Bank, threatened relating to Benefit Plans, any fiduciaries of such Benefit Plans with respect to their duties to Benefit Plans or the assets of any of the trusts under any Benefit Plans, other than routine claims for benefits, nor, to the Knowledge of the Company or the Bank, are there facts or circumstances that exist that are likely to give rise to any such Actions, and no written or oral communication has been received from the PBGC in respect of any Benefit Plan subject to Title IV of ERISA concerning the funded status of any such plan or any transfer of assets and liabilities from any such plan in connection with the Merger; and

(iv)    to the Knowledge of the Company or the Bank, no "reportable event" (as such term is defined in Section 4043 of ERISA), and no nonexempt "prohibited transaction" (as such term is defined in Section 406 of ERISA and Section 4975 of the Code), in each case whether or not waived, has occurred with respect to any Benefit Plan.

(d)    Neither the Bank nor any of its ERISA Affiliates has, within the preceding six years, maintained, contributed to, been required to contribute, or otherwise had any liability with respect to a plan subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Code. No Benefit Plan is a "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA) and neither the Bank nor any of its ERISA Affiliates has at any time within the preceding six years sponsored or contributed to, or has or had any liability or obligation in respect of, any multiemployer plan. None of the Company nor the Bank have any current or future obligation to provide post-retirement health, life or other welfare benefits, other than as required by Section 4980B of the Code or any similar applicable Law.

(e)    Except as provided in Section 3.8(e) of the Seller Disclosure Schedules, neither the Company nor the Bank is a party to any contract that will, directly or in combination with other events, result, separately or in the aggregate, in the payment, acceleration or enhancement of any benefit as a result of the Merger, and neither the execution of this Agreement, nor the consummation of the Merger will, either alone or in combination with another event:

(i)    result in severance pay or any increase in severance pay upon any termination of employment after the date of this Agreement,

(ii)    accelerate the time of payment or vesting or result in any payment or funding, through a grantor trust or otherwise, of compensation or benefits under, increase the amount payable or result in any other material obligation to, any of the Benefit Plans,

(iii)    limit or restrict the right of the Bank to merge, amend or terminate any of the Benefit Plans, or

-19-

(iv)    result in the payment of payments that would not be deductible under Section 280G of the Code.

3.9    Labor Matters.

(a)    There are no collective bargaining agreements or other labor union Contracts, agreements or understandings applicable to any employees of the Company or the Bank. There is no labor dispute, strike, work stoppage or lockout in respect of any collective bargaining agreements or other labor union Contracts, agreements or understandings applicable to any employees of the Company or the Bank, or, to the Knowledge of the Company or the Bank, threat thereof, by or with respect to any employees of the Company or the Bank, and there has been no labor dispute, strike, work stoppage or lockout since December 31, 2015. To the Knowledge of the Company and the Bank, there are no organizational efforts with respect to the formation of a collective bargaining unit presently being made or threatened involving employees of the Company or the Bank. The Company and the Bank are in compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages, hours of work and occupational safety and health, except where the failure to comply therewith would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Action asserting that the Company or the Bank has committed an unfair labor practice (within the meaning of the National Labor Relations Act of 1935) or seeking to compel the Company or the Bank to bargain with any labor organization as to wages or conditions of employment is pending or, to the Knowledge of the Company or the Bank, threatened with respect to the Company or the Bank before the National Labor Relations Board, the Equal Employment Opportunity Commission or any other Governmental Entity.

(b)    Neither the Company nor the Bank is a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Entity relating to employees or employment practices. None of the Bank or any of its or their executive officers has received since December 31, 2015 any written notice of intent by any Governmental Entity responsible for the enforcement of labor or employment laws to conduct an investigation relating to the Company or the Bank and, to the Knowledge of the Company or the Bank, no such investigation is in progress.

3.10    Environmental Matters.

(a)    Neither the Bank's nor the Company's conduct nor any condition of any property presently or previously owned, leased or operated by them, including in a fiduciary or agency capacity, violates or has violated in any material respects Environmental Laws;

(b)    to the Knowledge of the Company or the Bank, there has been no release of any Hazardous Substance by the Company or the Bank in any manner that has given or would reasonably be expected to give rise to any remedial obligation, corrective action requirement or liability under applicable Environmental Laws;

-20-

(c)   since January 1, 2008, neither the Company nor the Bank has received any written claims, notices, demand letters or requests for information, except for such claims, notices, demand letters or requests for information the subject matter of which has been resolved prior to the date of this Agreement, from any Governmental Entity or any other Person asserting that the Company or the Bank or the operation or condition of any property ever owned, leased, operated or held as collateral or in a fiduciary capacity by any of them are or were in violation of or otherwise are alleged to have liability under any Environmental Law, including responsibility or potential responsibility for the cleanup or other remediation of any pollutants, contaminants or hazardous or toxic wastes, substances or materials at, on, beneath or originating from any such property;

(d)   no Hazardous Substance has been disposed of, arranged to be disposed of, released or transported in violation of any applicable Environmental Law, or in a manner that has given rise to, or that would reasonably be expected to give rise to, any liability under any Environmental Law, from any current or former properties or facilities while owned or operated by the Company or the Bank or as a result of any operations or activities of the Company or the Bank at any location, and no other condition has existed or event has occurred with respect to the Company or the Bank or any such properties or facilities that, with notice or the passage of time, or both, would be reasonably likely to result in liability under Environmental Laws, and, to the Knowledge of the Company or the Bank, Hazardous Substances are not otherwise present at or about any such properties or facilities in amount or condition that has resulted in or would reasonably be expected to result in liability to the Company or the Bank under any Environmental Law; and

(e)   neither the Bank nor any of its respective properties or facilities are subject to, or are, to the Company's or the Bank's Knowledge, threatened to become subject to, any liabilities relating to any suit, settlement, court order, administrative order, regulatory requirement, judgment or claim asserted or arising under any Environmental Law or any agreement relating to environmental liabilities.

3.11   Taxes.

(a)   All income and other material Tax Returns required to have been filed by the Company and the Bank have been filed and such Tax Returns are accurate and complete in all material respects. All Taxes of the Company and the Bank, whether or not shown on such Tax Returns, have been paid. All Taxes not yet due and payable by the Company or the Bank have been, in all material respects, properly accrued on the most recent Company Financial Statements in accordance with GAAP.

(b)   No deficiency for any material amount of Tax has been asserted or assessed by a Governmental Entity in writing against the Company or the Bank that has not been satisfied by payment, settled or withdrawn.

-21-

(c)    There are no Liens for Taxes on the assets of the Company or the Bank, except for statutory Liens for Taxes not yet due and payable.

(d)    There are no outstanding waivers or agreements extending the period for assessment of Taxes for any period with respect to any Tax to which the Company or the Bank may be subject.

(e)    Neither the Company nor the Bank is a party to or bound by any Tax allocation or sharing agreement, the primary purpose of which is Taxes, other than an agreement solely among the Company and the Bank.

(f)    The Company and the Bank have complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and have withheld from and paid over to the proper Governmental Entities all amounts required to be so withheld and paid over under applicable Laws.

(g)    There are no audits, claims or controversies now pending, or to the Knowledge of Company or the Bank, threatened in writing against or with respect to the Company or the Bank with respect to any material Tax.

(h)    Neither the Company nor the Bank has been a party to any distribution occurring in the last two years in which the parties to such distribution treated the distribution as one to which Section 355 of the Code applied.

(i)    Neither the Company nor the Bank has participated in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4.

(j)    Neither the Company nor the Bank:

(i)    is or has been a member of an affiliated group (other than a group the common parent of which is the Company) filing a consolidated, joint, combined or unitary Tax Return or

(ii)    has any liability for Taxes of any Person, other than the Bank arising from the application of Treasury Regulations Section 1.1502-6 or any analogous provision of state, local or foreign law, as a transferee or successor, by contract, or otherwise.

(k)    During the last three years, no written claim has been made by any Governmental Entity that the Company or the Bank may be subject to taxation by a jurisdiction where Tax Returns have been filed by or on behalf of the Company or the Bank.

-22-

3.12   Contracts.

(a)      Section 3.12 of the Seller Disclosure Schedules lists each of the following types of Contracts to which the Company or the Bank is a party or by which any of their respective properties or assets is bound as of the date of this Agreement:

(i)      any lease of real property;

(ii)     any Contract that contains any noncompetition or exclusive dealing agreements or "most favored nation" provision or other agreement or obligation that purports to materially limit or restrict in any respect the ability of the Company or the Bank or, following the consummation of the Merger, would limit the ability of Buyer or any of its Affiliates to compete in any line of business or with any Person or in any geographic area other than as may be required by Law or any Governmental Entity or which grants any right of first refusal, right of first offer or similar right or that limits or purports to limit the ability of the Company or the Bank or, following consummation of the Merger, Buyer or any of its Affiliates to own, operate, sell, transfer, pledge or otherwise dispose of any assets or business;

(iii)    any Contract for, with respect to, or that contemplates, a possible merger, consolidation, reorganization, recapitalization or other business combination, or asset acquisition or sale or acquisition or sale of equity securities not in the Ordinary Course of Business, or any Contract that relates to a merger, consolidation, reorganization, recapitalization or other business combination, or asset acquisition or sale or acquisition or sale of equity securities and which contains representations, covenants, indemnities or other obligations, including indemnification, "earn-out" or other contingent obligations, that are in effect as of date of this Agreement;

(iv)     any Contract relating to the borrowing of money or the deferred purchase price of property or services by it or the guarantee by it of any such foregoing obligations of a third party, other than by customers of the business of Bank or other Bank loan parties, deposit liabilities and Federal Home Loan Bank borrowings and Contracts relating to endorsements for payment, guarantees and letters of credit made in the Ordinary Course of Business, including any sale and leaseback transactions, capitalized leases and other similar financing transactions;

(v)      any Contract that involves expenditures or receipts of it in excess of $100,000 per year, other than pursuant to Loans originated or purchased by the Company or the Bank in the Ordinary Course of Business and the estimated cost of terminating such contract prior to its expiration date;

(vi)     any Contract that provides for future payments or obligations of the Company or the Bank in excess of $100,000 in the aggregate and which by its terms does not terminate or is not terminable without penalty or payment upon notice of 180 days or less and the estimated cost of terminating such contract prior to its expiration date;

-23-

(vii)    any employment agreement, severance agreement, retention agreement, change of control agreement, consulting agreement or similar agreement that is with any director or executive officer;

(viii)    any Contract creating a joint venture, franchise, partnership, limited liability company agreement or similar arrangement, or relating to the operation, management or control of any partnership, franchise or joint venture, in each case, with any third party;

(ix)    any Contract which limits payments of dividends; or

(x)    any Contract required to be listed on Section 3.17 of the Seller Disclosure Schedules.

Each Contract of the type described in the foregoing clauses (i) through (x) is referred to in this Agreement as a "Material Contract."

(b)    (i)    Each Material Contact is valid and binding on the Company or the Bank, as applicable, and to the Knowledge of the Company or the Bank, each other party to such Material Contract, and is in full force and effect and enforceable in accordance with its terms, except to the extent that validity and enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the enforcement of creditors' rights generally or by general principles of equity or by principles of public policy and except where the failure to be valid, binding, enforceable and in full force and effect would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(ii)    there is no default under any Material Contact by the Company or the Bank or, to the Knowledge of the Company or the Bank, any other party thereto, and no event or condition has occurred that constitutes, or, after notice or lapse of time or both, is likely to constitute, a default on the part of the Company or the Bank or, to the Knowledge of the Company or the Bank, any other party to such Material Contract under any such Material Contact, nor has the Company or the Bank received any written notice of any such default, event or condition, or of any termination or non-renewal of any Material Contact, except where any such default, event or condition, or any such termination or non-renewal would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Company has made available to Buyer true and complete copies of all the Material Contacts, including any amendments to such Material Contracts.

(c)    Each Material Contract between DMIC and DGI, on the one hand, and the Company and/or the Bank, on the other hand, can be terminated as of the Closing Date without penalty to any party to such contracts.

-24-

3.13    Insurance. Section 3.13 of the Seller Disclosure Schedules sets forth a true and complete list of all the insurance policies, binders or bonds maintained by, or for the benefit of, the Company or the Bank. All of such policies, binders or bonds are in full force and effect, neither the Company nor the Bank are in default under such policies and all premiums and other payments due under any such policy have been paid in full. No written notice of cancellation or termination has been received with respect to any such policy. There is no material claim pending under any of such policies with respect to the Company or the Bank as to which coverage has been denied or disputed by the issuers of such policies. In the opinion of management of the Company and the Bank, respectively, the Company and the Bank are presently insured for amounts deemed reasonable by management against such risks as companies engaged in a similar business would customarily be insured.

3.14    Real and Personal Property.

(a)    Section 3.14(a) of the Seller Disclosure Schedules sets forth a true and complete list of all real property owned, leased or licensed by the Company or the Bank or otherwise occupied by the Company or the Bank.

(b)    The Company and the Bank have good, valid and marketable title to all real property owned by either of them free and clear of all Liens, except Permitted Liens. There are no outstanding options, rights of first offer or refusal or other preemptive rights or purchase rights with respect to any such owned real property. Except as set forth on Section 3.14(b) of the Seller Disclosure Schedules, there are no pending or, the Company's or the Bank's Knowledge, threatened, condemnation or similar proceedings affecting such owned real property or any portion of such owned real property.

3.15    Intellectual Property; Company IT Systems.

(a)    Section 3.15(a) of the Seller Disclosure Schedules sets forth, as of the date of this Agreement, a true and complete list of all registered Marks, patents and registered Copyrights, including any registrations and pending applications to register any of the foregoing, owned, in whole or in part, by the Company or the Bank or used in the business of the Company or the Bank (collectively, "Registered IP"). Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(i)    all the Registered IP is unexpired and, other than patent applications or applications to register trademarks, is valid and enforceable; and

(ii)    no Registered IP is involved in any interference, reissue, reexamination, opposition, cancellation or similar proceeding and, to the Knowledge of the Company or the Bank, no such action is or has been threatened with respect to any of the Registered IP.

(b)    The Company or the Bank own exclusively all the Registered IP and all other Intellectual Property that is material to the businesses of the Company or the Bank other than Intellectual Property owned by a third party that is licensed to the Bank thereof pursuant to an existing license agreement and used by the Bank within the scope of such license.

-25-

(c)      To the Company's and the Bank's Knowledge, the conduct of the Company's and the Bank's business, does not infringe or otherwise violate any intellectual property rights of any other Person, and neither the Company nor the Bank has received a written notice, claim or demand of any such infringement or violation. To the Company's Knowledge, no Person has materially infringed or is materially infringing or otherwise materially violating any of the Registered IP.

(d)      To the Company's and the Bank's Knowledge, all information technology and computer systems (including software, information technology and telecommunication hardware and other equipment) relating to the transmission, storage, maintenance, organization, presentation, generation, processing or analysis of data and information, whether or not in electronic format, used in or necessary to the conduct of the business of the Company or the Bank (collectively, the "Company IT Systems") have been reasonably maintained by technically competent personnel to ensure proper operation, monitoring and use. The Company IT Systems are in good working condition to effectively perform all information technology operations necessary to conduct the Company's consolidated business as currently conducted. Neither the Company nor the Bank has experienced within the past two years any material disruption to, or material interruption in, the conduct of its business attributable to a defect, bug, breakdown or other failure or deficiency of the Company IT Systems. No Person has gained unauthorized access to any of the Company IT Systems that has had, or is reasonably expected to have, a Material Adverse Effect on the Company. The Company and the Bank have taken reasonable measures to provide for the back-up and recovery of the data and information necessary to the conduct of their businesses without material disruption to, or material interruption in, the conduct of their respective businesses. The Company and the Bank are compliant in all material respects with all data protection and privacy laws and regulations as well as their own policies relating to data protection and the privacy and security of personal data and the non-public personal information of their respective customers and employees, except for immaterial failures to comply or immaterial violations.

3.16      Brokers.  No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission from the Company or the Bank in connection with the Merger based upon arrangements made by or on behalf of the Company or the Bank.

3.17      Intercompany and Affiliate Agreements.  Except as set forth in Section 3.17 of the Seller Disclosure Schedules, neither the Company nor the Bank is a party to any contract with or for the benefit of any stockholder, member, officer, director, manager, employee or Affiliate of Sellers, the Company or the Bank or, to the Company's or the Bank's Knowledge, any individual related by blood, marriage or adoption to any such Person or any entity in which any such Person owns any beneficial interest.

-26-

3.18    Derivative Instruments and Transactions.  Except as set forth on Section 3.18 of the Seller Disclosure Schedules, neither the Company nor the Bank participates in any Derivative Transactions.

3.19    Trust Business.  Neither the Company nor the Bank conducts trust operations.

3.20    Loan Matters.

(a)    There are:

(i)    except as set forth in Section 3.20(a) of the Seller Disclosure Schedules, no outstanding loans and other extensions of credit, including commitments to extend credit ("Loans") to any directors, executive officers or principal shareholders (as such terms are defined in the Federal Reserve's Regulation O (12 C.F.R. Part 215)) of the Company or the Bank,

(ii)    except as set forth in Section 3.20(a) of the Seller Disclosure Schedules, no outstanding Loans to any employee, officer or director of the Bank or other Affiliate of the Bank on which the borrower is paying a rate other than that reflected in the note or other relevant credit or security agreement or on which the borrower is paying a rate that was below market at the time the Loan was originated, and

(iii)    no such outstanding Loans that were not originated in compliance with all applicable Laws.

(b)    Except as set forth in Section 3.20(b) of the Seller Disclosure Schedules, each outstanding Loan, including Loans held for resale to investors or previously sold to investors, has been solicited and originated, and is and has been administered and, where applicable, serviced, and the relevant Loan files are being maintained, in all material respects in accordance with the relevant notes or other credit or security documents, the Bank's written underwriting standards (and, in the case of outstanding Loans held for resale to investors or previously sold to investors, the underwriting standards, if any, of the applicable investors) and in all material respects with all applicable requirements of Laws and applicable requirements of any government-sponsored enterprise program. Except as set forth on Section 3.20(b) of the Seller Disclosure Schedules, such notes or other credit or security documents with respect to each such outstanding Loan are complete and correct in all material respects. The Bank has properly fulfilled in all material respects its contractual responsibilities and duties in any outstanding Loans in which it acts as the lead lender or servicer and has complied in all material respects with their duties as required under applicable regulatory requirements.

(c)    None of the agreements pursuant to which the Bank has sold Loans or pools of Loans or participations in Loans or pools of Loans contains any obligation to repurchase such Loans or interests therein, other than repurchase obligations arising upon a breach of representations and warranties, covenants or other obligations.

-27-

(d)        Section 3.20(d) of the Seller Disclosure Schedules sets forth a true and complete list of (i) each Loan that as of March 31, 2018, (A) under the terms of which the obligor was contractually past due 90 days or more in payment of principal or interest, (B) was on a "watch list" by the Bank or any applicable regulatory authority, (C) where the interest rate terms have been reduced or the maturity dates have been extended subsequent to the agreement under which the Loan was originally created due to concerns regarding the borrower's ability to pay in accordance with such initial terms, (D) where a specific reserve allocation exists in connection therewith or (E) which is required to be accounted for as a troubled debt restructuring in accordance with Statement of Financial Accounting Standards No. 15 and (ii) each asset of the Company or the Bank that as of the date of this Agreement was classified as "Other Real Estate Owned" or as an asset to satisfy outstanding Loans, including repossessed equipment. For each Loan identified in response to clause (i) above, Section 3.20(d) of the Seller Disclosure Schedules sets forth the outstanding balance, including accrued interest, on each such Loan and the identity of the borrower under such Loan as of such date. True and complete copies of the currently effective credit policies and practices of the Bank have been made available to Buyer prior to the date of this Agreement.

(e)        Except as set forth in Section 3.20(e) of the Seller Disclosure Schedules, to the Knowledge of the Company or the Bank, each outstanding Loan (i) is evidenced by notes, agreements or other evidences of indebtedness that are true, genuine and what they purport to be, (ii) to the extent carried on the books of the Bank as a secured Loan, has been secured by valid Liens which have been perfected and (iii) is a legal, valid and binding obligation of the obligor named therein, enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

3.21    Community Reinvestment Act Compliance.    The Bank is in compliance in all material respects with the applicable provisions of the CRA and the regulations promulgated thereunder and has received a CRA rating of "satisfactory" in its most recently completed CRA examination, and as of the date of this Agreement, neither the Company nor the Bank has knowledge of the existence of any fact or circumstance or set of facts or circumstances that could reasonably be expected to result in the Bank not having at least a "satisfactory" rating following the release of its next CRA examination.

3.22    Allowance For Loan Losses.    The Bank's allowance for loan losses is in compliance with the standards established by applicable Governmental Entities and GAAP and, to the Knowledge of the Company and the Bank, is adequate.

3.23    Deposits.    Except as set forth in Section 3.23 of the Seller Disclosure Schedules, none of the deposits of the Bank is a "brokered deposit" as defined in 12 CFR Section 337.6(a)(2).

-28-

3.24  Sufficiency of Assets.  Except for those services provided to the Company and the Bank pursuant to the intercompany arrangements identified in Section 3.17 of the Seller Disclosure Schedules, the Company and the Bank own or have the right to use, and after the consummation of the Merger will continue to own or have the right to use, all of the tangible assets, rights and properties necessary to conduct the respective businesses of the Company and the Bank in all material respects in the same manner and on the same terms as currently conducted.

3.25  Corporate Documents and Records. The Company has previously provided a complete and correct copy of the Articles of Incorporation or Certificate of Incorporation and bylaws of the Company and the Bank, as in effect as of the date of this Agreement.  Neither the Company nor the Bank is in violation of its Articles of Incorporation or Certificate of Incorporation and bylaws.  The minute books of the Company and the Bank constitute a complete and correct record of all material actions taken by their respective boards of directors (and each committee thereof) and their stockholders.

3.26  No Violations. The execution, delivery and performance of this Agreement by Sellers and the Company do not, and the consummation of the transactions contemplated by this Agreement will not, (i) assuming that the consents, approvals and filings referred to in Section 3.4 have been obtained and the applicable waiting periods have expired, violate any law, rule or regulation or any judgment, decree, order, governmental permit or license to which the Company or the Bank (or any of their respective properties) is subject, (ii) violate the Certificate of Incorporation or bylaws of the Company or the similar organizational documents of the Bank or (iii) constitute a material breach or violation of, or a material default under (or an event that, with due notice or lapse of time or both, would constitute a default under), or result in the termination of, accelerate the performance required by, or result in the creation of any Lien upon any of the properties or assets of the Company or the Bank under, any of the terms, conditions or provisions of any note, bond, indenture, deed of trust, loan agreement or other similar agreement, instrument or obligation to which the Company or the Bank is a party, or to which any of their respective properties or assets may be subject.

3.27  No Additional Representations.

Except for the representations and warranties made by Sellers in this Article III, neither Sellers nor any other Person makes any express or implied representation or warranty with respect to the Company or the Bank or their respective businesses, operations, assets, liabilities, conditions, financial or otherwise, or prospects, and Sellers hereby disclaim any such other representations or warranties. In particular, without limiting the foregoing disclaimer, except for the representations and warranties made by Sellers in this Article III, neither Seller makes or has made any representation or warranty to Buyer or any of its Affiliates or Representatives with respect to (i) any financial projection, forecast, estimate, budget or prospective information relating to the Company, the Bank or their respective businesses or (ii) any oral or written information presented to Buyer or any of its Affiliates or Representatives in the course of their due diligence investigation of the Company and the Bank, the negotiation of this Agreement or in the course of the Merger.

-29-

## ARTICLE IV
### ADDITIONAL REPRESENTATIONS AND WARRANTIES OF DMIC AND DGI

Each Seller severally represents and warrants to Buyer, as to such Seller only, as follows:

4.1     Authority, Validity and Effect.   Each Seller has all requisite power and authority or capacity to enter into and perform such Seller's obligations under this Agreement and to consummate the Merger, and this Agreement has been duly executed and delivered by each such Seller pursuant to all necessary authorization and is the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, except to the extent that validity and enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the enforcement of creditors' rights generally or by general principles of equity or by principles of public policy.

4.2     Title to Shares of Company Common Stock.   Subject to receipt of the Regulatory Approvals, each Seller has full power, right and authority, and any approval required by Law, to make and enter into this Agreement and to sell, assign, transfer and deliver its shares of Company Common Stock to Buyer. Each Seller has good and valid title to its shares of Company Common Stock as of the date of this Agreement, in each case free and clear of all Liens.

4.3     No Shareholder or Policyholder Voting.

No approval of the policyholders of DMIC or the shareholders of DGI is required in connection with this Agreement or the transactions contemplated by this Agreement.

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this Article V are true and correct as of the date of this Agreement.

5.1     Incorporation and Authority of Buyer.   Buyer is a corporation duly incorporated, validly existing and in good standing under the Laws of the state of Maryland. Buyer has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations under this Agreement and to consummate the Merger. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations under this Agreement and the consummation by Buyer of the Merger have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and, assuming due authorization, execution and delivery by Sellers, this Agreement constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except to the extent that validity and enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws affecting the enforcement of creditors' rights generally or by general principles of equity or by principles of public policy.

-30-

5.2    No Conflicts; Consents. The execution, delivery and performance by Buyer of this Agreement, and the consummation of the Merger, do not and will not:

(a)    result in a violation or breach of any provision of the Certificate of Incorporation or Bylaws of Buyer;

(b)    result in a violation or breach of any provision of any Law or injunction, decree, order or judgment issued by a Governmental Entity applicable to Buyer; or

(c)    require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Buyer's ability to consummate the Merger.

No consent, approval, Permit, declaration or filing with, or notice to, any Governmental Entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the Merger, except for the Regulatory Approvals.

5.3    Capital Structure.

(a)    The authorized capital stock of Buyer consists of 500,000,000 shares of Common Stock, par value $0.01 per share ("Buyer Common Stock"), and 50,000,000 shares of preferred stock, par value $0.01 per share.

(b)    As of May 31, 2018, (i) 102,943,061 shares of Buyer Common Stock are issued and outstanding, all of which are validly issued, fully paid and nonassessable and were issued in full compliance with all applicable laws and not in violation of any preemptive rights; (ii) no shares of Buyer preferred stock are issued and outstanding; (iii) 6,149,839 shares of Buyer Common Stock are reserved for issuance pursuant to outstanding stock options; and (iv) 3,689,710 shares of Buyer Common Stock are reserved for future grants or awards under Buyer's stock-based benefit plans.

(c)    The shares of Buyer Common Stock to be issued in exchange for shares of Company Common Stock upon consummation of the Merger in accordance with this Agreement have been duly authorized and when issued in accordance with the terms of this Agreement, will be validly issued, fully paid and nonassessable and subject to no preemptive rights.

-31-

5.4 Brokers. Except for Ambassador Financial Group, no broker, finder or investment banker is entitled to any brokerage, finders or other fee or commission in connection with the Merger based upon arrangements made by or on behalf of Buyer.

5.5 Sufficiency of Funds. Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the cash portion of the Merger Consideration and to consummate the Merger.

5.6 Legal Proceedings. There are no actions, suits, claims, investigations or other legal proceedings pending or threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the Merger.

5.7 Registration Eligibility. Buyer satisfies all of the registration requirements of General Instruction I.A. of Form S-3 promulgated by the SEC under the Securities Act ("Form S-3"). Buyer is a "well-known seasoned issuer" and is eligible to file an "automatic shelf registration statement" under General Instruction I.D. of Form S-3 as those terms are defined in Rule 405 promulgated by the SEC under the Securities Act.

5.8 No Other Representations and Warranties. Buyer acknowledges and agrees that none of Sellers, the Company, the Bank or any other Person has made any representation or warranty as to Sellers, the Company, the Bank or this Agreement, except as expressly set forth in Article III and Article IV of this Agreement.

ARTICLE VI
COVENANTS

6.1 Conduct of Business. During the period from the date of this Agreement to the Closing, except as this Agreement expressly contemplates or permits, the Company shall, and shall cause the Bank to, (i) conduct their respective businesses in the Ordinary Course of Business in all material respects, (ii) use commercially reasonable efforts to maintain intact the material rights, properties and assets, and vendor, supplier and other business relationships of the Bank and (iii) take no action that would reasonably be expected to prevent or materially impede or delay the obtaining of, or materially adversely affect the ability of the Parties to obtain, any necessary approvals of any Governmental Entity required for the Merger or to perform their respective covenants and agreements under this Agreement or to consummate the Merger.

6.2 Negative Covenants. During the period from the date of this Agreement to the Closing, except as this Agreement expressly contemplates or permits, and except as required under applicable Law, the Company shall not, and shall not permit the Bank to, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed:

-32-

(a)    (i) Issue, sell or otherwise permit to become outstanding, or authorize the creation of, any additional shares of its stock or options or any securities convertible into or exchangeable for any additional shares of stock, (ii) enter into any agreement with respect to the foregoing, (iii) change or establish a record date for changing the number of, or provide for the exchange of, shares of its stock, as a result of a stock split, stock dividend, recapitalization, reclassification, or similar transaction with respect to its outstanding stock or any other such securities.

(b)    Declare, set aside or pay any dividends on or make other distributions whether in cash or otherwise in respect of any of its capital stock, except for the Company Special Dividend and the Bank Special Dividend.

(c)    Enter into or amend or renew any employment, consulting, compensatory, severance or similar agreements or arrangements with any director, officer or employee of the Company or the Bank, or grant any salary, wage or fee increase or increase any employee benefit or pay any incentive or bonus payments, except (i) normal increases in compensation to non-executive employees in the Ordinary Course of Business and pursuant to policies currently in effect, provided that, such increases shall not result in an annual adjustment in base compensation (which includes base salary and any other compensation other than bonus payments) of more than 4% for any individual or 2% in the aggregate for all non-executive employees of the Company or the Bank, (ii) as may be required by Law, (iii) to satisfy contractual obligations existing or contemplated as of the date of this Agreement, and (iv) bonus payments in the Ordinary Course of Business and pursuant to policies currently in effect as previously disclosed to Buyer in Section 6.2(c) of the Seller Disclosure Schedules and as property accrued pursuant to GAAP, provided that, such payments shall not be paid to any individual for whom such payment would be an "excess parachute payment" as defined in Section 280G of the Code.

(d)    (i)    Hire any person as an employee of the Company or the Bank, except for at-will employees at an annual rate of salary not to exceed $50,000 to fill vacancies that may arise from time to time in the Ordinary Course of Business, or

(ii)    promote any employee, except to fill vacancies that may arise in the Ordinary Course of Business or to satisfy contractual obligations existing as of the date of this Agreement.

(e)    Except in the Ordinary Course of Business, sell, transfer, mortgage, pledge, encumber or otherwise dispose of or discontinue any of its assets, deposits, business or properties or cancel or release any material indebtedness owed to the Company or the Bank.

(f)    Acquire, other than by way of foreclosures or acquisitions of control in a bona fide fiduciary capacity or in satisfaction of debts previously contracted in good faith, in each case in the Ordinary Course of Business, all or any portion of the assets, business, deposits or properties of any other entity.

-33-

(k)    Other than settlement of foreclosure actions in the Ordinary Course of Business, enter into any settlement or similar agreement with respect to any action, suit, proceeding, order or investigation to which the Company or the Bank is or becomes a party after the date of this Agreement, which settlement or agreement involves payment by the Company or the Bank of an amount which exceeds $100,000 individually or $250,000 in the aggregate and/or would impose any material restriction on the business of the Company or the Bank.

(l)    Enter into any new material line of business; change in any material respect its lending, investment, underwriting, risk and asset liability management and other banking and operating policies, except as required by applicable Law, regulation or policies imposed by any Governmental Entity.

(m)    Enter into any Derivative Transaction.

(n)    Incur, modify, extend or renegotiate any indebtedness for borrowed money or assume, guarantee, endorse or otherwise as an accommodation become responsible for the obligations of any other Person (other than creation of deposit liabilities, purchases of federal funds and sales of certificates of deposit, which are in each case in the Ordinary Course of Business).

(o)    Acquire (other than (i) by way of foreclosures or acquisitions in a bona fide fiduciary capacity or (ii) in satisfaction of debts previously contracted in good faith), sell or otherwise dispose of any debt security or equity investment or any certificates of deposit issued by other banks, unless such acquisition, sale or disposal is consented to in writing by Buyer.

(p)    Make any changes to deposit pricing that are not in the Ordinary Course of Business.

-34-

(g)    Make any capital expenditures other than capital expenditures in the Ordinary Course of Business in amounts not exceeding $50,000 individually, or $250,000 in the aggregate.

(h)    Amend the Certificate of Incorporation or Bylaws of the Company or the Articles of Incorporation or Bylaws of the Bank.

(i)    Implement or adopt any change in its accounting principles, practices or methods, other than as may be required by applicable Laws or GAAP.

(j)    Enter into, amend, modify or terminate any Material Contract or in...

(q)      Except for loans or extensions of credit approved and/or committed as of the date of this Agreement, (i) make or renew any loan, loan commitment, letter of credit or other extension of credit, unless any such loan, loan commitment, letter of credit or other extension of credit has been credit approved by the Bank in the Ordinary Course of Business in accordance with the current pricing and credit underwriting guidelines of the Bank and, if more than $1,000,000, has been consented to in writing by Buyer, (ii) renegotiate, increase, extend or modify any loan, loan commitment, letter of credit or other extension of credit, unless such renegotiation, increase, extension or modification is in the Ordinary Course of Business in accordance with the current pricing and credit underwriting guidelines of the Bank and, if more than $1,000,000, has been consented to in writing by Buyer or (iii) purchase any loans, unless such purchase has been consented to in writing by Buyer.

(r)      Make any investment or commitment to invest in real estate or in any real estate development project other than by way of foreclosure or deed in lieu of foreclosure or make any investment or commitment to develop, or otherwise take any actions to develop any real estate owned by the Company or the Bank.

(s)      Foreclose on or take a deed or title to any real estate other than single-family residential properties without first conducting an ASTM International 1527-13 Phase I Environmental Site Assessment (or any applicable successor standard) of the property that satisfies the requirements of 40 C.F.R. Part 312 ("Phase I"), or foreclose on or take a deed or title to any real estate other than single-family residential properties if such environmental assessment indicates the presence or likely presence of any Hazardous Substances under conditions that indicate an existing release, a past release, or a material threat of a release of any Hazardous Substances into structures on the property or into the ground, ground water, or surface water of the property, unless a Phase II investigation has been subsequently conducted and the analytical results eliminate the concern(s) identified in the prior Phase I.

(t)      Directly or indirectly repurchase, redeem or otherwise acquire any shares of the capital stock of the Company or the Bank or any securities convertible into or exercisable for any shares of capital stock of the Company or the Bank.

(u)      Except as required by Law, make application for the opening, relocation or closing of any, or open, relocate or close any, branch office, loan production or servicing facility or automated banking facility.

(v)      Change any material Tax election, file any material amended Tax Return, settle or compromise any material liability with respect to Taxes, or consent to any extension or waiver of the limitation period applicable to any material Tax claim or assessment.

(w)      (i) Purchase any equity securities, or purchase any securities other than securities: (A) rated "A" or higher by either Standard & Poor's Ratings Services or Moody's Investors Service, (B) with a weighted average life of not more than three years and (C) otherwise in the Ordinary Course of Business, or (ii) make any other material investment for its own account either by contributions to capital, property transfers or purchase of any property or assets of any other Person.

-35-

(x)     Sell any equity or fixed income securities owned by the Company or the Bank as of the date hereof; provided that Buyer will consult with Sellers in good faith to identify and approve securities to be sold to finance the Bank Special Dividend.

(y)     Compromise, resolve, or otherwise "workout" any delinquent or troubled loan unless any such loan workout is done in the Ordinary Course of Business, consistent with Bank's current policies and procedures and recent past practice.

(z)     Charge-off (except as may otherwise be required by applicable Law or by any Governmental Entity or by GAAP) any material credit, or make or enter into any commitments to make or extend any credit which varies materially from its written credit policies, copies of which have been made available to Buyer.

(aa)    Change the Bank's policies or procedures, or the implementation thereof, relating to its allowance for loan losses or loan loss provision, or maintain the allowance for loan losses in an amount not in conformance with GAAP.

(bb)    Enter into any contract with respect to, or otherwise agree or commit to do, any of the foregoing.

6.3     Current Information.  During the period from the date of this Agreement to the Closing, Sellers will cause one or more of their representatives to confer with representatives of Buyer and report the general status of the Company's and the Bank's ongoing operations at such times as Buyer may reasonably request, subject to any applicable regulatory law or policy. Sellers will promptly notify Buyer of any material change in the normal course of the Company's and the Bank's business or in the operation of their respective properties and, to the extent permitted by applicable Law, of any governmental complaints, investigations or hearings or communications indicating that the same may be contemplated or the institution or the threat of material litigation involving the Company or the Bank.

6.4     Regulatory Filings.

(a)     The Parties shall cooperate with each other and use their respective commercially reasonable efforts to prepare promptly all necessary documentation, to effect Buyer's filing of all applications, notices, petitions and filings, to obtain as promptly as practicable all permits, consents, approvals and authorizations of all third parties and Governmental Entities that are necessary or advisable to consummate the Merger, including the Bank Special Dividend and the Company Special Dividend, and to comply with the terms and conditions of all such permits, consents, approvals and authorizations of all such Governmental Entities. Sellers shall have the right to review in advance, and, to the extent practicable, consult with Buyer, in each case subject to applicable laws relating to the exchange of information, all the information relating to Buyer, the Company or the Bank, as the case may be, and any of their respective subsidiaries, which appear in any filing made by Buyer with, or written materials submitted to, any third party or any Governmental Entity in connection with the Merger. In exercising the foregoing right, each of the Parties shall act in a commercially reasonable manner and as promptly as practicable. The Parties shall consult with each other with respect to the obtaining of all permits, consents, approvals and authorizations of all third parties and Governmental Entities necessary or advisable to consummate the Merger and each Party will keep the other Parties apprised of the status of matters relating to completion of the Merger.

-36-

(b)    Sellers shall, upon request, furnish Buyer all information concerning itself, its subsidiaries, directors, officers, shareholders and affiliates and such other matters as may be reasonably necessary or advisable in connection with the filing, notice or application made by or on behalf of Buyer to any Governmental Entity in connection with the Merger and the other transactions this Agreement contemplates.

(c)    Each of Sellers and Buyer shall promptly advise the other upon receiving any communication from any Governmental Entity whose consent or approval is required for consummation of the Merger that causes such Party to believe that there is a reasonable likelihood that any Regulatory Approval will not be obtained or that the receipt of any such approval may be materially delayed.

6.5    Commercially Reasonable Efforts.  Each of the Parties agrees to exercise good faith and use its commercially reasonable efforts to satisfy the various covenants and conditions to Closing in this Agreement, and to consummate the Merger as promptly as possible.

6.6    Director and Officer Indemnification.

(a)    Buyer agrees, subject to the limitations of the MGCL and Buyer's Articles of Incorporation and bylaws, if any, that all rights to indemnification, advancement of expenses and exculpation by the Bank and the Company now existing in favor of each Person who is now, or has been at any time prior to the date of this Agreement or who becomes prior to the Closing Date, an officer or director of the Company or the Bank, as provided in their respective Bylaws, in each case as in effect on the date of this Agreement, or pursuant to any other agreements in effect on the date of this Agreement, shall survive the Closing Date and shall continue in full force and effect for a period of six years. Buyer further agrees to purchase tail insurance coverage for no less than six years from the Closing Date with respect to the Company's existing directors and officers liability policy for the benefit of the Company's and the Bank's directors, managers and officers; provided that, however, in no event shall Buyer be required to expend in the aggregate for such six years' tail insurance coverage pursuant to this Section 6.6(a) more than 150% of the annual premium currently paid by the Company and the Bank for such insurance.

(b)    The obligations of Buyer and the Company and the Bank under this Section 6.6 shall not be terminated or modified in such a manner as to affect adversely any director or officer to whom this Section 6.6 applies without the consent of such affected director or officer, it being expressly agreed that the directors and officers to whom this Section 6.6 applies shall be third party beneficiaries of this Section 6.6, each of whom may enforce the provisions of this Section 6.6.

-37-

(c)    In the event Buyer, the Company, the Bank or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in either such case, proper provision shall be made so that the successors and assigns of Buyer, the Company or the Bank, as the case may be, shall assume all of the obligations set forth in this Section 6.6.

6.7    Confidentiality.  From and after the Closing, each Seller shall, and shall cause its Affiliates to, hold, and shall use Seller's reasonable efforts to cause Seller's Representatives to hold, in confidence any competitively sensitive non-public information concerning the Company and the Bank, except information that:

(a)    is generally available to and known by the public through no fault of such Seller or any of its Affiliates or Representatives; or

(b)    is lawfully acquired by such Seller, any of such Seller's Affiliates or Representatives from and after the Closing from sources that are not prohibited from disclosing such information by a legal or contractual obligation.

Nothing in this Agreement shall restrict any Seller from disclosing any information which, upon the advice of such Seller's counsel, such Seller is required by Law to disclose, provided that if any such disclosure is contemplated, such Seller will use commercially reasonable efforts to notify Buyer in advance of such disclosure to give Buyer the opportunity to seek a protective order or other protective measures.

6.8    Public Announcements.  No Party to this Agreement shall make any public announcements in respect of this Agreement or the Merger or otherwise communicate with any news media without providing at least three (3) Business Days' advance written notice to the other Parties and, unless otherwise required by applicable Law, stock exchange requirements, or based upon the advice of counsel, without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed. The Parties shall cooperate as to the timing and contents of any such announcement. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall restrict the dissemination of customarily provided investment information by Buyer, or its lenders, investors or prospective investors or lenders.

6.9    Further Assurances.  Following the Closing, each of the Parties to this Agreement shall, and shall cause its respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the Merger.

-38-

6.10    No Solicitation.

(a)    From the date of this Agreement until the Closing, Sellers, shall not, and shall cause their Representatives and the Company, the Bank and their respective Representatives not to, directly or indirectly:

(i)    solicit, initiate, endorse, or knowingly encourage or facilitate (including by way of furnishing non-public information) any inquiry, proposal or offer with respect to, or the making or completion of, any Acquisition Proposal, or any proposal, offer or substantive inquiry that is reasonably likely to lead to any Acquisition Proposal,

(ii)    enter into, facilitate, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any Person any confidential or nonpublic information or data or afford access to the business, directors, officers, employees, properties, facilities, assets, contracts, books or records of the Company or the Bank to any Person in connection with any Acquisition Proposal,

(iii)    enter into any agreement relating to any Acquisition Proposal,

(iv)    waive, terminate, modify or fail to enforce any provision of any "standstill" or similar obligation of any Person (other than Buyer) with respect to the Company or the Bank, or

(v)    authorize, or commit or agree to do, any of the foregoing.

Without limiting the foregoing, it is agreed that any violation of the restrictions set forth in the preceding sentence by any Representative of Sellers, the Company or the Bank shall be a breach of this Section 6.10(a) by Sellers. Sellers, the Company and the Bank shall, and shall cause their respective Representatives to, (A) immediately cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Acquisition Proposal, (B) terminate access to any physical or electronic data rooms relating to any potential Acquisition Proposal, and (C) request the prompt return or destruction of all confidential information previously furnished in connection therewith.

(b)    Neither the Boards of Directors of Sellers, including any applicable committees of the Boards of Directors of Sellers, nor the Board of Directors of the Bank , nor any committees of any the foregoing, shall (i) adopt, approve, recommend, endorse or otherwise declare advisable the adoption of any Acquisition Proposal or (ii) cause or permit Sellers or the Bank to enter into any letter of intent, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement, option agreement, joint venture agreement, partnership agreement or other agreement relating to the Company or the Bank.

-39-

(c)    In addition to the obligations of Sellers and the Bank set forth in the foregoing provisions of this Section 6.10, on and after the date hereof, Sellers and the Bank shall promptly (and in any event within 24 hours of receipt) advise Buyer orally and in writing in the event any Sellers or the Bank or their respective Representatives receives (i) any Acquisition Proposal, (ii) any proposal, offer or substantive inquiry or request for information with respect to, or that could reasonably be expected to result in, an Acquisition Proposal, or (iii) any request to engage in discussions or negotiations that are reasonably likely to lead to, or that contemplate or relate to, an actual or potential Acquisition Proposal, in each case which notice shall include a summary of the material terms and conditions of such Acquisition Proposal or request, the identity of the Person making any such Acquisition Proposal, inquiry, offer, proposal or request for information and a copy of any Acquisition Proposal, inquiry, offer, proposal or request for information made in writing (and any proposed agreements related thereto) and a summary of the terms and conditions of any Acquisition Proposal, inquiry, offer, proposal or request for information not made in writing.

(d)    Each of Sellers and the Bank shall not enter into any Contract with any Person subsequent to the date of this Agreement that prohibits any of Sellers or the Bank from providing the information contemplated by this Section 6.10 to Buyer or otherwise limits or impairs any of Sellers' or the Bank's or their respective Representatives' ability to comply with their respective obligations in this Section 6.10.

6.11    Tax Returns.

(a)    Buyer, at its expense, shall prepare and file or cause to be prepared and filed all Tax Returns of the Company and the Bank that are required to be filed after the Closing Date (taking into account extensions) and shall be responsible for and pay or cause to be paid all Taxes shown due and owing on such Tax Returns.

(b)    Buyer and Sellers shall cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to Section 6.11(a). Such cooperation shall include the retention and, upon the other Party's reasonable request, the provision of records and information that are reasonably relevant to the preparation of such Tax Returns and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

-40-

6.12    Registration Rights. No later than the Closing Date, Buyer shall prepare and file a registration statement with the SEC providing for registration and resale from time to time, on a continuous or delayed basis pursuant to Rule 415, of all of the shares of Buyer Common Stock that is issued to Sellers as Merger Consideration ("Registrable Securities"); such registration statement shall be on Form S-3 (or any equivalent or successor form) under the Securities Act as an "automatic shelf registration statement" (as those terms are defined under Rule 405 promulgated under the Securities Act) (the registration statement on such form, as amended or supplemented, the "Registration Statement"). Buyer shall not take any action that would knowingly cause the Registration Statement not to be treated as an "automatic shelf registration statement" under the rules of the SEC promulgated under the Securities Act. Buyer shall use its commercially reasonable efforts to keep the Registration Statement continuously effective under the Securities Act from the time Buyer files the Registration Statement with the SEC until the date on which all of the Registrable Securities covered by such Registration Statement have been sold. The Registration Statement when effective (including the documents incorporated therein by reference) will comply as to form in all material respects with all applicable requirements of the Securities Act and the Securities Exchange Act of 1934 and will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any prospectus contained in such Registration Statement, in the light of the circumstances under which a statement is made). As soon as practicable following the date that the Registration Statement becomes effective, but in any event within one Business Day of such date, Buyer shall provide Sellers with written notice of the effectiveness of such Registration Statement. Buyer shall provide a reasonable number of copies of the prospectus included in the Registration Statement to Sellers for purposes of delivery of the prospectus at or prior to the time of any sale as necessary to comply with the prospectus delivery requirements of Rule 172 under the Securities Act. Buyer shall instruct its transfer agent to issue the Registrable Securities free of all restrictions and restrictive legends, whether the issuance of the Registrable Securities is in book entry format or, if certificated, in certificates representing the Registrable Securities. All fees and expenses incident to the performance of or compliance with this Section 6.12 by Buyer shall be borne by Buyer whether or not the Registrable Securities are sold pursuant to the Registration Statement, including, without limitation, fees and expenses of Buyer's legal counsel and independent registered public accounting firm.

6.13    Employment Agreements. Buyer shall honor the contractual terms of all employment, change in control, and severance agreements, if any, listed on Section 6.13 of the Seller Disclosure Schedules, except to the extent any such agreement is superseded with the consent of the executive or terminated as of, or following, the Closing Date of the Merger, or as otherwise set forth herein. The Bank shall, at Buyer's written request made no later than ten (10) days prior to the proposed Closing Date, provide to each individual listed in Section 6.13 of the Seller Disclosure Schedules who remains an employee of the Company or the Bank until the Closing Date and who is notified by Buyer that his or her employment will be terminated as of or shortly following the Closing Date, payment of the amounts that would be payable under such employee's employment, change in control or severance agreement as if such individual's employment were terminated at the Closing; provided, however that (i) each such employee entitled to a payment hereunder enters into a release of claims effective as of the Closing relating to any claims such employee would have against the Sellers or Buyer on or before the Closing, (ii) to the extent that any such payment, when aggregated with any other payments contingent on a change in control of the Company or the Bank would constitute a "parachute payment" (as such term is defined in Section 280G of the Code), such payments and/or benefits will be reduced to the extent necessary to avoid penalties under Sections 280G and 4999 of the Code (unless such payments and/or benefits qualify for exemption under Section 280G and the conditions of such exemption is satisfied) and (iii) the employee agrees in writing to accept cash severance in a lump sum payment, which Sellers will cause the Bank to request. The estimated amounts payable under such employment, change in control and severance agreements are set forth in Section 6.13 of the Seller Disclosure Schedules.

-41-

6.14    Severance Benefits.  Any employee of the Company or the Bank who does not have an employment, change in control or severance agreement and who is not eligible for and entitled to a severance benefit under any other severance plan or program maintained by or with the Company or the Bank, who is not offered employment with Buyer or Northwest Bank or whose employment is terminated by Buyer or Northwest Bank (other than for cause); including because such employee is not offered employment or is terminated as a result of customary background screening by Northwest Bank at or within six (6) months of the Closing Date, shall receive (i) a cash payment equal to two weeks of such employee's current base salary (or average hourly wage over a two (2) week period) for each year of service with the Company or the Bank, with a minimum payment of four (4) weeks base pay and a maximum of twenty-six (26) weeks base pay payable to each such employee, and (ii) be entitled to continue to receive the same or substantially similar medical insurance coverage to which such employee and his or her eligible dependents were enrolled as of the Closing Date (on the basis of the same employee contribution rate) for a period equal to the number of weeks' pay to which such employee is entitled pursuant to clause (i) hereof, subject to the execution of a release of claims by such employee satisfactory to Buyer. Notwithstanding the foregoing, solely at the written direction of Buyer to the Company no later than ten (10) days prior to the Closing, the Company shall pay, or shall cause the Bank to pay, such amounts as may be due under the cash severance benefit to any Company employee or Bank employee whose employment is terminated at Closing. Nothing set forth herein shall be construed to limit the period of continued health care coverage that such employee would be entitled under COBRA.

ARTICLE VII
CONDITIONS TO CLOSING

7.1    Conditions to Obligations of All Parties.  The obligations of each Party to consummate the Merger shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    All Regulatory Approvals required to consummate the Merger, the Bank Dividend and the Company Dividend shall have been obtained and shall remain in full force and effect and all statutory waiting periods in respect of such Regulatory Approvals, if any, shall have expired or been terminated.

(b)    No judgment, order, injunction or decree issued by any court or agency of competent jurisdiction or other legal restraint or prohibition preventing the consummation of any of the Merger shall be in effect. No statute, rule, regulation, order, injunction or decree shall have been enacted, entered, promulgated or enforced by any Governmental Entity that prohibits or makes illegal the consummation of any of the Merger.

-42-

(c)    Buyer and the Company shall have obtained the consent or approval of each Person (other than the governmental approvals or consents referred to in Section 7.1(a)) whose consent or approval is required to consummate the transactions contemplated by this Agreement, except those for which failure to obtain such consents and approvals would not, individually or in the aggregate, have a Material Adverse Effect on Buyer (after giving effect to the consummation of the transactions contemplated hereby).

(d)    Buyer shall have filed with The Nasdaq Stock Market LLC a notification form for the listing of all shares of Buyer Common Stock to be delivered as Merger Consideration, and The Nasdaq Stock Market LLC shall not have objected to the listing of such shares of Buyer Common Stock.

7.2    Conditions to Obligations of Buyer.    The obligations of Buyer to consummate the Merger shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Sellers contained in Article III and Article IV of this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date, except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date, except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect (disregarding any materiality, Material Adverse Effect or similar qualifications in such representations and warranties).

(b)    Each Seller shall have, in all material respects, duly performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)    The written consents of DGI and DMIC voting in favor of this Agreement executed as of the date hereof, shall remain in full force and effect.

(d)    Buyer shall have received a certificate, dated the Closing Date and signed by each Seller, that each of the conditions set forth in Section 7.2(a) and Section 7.2(b) of this Agreement have been satisfied.

(e)    Since the date of this Agreement:

(i)    no change or event has occurred which has resulted in the Company or the Bank being subject to a Material Adverse Effect, and

-43-

(ii)    no condition, event, fact, circumstance or other occurrence has occurred that may reasonably be expected to have or result in the Company or the Bank being subject to a Material Adverse Effect.

(f)    There shall not have been made or threatened by any third party any claim asserting that such third party (a) is the holder or the beneficial owner of any equity security of the Bank or (b) is entitled to all or any portion of the Merger Consideration.

(g)    Sellers shall have delivered to Buyer a certificate of their respective Secretary certifying: (i) the Certificate of Incorporation and Bylaws of the Company as in effect immediately prior to the Closing, (ii) the Articles of Incorporation and Bylaws of the Bank as in effect immediately prior to the Closing and (iii) complete and correct copies of the resolutions of the boards of directors of DGI, DMIC, and the Company, authorizing the execution, delivery and performance of this Agreement and the consummation of the Merger, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Merger.

(h)    Sellers shall have delivered, or caused to be delivered, to Buyer stock certificates evidencing the shares of Company Common Stock, free and clear of Liens, duly endorsed to Buyer or accompanied by stock powers or other instruments of transfer duly executed to Buyer.

(i)    Sellers shall have provided notice of termination and made all termination payments required under any Material Contract that Buyer requests Sellers to terminate by providing written notice to Sellers not less than thirty (30) days prior to Closing.

7.3    Conditions to Obligations of Sellers. The obligations of Sellers to consummate the Merger shall be subject to the fulfillment or Sellers' waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Buyer contained in Article V of this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the Merger (disregarding any materiality, Material Adverse Effect or similar qualifications in such representations and warranties).

(b)    Buyer shall have, in all material respects, duly performed and complied with all agreements, covenants and conditions of this Agreement required to be performed or complied with by it prior to or on the Closing Date.

-44-

(c)     Sellers shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 7.3(a) and Section 7.3(b) of this Agreement have been satisfied.

(d)     Sellers shall have received a certificate of the Secretary (or equivalent officer) of Buyer certifying that attached to such certificate are true and complete copies of all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the Merger, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the Merger.

(e)     Buyer shall have delivered to Sellers the Merger Consideration on the Closing Date.

ARTICLE VIII
INDEMNIFICATION

8.1     Survival of Representations, Warranties and Agreements.

(a)     All representations and warranties made by any Party to this Agreement shall survive the Closing until the date that is 18 months after the Closing Date; provided, however, that notwithstanding the foregoing:

(i)     the representations and warranties set forth in Section 3.1 (Organization, Incorporation and Authority of each Acquired Company), Section 3.2 (Capitalization), Section 3.16 (Brokers), Section 4.1 (Authority, Validity and Effect), Section 4.2 (Title to Shares of Company Common Stock), Section 5.1 (Incorporation and Authority of Buyer); and Section 5.4 (Brokers) (the "Fundamental Representations") shall survive the Closing Date indefinitely, and

(ii)     the representations and warranties contained in Section 3.11 (Taxes) shall expire at the Closing and shall not survive after the Closing.

(b)     All covenants and agreements contained in this Agreement to be performed on or prior to the Closing shall survive the Closing until the date that is six (6) months after the Closing Date. The covenants and agreements contained in this Agreement to be performed after the Closing, including the indemnification obligations contained in this Article VIII, shall survive until fully satisfied in accordance with their terms.

(c)     If any party seeking indemnification under this Agreement (an "Indemnified Party") delivers a written notice in accordance with Section 8.2 or Section 8.3 with respect to a claim for any indemnification as provided for under this Article VIII before the expiration of the applicable survival period, then the applicable representation, warranty, covenant or agreement shall survive until, but only for purposes of, the resolution of the matter covered by such claim.

-45-

8.2     Indemnification by Sellers.  Subject to the other terms and conditions of this Article VIII, Sellers shall, jointly and severally, indemnify and hold harmless Buyer and its Affiliates, and their respective officers, directors, managers, employees, representatives and agents, from and against any and all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees) (collectively, "Losses"), suffered or incurred by any such party, if and to the extent such Losses are suffered or incurred by reason of, or arising out of, any of the following:

(a)     any inaccuracy in or breach of any of the representations or warranties of Sellers contained in Article III or Article IV of this Agreement;

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Sellers pursuant to this Agreement; or

(c)     any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Merger based upon arrangements made by or on behalf of Sellers, the Company or the Bank or any of their respective Affiliates, including any amounts owed to Keefe, Bruyette & Woods, Inc.

8.3     Indemnification by Buyer.  Subject to the other terms and conditions of this Article VIII, Buyer shall indemnify and hold harmless Sellers and their Affiliates, and their respective officers, directors, managers, employees, representatives and agents, from and against any and all Losses suffered or incurred by any such party, if and to the extent such Losses are suffered or incurred by reason of, or arising out of, any of the following:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in Article V of this Agreement;

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; or

(c)     any broker's, finder's, financial advisor's or other similar fee or commission in connection with the Merger based upon arrangements made by or on behalf of Buyer or any of its respective Affiliates, including any amounts owed to Ambassador Financial Group.

8.4     Certain Limitations.

(a)     To the extent permitted by Law, Sellers shall not be required to provide indemnification under Section 8.2(a) unless and until the amount of the Losses for which a right of indemnification is provided, when aggregated with all other Losses for which a right of indemnification is provided under Section 8.2(a) exceeds $250,000 (the "Minimum Aggregate Liability Amount"), at which time indemnification for Losses may be asserted only to the extent such Losses exceed the Minimum Aggregate Liability Amount, up to $12,500,000. Notwithstanding the foregoing, Sellers shall not be liable for any Loss or series of related Losses under Section 8.2(a) which do not exceed $10,000. In addition, in no event shall Sellers have any liability for indemnification of Losses under Section 8.2(b) in excess of the proceeds actually received by Sellers pursuant to this Agreement.

-46-

(b)    Notwithstanding any other provision of this Agreement to the contrary, none of the Parties shall be liable to the other, whether in contract, tort or otherwise, for any special, punitive, exemplary, indirect, incidental, consequential or other similar type of damages whatsoever, including diminution in value, loss of business opportunity, or for any Losses based on a multiple of value, that in any way arise out of, or relate to, or are a consequence of, its performance or nonperformance under this Agreement, except to the extent to which a third party claim indemnified under this Article VIII includes such damages.

(c)    Sellers shall not be required to provide indemnification under this Article VIII with respect to any Losses suffered or incurred by reason of, or arising out of, any breach or failure of any representation or warranty of Sellers contained in this Agreement if Sellers informed Buyer in writing of such breach no less than thirty (30) days in advance of Closing.

8.5    Indemnification Procedures.

(a)    If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any Person who is not a Party to this Agreement or an Affiliate of a Party to this Agreement or a Representative of the foregoing (a "Third-Party Claim") against such Indemnified Party with respect to which a Party from whom indemnification may be sought (an "Indemnifying Party") is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right, with respect to a Third-Party Claim solely for money damages in an amount less than or equal to the maximum amount such Indemnifying Party may be liable for under the terms of this Article VIII, to participate in, or by giving written notice to the Indemnified Party to assume, the defense of such Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel reasonably acceptable to the Indemnified Party, and the Indemnified Party shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to Section 8.5(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right, at its own cost and expense, to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party elects not to compromise or defend such Third-Party Claim or fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, the Indemnified Party may, subject to Section 8.5(b), pay, compromise or defend such Third-Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third-Party Claim. Sellers and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third-Party Claim, including making available, subject to the provisions of Section 6.8, records relating to such Third-Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending Party, management employees of the non-defending Party as may be reasonably necessary for the preparation of the defense of such Third-Party Claim.

-47-

(b)    Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed, except as provided in this Section 8.5(b). If a firm offer is made to settle a Third-Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense pursuant to Section 8.5(b), it shall not agree to any settlement without the written consent of the Indemnifying Party, not to be unreasonably withheld or delayed.

(c)    Any claim by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice of the Loss. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have 30 days after its receipt of such notice to respond in writing to such Direct Claim. During such 30-day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance including access to the Company's premises and personnel and the right to examine and copy any accounts, documents or records as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such 30-day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

-48-

8.6    Tax Treatment of Indemnification Payments.  All indemnification payments made under this Agreement shall be treated by the Parties as an adjustment to the Merger Consideration for Tax purposes, unless otherwise required by Law.

8.7    Mitigation.  Each of the parties agrees to use commercially reasonable efforts to mitigate its respective Losses upon and after becoming aware of any event or condition that could reasonably be expected to give rise to any Losses indemnifiable under this Article VIII.

8.8    Net Losses; Subrogation.

(a)    The amount of any Losses incurred or suffered by any Indemnified Party shall be calculated after giving effect to any amounts, including insurance proceeds, recovered by the Indemnified Party or any of its Affiliates from any third Person and any Tax benefit that may be realized by any Indemnified Party or any of its Affiliates as a result of such Losses calculated by assuming such person is subject to Tax at the highest marginal Tax rates for both federal and state purposes, as determined on a combined basis. Each Indemnified Party shall exercise commercially reasonable efforts to obtain such proceeds, benefits and recoveries. If any such benefits or recoveries are received by an Indemnified Party (or any of its Affiliates) with respect to any Losses after an Indemnifying Party has made an indemnity payment to the Indemnified Party with respect to such Losses, the Indemnified Party or such Affiliate shall reimburse the Indemnifying Party the amount of such benefits or recoveries, net of Taxes (up to the amount of the Indemnifying Party's indemnity payment).

(b)    Upon making any payment to an Indemnified Party in respect of any Losses, the Indemnifying Party will, to the extent of such payment, be subrogated to all rights of the Indemnified Party and its Affiliates, against any third Person in respect of the Losses to which the payment relates. Such Indemnified Party and its Affiliates and such Indemnifying Party will execute upon request all instruments reasonably necessary to evidence or further perfect such subrogation rights.

-49-

8.9    Exclusive Remedies. Subject to Sections 9.1(c), 9.2 and 10.12, the Parties acknowledge and agree that, other than claims arising from fraud or willful breach of this Agreement, their sole and exclusive remedy with respect to any and all claims for any breach of any representation, warranty, covenant, agreement or obligation set forth in this Agreement or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article VIII. In furtherance of the foregoing, each Party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth in this Agreement or otherwise relating to the subject matter of this Agreement it may have against the other Parties to this Agreement and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this Article VIII. Nothing in this Section 8.9 shall limit any Person's right to terminate this Agreement pursuant to Section 9.1(c), or to seek and obtain any equitable relief to which any Person shall be entitled pursuant to Section 10.12.

## ARTICLE IX
## TERMINATION

9.1    Termination. This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Sellers and Buyer;

(b)    by either Sellers or Buyer:

(i)    if the Closing shall not have been consummated on or before June 30, 2019 (the "Outside Date"); provided, that the right to terminate this Agreement under this Section 9.1(b)(i) shall not be available to (i) Sellers, if Sellers' failure to comply with any provision of this Agreement has been the cause of the failure of the Closing to occur on or before such date or (ii) Buyer, if Buyer's failure to comply with any provision of this Agreement has been the cause of the failure of the Closing to occur on or before such date;

(ii)    if any court of competent jurisdiction or other Governmental Entity shall have issued a judgment, order, injunction, rule or decree, or taken any other action restraining, enjoining or otherwise prohibiting the Merger and such judgment, order, injunction, rule, decree or other action shall have become final and nonappealable; or

(iii)    if any Governmental Entity that must grant a Regulatory Approval has denied approval of the consummation of the Merger by final, nonappealable action of such Governmental Entity;

(c)    by Buyer by written notice to Sellers if Sellers shall have breached or failed to perform any of their respective representations, warranties, covenants or agreements set forth in this Agreement, which breach or failure to perform, either individually or in the aggregate, (A) would result in the failure to satisfy any of the conditions set forth in Sections 7.1 or 7.2 and (B) cannot be or has not been cured or has not been waived by the earlier of (1) the second Business Day prior to the Outside Date and (2) thirty 30 days after the giving of written notice to Sellers of such breach or failure;

-50-

(d)    by Sellers by written notice to Buyer if Buyer shall have breached or failed to perform any of its representations, warranties, covenants or agreements set forth in this Agreement, which breach or failure to perform, either individually or in the aggregate, (A) would result in the failure to satisfy any of the conditions set forth in Sections 7.1 or 7.3 and (B) cannot be or has not been cured or has not been waived by the earlier of (1) the second Business Day prior to the Outside Date and (2) thirty (30) days after the giving of written notice to Buyer of such breach or failure.

9.2    Effect of Termination.  In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any Party to this Agreement except:

(a)    as set forth in this Article IX, Section 6.7 and Article X of this Agreement;

(b)    in the event of termination of this Agreement (i) pursuant to Section 9.1(c) and, at the time of such termination Buyer is not in breach of any representation, warranty or material covenant contained herein, and (ii) within twelve (12) months of such termination, any of Sellers or the Bank enters into an agreement to sell, issue, lease, exchange, mortgage, pledge, transfer or otherwise dispose of all or a material portion of the assets or equity securities of the Bank or the Company or deposits of the Bank in a single transaction or series of related transactions, then the Company shall make payment to Buyer in the amount of $3,400,000 by wire transfer of immediately available funds within two (2) Business Days of written notice of such demand by Buyer; provided, however, that notwithstanding anything to the contrary in this Agreement, in the event that Buyer shall receive the payment under this Section 9.2(b), the receipt of the payment under this Section 9.2(b) shall be deemed to be liquidated damages for any and all losses or damages suffered or incurred by Buyer, any of its Affiliates, or any other Person in connection with this Agreement and the termination of this Agreement, the transactions contemplated by the Agreement (and the abandonment thereof) or any matter forming the basis for such termination, and none of Buyer, any of its Affiliates or any other Person shall be entitled to bring or maintain any other claim, action or proceeding against the Sellers arising out of this Agreement, any of the transactions contemplated by the Agreement or any matters forming the basis for such termination; and

(c)    that nothing in this Agreement and no termination of this Agreement shall relieve any Party to this Agreement from liability for any intentional breach of any provision of this Agreement or failure in the performance of any of the covenants, agreement or obligations arising under this Agreement and the Parties shall remain subject to the Confidentiality Agreement.

-51-

ARTICLE X
MISCELLANEOUS

10.1    Expenses.  Except as otherwise expressly provided in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Merger shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred, provided that nothing contained in this Agreement shall limit any Party's rights to recover any liabilities or damages arising out of another Party's willful breach of any provision of this Agreement.

10.2    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally. or if by e-mail so long as such e-mail states it is a notice delivered pursuant to this Section 10.2 and a duplicate copy of such e-mail is promptly delivered personally by courier or otherwise, (b) on the first Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered to the addresses set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

If to Buyer:                    Northwest Bancshares, Inc.
                                100 Liberty Street
                                Warren, Pennsylvania
                                Attn: William J. Wagner, Chief Executive Officer
                                E-mail: Bill.Wagner@northwest.com

with a copy to:                 Luse Gorman, PC
                                5335 Wisconsin Avenue, N.W., Suite 780
                                Washington, D.C. 20015
                                Attn: Eric Luse, Esq.
                                     Marc P. Levy, Esq.
                                E-mail: eluse@luselaw.com
                                        mlevy@luselaw.com

                                and

                                Northwest Bancshares, Inc.
                                100 Liberty Street
                                Warren, Pennsylvania
                                Attn: Richard K. Laws, Esq.
                                E-mail: Rich.Laws@northwest.com

-52-

If to Sellers:

Donegal Mutual Insurance Company
1195 River Road
Marietta, PA 17547
Attention: Kevin G. Burke, Acting Chief Executive Officer
Email: KevinBurke@donegalgroup.com

with a copy to:

Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103
Attention: Frederick W. Dreher, Esq. and
Richard L. Cohen, Esq.
Email: FWDreher@duanemorris.com  RLCohen@duanemorris.com

10.3    Interpretation.  When a reference is made in this Agreement to Articles, Sections, Exhibits or Schedules, such reference shall be to an Article or Section of or Exhibit or Schedule to this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, such words shall be deemed to be followed by the words "without limitation." This Agreement shall not be interpreted or construed to require any Person to take any action, or fail to take any action, if to do so would violate any applicable law.

10.4    Headings.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

10.5    Severability.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Merger be consummated as this Agreement originally contemplated to the greatest extent possible.

10.6    Entire Agreement.  This Agreement constitutes the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained in this Agreement, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the Exhibits, the statements in this Agreement will control.

-53-

10.7    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the Parties to this Agreement and their respective successors and permitted assigns. Neither Buyer, on the one hand, nor any Seller, on the other hand, may assign its rights or obligations under this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed; provided, however, that Buyer may assign its rights under this Agreement to an Affiliate so long as Buyer remains obligated under this Agreement. No assignment shall relieve the assigning Party of any of its obligations under this Agreement.

10.8    No Third-Party Beneficiaries.  This Agreement is not intended to and does not confer upon any Person other than the Parties any legal or equitable rights or remedies; provided, that the following Persons are expressly intended as third party beneficiaries with respect to the following specified sections of this Agreement and will have the right to enforce such specified sections against the parties to this Agreement: with respect to Section 6.6, the officers and directors specified therein; with respect to Section 10.9, the Non-Party Affiliates; and with respect to Section 10.14, Duane Morris LLP.

10.9    No Recourse.  All claims or causes of action (whether in contract or in tort, at law or in equity) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the Persons who are expressly identified as parties to this Agreement. No Person who is not a named party to this Agreement, including any past, present or future director, officer, employee, incorporator, member, manager, partner, equity holder, Affiliate, agent, attorney or representative of any named party to this Agreement ("Non-Party Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement, any document signed in connection with this Agreement or the Merger or for any claim based on, in respect of, or by reason of this Agreement, any document signed in connection with this Agreement or their respective negotiation or execution, and each Party to this Agreement waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates. Non-Party Affiliates are expressly intended as third-party beneficiaries of this provision of this Agreement.

10.10    Amendment and Modification; Waiver.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by the Parties. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

-54-

10.11    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement and all claims arising under this Agreement or relating to this Agreement, shall be governed and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of law thereof.

(b)    Each of the Parties irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any Pennsylvania state court or the United States District Court for the Western District of Pennsylvania, in any action or proceeding arising out of or relating to this Agreement. Each of the Parties agrees that, subject to rights with respect to post-trial motions and rights of appeal or other avenues of review, a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the Parties irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any Pennsylvania state court or the United States District Court for the Western District of Pennsylvania. Each of the Parties to this Agreement irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE MERGER THIS AGREEMENT CONTEMPLATES. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.11(c).

-55-

10.12    Specific Performance.  The rights and remedies of the Parties to this Agreement shall be cumulative. The Parties agree that irreparable damage would occur in the event any provision of this Agreement were not performed in accordance with the terms of this Agreement and that money damages would not be a sufficient remedy for any breach of this Agreement. Accordingly, in addition to and not in limitation of any other remedies available to the Parties to this Agreement for a breach or threatened breach of this Agreement, the Parties shall be entitled to specific performance of this Agreement and an injunction restraining any such Party from such breach or threatened breach. Each of the Parties to this Agreement herby waives any defense that a remedy at law would be adequate in any action for specific performance and any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

10.13    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

10.14    Attorney-Client Relationship.

(a)    In any dispute, proceeding or matter arising after the Closing under or in connection with this Agreement or the other agreements contemplated by this Agreement, the Parties agree that Sellers shall have the right, at their election to retain the firm of Duane Morris LLP ("Seller Law Firm") to represent them in such dispute, proceeding or matter, and Buyer (on behalf of itself and its current and future subsidiaries, and their respective successors and assigns) hereby irrevocably consents to any such representation in any such matter. In addition, each Seller on behalf of itself and its current and future subsidiaries, Affiliates, directors, officers, managers, employees and representatives and their respective successors and assigns hereby knowingly and voluntarily waives any actual or potential conflicts of interest as a result of the Seller Law Firm representing one or more Sellers in connection with the Merger. Notwithstanding the foregoing, neither the Buyer nor the Surviving Corporation is waiving any attorney-client privilege (including relating to the negotiation, documentation or consummation of this Agreement or the transactions contemplated hereby) in connection with any third-party litigation.

(b)    Each Party further agrees that the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege as to all communications between or among the Seller Law Firm, Sellers, the Company, the Bank or any officer, director, employee, Representative or Affiliate of Sellers, the Company or the Bank in such capacity, relating to this Agreement, the Merger, the other contracts and instruments to be entered into pursuant to this Agreement and the Merger, shall belong to Sellers and shall not pass to or be claimed by Buyer or any of its Affiliates or subsidiaries including, after the Closing, the Company or the Bank.

-56-

(c)    If the Merger is consummated neither Buyer nor the Company or the Bank shall have any right of access to or control over any of records of Seller Law Firm related to the Merger and the transactions contemplated thereby, which shall become the property of and be controlled by Sellers. Buyer acknowledges that it may be impracticable to remove from the records of the Company and the Bank (including emails and other electronic files) any privileged communications with the Seller Law Firm. Buyer, on behalf of itself and the Company and the Bank, agrees not to access, review or otherwise use, examine or rely upon such privileged communications that may remain in the records of the Company or the Bank, and the Parties agree that no attorney-client privilege, attorney work product or other privilege or protection is waived or intended to be waived by allowing such material to remain in the files of the Company and the Bank.

10.15    Several Obligations.    Except as set forth in Section 8.2, all obligations of Sellers shall be several and not joint, and in no event shall a Party have any liability or obligation with respect to the acts or omissions of any other Party to this Agreement.

[SIGNATURE PAGE FOLLOWS]

-57-

IN WITNESS WHEREOF, the Parties to this Agreement have caused this Agreement to be executed as of the date first written above.

SELLERS:

DONEGAL MUTUAL INSURANCE COMPANY

By:   /s/ Kevin G. Burke
       Kevin G. Burke,
       Acting Chief Executive Officer

DONEGAL GROUP INC.

By:   /s/ Kevin G. Burke
       Kevin G. Burke, President
        and Chief Executive Officer

DONEGAL FINANCIAL SERVICES CORPORATION

By:   /s/ Jeffrey D. Miller
       Jeffrey D. Miller, Senior Vice President
        and Chief Financial Officer

BUYER:

NORTHWEST BANCSHARES, INC.

By:   /s/ William J. Wagner
Name: William J. Wagner
Title:  Chief Executive Officer

-58-

Exhibit 99.1

**Northwest Bancshares, Inc. Expands Presence in Lancaster County, PA Through the Merger with Donegal Financial Services Corporation**

WARREN, PA and MARIETTA, PA June 12, 2018/PRNewswire/ -- Northwest Bancshares, Inc. ("Northwest") (NASDAQ: NWBI) and Donegal Financial Services Corporation ("DFSC") (privately-owned) announced today the signing of a definitive agreement pursuant to which Northwest will acquire DFSC in a cash and stock transaction for total consideration valued at $85 million. In addition to the $85 million deal consideration, given DFSC's substantial capital position, DFSC will pay a dividend of approximately $30 million to its two shareholders, Donegal Group Inc. and Donegal Mutual Insurance Company, immediately prior to the closing of the merger. DFSC is based in Marietta, Lancaster County, Pennsylvania and is the parent company of Union Community Bank. As of March 31, 2018, DFSC had total assets of $577 million, net loans of $430 million, deposits of $490 million, tangible equity of $79 million, and operates 14 branches in Lancaster County, which is one of Pennsylvania's fastest-growing counties.

Northwest's presence in Lancaster County will increase from six to 16 offices, while deposits will increase to $640 million from $150 million, elevating Northwest to the sixth highest market share in the county. It is anticipated that four of the branches of the combined entity will be consolidated with nearby offices. It is also expected that this acquisition, combined with Northwest's anticipated organic growth in 2018, will result in the company crossing the $10 billion asset threshold in 2019. When the transaction is consummated, the combination of the two banking companies will create an institution that provides banking services through 182 branch locations and 297 ATMs in three states.

William J. Wagner, Chairman and CEO of Northwest, stated, "We welcome the employees and customers of Union Community Bank to the Northwest family, where we believe they will embrace our community bank culture, superior product and service offering, and tradition of exceptional customer service. We are extremely excited to be acquiring a community bank of exceptional quality in one of the more rapidly-growing counties in our geographic footprint. In addition to providing meaningful accretion in earnings per share and return on equity, this merger will provide bottom-line earnings that exceed the loss of transaction income we will incur as mandated by the Dodd-Frank Act when we cross the $10 billion asset threshold. We believe we would have exceeded this asset threshold in 2019 due to normal internal growth."

Under the terms of the agreement, payment will be 50% cash and 50% stock, with the stock portion consisting of a fixed exchange of 137.84 Northwest shares for each of DFSC's 17,864 outstanding shares. The exchange ratio was based upon the average per share closing price of Northwest's stock for the ten trading

days ended June 4, 2018, which was $17.26. The agreement provides that the exchange ratio will switch to a floating basis if the value of Northwest's shares during a period ending the fifth trading day prior to closing is less than $15.53 or greater than $18.99, in an effort to provide protection to both parties such that the total purchase price shall not be less than $80.75 million or more than $89.25 million. Northwest also has the right to alter the mix of cash and stock to be

- received if the value of Northwest's shares during the calculation period is less than $15.53. The transaction is expected to close in the first quarter of 2019.

The transaction is expected to be immediately accretive to Northwest's earnings, excluding one-time costs. Upon achieving anticipated annual cost savings of approximately 40% of DFSC's expenses, annual earnings are projected to increase approximately $0.05 per share beginning in 2019, excluding merger-related expenses. Using those cost savings assumptions, the purchase price represents approximately 10.6 times the earnings contributed by the acquisition. Based on DFSC's actual earnings (annualized) for the quarter ending March 31, 2018, the purchase price equates to 16.2 times earnings.

Taking into consideration the aforementioned dividend payment, the purchase price represents 172% of DFSC's tangible book value as of March 31, 2018. The tangible book value per share dilution is estimated to be less than 3% with an estimated earn back period of less than 4 years. The acquisition is expected to increase Northwest's return on average common equity from approximately 8.4% to approximately 8.7% in the first year of combined operations.

Gregory E. Diehl, President and CEO of Union Community Bank stated, "We are very excited about joining the Northwest team. We strongly believe that Northwest shares our core values and is dedicated to its clients, employees, and the communities it serves. We believe Northwest's outstanding record of enhancing shareholder value and success as a community bank revolves around its connection to its customers as evidenced by being named by J.D. Power in six of the last nine years as the bank with the 'Highest Level of Customer Satisfaction in the mid-Atlantic region.'"

Ronald J. Seiffert, President and Chief Operating Officer of Northwest, added, "We believe this merger greatly enhances Northwest's franchise value and delivers an extremely attractive combination of market appeal, office locations, deposit mix and growth opportunities."

Completion of the transaction is subject to customary closing conditions, including regulatory approvals.

Ambassador Financial Group, Inc. served as financial advisor and Luse Gorman, PC served as legal counsel to Northwest in this transaction.
Keefe, Bruyette, & Woods, Inc., a Stifel Company, served as financial adviser to Donegal Mutual Insurance Company, who is the majority shareholder of DFSC and Duane Morris LLP served as legal counsel to Donegal Group Inc. and Donegal Mutual Insurance Company, who are DFSC's two shareholders.

**Investor Conference Call**

Executives from Northwest will host a conference call with investors and the financial community at 10:00 AM Eastern Time on Tuesday, June 12, 2018 to discuss this transaction. Those wishing to participate in the call may dial toll-free @ 1-877-870-4263. Participants should ask to be joined into the Northwest Bancshares, Inc. call. The slide presentation can be viewed at https://www.webcaster4.com/Webcast/Page/1049/26179 or by clicking on the link "Northwest Bancshares, Inc. investor presentation" on Northwest's website www.Northwest.com. A replay of the call will be available until June 19, 2018 by dialing toll-free @ 1-877-344-7529, with replay access code 10121138. The investor presentation on this transaction is also available at the Investor Relations section of Northwest's website www.Northwest.com.

**About Northwest Bancshares, Inc.**
Headquartered in Warren, Pennsylvania, Northwest Bancshares, Inc. is the holding company of Northwest Bank. Founded in 1896, Northwest Bank is a full-service financial institution offering a complete line of business and personal banking products and wealth management services, as well as the fulfillment of business and personal insurance needs. Northwest operates 172 community banking offices in Pennsylvania, New York and Ohio. Northwest Bancshares, Inc.'s common stock is listed on the NASDAQ Global Select Market ("NWBI"). Additional information regarding Northwest Bancshares, Inc. and Northwest Bank can be accessed on-line at www.Northwest.com.

**About Donegal Financial Services Corporation**
Donegal Financial Services Corporation. is the holding company of Union Community Bank with assets of approximately $577 million, as of March 31, 2018.

**About Donegal Group Inc.**

Donegal Group Inc. is an insurance holding company whose insurance subsidiaries offer personal and commercial property and casualty lines of insurance in 22 Mid-Atlantic, Midwestern, New England and Southern states. Donegal Mutual Insurance Company and the insurance subsidiaries of Donegal Group Inc. conduct business together as the Donegal Insurance Group. The Donegal Insurance Group has an A.M. Best rating of A (Excellent).

Donegal Group Inc.'s Class A common stock and Class B common stock trade on NASDAQ under the symbols DGICA and DGICB, respectively. As an effective acquirer of small to medium-sized "main street" property and casualty insurers, Donegal Group Inc. has grown profitably over the last three decades. The Company continues to seek opportunities for growth while striving to achieve its longstanding goal of outperforming the property and casualty insurance industry in terms of service, profitability and book value growth.

**Forward-Looking Statements**

This release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, statements about (1) the benefits of the merger between Northwest and DFSC, including anticipated future results, cost savings and accretion to reported earnings that may be realized from the merger; (2) Northwest's and DFSC's plans, objectives, expectations and intentions and other statements contained in this presentation that are not historical facts; and (3) other statements identified by words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates" or words of similar meaning.

Forward-looking statements involve risks and uncertainties that may cause actual results to differ materially from those in such statements. The following factors, among others, could cause actual results to differ materially from the anticipated results expressed in the forward-looking statements: the businesses of Northwest and DFSC may not be combined successfully, or such combination may take longer than expected; the cost savings from the merger may not be fully realized or may take longer than expected; operating costs, customer loss and business disruption following the merger may be greater than expected; governmental approvals of the merger may not be obtained, or adverse regulatory conditions may be imposed in connection with governmental approvals of the merger or otherwise; the stockholders of DFSC may revise their approval of the merger; credit and interest rate risks associated with Northwest's and DFSC's respective businesses; and difficulties associated with achieving expected future financial results. Additional factors that could cause actual results to differ materially from those expressed in the forward-looking statements are discussed in Northwest's reports (such as the Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K) filed with the Securities and Exchange Commission (the "SEC") and available at the SEC's Internet website (www.sec.gov). All subsequent written and oral forward-looking statements concerning the proposed transaction or other matters attributable to Northwest or DFSC or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements above. Except as required by law, Northwest and DFSC do not undertake any obligation to update any forward-looking statement to reflect circumstances or events that occur after the date the forward-looking statement is made.

Annualized, pro forma, projected and estimated numbers are used for illustrative purpose only, are not forecasts and may not reflect actual results.

SOURCE Northwest Bancshares, Inc.

Contact:
William J. Wagner, Chairman and CEO, Northwest Bancshares, Inc., +1-814-726-2140; or Jeffrey D. Miller, Executive Vice President and CFO, Donegal Group Inc., +1-717-426-1931, investors@donegalgroup.com

Exhibit 99.2

**NASDAQ GS:NWBI**

# Acquisition of
# Donegal Financial Services Corporation
## (parent of Union Community Bank)



## June 12, 2018

http://edgar.secdatabase.com/1806/114420418033843/filing-main.htm

3/14/22, 12:49 AM
Page 70 of 85



# Presented By



- William J. Wagner – Chairman & CEO

- Ronald J. Seiffert – President & COO

- William W. Harvey, Jr. – Senior EVP & CFO

# Disclosures



**Forward-Looking Statement**

This presentation contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, statements about (1) the benefits of the merger between Northwest Bancshares, Inc. ("Northwest") and Donegal Financial Services Corporation ("Donegal"), including anticipated future results, cost savings and accretion to reported earnings that may be realized from the merger; (2) Northwest's and Donegal's plans, objectives, expectations and intentions and other statements contained in this presentation that are not historical facts; and (3) other statements identified by words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates" or words of similar meaning.

Forward-looking statements involve risks and uncertainties that may cause actual results to differ materially from those in such statements. The following factors, among others, could cause actual results to differ materially from the anticipated results expressed in the forward-looking statements: the businesses of Northwest and Donegal may not be combined successfully, or such combination may take longer than expected; the cost savings from the merger may not be fully realized or may take longer than expected; operating costs, customer loss and business disruption following the merger may be greater than expected; governmental approvals of the merger may not be obtained, or adverse regulatory conditions may be imposed in connection with governmental approvals of the merger or otherwise; the stockholders of Donegal may revise their approval of the merger; credit and interest rate risks associated with Northwest's and Donegal's respective businesses; and difficulties associated with achieving expected future financial results. Additional factors that could cause actual results to differ materially from those expressed in the forward-looking statements are discussed in Northwest's reports (such as the Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K) filed with the SEC and available at the SEC's Internet website (www.sec.gov). All subsequent written and oral forward-looking statements concerning the proposed transaction or other matters attributable to Northwest or Donegal or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements above. Except as required by law, Northwest and Donegal do not undertake any obligation to update any forward-looking statement to reflect circumstances or events that occur after the date the forward-looking statement is made.

3

# Initial Transaction Appeal

- First opportunity we have seen in our footprint in 2 ½ years.
  - Best opportunity for a whole-bank acquisition in our Eastern Region in over 20 years.

- Market dynamics – Lancaster County is one of the fastest growing counties in Pennsylvania.

- With the $10 billion threshold looming, it was an opportunity to effectively offset the loss of transaction income mandated by the Durbin Amendment to the Dodd-Frank Act.

- Solid network of community based offices strategically located primarily in western Lancaster County which complement Northwest's six locations. Caters to Northwest's strength as a small-town bank.

- Commercial bank balance sheet – diversified loan portfolio + good deposit mix = strong net interest margin.

- Simple business model – banking and brokerage. No unusual products or services.

- Strong oversight and support provided by Donegal ownership group – very well managed and conservative institution.

4

## DFSC Highlights



| Company Overview (1Q18)* ($000s) | |
|---|---|
| **Company Info.** | |
| Year Founded | 2000 |
| Headquarters | Marietta, PA |
| Branches | 14 |
| **Balance Sheet** | |
| Total Assets | 577,379 |
| Loans | 429,593 |
| Deposits | 490,204 |
| Tang. Common Equity | 79,365 |
| **Credit** | |
| NPLs / Total Loans | 0.42% |
| Net Charge-Offs / Avg. Loans | 0.02% |
| **1Q18 Ann.** | |
| Net Interest Income | 20,096 |
| Non-Interest Expense | 17,044 |
| Net Income to Common | 5,244 |
| ROAA | 0.92% |
| ROAE | 6.52% |



Lancaster County, PA

● NWBI Branches    ● DFSC Branches

*Financial data as of or for the three months ended March 31, 2018.

5

# *Transaction Summary*





**Key Terms**

- 100% of shares owned by Donegal Group Inc. (NASDAQ:DGICA) and Donegal Mutual Insurance Company.

- Consideration: Fixed exchange of 50% stock/50% cash. 137.84 shares of NWBI stock and $2,379.09 in cash for each share of DFSC stock.

- Deal value = $4,758.21 per DFSC share, or $85 million in the aggregate. Exchange ratio based on NWBI's average closing price of $17.26.

- Protective collars equal to 10% stock consideration to the upside and downside. Deal value range of $80.75 million to $89.25 million.

- Northwest has the ability to alter stock/cash mix if our stock price decreases by more than 10%.

- Tangible book value dilution of less than 3% with an earn back period of less than 4 years.

Note: Exchange ratio is calculated using the 10 day average closing stock price of Northwest Bancshares, Inc. ending June 4, 2018 (the fifth trading day immediately preceding the date of the merger agreement).

6

# *Transaction Summary*





**Key Terms**

- Transaction anticipated to close in the 1st quarter of 2019, subject to regulatory approval and other customary closing conditions. (Required approvals: FDIC, PA Department of Banking, Federal Reserve Bank of Cleveland)

- Pro forma ownership: [97.7% NWBI / 2.3% Donegal Group]

- No capital raise necessary.

- No Board representation.

- Cost saves of 40% which includes 4 office consolidations.

- Northwest's tangible common equity post-merger will remain over 9% providing a capital cushion to support future acquisition opportunities.

- No restrictions on Donegal Group's ongoing ownership. Sophisticated investor who knows how to rebalance portfolios.

7

# Transaction Pricing



|  | Bottom Collar $80.75 million | Base Case $85 million | Upper Collar $89.25 million | All Cash $80.75 million |
|---|---|---|---|---|
| Cash % / Stock % | 53% / 47% | 50% / 50% | 48% / 52% | 100% / 0% |
| Price to tangible book value | 164% | 172% | 181% | 164% |
| Price to current earnings* | 15.4x | 16.2x | 17.0x | 15.4x |
| Price to last 12 months earnings | 19.3x | 20.3x | 21.3x | 19.3x |
| Price to earnings after cost saves | 10.1x | 10.6x | 11.2x | 10.1x |
| Tangible book value dilution | 2.8% | 2.8% | 2.8% | 4.8% |
| Earnings per share accretion | 5.1% | 5.1% | 5.1% | 7.2% |
| Earn back period | 3.9 years | 3.9 years | 3.9 years | 4.9 years |
| Core Deposit Premium | 6.5% | 7.4% | 8.3% | 6.5% |

*1Q18 earnings annualized

8



# Deal Value Range



| Scenario | NWBI Stock Price | Deal Value (millions) |
|---|---|---|
| A | $15.53 | $80.75 |
| B | $17.26 | $85.00 |
| C | $18.99 | $89.25 |

- NWBI has the ability to change the form of consideration to any percentage of cash and stock in its sole discretion if the average trading price for our common stock for the designated period prior to closing is below $15.53.

- We intend to utilize up to 100% cash for the deal consideration such that our payback period is capped at 4.9 years.

9

# Attractively Priced Relative to Comparable Transactions



| ($ in millions) | DFSC | Median* |
|---|---|---|
| Deal Value | $85.0 | $73.0 |
| Price / TBV | 172%** | 160% |
| | | |
| Price / Estimated 2018 Earnings with Cost Savings | 10.6x | N/A |
| Core Deposit Premium | 7.4% | 9.3% |

**Target Composite Financials\*\*\***

| | DFSC | Median* |
|---|---|---|
| Assets | $577 | $402 |
| TE / Assets | 13.77% | 9.11% |
| LTM ROAA | 0.74% | 0.52% |
| LTM ROAE | 5.19% | 5.34% |

*Median is comprised of deals announced since 2012 in Pennsylvania and Maryland with $250 - $800 million in total assets.
**Includes impact of pre-close dividend of approximately $30 million.
***Prior to pre-close dividend of approximately $30 million.

10

# *Overview of Companies*



| ($000s) | Northwest | DFSC |
|---|---|---|
| Assets | $9,520,979 | $577,379 |
| Loans | $7,827,056 | $429,593 |
| Deposits | $7,985,489 | $490,204 |
| Common Equity | $1,215,254 | $80,452 |
| Intangibles | $331,569 | $1,087 |
| Market Capitalization | $1.8 billion | N/A |
| Last Market Close | $17.81 | N/A |
| Shares Outstanding | 102.6 million | 17,864 |
| Offices | 172 | 14 |



● NWBI Branches     ● DFSC Branches

Financial information as of March 31, 2018. Stock prices as of June 8, 2018.

11

# A Diversified Loan Mix





| ($millions) | Northwest | % |
|---|---|---|
| Residential RE | 2,772.1 | 35.2% |
| Home Equity | 1,288.4 | 16.3% |
| Consumer | 686.0 | 8.7% |
| Commercial RE | 2,512.3 | 31.9% |
| Commercial | 623.5 | 7.9% |
| | 7,882.3 | 100% |
| Portfolio Yield | 4.51% | |

| ($millions) | DFSC | % |
|---|---|---|
| Residential RE | 4.5 | 1.0% |
| Home Equity | 91.4 | 21.0% |
| Consumer | 1.6 | 0.4% |
| Commercial RE | 275.3 | 63.4% |
| Commercial | 61.7 | 14.2% |
| | 434.5 | 100.0% |
| Portfolio Yield | 4.82% | |

| ($millions) | Combined | % |
|---|---|---|
| Residential RE | 2,776.6 | 33.4% |
| Home Equity | 1,379.8 | 16.6% |
| Consumer | 687.6 | 8.3% |
| Commercial RE | 2,787.6 | 33.5% |
| Commercial | 685.2 | 8.2% |
| | 8,316.8 | 100.0% |
| Portfolio Yield | 4.53% | |

- A diverse, high-quality loan portfolio provides additional balance to Northwest's current portfolio mix.
- Northwest's size and capital strength will allow DFSC's existing customers to gain access to expanded borrowing capabilities.
- DFSC's loan to deposit ratio is 87.6%.

12



# An Attractive Deposit Mix

| Northwest | DFSC | Combined |
|-----------|------|----------|
|  |  |  |

| ($millions) | Northwest | % |
|-------------|-----------|---|
| Non-Int. & Int. Checking | 3,156.0 | 39.5% |
| Money market | 1,707.8 | 21.4% |
| Savings | 1,701.0 | 21.3% |
| Time | 1,420.6 | 17.8% |
| | 7,985.5 | 100% |

Cost of Int. Bearing Deposits 0.41%

| ($millions) | DFSC | % |
|-------------|------|---|
| Non-Int. & Int. Checking | 212.6 | 43.3% |
| Money market | 90.8 | 18.5% |
| Savings | 53.6 | 10.9% |
| Time | 133.5 | 27.2% |
| | 490.4 | 100.0% |

Cost of Int. Bearing Deposits 0.56%

| ($millions) | Combined | % |
|-------------|----------|---|
| Non-Int. & Int. Checking | 3,368.6 | 39.7% |
| Money market | 1,798.6 | 21.2% |
| Savings | 1,754.6 | 20.7% |
| Time | 1,554.1 | 18.3% |
| | 8,475.9 | 100.0% |

Cost of Int. Bearing Deposits 0.42%

- Northwest's and DFSC's deposit mixes are similar with a solid base of checking accounts and strong core deposits.
- The core deposit premium being paid, based on deal pricing, is 7.4%.

13

# *Lancaster Market Dynamics*



- Pennsylvania's fifth most populous county.

    - Total residents of 542,000

    - Projected 2.16% annual population growth rate for 2018-2023

- Median household income of $64,287 with projected 9.7% growth rate for 2018-2023.

- Diverse economy near several large metropolitan areas.

    - Key industries include agriculture, education, finance, healthcare, manufacturing, and pharmaceutical.

    - Major employers include Donegal Mutual Insurance Company, Eurofins Lancaster Laboratories, Johnson & Johnson, Lancaster General Health Penn Medicine, QVC, Turkey Hill Dairy.

- Unemployment rate of 3.4% for Lancaster County vs. 4.7% for Pennsylvania and 3.8% for U.S.

Source: S&P Global Market Intelligence, U.S. Bureau of Labor Statistics

14

# Excellent Banking Opportunity



| Rank | Institution | Ticker | Branches | Deposits ($000s) | Market Share (%) | LTM* Deposit Growth (%) | Deposits per Branch |
|---|---|---|---|---|---|---|---|
| | Lancaster County Deposit Market Share as of June 30, 2017 | | | | | | |
| 1 | Fulton Financial Corporation | FULT | 28 | 3,130,912 | 28.28 | 7.4% | 111,818 |
| 2 | BB&T Corporation | BBT | 27 | 2,249,541 | 20.32 | -6.8% | 83,316 |
| 3 | PNC Financial Services Group, Inc. | PNC | 22 | 1,358,689 | 12.27 | 5.1% | 61,759 |
| 4 | Wells Fargo & Company | WFC | 14 | 885,690 | 8.00 | 5.1% | 63,264 |
| 5 | ENB Financial Corp | ENBP | 14 | 803,036 | 7.25 | 7.1% | 57,360 |
| 6 | Pro Forma** | NWBI | 16 | 606,033 | 5.48 | N/A | 37,877 |
| 6 | Donegal Financial Services Corp. | N/A | 14 | 457,856 | 4.14 | 9.0% | 32,704 |
| 7 | M&T Bank Corporation | MTB | 9 | 399,091 | 3.60 | 3.3% | 44,343 |
| 8 | Citizens Financial Group, Inc. | CFG | 6 | 327,694 | 2.96 | 12.7% | 54,616 |
| 9 | Banco Santander, SA | SAN | 8 | 309,392 | 2.79 | -0.5% | 38,674 |
| 10 | F.N.B. Corporation | FNB | 5 | 260,542 | 2.35 | 3.4% | 52,108 |
| 11 | S&T Bancorp, Inc. | STBA | 3 | 245,571 | 2.22 | 0.2% | 81,857 |
| 12 | Bank of Bird-in-Hand | N/A | 2 | 205,367 | 1.85 | 58.6% | 102,684 |
| 13 | Northwest Bancshares, Inc. | NWBI | 6 | 148,177 | 1.34 | 1.4% | 24,696 |
| | Other | | 25 | 290,865 | 2.63 | | 11,635 |
| | **Lancaster County Total:** | | 183 | 11,072,423 | | | 60,505 |

Deposits per Branch Increase: +53%

Source: S&P Global Market Intelligence
*June 30, 2017 vs. June 30, 2016
**Not included in totals

15

# Crossing $10 Billion Asset Threshold



- Northwest's assets are expected to exceed $10 billion in 2019 after the transaction closes.

- At March 31, 2018, total assets were $9.5 billion and were expected to cross the $10 billion threshold organically in 2019.

- With Durbin becoming effective July 1, 2020, the 2020 estimated interchange revenue loss in that year after-tax is expected to be approximately $3 million.

- Northwest has prepared for this event over the past seven years through significant investment in audit, compliance, risk management and technological resources.

- **Earnings accretion from this transaction expected to exceed costs associated with crossing $10 billion in assets by $5 million in 2020 and $2 million in 2021.**

16